UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KONINKLIJKE PHILIPS ELECTRONICS
N.V. and U.S. PHILIPS CORPORATION,

      Plaintiffs,

    v.

THE ADS GROUP fka ADVANCED
DUPLICATION SERVICES LLC;
AMERICAN MEDIA INTERNATIONAL,
LTD.; CARBONITE INC.; THE
COMVEST GROUP; CONCORD
RECORDS, INC.; CONCORD MUSIC
GROUP, INC; EVA-TONE, INC.; HAL
LEONARD CORP.; HUDSON VALLEY
CAPITAL PARTNERS, INC.; INOVERIS
LLC; INTUIT INC.; METATEC
INTERNATIONAL, INC.; MTI
ACQUISITION LLC aka MTI
ACQUISITION CORP.; MUSIC CITY
OPTICAL MEDIA, INC.; ZOMAX
INCORPORATED; MICHAEL F.
HARDWICK, an individual; ARUN
KHURANA, an individual; JEAN A.
LAGOTTE JR., an individual; JOHN
EDGAR MOLL, and individual, JOHN
STEVEN MOLL, an individual; DAVID A.
SILVON, an individual; and John Does No.
1 through 100,

      Defendants.

Civil Action No. 08-CV-4068 (CLB)



## FIRST AMENDED COMPLAINT

Plaintiffs Koninklijke Philips Electronics N.V. and U.S. Philips Corporation allege as follows based upon knowledge as to their own acts, and upon information and belief as to all other allegations:

1.    This is an action for breach of contract under the laws of the State of New York and, in the alternative, patent infringement under 35 U.S.C. 271 *et seq.* This Complaint also contains a

claim for constructive trust under New York law with respect to Eva-Tone, Inc. and Music City Optical Media, Inc.

### The Parties

2.     Plaintiff Koninklijke Philips Electronics N.V. is a corporation organized under the laws of The Netherlands with its principal place of business in Amsterdam, The Netherlands.  Plaintiff U.S. Philips Corporation is a corporation organized under the laws of Delaware with its principal place of business at 3000 Minuteman Road, M/S 109 Andover, MA 01810, and an office at 345 Scarborough Rd., Briarcliff Manor, New York.  Plaintiffs Koninklijke Philips Electronics N.V. and U.S. Philips Corporation are collectively referred to as "Philips."

3.     Defendant The ADS Group fka Advanced Duplication Services LLC ("ADS") is a limited liability company organized under the laws of Minnesota with a principal place of business at 2155 Niagara Lane North, Plymouth, Minnesota.

4.     Defendant Michael F. Hardwick ("Hardwick") is the Chief Executive Officer of ADS.

5.     Defendant Hudson Valley Capital Partners, Inc. ("Hudson Valley") is a corporation organized under the laws of New York with a principal place of business at 555 Pleasantville Rd., # 120, Briarcliff Manor, NY 10510.  Hudson Valley owns ADS.

6.     Defendant Jean A. Lagotte Jr. ("Lagotte") is an individual residing at 17 Wampus Lake Dr., Armonk, NY 10504.  Lagotte is the Chief Executive Officer of Hudson Valley.

7.     Defendant American Media International, Ltd. ("AMI") is a company organized under the laws of North Carolina with a principal place of business at 2609 Tucker Street, Burlington, North Carolina.

8.     Defendant Carbonite Inc. ("Carbonite")  is a corporation organized under the laws of Delaware with a principal place of business at 111 Huntington Ave., 26th Fl, Boston, MA 02199.

9.    Defendant Eva-Tone, Inc. ("Eva-Tone") is a corporation organized under the laws of Florida with a principal place of business at 4801 Ulmerton Road, Clearwater, Florida.

10.    Defendant Hal Leonard Corp. ("Hal Leonard") is a corporation organized under the laws of Wisconsin with a principal place of business at  7777 W Bluemound Rd., Milwaukee, WI, 53213.

11.    Defendant Inoveris LLC ("Inoveris") is a limited liability company organized under the laws of Delaware with a principal place of business at 7001 Discovery Blvd., Dublin, Ohio.

12.    Defendant Intuit Inc. ("Intuit") is a corporation with a place of business at 2632 Marine Way, Mountain View, CA, 94043.

13.    Defendant Metatec International, Inc. ("Metatec") is a corporation organized under the laws of Florida with a principal place of business at 7001 Metatec Boulevard, Dublin, Ohio.

14.    Defendant MTI Acquisition LLC aka MTI Acquisition Corp. ("MTI") is a corporation organized under the laws of Delaware with a principal place of business at 830 Third Avenue-8th Floor, New York, NY 10022.

15.    Defendant Music City Optical Media, Inc. ("Music City") is a corporation organized under the laws of Tennessee with a principal place of business at 1045 Firestone Parkway, La Vergne, Tennessee.

16.    Defendant John Steven Moll ("Steven Moll") is an individual residing at 1100 Crater Hill Dr., Nashville, TN 37215.  Steven Moll is the President of Music City.

17.    Defendant John Edgar Moll ("John Moll") is an individual residing at 48 Sunrise Cay Dr. # 48 Key Largo, FL 33037.  John Moll is the Chief Executive Officer of Music City.  Steven Moll and John Moll are collectively referred to as "the Molls".

18.     Defendant Concord Records, Inc. and Concord Music Group, Inc. ("Concord") are corporations organized under the laws of California and Delaware, respectively, with a principal place of business at 100 N. Crescent Drive, No. 275, Beverly Hills, California 90210.  Concord Records, Inc. has a registered office at 9665 Wilshire Blvd., Beverly Hills, California 90212 and/or 9444 ½ Billingham Ave., North Hollywood, California 91606.

19.     Defendant Zomax Incorporated ("Zomax") is a corporation organized under the laws of Minnesota with a principal place of business at 5353 Nathan Lane, Plymouth, Minnesota.

20.     Defendant Arun Khurana ("Khurana") is an individual residing at 231 South Lane, Princeton, NJ 08550.  Khurana is the Chief Executive Officer of Zomax.

21.     Defendant David A. Silvon ("Silvon") is an individual residing at 5339 Monticello Hall Dr., Columbus, OH 43221.  Silvon is the Chief Financial Officer of Zomax.

22.     Defendant The ComVest Group ("ComVest") is a company organized under the laws of Florida with a principal place of business at One North Clematis Street, Suite 300, West Palm Beach, FL 33401.  ComVest, through its private equity fund ComVest Investment Partners, is the owner of Zomax.

23.     ADS, AMI, ComVest, Eva-Tone, Hudson Valley, Inoveris, Metatec, MTI, Music City, and Zomax are sometimes collectively referred to in this Complaint as the "Replicator Defendants."   ComVest, Inoveris, Metatec, MTI, and Zomax are sometimes collectively referred to in this Complaint as the "Zomax Defendants."  Carbonite, Hal Leonard, Intuit, and Concord are sometimes collectively referred to in this Complaint as the "Customers."  Hardwick, Khurana, Lagotte, the Molls, and Silvon are sometimes collectively referred to in this Complaint as the "Individual Defendants."

24.    Defendants John Doe No. 1 through John Doe No. 100 inclusive are or may be entities related to the Replicator Defendants, or customers of the Replicator Defendants, the identities of which are unknown at this time.

### Jurisdiction and Venue

25.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367(a), and 35 U.S.C. §§ 271 and 281.

26.    Venue in this Court is proper under  28 U.S.C. §§ 1391(b) and (c) and 1400(b).

27.    This Court has personal jurisdiction over the Replicator Defendants, Customers, and Individual Defendants under the New York Long Arm Statute, N.Y. C.P.L.R. 301, 302, 317 (McKinney 2007) and Fed. R. Civ. P. 4(e)(1).

28.    The Replicator Defendants have committed acts of patent infringement in this judicial district.

29.    Hardwick is actively involved in the control and management of ADS.

30.    Hardwick has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by ADS.

31.    Lagotte is actively involved in the control and management of ADS.

32.    Lagotte has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by ADS.

33.    Hudson Valley is actively involved in the control and management of ADS.

34.    Hudson Valley committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by ADS.

35.    The Molls are actively involved in the control and management of Music City.

36.     The Molls have committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by Music City.

37.     Khurana is actively involved in the control and management of Zomax.

38.     Khurana has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by Zomax.

39.     Silvon is actively involved in the control and management of Zomax.

40.     Silvon has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by Zomax.

41.     ComVest is actively involved in the control and management of Zomax.

42.     ComVest has committed acts of patent infringement in this judicial district, including but not limited to directing and controlling patent infringement by Zomax.

43.     The Customers have each committed acts of patent infringement in this judicial district.

44.     The Replicator Defendants have irrevocably waived any objections to the jurisdiction, process, and venue of this Court, and to the effectiveness, execution, and enforcement of any order or judgment (including a default judgment) with respect to the Agreements and Side Letters identified in ¶¶ 54-59 of this Complaint.

45.     The Replicator Defendants, Customers, and Individual Defendants are subject to personal jurisdiction in this district because they purposefully engaged in activities that gave rise to this claim for patent infringement, which were directed at residents of New York and this judicial district.

46.     The Replicator Defendants, Customers, and Individual Defendants voluntarily placed unlicensed CD-Discs (as defined in ¶ 62) into the stream of U.S. commerce, conscious that New

York and this judicial district were the likely destination of a substantial quantity of those unlicensed CD-Discs.

**Facts Related to Philips**

47.     Philips and its related companies have engaged for many years in research and development ("R&D") of systems in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam.

48.     One of the achievements of such R&D efforts was a revolutionary high-fidelity sound storage and reproduction system, known as the Compact Disc Digital Audio System ("CD-Audio System").

49.     Philips and Sony Corporation ("Sony") developed the Compact Disc Data System ("CD-ROM System") from the CD-Audio System.

50.     Philips and Sony also developed a multi-session CD system, known as the Enhanced Music Compact Disc System ("Enhanced Music CD System" or "CD Extra System").

51.     The CD-Audio System, CD-ROM System, and CD Extra System are referred to collectively in this Complaint as the "CD Systems".

52.     U.S. Philips Corporation is the owner by assignment of all right, title, and interest in U.S. Patent No. 5,068,846, entitled "Reflective, Optical Record Carrier," relating to the CD Systems ("the '846 patent").  The '846 patent was duly and legally issued by the U.S. Patent and Trademark Office on November 26, 1991, after full and fair examination, and is valid and subsisting in the United States.  A true copy of the '846 patent is attached as **Exhibit A**.

53.     The CD Systems are defined by "Standard Specifications", namely, the CD-Audio Standard Specifications, CD-Audio Maxi-Single Standard Specifications, CD-ROM Standard

Specifications, CD-ROM-XA Specifications, and the Enhanced Music CD Standard Specifications.

## Facts Related to the Replicator Defendants

54.    Effective July 1, 2002, Philips and ADS entered into a "CD Disc Patent License Agreement" whereby Philips granted ADS worldwide rights under certain patents related to CD Systems, including for the territory of the United States, its territories, and possessions (the "ADS Agreement") (**Exhibit B**).  Effective March 31, 2003, Philips entered into a "Side Letter" with ADS**,** and under ¶ 1 thereof the Side Letter is "a legally binding and integral part of the Agreement".  ADS signed the Side Letter on March 31, 2003. (**Exhibit C**)  Effective January 17, 2003, Philips entered into an "Workout Agreement" with ADS, and under the provisions thereof ADS agreed to a payment schedule for past due amounts owed by ADS to Philips (**Exhibit D**). Effective December 1, 2004, Philips entered into an "Second Workout Agreement" with ADS (**Exhibit E**), and under the provisions thereof ADS agreed to a payment schedule for past due amounts owed by ADS to Philips.  Effective February 2, 2005, Philips entered into a letter agreement with ADS (**Exhibit F**), and under ¶ 2 thereof Article 5.05 of the ADS Agreement was amended.

55.    Effective July 1, 2002, Philips and AMI entered into a "CD Disc Patent License Agreement" whereby Philips granted AMI worldwide rights under certain patents related to CD Systems, including for the territory of the United States, its territories, and possessions (the "AMI Agreement") (**Exhibit G**).

56.    Effective July 1, 2002, Philips and Eva-Tone entered into a "CD Disc Patent License Agreement" whereby Philips granted Eva-Tone worldwide rights under certain patents related to CD Systems, including for the territory of the United States, its territories, and possessions (the

"Eva-Tone Agreement") (**Exhibit H**).  Effective July 1, 2002, Philips entered into a "Side Letter" with Eva-Tone, and under ¶ 1 thereof the Side Letter is "a legally binding and integral part of the Agreement".  Eva-Tone signed the Side Letter on November 25, 2002. (**Exhibit I**) Effective January 17, 2006, Philips entered into a "Workout Agreement" with Eva-Tone (**Exhibit J**), and under the provisions thereof Eva-Tone agreed to a payment schedule for past due amounts owed by Eva-Tone to Philips.  The Workout Agreement provides that if Eva-Tone fails to make timely payments under such agreement or the Agreement, or fails to provide timely royalty reports under the Agreement, and fails to cure as provided in the Workout Agreement, (1) the entire remaining unpaid balance under the Workout Agreement shall immediately become due and payable, (2) Philips shall be entitled to injunctive relief and/or confession of judgment for such unpaid balance, and (3) Philips shall be entitled to an award of its reasonable attorneys' fees and costs for enforcement of the Workout Agreement.

57.     Effective August 9, 2002, Philips and Metatec entered into a "CD Disc Patent License Agreement" whereby Philips granted Metatec worldwide rights under certain patents related to CD Systems, including for the territory of United States, its territories, and possessions (the "Metatec Agreement") (**Exhibit K**).  Effective December 19, 2003, Philips, Metatec, and MTI Acquisition, LLC ("MTI") entered into a Stipulation and Agreement for Assignment and Assumption of License Agreements whereby terms governing the assignment of the Metatec Agreement to MTI were agreed upon ("MTI Agreement") (**Exhibit L**).

58.     Effective July 1, 2002, Philips and Music City entered into a "CD Disc Patent License Agreement" whereby Philips granted Music City worldwide rights under certain patents related to CD Systems, including for the territory of the United States, its territories, and possessions (the "Music City Agreement") (**Exhibit M**).  Effective September 17, 2002, November 24, 2002,

and November 24, 2003, Philips entered into "Workout Agreements" with Music City, and under the provisions thereof Music City agreed to a payment schedule for past due amounts owed by Music City to Philips (**Exhibit N, O, P**).

59.    Effective October 1, 2003, Philips and Zomax entered into a "CD Disc Patent License Agreement" whereby Philips granted Zomax worldwide rights under certain patents related to CD Systems, including for the territory of the United States, its territories, and possessions (the "Zomax Agreement") (**Exhibit Q**).  Effective October 1, 2003, Philips also entered into a "Side Letter" with Zomax, and under ¶ 1 thereof the Side Letter is "a legally binding and integral part of the Agreement".  Zomax signed the Side Letter on December 1, 2003. (**Exhibit R**)

60.    The ADS Agreement, AMI Agreement, Eva-Tone Agreement, Metatec Agreement, and Music City Agreement are sometimes referred to collectively in this Complaint as the "Replicator Agreements."

61.    As reflected in the "MTI Agreement", MTI acquired the Metatec Agreement and Metatec's assets.  MTI was renamed Inoveris and/or does business as Inoveris. In 2006, Inoveris bought Zomax and merged with it.  The company resulting from the merger retained the name Zomax.  To the extent that Metatec and/or MTI have any independent existence, they are liable for their own acts and omissions that form the basis of Philips' claims set forth in this Complaint. As Metatec's successor in interest, MTI, Inoveris, and/or Zomax are liable for Metatec's acts and omissions that form the basis of Philips' claims set forth in this Complaint.  MTI, Inoveris, and/or Zomax are also liable for their own acts and omissions that form the basis of Philips' claims set forth in this Complaint.

62.    The Replicator Agreements and the Zomax Agreement identify the Standard Specifications for CD System discs, specifically, "CD-Audio Discs", "CD-Audio Maxi-Singles",

"CD-ROM Discs", and Enhanced Music CD Discs/CD Extra Discs.  The Zomax Agreement also identifies the Standard Specifications for "CD-ROM Disc mode 1",  "CD-ROM Disc mode 2", "CD-ROM XA Disc sub-mode 1", "CD-ROM XA Disc sub-mode 2", "CD Extra Discs", "CD Extra Discs sub-mode 1", and "CD Extra Discs sub-mode 2".  Such CD System discs are referred to collectively in this Complaint as "CD-Discs".

63.     Paragraph 1.15 of the Replicator Agreements defines "Licensed Product" as "a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement."

64.     Paragraph 1.16 of the Replicator Agreements defines "Licensed Patents" as "the patents listed in the relevant Exhibits as selected by Licensee pursuant to" five "Options", Options A1 through A5.  Each Option corresponds to a different type of CD-Disc defined in ¶¶ 1.02 through 1.05 of the Replicator Agreements, made in compliance with the Standard Specifications for each type of CD-Disc defined in ¶¶ 1.06 through 1.09 of the Replicator Agreements.  Option A1 states that "Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications."  Using identical language, Options A2 and A3 cover:

> Option A2:  Exhibits E1 and E2 for CD-ROM Discs conforming to the CD-ROM Standard Specifications;

> Option A3:  Exhibits E1, E2, and E3 for CD Extra Discs conforming to the Enhanced Music CD Standard Specifications.

Option A4 states that "Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information." Option A5 states that "Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs."

65.    Under ¶ 1.16 of the Replicator Agreements, Licensed Patents identified in Exhibit E1 cover all CD-Discs under Options A1 through A4.

66.    Paragraph 1.23 of the Zomax Agreement defines "Licensed Patents" as "any one or more of the essential patents for the manufacture and/or sale of the various types of CD-Discs", breaks out such patents into Categories I through III, and incorporates the specific patents listed in Annexes A1 through A8. Under ¶ 1.23 of the Zomax Agreement, Licensed Patents identified in Annex A1 cover all CD-Discs, in Categories I through III.

67.    Paragraph 1.22 of the Zomax Agreement defines "Licensed Product(s)" by eleven "Options", Options A through K, "as selected by Licensee, manufactured and/or sold in accordance with the provisions hereof, which are duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement." Each Option corresponds to a different type of CD-Disc defined in ¶¶ 1.2 through 1.11 of the Zomax Agreement, made in compliance with the Standard Specifications for each type of CD-Disc defined in ¶¶ 1.12 through 1.16 of the Zomax Agreement. For example, Option A is "CD-Audio Discs and/or CD-Audio Maxi Singles" defined in ¶¶ 1.2 and 1.3, respectively, made in compliance with the ¶¶ 1.12 and 1.13 Standard Specifications, and Option C is "CD-ROM Discs mode 1" defined in ¶ 1.5, made in compliance with the ¶ 1.14 Standard Specifications.

68.    The '846 patent was listed in Exhibit E1 of the Replicator Agreements and Annex A1 of the Zomax Agreement when the Replicator Defendants signed the Replicator Agreements and the Zomax Agreement and relevant Side Letters and is currently listed in Exhibit E1 of the Replicator Agreements and Annex A1 of the Zomax Agreement, and therefore is a Licensed Patent applicable to all CD-Discs manufactured and/or sold by the Replicator Defendants under Options A1 through A4 of the Replicator Agreements and Options A through K of the Zomax Agreement and relevant Side Letters.

69.    Under ¶ 1.16 of the Replicator Agreements and ¶ 1.23 of the Zomax Agreement, Philips and the Replicator Defendants agreed that Philips would commission an independent expert to review the patents listed in Exhibits E1 through E4 of the Replicator Agreements and Annexes A1 through A8 of the Zomax Agreement to confirm that each patent is "essential" to the manufacture and sale of CD-Discs made according to the Standard Specifications.  Philips did so.

70.    Under ¶ 1.16 of the Replicator Agreements and ¶ 1.23 of the Zomax Agreement, the term "essential" as used in relation to Licensed Patents means "patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s)."

71.    The independent expert commissioned by Philips determined that the '846 patent is an essential patent and is properly listed in Exhibit E1 of the Replicator Agreements and Annex A1 of the Zomax Agreement.

72.    The Replicator Defendants selected the following Options:

       a. ADS: A1, A3, A4
       b. AMI: All Options (A1-A5)
       c. Eva-Tone: A1-A3, A5
       d. Metatec: All Options (A1-A5)
       e. Music City: All Options (A1-A5)
       f. Zomax:  All Options (A-K)

73.     ADS has paid royalties for the manufacture and sale of CD-ROM Discs that conform to the CD-ROM Standard Specifications, even though it did not select Option A2.

74.     Under ¶ 2.01 of the Replicator Agreements and ¶ 2.1 of the Zomax Agreement, Philips granted to the Replicator Defendants "a non-exclusive, non-transferable license under the Licensed Patents" (listed in the Exhibits and Annexes corresponding to the Options selected by the Replicator Defendants) "to manufacture Licensed Products" "in accordance with the . . . Standard Specifications" set forth in ¶¶ 1.06 through 1.09 of the Replicator Agreements and ¶¶ 1.12 through 1.16 of the Zomax Agreement, within the United States and its territories and possessions, "and to sell or otherwise dispose of" "Licensed Products so manufactured in all countries of the world."

75.     Under ¶ 5.02 of the Replicator Agreements, the relevant Replicator Defendants promised to "pay to Philips a royalty on each Licensed Product sold by Licensee, in which any one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed Patent(s) is (are) used in the country of manufacture, sale or other disposal."

76.     The '846 patent is and must be used in the United States by the Replicator Defendants to make Licensed Products, namely, CD-Discs that conform to the Standard Specifications.

77.     Under ¶ 5.2 of the Zomax Agreement, Zomax promised to "pay to Philips a royalty for each CD-Disc sold or otherwise disposed of by Licensee, any of Licensee's Associated Companies [as defined in ¶ 1.24] or an agent of Licensee, in any country where at least one of the Licensed Patents essential to the type(s) of CD-Discs as selected by Licensee . . . exists."

78.     The '846 patent exists in the United States, and has existed at all times relevant to this action.

79.    With respect to the royalty required by the Replicator Agreements and the Zomax Agreement, the Replicator Defendants agreed to pay Philips the "Standard Rate" of 3 cents (3¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, and 2 cents (2¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, as defined in ¶ 5.02 of the Replicator Agreements and ¶ 5.2 of the Zomax Agreement.

80.    With respect to CD-Discs sold on or after July 1, 2002, Philips permitted the Replicator Defendants to pay the "Compliance Rate" of 1.75 cents (1.75¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, and 1.15 cents (1.15¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, also as defined in ¶ 5.02 of the Replicator Agreements and ¶ 5.2 of the Zomax Agreement, provided that the Replicator Defendants meet the "Compliance Requirements" specified in the Replicator Agreements and Zomax Agreement, and relevant Side Letters, as the case may be.

81.    Paragraph 5.02 of the Replicator Agreements and ¶ 5.2 of the Zomax Agreement further provide that "[i]n the event that Licensee fails to comply at any time with any of its obligations" under such Agreements, "the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from":

    a.    Replicator Agreements: "the moment of such non-compliance until such moment that Licensee's non-compliance will have been remedied in full."

    b.    Zomax Agreement: "the first day of the reporting period to which the occurrence of non-compliance relates until such moment that Philips confirms in writing to Licensee that Licensee's non-compliance has been remedied in full."

82.     Paragraphs 5.03 and 5.10 of the Replicator Agreements and ¶¶ 5.3 and 5.10 of the Zomax

Agreement require the Replicator Defendants to submit quarterly "Royalty Reporting Forms" to

Philips listing all CD-Discs that they manufacture and sell, and to keep complete and accurate

books and records relating to the Replicator Defendants' manufacture and sale or other disposal

of CD-Discs.

### Facts Relating to Breach of Contract Claim

83.     The Replicator Defendants selected the following Options:

      a. ADS: A1, A3, A4
      b. AMI: All Options (A1-A5)
      c. Eva-Tone: A1-A3, A5
      d. Metatec: All Options (A1-A5)
      e. Music City: All Options (A1-A5)
      f. Zomax:  All Options (A-K)

To be Licensed Products, selected CD-Discs must be manufactured and sold in compliance with

the corresponding Standard Specifications and the provisions of the Replicator Agreements and

the Zomax Agreement, such sales must be reported to Philips, and royalties for the sale of such

CD-Discs must be paid to Philips.  For example, a CD-Audio Disc is defined by ¶ 1.02 of the

Replicator Agreements and ¶ 1.2 of the Zomax Agreement to "mean a Disc [as defined in ¶ 1.01

of the Replicator Agreements and ¶ 1.1 of the Zomax Agreement] comprising audio information

encoded in digital form, which is optically readable by a CD-Audio Player [as defined in ¶ 1.11

of the Replicator Agreements and ¶ 1.18 of the Zomax Agreement] and which conforms to the

CD-Audio Standard Specifications [as defined in ¶ 1.06 of the Replicator Agreements and ¶ 1.12

of the Zomax Agreement]."  Paragraph 1.06 of the Replicator Agreements and ¶ 1.12 of the

Zomax Agreement defines the CD-Audio Standard Specifications to "mean the specifications for

the CD-Audio System [as defined in the second "Whereas" clause of the Replicator Agreements

and the Zomax Agreement], including" "the Subcode/Control and Display System, Channels R ..

W, chapter 5.8, the CD-TEXT mode, as made available, modified or extended from time to time."

84.     Under ¶ 2.01 of the Replicator Agreements and ¶ 2.1 of the Zomax Agreement, the Replicator Defendants are licensed only to manufacture selected Licensed Products "**in accordance with the relevant CD Standard Specifications** and to sell or otherwise dispose of such Licensed Products **so manufactured** in all countries of the world." (Emphasis added.)

85.     Because the '846 patent is essential and therefore must be used to make CD-Discs that conform to the Standard Specifications, and exists in the United States, under ¶ 5.02 of the Replicator Agreements and ¶ 5.2 of the Zomax Agreement, the Replicator Defendants must pay Philips either the Standard rates or the Compliance Rates for each CD-Disc sold or otherwise disposed of by the Replicator Defendants in the U.S.

86.     Beginning in or about the following calendar quarters, the Replicator Defendants began paying royalties under the Replicator Agreements and the Zomax Agreement, according to the Compliance Rates, for the manufacture and sale of CD-Audio Discs with an outer diameter greater than 90 mm (1.75 cents (1.75¢) per disc), CD-Audio Discs with an outer diameter smaller than 90 mm (1.15 cents (1.15¢) per disc), CD-Audio Max Single Discs (1.55 cents (1.55¢) per disc), CD-ROM Discs with an outer diameter greater than 90 mm (1.75 cents (1.75¢) per disc), and CD-ROM Discs with an outer diameter smaller than 90 mm (1.15 cents (1.15¢) per disc) in the United States:

    a. ADS: 2Q 2002
    b. AMI: 2Q 2002
    c. Eva-Tone: 2Q 2002
    d. Metatec: 2Q 2002
    e. Music City: 2Q 2002
    f. Zomax:  3Q 2003

87.     Beginning no later than the following calendar quarters, the Replicator Defendants ceased paying royalties for all CD-Discs made and sold in the U.S.:

        a. ADS: 1Q 2006
        b. AMI: 2Q 2006
        c. Eva-Tone: 1Q 2007
        d. Metatec/MTI/Inoveris: 1Q 2006
        e. Music City: 2Q 2006
        f. Zomax:  4Q 2006

88.     After the calendar quarters identified in ¶ 87 of this Complaint, the Replicator Defendants have continued to make and sell CD-Discs in the U.S., without providing royalty reports and/or paying royalties to Philips for all CD-Discs that they manufacture and/or sell:

        a. ADS:  at least 45 million CD-Discs
        b. AMI:  at least 75 million CD-Discs
        c. Eva-Tone:  at least 20 million CD-Discs
        d. Metatec/MTI/Inoveris: at least 28 million CD-Discs
        e. Music City: at least 65 million CD-Discs
        f. Zomax:  at least 54 million CD-Discs

89.     The CD-Discs made and sold by the Replicator Defendants after they stopped paying royalties to Philips have been and are available for purchase on the open market in the U.S., and within the district.

90.     The Replicator Defendants do not contest that the CD-Discs they have made and sold in the U.S. after they stopped paying royalties to Philips comply with the relevant Standard Specifications.

91.     The Replicator Defendants have failed to submit quarterly "Royalty Reporting Forms" to Philips listing all CD-Discs that they manufacture and sell, and/or to keep complete and accurate books and records, relating to the Replicator Defendants' manufacture and sale or other disposal of all CD-Discs in the U.S., as required by ¶¶ 5.03 and 5.10 of the Replicator Agreements and ¶¶ 5.3 and 5.10 of the Zomax Agreement.

92.     AMI sold about 750,000 CD-Discs to a third party supplier during 3Q 2007, did not report the sale of such CD-Discs, and did not pay royalties to Philips on such CD-Discs.

93.     Under the Second Workout Agreement, ADS was required to pay Philips $208,455.97 on or before December 1, 2006 and $118,128.49 on or before June 1, 2007.  ADS has failed to make such payments due to Philips under the Second Workout Agreement, and owes Philips at least $255,000.00 under such agreement.

94.     Under the Eva-Tone Workout Agreement, Eva-Tone was required to pay Philips $22,512.41 on or before December 5, 2007 and again on or before January 5, 2008.  Eva-Tone has failed to make such payments due to Philips under the Workout Agreement.

## Facts Relating to Patent Infringement Claim

95.     The CD-Discs made and sold by the Replicator Defendants and Individual Defendants in the U.S. without paying royalties to Philips fall within the claims of the '846 patent.

96.     The Replicator Defendants' license to make and sell such CD-Discs in the U.S. is contingent upon the Replicator Defendants' payment of royalties to Philips.

97.     As set forth in this Complaint, the Replicator Defendants  and Individual Defendants are making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips.

98.     Hardwick personally, actively, and knowingly controlled and directed ADS in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Hardwick knew that his actions would induce ADS to make and sell CD-Discs covered by the '846 patent.

99.     Hardwick intended to avoid personal liability for his acts of patent infringement by acting as ADS in making and selling CD-Discs covered by the '846 patent.  Hardwick is the alter ego of ADS.

100.    Lagotte personally, actively, and knowingly controlled and directed ADS in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Lagotte knew that his actions would induce ADS to make and sell CD-Discs covered by the '846 patent.

101.    Lagotte intended to avoid personal liability for his acts of patent infringement by acting as ADS in making and selling CD-Discs covered by the '846 patent.   Lagotte is the alter ego of ADS.

102.    Hudson Valley actively and knowingly controlled and directed ADS in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Hudson Valley knew that its actions would induce ADS to make and sell CD-Discs covered by the '846 patent.

103.    Hudson Valley intended to avoid liability for its acts of patent infringement by acting as ADS in making and selling CD-Discs covered by the '846 patent.  Hudson Valley is the alter ego of ADS.

104.    The Molls personally, actively, and knowingly controlled and directed Music City in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips.  The Molls knew that their actions would induce Music City to make and sell CD-Discs covered by the '846 patent.

105.    The Molls intended to avoid personal liability for their acts of patent infringement by acting as Music City in making and selling CD-Discs covered by the '846 patent.  The Molls are the alter ego of Music City.

106.    Khurana personally, actively, and knowingly controlled and directed Zomax in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Khurana knew that his actions would induce Zomax to make and sell CD-Discs covered by the '846 patent.

107.    Khurana intended to avoid personal liability for his acts of patent infringement by acting as Zomax in making and selling CD-Discs covered by the '846 patent.  Khurana is the alter ego of Zomax.

108.    Silvon personally, actively, and knowingly controlled and directed Zomax in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips. Silvon knew that his actions would induce Zomax to make and sell CD-Discs covered by the '846 patent.

109.    Silvon intended to avoid personal liability for his acts of patent infringement by acting as Zomax in making and selling CD-Discs covered by the '846 patent.  Silvon is the alter ego of Zomax.

110.    ComVest actively and knowingly controlled and directed Zomax in making and selling CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips.  ComVest knew that its actions would induce Zomax to make and sell CD-Discs covered by the '846 patent.

111.    ComVest intended to avoid liability for its acts of patent infringement by acting as Zomax in making and selling CD-Discs covered by the '846 patent.  ComVest is the alter ego of Zomax.

112.     As set forth in this Complaint, ADS is making and selling CD-ROM Discs covered by the '846 patent in the U.S. without a license, and without paying royalties to Philips.

113.     Because the Replicator Defendants have not paid royalties to Philips and are in material breach of the Replicator Agreements and the Zomax Agreement, as set forth in this Complaint, the CD-Discs made and sold by the Replicator Defendants since the breach began are not Licensed Products, and are not licensed, under the '846 patent.

114.     Carbonite has purchased from Inoveris unlicensed CD-Discs that are covered by the '846 patent.

115.     Carbonite uses, sells, and/or offers to sell CD-Discs in the U.S. purchased from Inoveris and covered by the '846 patent without a license from Philips and/or without paying royalties to Philips.

116.     Intuit has purchased from Inoveris unlicensed CD-Discs that are covered by the '846 patent.

117.     Intuit uses, sells, and/or offers to sell CD-Discs in the U.S. purchased from Inoveris and covered by the '846 patent without a license from Philips and/or without paying royalties to Philips

118.     Hal Leonard has purchased from ADS unlicensed CD-Discs that are covered by the '846 patent.

119.     Hal Leonard uses, sells, and/or offers to sell CD-Discs in the U.S. purchased from ADS and covered by the '846 patent without a license from Philips and/or without paying royalties to Philips.

120.     Concord has purchased from Music City unlicensed CD-Discs that are covered by the '846 patent.

121.    Concord uses, sells, and/or offers to sell CD-Discs in the U.S. purchased from Music City and covered by the '846 patent without a license from Philips and/or without paying royalties to Philips.

122.    The John Doe Defendants are making and/or selling CD-Discs covered by the '846 patent in the U.S. without a license from Philips under the Licensed Patents, and/or without paying royalties to Philips.

<u>**Facts Related to Constructive Trust Claim**</u>

123.    As alleged above, Music City has made and sold CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips.  Music City wrongfully has retained the funds it should have paid to Philips as royalties, and those funds are part of Music City's assets.  Music City would be unjustly enriched if it were permitted to retain the funds it should have paid to Philips as royalties.

124.    As alleged above, Eva-Tone also has made and sold CD-Discs covered by the '846 patent in the U.S. without paying royalties to Philips.  Eva-Tone wrongfully has retained the funds it should have paid to Philips as royalties, and those funds are part of Eva-Tone's assets.  Eva-Tone would be unjustly enriched if it were permitted to retain the funds it should have paid to Philips as royalties.

125.    Music City has sold or plans to sell all or substantially all of its assets, including the royalties it wrongfully has withheld from Philips, to Eva-Tone.  To pay for these assets, Eva-Tone will use funds including the royalties it wrongfully has withheld from Philips.

126.    An express or implied understanding exists between Music City and Eva-Tone that Philips will have difficulty reaching Music City's assets and/or Eva-Tone's money if Music

City's asserts are purchased by Eva-Tone. Eva-Tone intentionally withheld from Philips the fact that it planned to buy all or substantially all of Music City's assets, using money owed to Philips.

**Count I**
**Breach of Contract**
**Asserted Against All Defendants Except the Customers**

127.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint.

128.    The Replicator Agreements and the Zomax Agreement and Side Letters are valid and subsisting agreements under New York law between Philips and the Replicator Defendants. Such Agreements and Side Letters are supported by adequate consideration. Neither Philips nor the Replicator Defendants have terminated the Replicator Agreements or the Zomax Agreement or Side Letters.

129.    In ¶ 13.06 of the Replicator Agreements and ¶ 13.7 of the Zomax Agreement, Philips and the Replicator Defendants agreed that New York law controls the construction of such Agreements.

130.    The Replicator Defendants have materially breached the Replicator Agreements and the Zomax Agreement and Side Letters by failing to pay royalties on their manufacture and sale of CD-Discs, as set forth in this Complaint.

131.    The Replicator Defendants have materially breached the Replicator Agreements and the Zomax Agreement and Side Letters in other ways, the details of which are unknown at this time.

132.    The Individual Defendants and/or Hudson Valley and/or ComVest intentionally induced the Replicator Defendants to breach the Replicator Agreements and the Zomax Agreement and Side Letters, as the case may be.

133.    In view of the Replicator Defendants' breach of the Replicator Agreements and the Zomax Agreement and Side Letters, Philips is entitled to receive royalties for the Replicator

24

Defendants' manufacture and sale in the U.S. of CD-Discs beginning in the Quarters identified in ¶ 87 at the Standard Rates (3 cents (3¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, and 2 cents (2¢) per CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm).

134.     The Replicator Defendants have materially breached the Replicator Agreements and Zomax Agreement and Side Letters by failing to provide accurate audit statements to Philips listing all CD-Discs that they manufacture and sell, failing to submit quarterly "Royalty Reporting Forms" to Philips, and/or failing to keep complete and accurate books and records relating to the Replicator Defendants' manufacture and sale or other disposal of CD-Discs in the U.S., in breach of ¶ 5.02, 5.03, 5.05, and/or 5.10 of the Replicator Agreements and ¶ 5.2, 5.3, 5.5, and/or 5.10 of the Zomax Agreement.

135.     Under ¶ 5.07 of the Replicator Agreements and ¶ 5.7 of the Zomax Agreement, Philips is entitled to interest on all unpaid royalties owed to Philips by the Replicator Defendants, accruing at the rate of 2% (two percent) per month, or the maximum amount permitted by applicable law, whichever is lower.

136.     Under ¶ 13.04 of the Replicator Agreements and ¶ 13.5 of the Zomax Agreement, the Replicator Defendants agreed that neither Philips' failure nor delay in enforcing any provision of such Agreements shall constitute a waiver of such provision or of Philips' right to enforce any provision of such Agreements.

137.     The Second Workout Agreement with ADS is a valid and subsisting agreement between Philips and ADS, and is supported by adequate consideration.  Neither Philips nor ADS has terminated such agreement.

138.    ADS has materially breached the Second Workout Agreement by failing to make the payments due under such agreement on and after December 1, 2006.  Philips is entitled to such payments.

139.    The Workout Agreement with Eva-Tone is a valid and subsisting agreement between Philips and Eva-Tone, and is supported by adequate consideration.  Neither Philips nor Eva-Tone has terminated such agreement.

140.    Eva-Tone has materially breached the Workout Agreement by failing to make the payments due under such agreement on and after December 5, 2007.  Philips is entitled to such payments.

141.    In view of Eva-Tone's breach of the Agreement and/or the Workout Agreement, the entire remaining unpaid balance under the Workout Agreement is now immediately due and payable, and Philips is entitled to injunctive relief and/or confession of judgment for such unpaid balance, and an award of its reasonable attorneys' fees and costs for enforcement of the such agreements.

142.    Philips has suffered monetary and other damages, in an as-yet undetermined amount, as the direct and proximate result of the Replicator Defendants' material breach of the Replicator Agreements and the Zomax Agreement and Side Letters.

143.    Philips has suffered monetary and other damages, in an as-yet undetermined amount, as the direct and proximate result of the inducement to breach the Replicator Agreements and the Zomax Agreement by Hudson Valley, ComVest, and/or the Individual Defendants.

**Count II**
**Patent Infringement**
**Asserted Against All Defendants**

144.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint.

145.    In the alternative to Philips' breach of contract claim with respect to the Replicator Agreements, the Replicator Defendants, Customers, and Individual Defendants have infringed and are continuing to infringe, literally and/or under the doctrine of equivalents, the '846 patent by practicing one or more claims of the '846 patent in their manufacture, use, offering for sale, sale, and/or importation of products, and/or by inducing or contributing to the infringement of the '846 patent, under 35 U.S.C. § 271.

146.    In the alternative to Philips' breach of contract claim, ADS has infringed and is continuing to infringe, literally and/or under the doctrine of equivalents, the '846 patent by practicing one or more claims of the '846 patent in its manufacture, use, offering for sale, sale, and/or importation of CD-ROM Discs, and/or by inducing or contributing to the infringement of the '846 patent, without a license and/or without paying royalties to Philips, under 35 U.S.C. § 271.

147.    The John Doe Defendants have infringed and are continuing to infringe, literally and/or under the doctrine of equivalents, the '846 patent by practicing one or more claims of the '846 patent in their manufacture, use, offering for sale, sale, and/or importation of products, and/or by inducing or contributing to the infringement of the '846 patent, under 35 U.S.C. § 271.

148.    The '846 patent is valid and subsisting and is entitled to a presumption of validity under 35 U.S.C. § 282.

149.    U.S. Philips Corporation is the assignee of all rights, title, and interest in and to the '846 patent and possesses all rights of recovery under the '846 patent.

150.    A Reexamination Request for the '846 patent was filed in the U.S. Patent and Trademark Office on December 8, 2004.  Ex Parte Reexamination Certificate No. US 5,068,846 C1 (the

"Reexamination Certificate"), confirming the patentability of claims 1 through 7 of the '846 patent, was issued by the U.S. Patent and Trademark Office on September 19, 2006.  A true copy of the Reexamination Certificate is attached as **Exhibit S**.

151.    The Replicator Defendants and Individual Defendants have had knowledge of the '846 patent at all times relevant to this action.

152.    The infringement of the '846 patent by the Replicator Defendants and Individual Defendants has been and continues to be willful, and therefore Philips is entitled to treble damages under 35 U.S.C. § 284.

153.    Philips has suffered monetary and other damages in an as-yet undetermined amount, and irreparable injury, as the direct and proximate result of the infringement of the '846 patent by the Replicator Defendants, Customers, and Individual Defendants.  Philips has no adequate remedy at law.  Unless enjoined, the Replicator Defendants, Customers, and Individual Defendants will continue to infringe and to damage Philips irreparably.

<div align="center">

**Count III**
**<u>Constructive Trust</u>**
**Asserted Against Eva-Tone and Music City**

</div>

154.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint.

155.    Music City wrongfully has retained the funds it should have paid to Philips as royalties, and those funds are part of Music City's assets.  Music City would be unjustly enriched if it were permitted to retain the funds it should have paid to Philips as royalties.

156.    Eva-Tone wrongfully has retained the funds it should have paid to Philips as royalties, and those funds are part of Eva-Tone's assets.  Eva-Tone would be unjustly enriched if it were permitted to retain the funds it should have paid to Philips as royalties.

157.     Music City has sold or plans to sell all or substantially all of its assets, including the royalties it wrongfully has withheld from Philips, to Eva-Tone.  To pay for these assets, Eva-Tone will use funds including the royalties it wrongfully has withheld from Philips.

158.     An express or implied understanding exists between Music City and Eva-Tone that Philips will have difficulty reaching Music City's assets and/or Eva-Tone's money if Music City's asserts are purchased by Eva-Tone.  Eva-Tone intentionally withheld from Philips the fact that it planned to buy all or substantially all of Music City's assets, using money owed to Philips.

159.     Under these circumstances, Music City's and Eva-Tone's retention of the royalties that they have wrongfully withheld from Philips is unconscionable and inequitable.  Accordingly, to prevent Music City's and Eva-Tone's unjust enrichment, the Court should impose a constructive trust over the royalties that Music City and Eva-Tone have wrongfully withheld from Philips, and permit Philips to trace those trust funds into all of their subsequent proceeds.

## **Prayer for Relief**

Wherefore, Philips requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief, including but not limited to a judgment and order as follows:

A.     holding the Replicator Defendants severally liable for breach of contract, specifically, the Replicator Agreements, the ADS Second Workout Agreement, and the Eva-Tone Workout Agreement;

B.     holding the Zomax Defendants jointly and severally liable for breach of contract;

C.     in the alternative with respect to Philips' breach of contract claim relating to the Replicator Agreements, holding:

1.     the Replicator Defendants severally liable for patent infringement;

2.     ADS liable for patent infringement with respect to CD-ROM Discs;

3.     the Zomax Defendants jointly and severally liable for patent infringement;

D.     holding the Customers liable for patent infringement;

E.     holding the John Doe Defendants jointly and/or severally liable for patent infringement;

F.     holding the Molls personally liable for actively inducing Music City to infringe under 35 U.S.C. § 271(b);

G.     holding that Music City was merely the alter ego of the Molls, and holding the Molls personally liable for direct infringement under 35 U.S.C. § 271(a);

H.     holding Hardwick and Lagotte personally liable for actively inducing ADS to infringe under 35 U.S.C. § 271(b);

I.     holding that ADS was merely the alter ego of Hardwick and/or Lagotte, and holding Hardwick and Lagotte personally liable for direct infringement under 35 U.S.C. § 271(a);

J.     holding Hudson Valley liable for actively inducing ADS to infringe under 35 U.S.C. § 271(b);

K.     holding that ADS was merely the alter ego of Hudson Valley, and holding Hudson Valley liable for direct infringement under 35 U.S.C. § 271(a);

L.     holding Khurana and Silvon personally liable for actively inducing Zomax to infringe under 35 U.S.C. § 271(b);

M.     holding that Zomax was merely the alter ego of Khurana and Silvon, and holding Khurana and Silvon personally liable for direct infringement under 35 U.S.C. § 271(a);

N.     holding ComVest liable for actively inducing Zomax to infringe under 35 U.S.C. § 271(b);

O.    holding that Zomax was merely the alter ego of ComVest, and holding ComVest liable for direct infringement under 35 U.S.C. § 271(a);

P.    directing the Replicator Defendants and Individual Defendants to pay to Philips its actual damages for:

    a.    the Replicator Defendants' breach of contract; or

    b.    in the alternative with respect to Philips' breach of contract claim relating to the Replicator Agreements, the Replicator Defendants'  and Individual Defendants' patent infringement, under 35 U.S.C. § 284;

Q.    directing the Customers to pay Philips its actual damages for patent infringement, under 35 U.S.C. § 284;

R.    directing the John Doe Defendants to pay to Philips its actual damages for patent infringement, under 35 U.S.C. § 284;

S.    directing the Replicator Defendants  and Individual Defendants to pay unpaid royalties at the Standard Rates;

T.    directing ADS and Eva-Tone to pay the entire remaining unpaid balances under the ADS Second Workout Agreement and the Eva-Tone Workout Agreement, and directing Eva-Tone to confess judgment for such amount;

U.    directing the Replicator Defendants, Customers, Individual Defendants , and the John Doe Defendants to pay Philips' other damages, including but not limited to direct, consequential, indirect, compensatory, and punitive damages;

V.    directing the Replicator Defendants  and Individual Defendants to pay interest on all unpaid royalties;

W.     holding that the Replicator Defendants', Customers', Individual Defendants', and the John Doe Defendants' patent infringement has been and continues to be willful, and trebling Philips' damages;

X.     enjoining the Replicator Defendants,  Customers, Individual Defendants , and the John Doe Defendants from making, having made, using, importing, or selling CD-Discs under 35 U.S.C. § 283, and/or from continuing to breach the Eva-Tone Workout Agreement;

Y.     directing the Replicator Defendants, Customers, Individual Defendants, and the John Doe Defendants to pay Philips' attorneys' fees and costs under 35 U.S.C.  § 285 and/or the Eva-Tone Workout Agreement;

Z.     directing the Replicator Defendants, Customers, Individual Defendants , and the John Doe Defendants to pay prejudgment and post-judgment interest;

AA.     imposing a constructive trust on any money transferred from Eva-Tone to Music City in exchange for Music City's assets, and on any of Music City's assets received by Eva-Tone;

BB.     imposing a constructive trust on the royalties that Music City and Eva-Tone wrongfully have withheld and permitting Philips to trace those funds to all of their proceeds, including any money transferred from Eva-Tone to Music City in exchange for Music City's assets, and any of Music City's assets received by Eva-Tone;

CC.     providing such other and further relief as this Court deems just and appropriate.

### Jury Trial

Philips demands a jury trial on all claims set forth in this Complaint.

Date: June 10, 2008

Edward D. Johnson
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, California 94306-2112
Tel: (650) 331-2000
Fax: (650) 331-2060

Christopher J. Houpt
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Tel: (212) 506-2380
Fax: (212) 849-5830

Vince P. Kovalick
John F. Hornick
Samuel C. Bass
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Tel: (202) 408-4000
Fax: (202) 408-4400

*Attorneys for Plaintiffs*
*Koninklijke Philips Electronics N.V. and*
*U.S. Philips Corporation*

# Exhibit A

# United States Patent [19]

**Kramer**

[11] **Patent Number:** 5,068,846

[45] **Date of Patent:** Nov. 26, 1991

[54] **REFLECTIVE, OPTICAL RECORD CARRIER**

[75] Inventor: **Pieter Kramer**, Eindhoven, Netherlands

[73] Assignee: **U.S. Philips Corporation**, New York, N.Y.

[21] Appl. No.: **858,550**

[22] Filed: **Apr. 23, 1988**

### Related U.S. Application Data

[63] Continuation of Ser. No. 146,554, May 5, 1980, abandoned, which is a continuation of Ser. No. 949,919, Oct. 10, 1978, abandoned, which is a continuation of Ser. No. 772,914, Feb. 28, 1977, abandoned, which is a continuation of Ser. No. 344,867, Mar. 26, 1973, abandoned.

[30] **Foreign Application Priority Data**

Sep. 2, 1972 [NL]   Netherlands ...................... 7211999

[51] Int. Cl.⁵ ...................... G11B 7/24; H04N 5/85
[52] U.S. Cl. ...................... 369/275.1; 358/342; 369/275.5; 369/109
[58] Field of Search ............... 358/342; 365/113, 120; 369/275, 109, 93–94, 125, 107, 111, 275.1, 275.4, 275.5, 275

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,898,040 | 2/1933 | Eldred . |
| 1,967,882 | 7/1934 | Hammond . |
| 2,092,892 | 9/1937 | Runge . |
| 2,595,670 | 5/1952 | Goehner ...................... 369/125 |
| 3,174,140 | 3/1965 | Hagopian et al. . |
| 3,430,966 | 3/1969 | Gregg . |
| 3,518,442 | 6/1970 | Johnson . |
| 3,534,166 | 10/1970 | Korpel ...................... 358/129 |
| 3,626,386 | 12/1971 | Feinleib . |
| 3,636,526 | 1/1972 | Feinleib . |
| 3,665,425 | 5/1972 | Feinleib . |
| 3,665,483 | 5/1972 | Becker et al. ...................... 369/275.5 |
| 3,696,344 | 10/1972 | Feinleib et al. . |
| 3,764,759 | 10/1973 | Herriger et al. . |
| 3,795,902 | 3/1974 | Russell . |
| 3,833,769 | 9/1974 | Compaan et al. ................. 369/44.24 |
| 3,838,401 | 9/1974 | Graf et al. ...................... 369/109 |
| 3,848,095 | 11/1974 | Wohlmut et al. . |
| 3,876,841 | 4/1975 | Kramer et al. ................... 369/44.24 |
| 3,876,842 | 4/1975 | Bouwhuis ...................... 369/44.37 |
| 3,999,009 | 12/1976 | Bouwhuis . |
| 4,010,317 | 3/1977 | Bouwhuis ...................... 369/44.24 |
| 4,041,530 | 8/1977 | Kramer et al. . |

#### FOREIGN PATENT DOCUMENTS

1038593 8/1966 United Kingdom .

#### OTHER PUBLICATIONS

"Long Play Video Disc with Optical Scanning", Funk Technik, No. 19, pp. 692–694, Oct. 1972.
"Philips TV Disk, Read by Light Beam, Could Shape Market", Electronics, Sep. 11, 1972, pp. 29–30.
Rice et al., An Experimental Television Recording and Playback System Using Photographic Discs, Journal of the SMPTE, vol. 79, No. 11, 11/70, pp. 997–1002.

*Primary Examiner*—Robert Weinhardt
*Attorney, Agent, or Firm*—Algy Tamoshunas; Leroy Eason

[57] **ABSTRACT**

A record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate provided with an optical structure in accordance with the information is described. By making the optical structure radiation-reflecting and the substrate radiation-transmitting, whilst the surface of the substrate more remote from the optical structure forms both the entrance face and the exit face for the read radiation, and by coating a surface of the optical structure more remote from the substrate with an additional layer, a simple record carrier is obtained which is well protected against dust particles and damage.

**7 Claims, 3 Drawing Sheets**



**U.S. Patent**      Nov. 26, 1991      Sheet 1 of 3      **5,068,846**



**Fig.1**



**Fig.2**



## Fig.3



## Fig.4



*FIG. 5*

5,068,846

1

# REFLECTIVE, OPTICAL RECORD CARRIER

This application is a continuation of Ser. No. 146,554, filed May 5, 1980, which is a continuation of Ser. No. 949,919, filed Oct. 10, 1978, which is a continuation of Ser. No. 772,914, filed Feb. 28, 1977, which is a continuation of Ser. No. 344,867, filed Mar. 26, 1973, all such prior applications having been abandoned. This application is, further, a continuation-in-part of Ser. No. 229,285, filed Feb. 25, 1972, abandoned, which was continued as application Ser. No. 396,399, filed Sept. 12, 1973, abandoned, which was continued as application Ser. No. 618,215, filed Sept. 30, 1975, and issued as U.S. Pat. No. 4,041,530, dated Aug. 9, 1977.

The invention relates to a record carrier for information, for example video and/or audio·information, in the form of a disk-shaped carrier substrate on which an optical structure is provided in accordance with the information, which record carrier is intended to be read by means of optical radiation. The invention also relates to an apparatus for reading the record carrier.

Such a record carrier and read apparatus are known and are described, inter alia, in "Journal of the S.M.P.T.E." 79(November 1970) pages 997–1002. In the known record carrier the information is stored in analog form, for example in the form of areas which have different absorption coefficients and are arranged in·tracks. This registration carrier is read in the transmission mode in which a read beam enters the carrier on the side of the optical structure and emerges from it on the opposite side. In its passage through the carrier the beam is modulated by the structure in accordance with the information stored in it. The modulated beam is converted into an electric signal by a radiation-sensitive detector.

Because a large amount of information is stored on the record carrier, the details of the optical structure are very small, if, for example, a video program having a duration of 45 minutes is stored on a disk record carrier having an outer diameter of 30 cm, the side of the details will be of the order of 1 μm. Reading such a fine structure is highly susceptible to dust particles, fluff and the like. If these small objects lie on the optical structure, they may cover a large number of adjacent tracks and details in these tracks, preventing the latter from being read. In addition there is a very real possibility that, for example when the record carrier is handled or placed in the read apparatus, scratches and the like are made in the optical structure. Because the record carrier is intended to be played back in non-ideal circumstances, for example in the living room, provisions must be made to render the optical structure more or less unsusceptible to dust and damage.

The aforementioned paper proposes to coat the optical structure with an additional transparent layer. This is done to ensure that dust particles screen off only part of the read beam focussed on the optical structure of the record carrier. However, this requires the protective layer to have a minimum thickness of the order of many times the depth of focus of the lens used, for example a thickness of 100 μm. Moreover, the protective layer must intimately engage the optical structure, preventing the occurrence of local air bubbles between the optical structure and the protective layer.

In the known apparatus it is attempted to maintain the focus of the objective which focusses the read beam on the optical structure by causing the objective to "fiont"

2

on an air cushion on the record carrier. This pre-supposes, however, that the thickness of the protective layer is constant throughout the entire surface, or at least that it contains no variations in excess of the depth of focus of the objective, which is of the order of 1 μm. Consequently the protective layer has to satisfy exacting requirements.

It is an object of the present invention to provide a record carrier in which the optical structure is protected against dust particles and damage without the use of a protective layer which is required to satisfy stringent requirements. For this purpose the record carrier according to the invention is characterized in that the optical structure is a radiation-reflecting structure and the carrier substrate is radiation-transmitting, the surface of the carrier substrate more remote from the optical structure forming both the entrance face and the exit face for the read radiation. In this record carrier the carrier substrate itself ensures that dust particles are sufficiently spaced away from the optical structure.

According to a further feature of a record carrier according to the invention, the surface of the optical structure more remote from the carrier substrate is provided with an additional layer. Because the optical structure is completely embedded between two layers, it cannot readily be damaged.

The optical structure is read in the reflection mode, which means that the read beam is modulated by reflection at the optical structure. The additional layer is not traversed by the read beam and is only required to protect the optical structure from damage. Hence this layer need not satisfy exacting requirements. It need not be radiation-transmissive and need not have a constant thickness throughout its surface. In addition, it need not accurately engage the optical structure. It may, for example, be a plate which is secured to the carrier substrate along the edges.

The reflecting optical structure may be in the form of co-planar radiation-reflecting regions and intermediate areas, the areas having a coefficient of reflection different from that of the regions. Preferably, however, the optical structure consists of regions and intermediate areas having equally high reflection coefficients but situated at different levels.

The record carrier according to the invention differs from the known record carrier not only in construction but also in the manner in which during reading the read beam is maintained in focus on the optical structure. The flatness of the carrier substrate also which is required when employing the known method (an objective supported by an air cushion) can only be achieved by painstaking polishing. This greatly increases the cost of the disk. Optical determination according to the invention of the deviation between the plane of the optical structure and the plane in which the beam of radiation is focussed enables the range of permissible thickness variations over the carrier substrate to be extended to, for example, 300 μm.

Embodiments of the invention will now be described, by way of example, with reference to the accompanying diagrammatic drawings, in which:

FIG. 1 is a plan view of a record carrier not coated with an additional layer,

FIG. 2 is a cross-sectional view of an embodiment of a record carrier according to the invention,

FIG. 3 is a known apparatus for reading the record carrier,

5,068,846

3

FIG. 4 is a cross-sectional view of a second embodiment of a record carrier according to the invention, and

FIG. 5 shows an arrangement for detecting focusing errors during reading of information from the record carrier.

FIG. 1 is a plan view of a circular record carrier. The carrier may contain a single spiral structure comprising a plurality of quasi-concentric tracks. As an alternative, the tracks may be concentric, as is shown in FIG. 1. Only parts of two adjacent tracks denoted by 12 and 13 are shown. Each of the tracks contains, for example, a crenellated structure comprised of depressions which are spaced apart by intermediate areas or lands in the track direction, the dimensions of which are shown greatly exaggerated in FIG. 2, which is a tangential sectional view of a record carrier according to the invention. The spacings between, and the length of, the upper surfaces 3 and 5, 5 and 7, and so on of the merlons are different. Their heights 4, 6, and so on are equal to one another and, preferably, to about one quarter wavelength of the radiation used for reading. Instead of perpendicular leading and trailing edges the optical structure may alternatively have smooth transitions between the upper and lower surfaces.

The carrier substrate 1 transmits the radiation used for reading. The optical structure is provided on the upper surface of the disk, whilst the lower surface acts both as the entrance surface for the unmodulated beam and as the exit surface for the modulated beam. The faces of the optical structure have been made highly reflecting, for example in that after the structure has been pressed in the substrate a metal layer is deposited on it from vapour. The thickness of this metal layer is not of importance. A protective layer 10 is provided on top of the optical structure. The only purpose of this layer is to protect the optical structure of the record carrier against damage. Hence any layer which provides protection against rough handling of the carrier may be used. As FIG. 2 shows, the layer may be a thin disk which is spaced from the optical structure and is secured to the substrate along the edge only. In addition, a sheet of paper or a foil of a synthetic material provided with an adhesive on one surface may be stuck onto the optical structure. As an alternative, as is shown in FIG. 4, the layer, for example a sprayed layer of lacquer, may be provided on and between the merlons, in which case the thickness of the layer must be greater than the height of the merlons. Because the optical structure lies between the substrate 1 and the layer 10 it is fairly capable of withstanding rough handling.

A read beam (15) is modulated in phase by the crenellated structure shown in FIG. 2. As an alternative, the upper surface 9 of the substrate may be provided with a structure of radiation-reflecting regions and radiation-absorbing intermediate areas, causing the read beam to be modulated in amplitude.

When the disk record carrier shown in FIG. 1 is to be read, it is rotated at a speed of, for example, 1500 revolutions per minute by means of a driving spindle 24, as is shown in FIG. 3. In this Figure the record carrier is shown in radial section. A read beam 30 emitted by a source of radiation 25 is reflected to the record carrier by a half-silvered mirror 26. The beam passes through the carrier substrate 1 to be reflected at the optical structure (shown as tracks 2) on the upper surface of the disk. An objective 27 forms an image of the source on the optical structure, the size of this image being of the order of the smallest detail of the structure.

4

During rotation of the record carrier the read beam is modulated in time in accordance with the sequence of, for example, the merlons in a track. The modulated read beam 31 passes through the half-silvered mirror 26 to be intercepted by a radiation-sensitive detector 28. At the output of the detector an electric signal is produced which corresponds to the information stored in the record carrier. The detector 28 may be connected to known electronic means for converting the output signal of the detector into picture and sound.

The advantages of reading in reflection will be clear from FIG. 3. All the optical elements and the electronic processing devices are disposed on one side of the record carrier, permitting the carrier to be readily placed in the read apparatus. Moreover the elements may be incorporated so as to be well protected. Furthermore the number of optical elements may be reduced, because some elements are used twice. The reduced number of elements results in a reduced likelihood of relative oscillations.

Also, the record carrier may be read in a non-dustfree room, for example a living room, for dust particles deposited on the layer 10 have no effect, because the read beam does not pass through this layer. A dust particle on the lower surface 8 of the substrate may reduce the intensity of the radiation incident on the optical structure. However, a reduction in intensity is not highly inconvenient, because the information is recorded in digital form. A dust particle cannot entirely intercept the beam, because the beam has a comparatively large diameter in the plane of the dust particle. This is due to the fact that the substrate by nature has a certain thickness, inter alia because of the desired rigidity.

If the record carrier is to be suitable for manufacture by mass production methods, the flatness of the substrate should not have to satisfy exacting requirements. However, because the depth of focus of the objective 27 is of the order of 1 $\mu m$, variations in the thickness of the substrate may cause parts of the optical structure to become located outside the focussed light spot at the sites of these variations. These thickness variations, which cannot be compensated for by an objective floating in an aircushion, may cause the detector to receive not only radiation from the track part to be read, but also radiation from the surroundings of this part. As a result, the modulation depth of the output signal from the detector is reduced, while moreover, because not one track only but adjacent tracks are also illuminated, crosstalk may occur.

According to the invention the record carrier described may be used to advantage if during reading an optical focussing detection method is employed. For this purpose read apparatuses provided with focussing detection systems described in the patents identified below may be used. The use of the apparatuses for reading the record carrier according to the invention described in these patents means that the possibilities of the apparatuses described therein are particularly efficiently utilized.

One such arrangement is illustrated in FIG. 5 wherein a screen 34 is disposed in the path of the reflected beam 31 at a position such that the detectors 35' and 35" receive equal amounts of radiation when the beam is properly focused on the reflective optical structure. If, on the other hand, the plane of the optical structure shifts from the desired position, the screen will intercept the rays which travel to one of the detectors

5,068,846

so that said one detector will receive less radiation than the other. The amount and direction that the plane of the reflective optical structure deviates from the desired position can thus be determined by comparison of the output signals from the detectors 35' and 35''.

An optical determination of the deviation between the plane of the optical structure and the plane in which the read beam is focussed may be effected by imaging a grating constituted by adjacent tracks of the optical structure on two physical gratings spaced from the record carrier by different distances. The difference between the output signals of the detectors disposed behind the gratings indicates the magnitude and the direction of any deviation. A read apparatus including such focussing detection is described in U.S. Pat. No. 3,833,769.

A second possibility is offered by the apparatus described in U.S. Pat. No. 4,010,317 in which two detectors are arranged side by side, viewed in the direction of length of the track. The detectors intercept two different parts of the modulated beam.

As an alternative, the deviation between the plane of the optical structure and the plane in which the read beam is focussed may be detected without using the details in the optical structure, in contradistinction to the two aforementioned apparatuses. In such a method the optical structure is used only as a reflecting face, as is described in U.S. Pat. No. 3,876,841 and U.S. Pat. No. 3,876,842. By means of, inter alia, this face an image of an object is formed, the location of this image being determined by the location of the plane of the reflecting optical structure.

FIG. 4 shows a second embodiment of a record carrier according to the invention. Two substrates 1 and 1' which each have an optical structure on one surface 9 and 9' respectively are combined with an intermediate layer 10 to form an integral unit. Such a record carrier may be manufactured by methods known from the technology of disk-shaped sound records. The structures on the surfaces 9 and 9' are read by means of beams in opposite directions. In this embodiment the layer 10 is only required to separate the optical structures and need not protect them against external influences.

In the record carrier shown in FIG. 4 the two halves of one program may be stored in the two optical structures.

The record carrier shown in FIG. 4 is eminently suitable to realize a further inventional idea. According to this idea information about the same colored pictures is stored in different color codes in two optical structures of one record carrier. In one of these optical structures the program may be recorded, for example, according to the PAL-standard and in the other optical structure according to the Secam-standard or the NTSC-standard. The advantage is that the same information on one record carrier may be used in a large geographic area in spite of the fact that different apparatuses are used for rendering pictures and sound visible and audible respectively.

What is claimed is:

1. A record carrier containing information which is readable by a beam of radiation, said record carrier comprising a disc-shaped, radiation-transmitting substrate having a pair of planar surfaces on opposite sides thereof, a non-transmissive, radiation reflecting optical structure on one of said planar surfaces of said substrate, said optical structure comprising a plurality of adjacent, circular tracks extending about the center of said sub-

strate and defining turns of a spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions in said one surface of said substrate, said depressions being spaced apart in the track direction by intermediate areas, and a reflective layer extending over said intermediate areas and said depressions so that upon illumination by a convergent beam of radiation which is projected on and enters through the other of said planar surfaces and which passes through said substrate and is focussed on said optical structure to a spot of a size of the order of the smallest detail of said optical structure, the radiation is modulated by said depressions and intermediate areas in accordance with the sequence thereof and the modulated radiation is reflected by said reflective layer towards said other surface and exists through said other planar surface, said substrate defining a substantially rigid support for said optical structure and having a thickness such that in the plane of said other surface, which forms the entrance and exit faces for the radiation, the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface, do not interfere with readout of information by the convergent beam focussed to said spot on said optical structure, and an additional layer secured to the side of said substrate remote from said other surface, said optical structure being disposed between said substrate and said additional layer so that it is protected from damage during handling.

2. The record carrier according to claim 1 wherein said depressions are pressed into said one surface of said substrate and said reflective layer is metallic and is deposited on said one surface.

3. The record carrier according to claim 1 or 2 wherein the thickness of said additional layer is substantially smaller than the thickness of said substrate.

4. The record carrier according to claim 2 wherein said reflective, metallic layer is deposited on said one surface from vapour.

5. The record carrier according to claim 4 wherein said additional layer is a layer of lacquer sprayed on said optical structure.

6. An apparatus for reading information stored on a record carrier having a disk-shaped radiation transmitting substrate with a pair of parallel, planar surfaces on opposite sides thereof and a non-transmissive, radiation reflecting optical structure disposed on one of said planar surfaces, said optical structure comprising a plurality of adjacent, circular tracks extending about the center of the substrate and defining turns of a spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions spaced apart by intermediate areas in the track direction, said apparatus comprising means for supporting the record carrier for rotation about the center of the substrate in a plane parallel to the plane of said one surface, means positioned on the side of said substrate remote from said optical structure for producing a beam of radiation which is projected onto the other surface of said substrate so that the radiation passes through said substrate and is incident on said reflective optical structure, an objective system for focusing said beam to a spot on said optical structure so that the radiation is modulated by said optical structure in accordance with information stored thereby and the modulated radiation is reflected by said optical structure back through said other surface and passes through said objective system, said substrate having a thickness such that in the plane

5,068,846

7

of said other surface the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface do not interfere with readout of information by the beam focussed to said spot on said optical structure, radiation-sensitive means for converting the modulated radiation into an electrical signal, said radiation sensitive means being disposed in the path of the modulated radiation reflected by the optical structure, and means for deriving from the radiation a signal indicative of a deviation of the plane of the optical structure from the plane at which the radiation is focused by said objective system for correcting the focusing.

7. A record carrier containing information which is readable by a beam of radiation, said record carrier comprising a pair of disc-shaped, radiation-transmitting substrates each having a pair of planar surfaces on opposite sides thereof, a non-transmissive, radiation reflecting optical structure on one of said planar surfaces of each substrate, said optical structures each comprising a plurality of adjacent, circular tracks extending about the center of said substrate and defining turns of spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions which are spaced apart in the track direc-

8

tion by intermediate areas, said substrates being disposed in a superposed relationship with said optical structures being adjacent each other so that upon illumination of said one optical structure by a beam of radiation which is projected on and enters through the other of said planar surfaces of the associated substrate and which passes through said associated substrate and is focussed on said one optical structure to a spot of a size of the order of the smallest detail of the optical structure, the radiation is modulated by said depressions and intermediate areas in accordance with the sequence thereof and the modulated radiation is reflected by said one optical structure towards and exits through said other planar surface of said associated substrate, each substrate defining a substantially rigid support for the respective optical structure and having a thickness such that in the plane of said other surface, which forms the entrance and exit faces for the radiation, the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface, do not interfere with readout of information by the convergent beam focussed to said spot on said optical structure.

\* \* \* \* \*

# Exhibit B

RECEIVED MAY 0 8 2003

1

## CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this __1st__ day of __July____, 2002 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

LLC
ADVANCED DUPLICATION SERVICES, ~~INC.,~~ having its registered office in [2155 Niagara Lane North, Suite 120, Plymouth, MN 55447 (hereinafter referred to as "Licensee")

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation of Japan ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System together are referred to as "the CD Systems");

WHEREAS, Philips and Sony own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as such patents relating to the CD Systems which are jointly owned by Philips and Sony, while Philips and Sony each retain the right also to license their respective patents relating to the CD Systems separately, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs and wishes such CD-Discs to be compatible with CD-Players conforming to the Standard Specifications for any of the relevant CD Systems; and

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001753

2

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein; NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## Article 1 - Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.01    **"Disc"** shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.02    **"CD-Audio Disc"** shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined).

1.03    **"CD-Audio Maxi-Single"** shall mean a CD-Audio Disc which, in addition, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.04    **"CD-ROM Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-ROM Player (as hereinafter defined) and which conforms to the CD-ROM Standard Specifications (as hereinafter defined).

1.05    **"Enhanced Music CD Disc/CD Extra Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, a CD-ROM Player and which conforms to the CD-ROM Standard Specifications and an Enhanced Music CD Player (as hereinafter defined) which conforms to the Enhanced Music CD Standard Specifications (as hereinafter defined).

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc and the CD Extra Disc together are referred to as "CD-Discs".

1.06    **"CD-Audio Standard Specifications"** shall mean the specifications for the CD-Audio System, including the Subcode/Control and Display System, Channels R ..W, Chapter 5.8, The CD-TEXT mode, as made available, modified or extended from time to time.

1.07    **"CD-Audio Maxi-Single Standard Specifications"** shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                November 2002

**P 001754**

3

1.08  **"CD-ROM Standard Specifications"** shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.09  **"Enhanced Music CD Standard Specifications"** shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time.

The CD-Audio, CD-Audio Maxi-Single, CD-ROM and Enhanced Music CD Standard Specifications together are referred to as the "CD Standard Specifications".

1.10  **"Player"** shall mean a playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.11  **"CD-Audio Player"** shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

1.12  **"CD-ROM Player"** shall mean a Player solely capable of reproducing information stored on a CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.13  **"Enhanced Music CD Player"** shall mean a Player solely capable of reproducing information stored on a CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.14  **"Combi-Player"** shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player together are referred to as the "CD-Players".

1.15  **"Licensed Product"** shall mean a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

1.16  **"Licensed Patents"** shall mean the patents listed in the relevant Exhibits as selected by Licensee pursuant to the Options below.

**Option A1**: Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302          November 2002

**P 001755**

4

**Option A2**: Licensee chooses the essential patents listed in Exhibit E1 and Exhibit E2, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-ROM Discs, which conform to the CD-ROM Standard Specifications.

**Option A3**: Licensee chooses the essential patents listed in Exhibit E1, Exhibit E2 and Exhibit E3, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs, which conform to the Enhanced Music CD Standard Specifications.

**Option A4**: Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information.

**Option A5**: Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs.

Option(s): ⊘ A1  o A2  ⊘ A3 ⊘ A4  o A5

(please tick any combination as appropriate)

Initial: _____

The term **"essential"** as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips will commission an independent patent expert to review the European, Japanese and US patents listed as essential in Exhibits E1, E2, E3 and E4 in order to confirm the essentiality of such patents. In the event that such independent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips shall delete such patent (as well as the equivalent national patents) from the relevant Exhibit and such patent will be put on the relevant Exhibit of non-essential patents. Any such finding and deletion however, shall not affect the obligation of Licensee to pay the royalty on each Licensed Product as specified in Article 5.02, provided that, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302   November 2002

P 001756

5

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of January 1, 1985), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of Licensed Products and which have a filing date or are entitled to a so-called priority date prior to either January 1, 1983 for CD-Audio Discs, January 1, 1985 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Exhibits hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents. Any patents as may be added as essential patents to any of the respective Exhibits hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of the Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon execution of this Agreement.

1.17    **"Associated Company"** shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.18    **"Territory"** shall mean the geographic area known as the United States of America, its territories and possessions.

## Article 2 – Grant of Rights

Subject to the conditions of this Agreement:

2.01    For the term of this Agreement, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents selected by Licensee pursuant to Article 1.16 to manufacture Licensed Products within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001757

6

2.02    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee, upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire from third parties the free right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Article 2.02, additional royalties may have to be paid over and above the royalties specified in Article 5.02.

2.03    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, to manufacture CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players and to sell or otherwise dispose of such Players so manufactured in all countries of the world, under any and all present and future patents essential to the manufacture, sale or other disposal of such Players, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire the free right to grant licenses.

2.04    In consideration of the undertakings set forth in Articles 2.01, 2.02 and 2.03 and similar undertakings by third party licensees of Philips and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date (as hereinafter defined) Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16 and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which have made the same selection pursuant to Article 1.16 as Licensee and which in that respect accept or have accepted a similar undertaking as contained in this Article 2.04.

2.05    In addition, in consideration of the undertakings set forth in Articles 2.01, 2.02, 2.03 and 2.04 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning Players, non-

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                November 2002

P 001758

7

exclusive, non-transferable licenses on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of such CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such Players and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which accept or have accepted a similar undertaking as contained in this Article 2.05.

2.06    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

In consideration of Philips' undertaking as set out in the preceding paragraph, Licensee undertakes that all of its Associated Companies which have or may hereafter acquire patents essential to the manufacture, sale or other disposal of CD-Discs and which patents were first filed in any country of the world prior to the date of termination of this Agreement, shall make available licenses under such patents, on reasonable, non-discriminatory conditions comparable to those set forth herein to Philips, any of Philips' Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips in respect of CD-Discs.

2.07    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER/RECORDER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF RECORDING/PLAYBACK DEVICES DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR RECORDING/PLAYBACK DEVICES (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVI-CES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR PATENTS RELATING TO CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS, RECORDING/PLAYBACK DEVICES WITH ANY OTHER ITEMS, PRODUCTS, SYSTEMS, STRUCTURES, EQUIPMENT OR

P 001759

8

SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED
PRODUCT AND A PLAYER OR RECORDING/PLAYBACK DEVICE.

### Article 3 - Standard Specifications, Technical Information and Support

3.01  Upon receipt of the payment provided for in Article 5.01 and the payment provided for in Article 5.12, Philips shall make available to Licensee for use by Licensee in accordance with the provisions hereof, a copy of the then current version of the respective CD Standard Specifications, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, together with such other information and support as Philips considers necessary for the interpretation and/or correct application of the relevant CD Standard Specifications.

3.02  Licensee shall be notified in writing of any addition or modification to any of the relevant CD Standard Specifications and shall be provided with relevant information in connection therewith.

3.03  Philips and Licensee undertake to keep each other generally informed of developments or initiatives, which may have an impact on the relevant CD Standard Specifications.

### Article 4 - Have Made

4.01  The rights granted to Licensee pursuant to Article 2 and the right to use the information pursuant to Article 3, include the right for Licensee to have Licensed Products made for it by third party manufacturers, duly licensed by Philips under an agreement similar to this Agreement, provided that Licensee will properly identify such third party manufacturer in the royalty reporting forms to be submitted to Philips hereunder, together with the quantities of Licensed Products so purchased.

Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any third party not licensed by Philips, where such purchase or sale would constitute an act of infringement of any of the Licensed Patents.

### Article 5 - Royalties, Reports and Payments

5.01  In consideration of the rights granted by Philips and the information to be provided by Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable, non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.02  In further consideration of the rights granted hereunder by Philips to Licensee, Licensee agrees to pay to Philips a royalty on each Licensed Product sold by Licensee, in which any one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed Patent(s) is (are) used in the country of manufacture, sale or other disposal.

These royalties shall amount to:

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advanced duplication services-cd disc-joint-usa-121302                 November 2002

**P 001760**

9

(a)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)    US$ 0.027 (two point seven US Dollar cents) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm; and

(f)    US$ 0.045 (four and a half US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Standard Rates".

With respect to Licensed Products sold after July 1, 2002, provided that Licensee is in full compliance with its obligations under this Agreement and subject to Article 6.01, the royalties shall amount to:

(a)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)    US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm;

(f)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations hereunder, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the moment of such non-compliance until such moment that Licensee's non-compliance will have been remedied in full.

A Licensed Product shall be considered sold when invoiced or, if not invoiced, when delivered to a party other than Licensee.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                November 2002

**P 001761**

10

No royalties shall be payable on Licensed Products purchased by Licensee on a "have made" basis in accordance with Article 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such Licensed Products.

For the avoidance of doubt, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist.

5.03    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Exhibit C3 (Royalty Reporting Form) signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee, specified per individual type of CD-Disc;

(2)    the quantities of CD-Discs purchased from other licensed manufacturers in accordance with the provisions of Article 4, specified per individual type of CD-Disc;

(3)    on a per-country basis, specifying for each individual type of CD-Disc:

(a)    the quantities of CD-Discs sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)    the quantities of CD-Discs sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period, in such US Dollars.

5.04    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Article 5.03, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                November 2002

P 001762

11

Licensee acknowledges and agrees that any Advance shall not be due by way of penalty but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time; the payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form; the payment by Licensee of an Advance shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.05   Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be public certified auditors, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet Philips' requirements as specified in the Audit Guidelines attached hereto as Exhibit C1 and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement shall be verified by Philips by means of a work paper review, conducted by one of the public certified auditors selected by Philips. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Article 5.10.

5.06   Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of Licensed Products in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Article 5.02 and Article 5.12, shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Article 5.06 shall be without prejudice to the provisions of Article 12.06.

5.07   Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.08   All payments to Philips under this Agreement shall be made by transfer in such currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.09   All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001763

12

a country imposes any income taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Article 5 may be verified, Licensee shall keep complete and accurate books and records and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each Licensed Product.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a public certified auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Article 5.03 and Article 5.05, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Article 5.10 shall survive termination or expiration of this Agreement.

5.11    Without prejudice to the provisions of Article 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12    As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of CD-Discs manufactured and sold or otherwise disposed of by Licensee before the Effective Date of this Agreement in accordance with the provisions of Article 5.03. Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties on such CD-Discs, calculated by applying the royalty rates of (a) US$ 0.03 for each CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, (b) US$ 0.02 for each CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, (c) US$ 0.027 for each CD-Audio Maxi-Single and (d) US$ 0.045 or US$ 0.048 for each CD Extra Disc, depending on the selection made by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement. The above rates are effective for CD-Discs sold after June 30, 2000. CD-Audio Discs and CD-ROM Discs having an outer diameter greater than 90 mm sold prior to July 1, 1998 are subject to a royalty rate of US$

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001764

13

0.045; if sold after June 30, 1998 and prior to July 1, 1999 such Discs are subject to a royalty rate of US$ 0.04; and if sold after June 30, 1999 and prior to July 1, 2000 such Discs are subject to a royalty rate of US$ 0.035. The royalty statement shall similarly be subject to Philips' right of audit as set out in Article 5.10. Within 45 days following the execution of this Agreement, Licensee shall submit to Philips an audit statement by its external auditors, who shall be public certified auditors, confirming that this royalty statement is true, complete and accurate in every respect.

## Article 6 – Manufacturing Equipment Identification System

6.01    Upon signing of the Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment used for the manufacture of Licensed Products. Further, upon any acquisition, transfer or disposal of manufacturing equipment used for the manufacture of Licensed Products, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Article 5.05. Such overview shall be in the form as attached hereto as Exhibit C2 (Manufacturing Equipment List), signed by a duly authorized officer on behalf of Licensee. The Compliance Rates referred to in Article 5.02 shall only apply to Licensed Products manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting Philips' requirements as set out in the Audit Guidelines, in accordance with the provisions in Article 5.05. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used for the manufacture of Licensed Products prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee can demonstrate to Philips' full satisfaction, that the newly acquired manufacturing equipment originates from and has been used by a company which was properly licensed by Philips for the manufacture of Licensed Products and in full compliance with its obligations under its license agreement at the time of the acquisition of the newly acquired manufacturing equipment by Licensee. In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rates shall apply to Licensee's manufacture and sale of Licensed Products instead of the Compliance Rates.

## Article 7 - Most Favourable Conditions

7.01    In the event that licenses under the patents referred to in Article 2 are granted by Philips for Licensed Products to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

**P 001765**

15

9.03    The obligations concerning confidentiality contained in Article 9.01 and Article 9.02 shall survive termination of this Agreement

9.04    Philips shall, during the term of this Agreement as specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party any confidential information obtained by Philips in connection with Article 5.03 and/or Article 5.05, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections a, b and/or c of Article 9.02.

### Article 10 - Logo

10.01   For the term of this Agreement and subject to the full and timely performance and observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be entitled to use on the Licensed Products as well as in advertisements and sales literature with respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo") in accordance with the instructions laid down in the CD-Logo Guide which shall be made available to Licensee together with the Standard Specifications.

10.02   Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of the Logo does not infringe or will not cause infringement of any third party intellectual property rights.

### Article 11 – No Assignment

11.01   This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips.

### Article 12 - Term and Termination

12.01   This Agreement shall enter into force on the "Effective Date", being the date first written above. In the event that validation of this Agreement is required by the competent governmental authorities, the Effective Date shall be the date of such validation. This Agreement shall remain in force for a period of 10 years from the Effective Date unless terminated earlier in accordance with the provisions of this Article 12.

12.02   Without prejudice to the provisions of Article 12.03 through 12.06, each party may terminate this Agreement at any time by means of written notice to the other party in the event that the other party fails to perform any obligation under this Agreement and such failure is not remedied within 30 days after receipt of a notice specifying the nature of such failure and

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001766

17

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips International B.V.
Intellectual Property & Standards - Legal Department
P.O. Box 220, Building WAH-2
5600 AE Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

U.S. Philips Corporation
580 White Plains Road
Tarrytown, New York 10591
Fax: +(914) 332-0615

or to such other address as may have been previously specified in writing by either party to the other.

13.02   This Agreement sets forth the entire understanding and agreement between the parties as to the subject matter hereof and supersedes and replaces all prior arrangements, discussions and understandings between the parties relating thereto. Neither party shall be bound by any obligation, warranty, waiver, release or representation except as expressly provided herein, or as may subsequently be agreed in writing between the parties.

13.03   Nothing contained in this Agreement shall be construed:

   (a)   as imposing on either party any obligation to instigate any suit or action for infringement of any of the patents licensed hereunder or to defend any suit or action brought by a third party which challenges or relates to the validity of any of such patents. Licensee shall have no right to instigate any such suit or action for infringement of any of the patents licensed by Philips hereunder, nor the right to defend any such suit or action which challenges or relates to the validity of any such patent licensed by Philips hereunder;

   (b)   as imposing any obligation to file any patent application or to secure any patent or to maintain any patent in force;

   (c)   as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips, Sony or any of their Associated Companies;

   (d)   as conferring any license to manufacture, sell or otherwise dispose of any product or device other than a Licensed Product.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302          November 2002

P 001767

18

13.04   Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

13.05   Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by written notice to Licensee.

13.06   This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS        ADVANCED DUPLICATION SERVICES,
N.V.                                    ~~INC.~~ LLC

Name:   H. Sanders    BW           Name:

Title:   by proxy                  Title:

Date:                              Date:

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302          November 2002

P 001768

Exhibit E1 to the CD Disc Patent License Agreement
CD-Disc/CD-Audio and CD-Maxi Single part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | Q.080007 - | 285958 | 02-Jul-81 | | 250649 | 06-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | Q.080009 - | 285400 | 20-May-81 | | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | Q.080007 - | 81-A3107 | 14-Jul-81 | | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | Q.080009 - | 81-A2215 | 18-May-81 | 395794 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | Q.080007 - | 98-00033 | 21-Apr-98 | | | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | P15.688 - | 399564 | 26-Mar-82 | | 1207443 | 08-Jul-03 | Optical readable carriers |
| CA | Q.080007 - | 381362 | 08-Jul-81 | | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q.080007 A | 514656 | 02-Aug-82 | | 514656 | 20-Jun-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q.080009 - | 502320 | 19-May-81 | | 502320 | 09-Sep-02 | Error correctable data transmission method |
| US | N.006493 D | 06/858550 | 23-Apr-86 | | 5068846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | P15.688 - | 890316 | 30-Mar-82 | | 5305301 | 19-Apr-11 | Optical readable carriers |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list.

Page 1 of 1    Prindate    21 June 2002

P 001769

Exhibit E2 to the CD Disc Patent License Agreement

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | P18.816 | 849010.1.1 | 02-Mar-84 | | 52866 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AT | Q 083025 | 84-42769 | 29-Aug-84 | | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | E49835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-42040 | 22-Mar-85 | | 584983 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | PI8501277.7 | 21-Mar-85 | | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | PI8700846 | 23-Feb-07 | Real-time format switching |
| CA | P | | | | 1235812 | 26-Apr-05 | Disc playback apparatus |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 1280208 | 12-Feb-08 | Real-time format switching |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 1010517 | 21-Feb-07 | Real-time format switching |
| CZ | Q 084008 | 85-PV2009 | 21-Mar-85 | | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | P | 84305176.4 | 30-Jul-84 | | P3476289.2 | 30-Jul-04 | Disc playback apparatus |
| DE | P18.816 | 849010.1.1 | 02-Mar-84 | | P3482231.7 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | Q 083025 | P343181O.0 | 30-Aug-84 | 3431810 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 3701763 | 22-Jan-07 | Real-time format switching |
| FR | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| FR | P18.816 | 849010.1.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 2561639 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 2594996 | 20-Feb-07 | Real-time format switching |
| GB | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| GB | P18.816 | 849010.1.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-I discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM/XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

P 001770

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | Q 084008 | 8507248 | 20-Mar-85 | | 2156555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 | 8704011 | 20-Feb-87 | | 2187008 | 20-Feb-07 | Real-time format switching |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | NOT GIVEN | 20-Mar-85 | | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 086003 | 87-A19447 | 20-Feb-87 | | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | P | | | | 1912619 | 30-Jul-03 | Disc playback apparatus |
| JP | P18.816 | 35459/83 | 04-Mar-83 | | 19126134 | 04-Mar-03 | Method and apparatus for recording digitized infor |
| JP | Q 083025 | 83-161514 | 01-Sep-83 | 60-52961 | | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | 84-57595 | 24-Mar-84 | 60-201575 | | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 | 87-38997 | 23-Feb-87 | 87-217468 | | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 | 85-1914 | 23-Mar-85 | 94-8742 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 95-7946 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| NL | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8500450 | 192151 | 24-Feb-06 | Real-time format switching |
| SE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 | 9290553.8 | 20-Mar-85 | | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 | 84-PV6607 | 03-Sep-84 | | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 | 85-PV2009 | 21-Mar-85 | | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 | 76100969 | 25-Feb-87 | | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 | 3874714 | 22-Mar-85 | | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | P18.816 | 668237 | 02-Mar-84 | | 4707818 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| US | Q 084008 R | 07/379627 | 13-Jul-89 | | RE33462 | 22-Nov-05 | CD-ROM Error Correction System A |
| US | Q 086003 | 07/018163 | 24-Feb-87 | | 4802169 | 24-Feb-07 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084/008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086/003 and P 18/816 are essential to CD-ROM/X4 type discs
Patents with reference Q 083/025 and P are essential to all type of CD-ROM discs

Page 2 of 2                    Printdate        27 September 2002

Exhibit E3 to the CD-Disc Patent License Agreement
CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | S85P0059 | 85900170.3 | 30-Nov-84 | - | E76996 | 30-Nov-04 | Disc recording medium |
| AT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| AT | S95P0806 | - | | | E206238 | | Recording medium having a first management area |
| AU | N 013661 | 92-13942 | 31-Mar-92 | 92-13942 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S85P0059 | 37412/85 | 30-Nov-84 | 3741285 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S94P5088 | 34358/95 | 19-Oct-95 | - | 703045 | 19-Oct-15 | Mass produced multisessions disc |
| AU | S95P0806 | 40388/95 | 13-Dec-95 | 692961 | 692961 | 13-Dec-15 | Recording medium having a first management area |
| AU | S96P0005 | 22565/00 | 24-Mar-00 | - | 728279 | 23-Jan-16 | Multi-session disc having disc type code area loca |
| BR | S95P0806 | 9505999 | 21-Dec-95 | - | - | | Recording medium having a first management area |
| CA | N 013661 | 2064511 | 31-Mar-92 | - | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | S95P0806 | 2164801 | 08-Dec-95 | - | - | | Recording medium having a first management area |
| CH | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| CH | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| CN | S94P5088 | 95116095.6 | 19-Oct-95 | CN1113131A | - | | Mass produced multisessions disc |
| CN | S95P0806 | 95121699 | 22-Dec-95 | CN1135633A | - | | Recording medium having a first management area |
| CN | S96P0005 | 96104382 | 30-Jan-96 | CN1137675A | - | | Multi-session disc having disc type code area loca |
| CZ | N 013685 | 92-PV970 | 01-Apr-92 | - | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 69228116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S85P0059 | 85900170.3 | 30-Nov-84 | - | P3485761.3 | 30-Nov-04 | Disc recording medium |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | oduced multisessions disc for playback on audio-on |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| DE | S95P0806 | 95119580.9 | 12-Dec-95 | DE69522917T | 69522917 | 12-Dec-15 | Recording medium having a first management area |
| ES | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 2118784 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ES | S95P0806 | 95119580.9 | 12-Dec-95 | ES2183469T | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S85P0059 | 85900170.3 | 30-Nov-84 | 708445 | 165320 | 30-Nov-04 | Disc recording medium |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 4

Printdate    21 June 2002

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| FR | S94P5088 | 95307463.0 | 19-Oct-95 | - | - | - | Mass produced multisessions disc |
| FR | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| GB | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 | 859001170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| GB | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| GB | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| HK | S85P0059 | - | - | - | 081511995 | - | Disc recording medium |
| HK | S94P5088 | 981037176.7 | 04-May-98 | - | - | - | Mass produced multisessions disc |
| HU | N 013685 | P9201055 | 30-Mar-92 | - | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S95P0806 | P-962737 | 19-Dec-95 | - | - | - | Recording medium having a first management area |
| ID | S96P0005 | P-960210 | 30-Jan-96 | 012.685A | ID0004712 | 30-Jan-16 | Multi-session disc having disc type code area loca |
| IN | S95P0806 | 2287/DEL/95 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| IN | S96P0005 | 0188/DEL/96 | 29-Jan-96 | - | - | - | Multi-session disc having disc type code area loca |
| IT | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| IT | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| IT | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| JP | 84000899 | 58226598 | 30-Nov-83 | 60-119670 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 | 59-057593 | 24-Mar-84 | 60-201575 | 2085642 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060963 | 07311437 | 29-Nov-95 | 08-227577 | - | - | Recording medium having a first management area |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013661 | 92-81010 | 02-Apr-92 | 93-89896 | 3293851 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013685 | 82-79901 | 01-Apr-92 | 93-94675 | - | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S85P0059 | 59-057596 | 24-Mar-84 | 60-201576 | 1981180 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | S94P5088 | 07-270220 | 18-Oct-95 | - | - | - | Mass produced multisessions disc |

All corresponding patent applications, patents, divisions, continuations and reissue based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate        21 June 2002

P 001773

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| JP | S95P0806 | 06320107 | 22-Dec-94 | | | | Recording medium having a first management area |
| JP | S96P005 | 07013211 | 30-Jan-95 | 08-203210 | | | Multi-session disc having disc type code area loca |
| KR | N 013661 | 92-5313 | 31-Mar-92 | 92-20420 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013685 | 92-5314 | 31-Mar-92 | 92-20418 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 | 85-700146 | 29-Jul-85 | 85-00175 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 | 92-702698 | 30-Oct-92 | | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S94P5088 | 95-35873 | 18-Oct-95 | | | | Mass produced multisessions disc |
| KR | S95P0806 | 95-72133 | 21-Dec-95 | 96-25644 | | | Recording medium having a first management area |
| KR | S96P0005 | 96-02552 | 30-Jan-96 | 96-30119 | | | Multi-session disc having disc type code area loca |
| MX | S95P0806 | 955172 | 11-Dec-95 | | 189100 | 11-Dec-12 | Recording medium having a first management area |
| MY | S95P0806 | PI9503773 | 07-Dec-95 | | | | Recording medium having a first management area |
| MY | S96P0005 | PI9600317 | 29-Jan-96 | | | | Multi-session disc having disc type code area loca |
| NL | S85P0059 | 85900170.3 | 30-Nov-84 | | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | | | Mass produced multisessions disc |
| NL | S95P0806 | 95119580.9 | 12-Dec-95 | | | | Recording medium having a first management area |
| NL | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | | | Multi-session disc having disc type code area loca |
| PL | S95P0806 | P312001 | 21-Dec-95 | | 179800 | 21-Dec-15 | Recording medium having a first management area |
| PL | S95P0806 | P338168 | 28-Feb-00 | | 179603 | 21-Dec-15 | Recording medium having a first management area |
| RU | N 013661 | 5011395 | 01-Apr-92 | | 2072566 | 01-Apr-12 | Recording of content information in Lead-Out |
| RU | S95P0806 | 95122380 | 21-Dec-95 | | 2162252 | 21-Dec-15 | Recording medium having a first management area |
| RU | S95P0806 | 99128046 | 30-Dec-99 | | | | Recording medium having a first management area |
| RU | S95P0806 | 99104165 | 03-Jan-99 | | | | Recording medium having a first management area |
| RU | S95P0806 | 99103927 | 03-Jan-99 | | | | Recording medium having a first management area |
| SE | S85P0059 | 85900170.3 | 30-Nov-84 | | 165320 | 30-Nov-04 | Disc recording medium |
| SE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | | | Mass produced multisessions disc |
| SG | S95P0806 | 9502053 | 07-Dec-95 | | 38892 | 07-Dec-15 | Recording medium having a first management area |
| SG | S96P0005 | 9600515 | 27-Jan-96 | | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013685 | 92-PV0970 | 01-Apr-92 | | 282293 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TH | S95P0806 | 029364 | 20-Dec-95 | 22587 | | | Recording medium having a first management area |
| TR | S95P0806 | 053122 | 21-Dec-95 | 960597 | | | Recording medium having a first management area |

*All corresponding patent applications, patents, divisions, patents, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Printdate　　21 June 2002*

P 001774

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|---|
| TW | N 013661 | - | 80109966 | 19-Dec-91 | UNKNOWN | 57337 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| TW | N 013685 | - | 80109963 | 19-Dec-91 | | 59397 | 59397 | 19-Dec-11 | CD-ROM XA Multi-session WO |
| TW | S94P5088 | - | 83109977 | 28-Oct-94 | | | 72376 | 27-Oct-14 | Mass produced multisessions disc |
| TW | S95P0806 | - | 84113465 | 16-Dec-95 | | | 86403 | 15-Dec-15 | Recording medium having a first management area |
| UA | N 013661 | - | 93002573 | 15-Nov-93 | | | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 013661 | V | 07/900874 | 18-Jun-92 | | | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |
| US | N 013685 | A | 08/180002 | 11-Jan-94 | | | 5390159 | 14-Feb-12 | CD-ROM XA Multi-session WO |
| US | N 013685 | B | 08/328307 | 24-Oct-94 | | | 5878019 | 02-Mar-16 | CD-ROM XA Multi-session WO |
| US | N 013685 | V | 08/371644 | 12-Jan-95 | | | 5884786 | 04-Nov-14 | CD-ROM XA Multi-session WO |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S85P0059 | - | 266207 | 27-Oct-88 | | | 4893193 | 09-Jan-07 | Disc recording medium |
| US | S94P5088 | - | 324406 | 20-Oct-94 | | | - | | Mass produced multisessions disc |
| US | S94P5088 | - | 471982 | 06-Jun-95 | | | 5661715 | 20-Oct-14 | Mass produced multisessions disc |
| US | S95P0806 | - | 572528 | 14-Dec-95 | | | 5754521 | 14-Dec-15 | Recording medium having a first management area |
| US | S96P0005 | - | 592962 | 29-Jan-96 | | | 5778257 | 29-Jan-16 | Multi-session disc having disc type code area loca |
| VN | S95P0806 | - | S-1614/9ST2 | 26-Jun-00 | | | - | | Recording medium having a first management area |
| VN | S95P0806 | - | S-1614/95 | 21-Dec-95 | | | - | | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 4 of 4                                                                                               Printdate          21 June 2002

P 001775

Exhibit E4 to the CD Disc Patent License Agreement
CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104337 | 13-Sep-96 | | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information records |
| AT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 65625/96 | 13-Sep-96 | . | 714409 | 13-Sep-16 | Reproducing medium having text information records |
| AU | D 088009 | 29-28557 | 18-Jan-89 | 639411 | 639411 | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603829 | 20-Sep-96 | . | | 22-Sep-16 | Reproducing medium having text information records |
| CA | D 088009 | 588304 | 16-Jan-89 | | 1322593 | 28-Sep-10 | Repeated transfer of subcode data |
| CH | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | | 22-Sep-16 | Reproducing medium having text information records |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | | 02-Nov-16 | Recording medium and its reproducing apparatus |
| CN | D 088009 | 89101069.6 | 19-Jan-89 | 1035577-A | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009 A | 92102717.6 | 19-Jan-89 | 1068673-A | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 284768 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | P69612472.6 | 03-Dec-16 | Disc Reproducing apparatus |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| DE | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 68927063.1 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| FR | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 3                                                                 Printdate          21 June 2002

P 001776

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98106421.9 | 16-Jan-89 | - | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-96 | - | - | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963566 | 02-Dec-96 | - | 655 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962647 | 19-Sep-96 | - | - | 19-Nov-16 | Reproducing medium having text information records |
| ID | 95085448 | P963188 | 04-Nov-96 | - | 5137 | 04-Nov-18 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | 014759-A | - | 12-Sep-10 | Transferring information via the lead-in of CD |
| IN | 95069128 | 2023/DEL/96 | 16-Sep-96 | - | - | 16-Sep-11 | Reproducing medium having text information records |
| IN | N 015474 | 96-1617 | 11-Sep-96 | - | - | 11-Sep-10 | Transferring information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | - | 26-Aug-16 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244959 | 22-Sep-95 | 09-091880 | - | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310080 | 02-Nov-95 | 09-128868 | - | 22-Sep-15 | Reproducing medium having text information records |
| JP | 95100948 | 08-242659 | 26-Aug-96 | 10-84245 | - | 02-Nov-15 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7176 | 3092924 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-505270 | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | 95063039 | 96-62692 | 07-Dec-96 | 97-50695 | - | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | - | 23-Sep-16 | Reproducing medium having text information records |
| KR | 95085448 | 96-51644 | 02-Nov-96 | 98-29706 | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | - | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | - | 196099 | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | 95069128 | 964179 | 19-Sep-96 | - | - | 19-Sep-16 | Reproducing medium having text information records |
| MX | N 015474 | 973530 | 09-Sep-96 | - | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 95063039 | 9605148 | 07-Dec-96 | - | - | | Disc Reproducing apparatus |
| MY | 95069128 | 9603888 | 20-Sep-96 | - | - | | Reproducing medium having text information records |
| MY | N 015474 | PI9603785 | 13-Sep-96 | - | - | | Transferring information via the lead-in of CD |
| NL | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information records |
| PH | 95069128 | 54335 | 19-Sep-96 | 54335 | - | | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3    Printdate    21 June 2002

P 001777

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| PT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 | 4613351 | 17-Jan-89 | | 2095857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | 9704855.5 | 09-Sep-96 | | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 | 89-PV0287 | 16-Jan-89 | | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 95069128 | 851577 | 21-Sep-96 | | 94512 | 20-Sep-16 | Reproducing medium having text information records |
| TW | D 088009 | 78100300 | 17-Jan-89 | | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | 85114202 | 19-Nov-96 | 410326 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 | 93003372 | 17-Jan-89 | | 28980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 95063039 | 09/515656 | 24-Feb-00 | | 5745454 | 20-Sep-16 | Disc Reproducing apparatus |
| US | 95063039 | 753675 | 27-Nov-96 | | 582573] | 27-Nov-16 | Disc Reproducing apparatus |
| US | 95069128 | 716953 | 20-Sep-96 | | 5859821 | 30-Oct-16 | Reproducing medium having text information records |
| US | 95085448 | 739821 | 30-Oct-96 | | | | Recording medium and its reproducing apparatus |
| US | D 088009 B | 08/300002 | 05-Apr-93 | | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | 08/716688 | 16-Sep-96 | | 5798990 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 95069128 | SC0210/96 | 21-Sep-96 | | | 02-Nov-10 | Recording medium and its reproducing apparatus |
| VN | 95085448 | SC0328/96 | 02-Nov-96 | | | 21-Sep-10 | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 3 of 3     Printdate : 21 June 2002

P 001778

Exhibit E5 to the CD Disc  Patent License Agreement

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Sector and Word Offset in Video Header |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Method of transmitting full motion |
| AT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | E157830 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219     641726 | 641726 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| BE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2036585 | 19-Feb-91 | | 2036585 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Sector and Word Offset in Video Header |
| CA | N 013409  A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409  A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Sector and Word Offset in Video Header |
| DE | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 3855114 | 27-Apr-08 | Motion estimation on superblocks |
| DE | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 69109346.6 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Method of transmitting full motion |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 69127504.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DK | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DK | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FI | N 013257 | 910791 | 19-Feb-91 | | 101442 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 3

Printdate        21 June 2002

P 001779

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| GB | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| GB | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| GB | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| HK | N 013257 | NOT GIVEN | 18-Feb-91 | | 0960615 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| IT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| IT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| JP | D 087091 | 88-109222 | 06-May-88 | 88-287186 | 2630809 | 06-May-08 | Motion estimation on superblocks |
| JP | N 013257 | 91-47659 | 20-Feb-91 | 92-216288 | 3174586 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| JP | N 013257 A | 00-344604 | 13-Nov-00 | | | | Image Data Block with hierarchical encoding level |
| JP | N 013409 | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 A | 01-151175 | 21-May-01 | | | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 A | 01-151175 | 21-May-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013709 | 91-159490 | 04-Jun-91 | 92-229464 | 3162110 | 04-Jun-11 | Decoder delay in coded video frames |
| JP | N 013709 A | 00-393982 | 26-Dec-00 | | | 04-Jun-11 | Decoder delay in coded video frames |
| KR | N 013409 | 91-9152 | 03-Jun-91 | | 0245962 | 03-Jun-11 | Method of transmitting full motion |
| KR | N 013409 | 91-9152 | 03-Jun-91 | | 0245962 | 03-Jun-11 | Sector and Word Offset in Video Header |
| KR | N 013709 | 91-9187 | 04-Jun-91 | 92-1479 | 239837 | 04-Jun-11 | Decoder delay in coded video frames |
| NL | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| NL | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SE | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| SE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| SE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| SE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SG | N 013257 | 9690467.7 | 18-Feb-91 | | 30173 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| US | D 087091 B | 07/590450 | 24-Sep-90 | | 5021879 | 25-Apr-08 | Motion estimation on superblocks |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Printdate      21 June 2002*

CD-Disc/CD Non-essential part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|--|-----------|-------------|----------------|----------|-------------|-------|
| US | N 013257 | C | 08/647149 | 09-May-96 | | 5699476 | 16-Dec-14 | Image Data Block with hierarchical encoding level |
| US | N 013409 | A | 08/269941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Method of transmitting full motion |
| US | N 013409 | A | 08/269941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Method of transmitting full motion |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013709 | B | 08/299027 | 31-Aug-94 | | 5606539 | 25-Feb-14 | Decoder delay in coded video frames |
| US | N 013709 | C | 08/616951 | 18-Mar-96 | | 5608697 | 04-Mar-14 | Decoder delay in coded video frames |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate          21 June 2002

P 001781

Exhibit C



# **PHILIPS**

**Philips Intellectual Property & Standards**

March 31, 2003

RECEIVED MAY 0 8 2003

Re:    CD Disc Patent License Agreement

Dear Sirs:

Reference is made to the CD Disc Patent License Agreement ("***Agreement***") between Advanced Duplication Services, LLC ("***Licensee***") and Koninklijke Philips Electronics N.V. ("***Philips***") covering the Territory of the United States and having an effective date of July 1, 2002, as well as the definitions used therein.

It is hereby agreed as follows:

1. This Side Letter shall constitute a legally binding and integral part of the Agreement and shall be effective as of July 1, 2002. In the event of a conflict between the terms of this Side Letter and the Agreement, this Side Letter shall govern.

2. The Agreement supersedes and replaces the Comprehensive CD Disc License Agreement between U.S. Philips Corporation and Licensee having an effective date of January 4, 1999.

3. Licensee shall not be required to pay the initial fee set forth in Article 5.01, as this fee was previously paid by Licensee in the Comprehensive CD Disc License Agreement effective January 4, 1999.

4. Licensee shall not be required to make a report and payment pursuant to Article 5.12, as Licensee has reported the royalties accrued through July 1, 2002.

5. Licensee may pay the royalties due for the period July 1, 2002 through December 31, 2002 at the Compliance Rate, subject to submission of the first audit statement, which shall cover the period July 1, 2002 through September 30, 2003. If the audit statement reveals an under payment of more than 3%, Licensee shall not be entitled to the Compliance Rate for the period of such discrepancy.

6. Within 10 business days of execution of the Agreement, Licensee shall (i) pay Philips $85,098.25 for the 4,862,757 CD Discs sold by Licensee for the period July 1, 2002 through September 30, 2002 and (ii) report and pay at the Compliance Rate under Articles 5.02 and 5.03

Philips Electronics North America Corporation
580 White Plains Road Tarrytown, NY 10591-5190
Tel: (914) 332-0222 Fax: (914) 332-0615

**P 001782**

Page 2

September 30, 2002 and (ii) report and pay at the Compliance Rate under Articles 5.02 and 5.03 for all CD Discs sold by Licensee during the period October 1, 2002 through December 31, 2002.

7.  Those provisions of the Agreement (including, without limitation, Articles 1.13, 2.02 2.03) which state or purport to imply that a valid license is not granted unless Licensee has duly reported and paid all royalties due thereunder and/or is otherwise in full compliance with all the terms of the Agreement shall be read to mean that such license[s] shall not be valid only as to any Licensed Product on which a royalty has not been duly reported and paid (and not on any other Licensed Products) and that if Licensee thereafter duly reports and pays all royalties theretofore due, along with any interest due thereon, the license shall also be deemed valid and in full force and effect as to any Licensed Products which have been reported and paid on effective as of the time of such payment, even if such reports and payments were not timely made.

8.  The last two sentences of Article 6.01 shall be deleted and the following shall be added in replacement thereof:

"In the event that Licensee puts into use newly acquired manufacturing equipment (i.e., manufacturing equipment described in Exhibit C2 to this Agreement that was acquired by Licensee after July 1, 2002) which has been used by the seller or its controlled affiliates primarily for the manufacture of Licensed Products prior to the acquisition of that equipment by Licensee, then the Compliance Rates shall only apply to CD-Discs manufactured with such newly acquired equipment if such newly acquired manufacturing equipment either:

(a) is purchased from a company that was properly licensed by Philips for the manufacture of Licensed Products and, to Licensee's knowledge after due inquiry, was in material compliance with its obligations under its license agreement with Philips at the time of the acquisition of the newly acquired manufacturing equipment by Licensee; or

(b) is purchased from a company not licensed or not fully compliant with its license, but such company was **not** an Associated Company of Licensee during such prior non-compliant period or an Associated Company that controlled Licensee during the one year subsequent to the purchase of such equipment by Licensee from such company; or

(c) is purchased from a company not licensed or not fully compliant with its license, but Licensee and such company during such non-compliant period did **not** have the same chief executive officer, chief financial officer, or chief operating officer; or

(d) is purchased via a sale of assets of a company not licensed or not fully compliant with its license, which sale is authorized by a receiver, trustee or similar or other officer pursuant to any bankruptcy or insolvency law, and Licensee and such company do not have a relationship as set forth in subparts (b) and (c) of this Article 6.01.

In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rate shall apply to Licensed Products manufactured by Licensee with such acquired equipment instead of the Compliance Rates. "

**P 001783**



Page 3

9. In relation to Licensee's obligations under Article 5.04 of the Agreement, Philips agrees to notify Licensee for any late royalty reporting forms or royalty payments due by Licensee. Upon receipt of such notification by Licensee, Licensee shall have 10 business days to remedy each such default respectively. If Licensee does not remedy its default under the Agreement within 10 business days of receipt of Philips' notification, such failure brings back into effect Licensee's obligations under Article 5.04 and 5.12 of the Agreement for the period of non-compliance, with all penalties and interest determined from the original due date of the overdue royalty payment and/or Advance. If Licensee remedies such default within said 10 business days, the provisions of Article 5.04 shall not apply.

10. In Articles 2.02 and 2.03, the phrase "on reasonable, non-discriminatory conditions" shall be amended to "on reasonable, non-discriminatory conditions, comparable to those set forth herein".

11(a) In Articles 2.04, 2.05 and 2.06, Licensee acknowledges its obligations with respect to grant back of patent rights of Licensee, Licensee's Associated Companies as of the effective date of the Agreement, and any further Associated Companies which License or its current Associated Companies may acquire after the effective date of the Agreement. Licensee, however, has noticed its objection to Philips with respect to its ability to bind Associated Companies (other than subsidiaries) and persons or entities that hereafter become Associated Companies (other than subsidiaries) and disputes the enforceability of Articles 2.04, 2.05 and 2.06 in this respect. Philips and Licensee both recognize, however, the remote chance that any such Associated Companies (other than subsidiaries) and persons or entities that hereafter become Associated Companies (other than subsidiaries) will have any essential patents under which grant back licenses would be required by these Articles. Accordingly, for the sake of concluding this Agreement, Philips and Licensee each have agreed to reserve their respective positions as to the enforceability of these Articles 2.04, 2.05 and 2.06. Accordingly, no inference shall be given adverse to either party's position as a result of entering into the Agreement and this Side Letter. If a court of competent jurisdiction later finds that Articles 2.04, 2.05 and 2.06 are enforceable in full, and any of Licensee's Associated Companies (other than subsidiaries) and/or persons or entities which hereafter become Associated Companies (other than subsidiaries) refuse to grant such grant back licenses, Philips and Licensee agree that Philips' remedies shall include termination of the Agreement against Licensee and collection of any monies due there-under, but shall not include money damages for losses or injuries arising out of such failure to offer grant back licenses.

11.(b) For the avoidance of doubt, any grant backs which may be given as a result of the Articles 2.04, 2.05 and 2.06 shall terminate on the same day as the last to expire of the Licensed Patents for the option selected by Licensee under Article 1.16.

12. In Article 3.02, the phrase "Licensee shall be notified in writing" is amended to "Philips shall notify Licensee in writing" and the phrase "shall be provided with relevant information" is amended to "shall provide Licensee with relevant information".

13. Philips shall maintain strict confidentiality (in accordance with Article 9 as if Philips were the Licensee under such Article) with respect to any audit statement delivered to it under Article 5.05.

**P 001784**



Page 4

14. All payments to Philips under the Agreement shall be made in U.S. Dollars.

15. The words "5 years" in the third line of Article 5.10 of the Agreement shall be replaced with "3 years".

16. The last sentence of Article 8.02 of the Agreement is hereby amended by adding at the end thereof "; provided, however, that Licensee shall have no obligation to indemnify Philips, Sony or their respective Associated Companies against claims challenging the validity or enforcement of the Licensed Patents or other industrial and/or intellectual property rights licensed to Licensee hereunder".

17. The license for use of the Logo by Licensee on Licensed Products granted pursuant to Article 10.01 shall be without payment of royalties in addition to those specified in Article 5.

18. The Agreement may not be assigned by Licensee to an Associated Company, without prior written consent of Philips, which consent shall not be unreasonably withheld.

19. The words "any of the assets of Licensee" in Article 12.03 shall be replaced with "all or substantially all of the assets of Licensee".

20. With reference to Article 2.06, the grant of a license to any of Licensee's Associated Companies shall be without payment of an additional $25,000 initial fee pursuant to Article 5.01, so long as Licensee is in full compliance with the terms of the Agreement and this side letter.

21. The fifth paragraph of Article 5.02 shall be amended as follows: "A Licensed Product shall be considered sold when invoiced or, if not invoiced by Licensee, when delivered (i) to a party other than Licensee or an Associated Company of Licensee or (ii) to an Associated Company of Licensee not engaged in the warehousing or distribution of Licensed Product. For the avoidance of doubt, Licensed Product delivered to an Associated Company of Licensee for internal use by such Associated Company shall be considered "sold" upon delivery. Licensed Product delivered to an Associated Company engaged in warehousing or distribution of Licensed Product shall be considered "sold" when invoiced to a third party or delivered to a third party. Philips' right of audit under Article 5.10 shall extend to any such Associated Company of Licensee engaged in the distribution or warehousing of Licensed Product."

22. Philips and Licensee agree to keep the terms of this Side Letter confidential and shall not disclose it to third parties, except as may be necessary by either Philips or Licensee to enforce its rights hereunder or to comply with a requirement of a competent court or governmental body.

Continued ....



Page 5

If the above properly reflects our mutual understanding and agreement, please indicate so by signing both copies of this Side Letter and returning these to us. Upon receipt thereof we will arrange for countersignature on our part.

Yours sincerely,

KONINKLIJKE PHILIPS ELECTRONICS N.V.

Name:    H. Sakkers
Title:    by proxy
Date:

Read and Agreed:

ADVANCED DUPLICATION SERVICES, LLC

Name:
Title:
Date:

**P 001786**

# Exhibit D

RECEIVED MAY 0 8 2003

January 17, 2003

Advanced Duplication Services, LLC
2155 Niagara Lane N., Suite 120
Plymouth, MN  55447-4654

### Re:    Comprehensive CD Disc License Agreement – Workout Agreement

Dear Mr. Lagotte:

U.S. Philips Corporation ("*USPC*") and Advanced Duplication Services, LLC
("*Licensee*") hereby confirm the following agreement ("*Workout Agreement*") regarding the
Comprehensive CD Disc License Agreement ("*License Agreement*") having an effective date of
January 4, 1999.

1.    Licensee represents that it has produced and sold 4,137,914 CD Discs for the first
(1st) Quarter of 2002 and 4,894,833 CD Discs for the Second (2nd) Quarter of 2002 for which
Licensee owes $124,137.42 and $146,844.99, respectively, to USPC under the License
Agreement.  Licensee will pay USPC the amount of $270,982.41 in respect of the First (1st) and
Second (2nd) Quarters of 2002 ("*Past Due Amount*") in three equal installment payments
("*Payment*") of US $90,327.47, with each payment due on or before the 31st of December of
2003, 2004 and 2005 ("*Due Date*"), respectively.  Payment of the Past Due Amount shall
constitute payment in full for the 4,137,914 and the 4,894,833 CD Discs produced and sold by
Licensee for such First and Second Quarters of 2002.

2.    Each Payment shall be credited against the Past Due Amount.  The above
Payments and the payment referred to in Paragraph 3 below shall not be deemed to waive the
rights of USPC against the Licensee in respect of any other payments which may be due under
the License Agreement.

3.    USPC hereby waives any and all prior breaches of the License Agreement and
releases Licensee from any claim or liability arising out of such past breaches except that USPC
shall preserve its right to additional payments in accordance with the License Agreement if the
number of CD Discs produced and sold by Licensee for such prior periods have been
underreported by Licensee.

4.    If Licensee fails to make any of the payments for Past Due Amount as of the due
date specified and Licensee fails to cure such error within thirty (30) business days of written
notice by USPC then:

NY01/JABLJ/798243.1                                                              **P 001802**

(a)     the entire remaining unpaid balance of the Past Due Amount shall
        immediately become due and payable; and

(b)     USPC shall be entitled to an award of reasonable counsel fees and costs
        incurred in enforcing this Workout Agreement.

5.      Licensee and USPC shall treat the contents of this Workout Agreement as
confidential information and shall not disclose it to third parties, except as may be necessary by
either USPC or Licensee to enforce its rights hereunder in a governmental body or court of law.

Please acknowledge Advanced Duplication Services, LLC's approval and acceptance to
the foregoing by completing the signature block below.

Very truly yours,

Matthieu van Kaam
Vice President, USPC

Advanced Duplication Services, LLC

By: _____
Joan A. Lagotte, Jr.
Chairman & Chief Executive Officer

Date: 1-17-03

P 001803

# Exhibit E

# Exhibit A

# United States Patent [19]

**Kramer**

[11] **Patent Number:** **5,068,846**

[45] **Date of Patent:** **Nov. 26, 1991**

[54] **REFLECTIVE, OPTICAL RECORD CARRIER**

[75] Inventor: **Pieter Kramer,** Eindhoven, Netherlands

[73] Assignee: **U.S. Philips Corporation,** New York, N.Y.

[21] Appl. No.: **858,550**

[22] Filed: **Apr. 23, 1988**

### Related U.S. Application Data

[63] Continuation of Ser. No. 146,554, May 5, 1980, abandoned, which is a continuation of Ser. No. 949,919, Oct. 10, 1978, abandoned, which is a continuation of Ser. No. 772,914, Feb. 28, 1977, abandoned, which is a continuation of Ser. No. 344,867, Mar. 26, 1973, abandoned.

[30] **Foreign Application Priority Data**

Sep. 2, 1972 [NL]  Netherlands ........................ 7211999

[51] Int. Cl.⁵ ................................. G11B 7/24; H04N 5/85
[52] U.S. Cl. ................................. 369/275.1; 358/342; 369/275.5; 369/109
[58] Field of Search ................. 358/342; 365/113, 120; 369/275, 109, 93–94, 125, 107, 111, 275.1, 275.4, 275.5, 275

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,898,040 | 2/1933 | Eldred . |
| 1,967,882 | 7/1934 | Hammond . |
| 2,092,892 | 9/1937 | Runge . |
| 2,595,670 | 5/1952 | Goehner ............................. 369/125 |
| 3,174,140 | 3/1965 | Hagopian et al. . |
| 3,430,966 | 3/1969 | Gregg . |
| 3,518,442 | 6/1970 | Johnson . |
| 3,534,166 | 10/1970 | Korpel ................................ 358/129 |
| 3,626,386 | 12/1971 | Feinleib . |
| 3,636,526 | 1/1972 | Feinleib . |
| 3,665,425 | 5/1972 | Feinleib . |
| 3,665,483 | 5/1972 | Becker et al. .................... 369/275.5 |
| 3,696,344 | 10/1972 | Feinleib et al. . |
| 3,764,759 | 10/1973 | Herriger et al. . |
| 3,795,902 | 3/1974 | Russell . |
| 3,833,769 | 9/1974 | Compaan et al. ................. 369/44.24 |
| 3,838,401 | 9/1974 | Graf et al. ........................... 369/109 |
| 3,848,095 | 11/1974 | Wohlmut et al. . |
| 3,876,841 | 4/1975 | Kramer et al. .................... 369/44.24 |
| 3,876,842 | 4/1975 | Bouwhuis ........................... 369/44.37 |
| 3,999,009 | 12/1976 | Bouwhuis . |
| 4,010,317 | 3/1977 | Bouwhuis ........................... 369/44.24 |
| 4,041,530 | 8/1977 | Kramer et al. . |

#### FOREIGN PATENT DOCUMENTS

1038593  8/1966  United Kingdom .

#### OTHER PUBLICATIONS

"Long Play Video Disc with Optical Scanning", Funk Technik, No. 19, pp. 692–694, Oct. 1972.
"Philips TV Disk, Read by Light Beam, Could Shape Market", Electronics, Sep. 11, 1972, pp. 29–30.
Rice et al., An Experimental Television Recording and Playback System Using Photographic Discs, Journal of the SMPTE, vol. 79, No. 11, 11/70, pp. 997–1002.

*Primary Examiner*—Robert Weinhardt
*Attorney, Agent, or Firm*—Algy Tamoshunas; Leroy Eason

[57] **ABSTRACT**

A record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate provided with an optical structure in accordance with the information is described. By making the optical structure radiation-reflecting and the substrate radiation-transmitting, whilst the surface of the substrate more remote from the optical structure forms both the entrance face and the exit face for the read radiation, and by coating a surface of the optical structure more remote from the substrate with an additional layer, a simple record carrier is obtained which is well protected against dust particles and damage.

**7 Claims, 3 Drawing Sheets**





**Fig.1**



**Fig. 2**



Fig.3



Fig.4



*FIG. 5*

5,068,846

1

# REFLECTIVE, OPTICAL RECORD CARRIER

This application is a continuation of Ser. No. 146,554, filed May 5, 1980, which is a continuation of Ser. No. 949,919, filed Oct. 10, 1978, which is a continuation of Ser. No. 772,914, filed Feb. 28, 1977, which is a continuation of Ser. No. 344,867, filed Mar. 26, 1973, all such prior applications having been abandoned. This application is, further, a continuation-in-part of Ser. No. 229,285, filed Feb. 25, 1972, abandoned, which was continued as application Ser. No. 396,399, filed Sept. 12, 1973, abandoned, which was continued as application Ser. No. 618,215, filed Sept. 30, 1975, and issued as U.S. Pat. No. 4,041,530, dated Aug. 9, 1977.

The invention relates to a record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate on which an optical structure is provided in accordance with the information, which record carrier is intended to be read by means of optical radiation. The invention also relates to an apparatus for reading the record carrier.

Such a record carrier and read apparatus are known and are described, inter alia, in "Journal of the S.M.P.T.E." 79(November 1970) pages 997–1002. In the known record carrier the information is stored in analog form, for example in the form of areas which have different absorption coefficients and are arranged in tracks. This registration carrier is read in the transmission mode in which a read beam enters the carrier on the side of the optical structure and emerges from it on the opposite side. In its passage through the carrier the beam is modulated by the structure in accordance with the information stored in it. The modulated beam is converted into an electric signal by a radiation-sensitive detector.

Because a large amount of information is stored on the record carrier, the details of the optical structure are very small, if, for example, a video program having a duration of 45 minutes is stored on a disk record carrier having an outer diameter of 30 cm, the side of the details will be of the order of 1 μm. Reading such a fine structure is highly susceptible to dust particles, fluff and the like. If these small objects lie on the optical structure, they may cover a large number of adjacent tracks and details in these tracks, preventing the latter from being read. In addition there is a very real possibility that, for example when the record carrier is handled or placed in the read apparatus, scratches and the like are made in the optical structure. Because the record carrier is intended to be played back in non-ideal circumstances, for example in the living room, provisions must be made to render the optical structure more or less unsusceptible to dust and damage.

The aforementioned paper proposes to coat the optical structure with an additional transparent layer. This is done to ensure that dust particles screen off only part of the read beam focussed on the optical structure of the record carrier. However, this requires the protective layer to have a minimum thickness of the order of many times the depth of focus of the lens used, for example a thickness of 100 μm. Moreover, the protective layer must intimately engage the optical structure, preventing the occurrence of local air bubbles between the optical structure and the protective layer.

In the known apparatus it is attempted to maintain the focus of the objective which focusses the read beam on the optical structure by causing the objective to "fiont"

2

on an air cushion on the record carrier. This pre-supposes, however, that the thickness of the protective layer is constant throughout the entire surface, or at least that it contains no variations in excess of the depth of focus of the objective, which is of the order of 1 μm. Consequently the protective layer has to satisfy exacting requirements.

It is an object of the present invention to provide a record carrier in which the optical structure is protected against dust particles and damage without the use of a protective layer which is required to satisfy stringent requirements. For this purpose the record carrier according to the invention is characterized in that the optical structure is a radiation-reflecting structure and the carrier substrate is radiation-transmitting, the surface of the carrier substrate more remote from the optical structure forming both the entrance face and the exit face for the read radiation. In this record carrier the carrier substrate itself ensures that dust particles are sufficiently spaced away from the optical structure.

According to a further feature of a record carrier according to the invention, the surface of the optical structure more remote from the carrier substrate is provided with an additional layer. Because the optical structure is completely embedded between two layers, it cannot readily be damaged.

The optical structure is read in the reflection mode, which means that the read beam is modulated by reflection at the optical structure. The additional layer is not traversed by the read beam and is only required to protect the optical structure from damage. Hence this layer need not satisfy exacting requirements. It need not be radiation-transmissive and need not have a constant thickness throughout its surface. In addition, it need not accurately engage the optical structure. It may, for example, be a plate which is secured to the carrier substrate along the edge.

The reflecting optical structure may be in the form of co-planar radiation-reflecting regions and intermediate areas, the areas having a coefficient of reflection different from that of the regions. Preferably, however, the optical structure consists of regions and intermediate areas having equally high reflection coefficients but situated at different levels.

The record carrier according to the invention differs from the known record carrier not only in construction but also in the manner in which during reading the read beam is maintained in focus on the optical structure. The flatness of the carrier substrate also which is required when employing the known method (an objective supported by an air cushion) can only be achieved by painstaking polishing. This greatly increases the cost of the disk. Optical determination according to the invention of the deviation between the plane of the optical structure and the plane in which the beam of radiation is focussed enables the range of permissible thickness variations over the carrier substrate to be extended to, for example, 300 μm.

Embodiments of the invention will now be described, by way of example, with reference to the accompanying diagrammatic drawings, in which:

FIG. 1 is a plan view of a record carrier not coated with an additional layer,

FIG. 2 is a cross-sectional view of an embodiment of a record carrier according to the invention,

FIG. 3 is a known apparatus for reading the record carrier,

5,068,846

3

FIG. 4 is a cross-sectional view of a second embodiment of a record carrier according to the invention, and

FIG. 5 shows an arrangement for detecting focusing errors during reading of information from the record carrier.

FIG. 1 is a plan view of a circular record carrier. The carrier may contain a spiral structure comprising a plurality of quasi-concentric tracks. As an alternative, the tracks may be concentric, as is shown in FIG. 1. Only parts of two adjacent tracks denoted by 12 and 13 are shown. Each of the tracks contains, for example, a crenellated structure comprised of depressions which are spaced apart by intermediate areas or lands in the track direction, the dimensions of which are shown greatly exaggerated in FIG. 2, which is a tangential sectional view of a record carrier according to the invention. The spacings between, and the length of, the upper surfaces 3 and 5, 5 and 7, and so on of the merlons are different. Their heights 4, 6, and so on are equal to one another and, preferably, to about one quarter wavelength of the radiation used for reading. Instead of perpendicular leading and trailing edges the optical structure may alternatively have smooth transitions between the upper and lower surfaces.

The carrier substrate 1 transmits the radiation used for reading. The optical structure is provided on the upper surface of the disk, whilst the lower surface acts both as the entrance surface for the unmodulated beam and as the exit surface for the modulated beam. The faces of the optical structure have been made highly reflecting, for example in that after the structure has been pressed in the substrate a metal layer is deposited on it from vapour. The thickness of this metal layer is not of importance. A protective layer 10 is provided on top of the optical structure. The only purpose of this layer is to protect the optical structure of the record carrier against damage. Hence any layer which provides protection against rough handling of the carrier may be used. As FIG. 2 shows, the layer may be a thin disk which is spaced from the optical structure and is secured to the substrate along the edge only. In addition, a sheet of paper or a foil of a synthetic material provided with an adhesive on one surface may be stuck onto the optical structure. As an alternative, as is shown in FIG. 4, the layer, for example a sprayed layer of lacquer, may be provided on and between the merlons, in which case the thickness of the layer must be greater than the height of the merlons. Because the optical structure lies between the substrate 1 and the layer 10 it is fairly capable of withstanding rough handling.

A read beam (15) is modulated in phase by the crenellated structure shown in FIG. 2. As an alternative, the upper surface 9 of the substrate may be provided with a structure of radiation-reflecting regions and radiation-absorbing intermediate areas, causing the read beam to be modulated in amplitude.

When the disk record carrier shown in FIG. 1 is to be read, it is rotated at a speed of, for example, 1500 revolutions per minute by means of a driving spindle 24, as is shown in FIG. 3. In this Figure the record carrier is shown in radial section. A read beam 30 emitted by a source of radiation 25 is reflected to the record carrier by a half-silvered mirror 26. The beam passes through the carrier substrate 1 to be reflected at the optical structure (shown as tracks 2) on the upper surface of the disk. An objective 27 forms an image of the source on the optical structure, the size of this image being of the order of the smallest detail of the structure.

4

During rotation of the record carrier the read beam is modulated in time in accordance with the sequence of, for example, the merlons in a track. The modulated read beam 31 passes through the half-silvered mirror 26 to be intercepted by a radiation-sensitive detector 28. At the output of the detector an electric signal is produced which corresponds to the information stored in the record carrier. The detector 28 may be connected to known electronic means for converting the output signal of the detector into picture and sound.

The advantages of reading in reflection will be clear from FIG. 3. All the optical elements and the electronic processing devices are disposed on one side of the record carrier, permitting the carrier to be readily placed in the read apparatus. Moreover the elements may be incorporated so as to be well protected. Furthermore the number of optical elements may be reduced, because some elements are used twice. The reduced number of elements results in a reduced likelihood of relative oscillations.

Also, the record carrier may be read in a non-dustfree room, for example a living room, for dust particles deposited on the layer 10 have no effect, because the read beam does not pass through this layer. A dust particle on the lower surface 8 of the substrate may reduce the intensity of the radiation incident on the optical structure. However, a reduction in intensity is not highly inconvenient, because the information is recorded in digital form. A dust particle cannot entirely intercept the beam, because the beam has a comparatively large diameter in the plane of the dust particle. This is due to the fact that the substrate by nature has a certain thickness, inter alia because of the desired rigidity.

If the record carrier is to be suitable for manufacture by mass production methods, the flatness of the substrate should not have to satisfy exacting requirements. However, because the depth of focus of the objective 27 is of the order of 1 $\mu$m, variations in the thickness of the substrate may cause parts of the optical structure to become located outside the focussed light spot at the sites of these variations. These thickness variations, which cannot be compensated for by an objective floating on an aircushion, may cause the detector to receive not only radiation from the track part to be read, but also radiation from the surroundings of this part. As a result, the modulation depth of the output signal from the detector is reduced, while moreover, because not one track only but adjacent tracks are also illuminated, crosstalk may occur.

According to the invention the record carrier described may be used to advantage if during reading an optical focussing detection method is employed. For this purpose read apparatuses provided with focussing detection systems described in the patents identified below may be used. The use of the apparatuses for reading the record carrier according to the invention described in these patents means that the possibilities of the apparatuses described therein are particularly efficiently utilized.

One such arrangement is illustrated in FIG. 5 wherein a screen 34 is disposed in the path of the reflected beam 31 at a position such that the detectors 35′ and 35″ receive equal amounts of radiation when the beam is properly focused on the reflective optical structure. If, on the other hand, the plane of the optical structure shifts from the desired position, the screen will intercept the rays which travel to one of the detectors

5,068,846

so that said one detector will receive less radiation than the other. The amount and direction that the plane of the reflective optical structure deviates from the desired position can thus be determined by comparison of the output signals from the detectors 35' and 35''.

An optical determination of the deviation between the plane of the optical structure and the plane in which the read beam is focussed may be effected by imaging a grating constituted by adjacent tracks of the optical structure on two physical gratings spaced from the record carrier by different distances. The difference between the output signals of the detectors disposed behind the gratings indicates the magnitude and the direction of any deviation. A read apparatus including such focussing detection is described in U.S. Pat. No. 3,833,769.

A second possibility is offered by the apparatus described in U.S. Pat. No. 4,010,317 in which two detectors are arranged side by side, viewed in the direction of length of the track. The detectors intercept two different parts of the modulated beam.

As an alternative, the deviation between the plane of the optical structure and the plane in which the read beam is focussed may be detected without using the details in the optical structure, in contradistinction to the two aforementioned apparatuses. In such a method the optical structure is used only as a reflecting face, as is described in U.S. Pat. No. 3,876,841 and U.S. Pat. No. 3,876,842. By means of, inter alia, this face an image of an object is formed, the location of this image being determined by the location of the plane of the reflecting optical structure.

FIG. 4 shows a second embodiment of a record carrier according to the invention. Two substrates 1 and 1' which each have an optical structure on one surface 9 and 9' respectively are combined with an intermediate layer 10 to form an integral unit. Such a record carrier may be manufactured by methods known from the technology of disk-shaped sound records. The structures on the surfaces 9 and 9' are read by means of beams in opposite directions. In this embodiment the layer 10 is only required to separate the optical structures and need not protect them against external influences.

In the record carrier shown in FIG. 4 the two halves of one program may be stored in the two optical structures.

The record carrier shown in FIG. 4 is eminently suitable to realize a further inventional idea. According to this idea information about the same colored pictures is stored in different color codes in two optical structures of one record carrier. In one of these optical structures the program may be recorded, for example, according to the PAL-standard and in the other optical structure according to the Secam-standard or the NTSC-standard. The advantage is that the same information on one record carrier may be used in a large geographic area in spite of the fact that different apparatuses are used for rendering pictures and sound visible and audible respectively.

What is claimed is:

1. A record carrier containing information which is readable by a beam of radiation, said record carrier comprising a disc-shaped, radiation-transmitting substrate having a pair of planar surfaces on opposite sides thereof, a non-transmissive, radiation reflecting optical structure on one of said planar surfaces of said substrate, said optical structure comprising a plurality of adjacent, circular tracks extending about the center of said sub-

strate and defining turns of a spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions in said one surface of said substrate, said depressions being spaced apart in the track direction by intermediate areas, and a reflective layer extending over said intermediate areas and said depressions so that upon illumination by a convergent beam of radiation which is projected on and enters through the other of said planar surfaces and which passes through said substrate and is focussed on said optical structure to a spot of a size of the order of the smallest detail of said optical structure, the radiation is modulated by said depressions and intermediate areas in accordance with the sequence thereof and the modulated radiation is reflected by said reflective layer towards said other surface and exists through said other planar surface, said substrate defining a substantially rigid support for said optical structure and having a thickness such that in the plane of said other surface, which forms the entrance and exit faces for the radiation, the diameter of the beam is sufficiently larger than the diameter of said spot so that dust particles, scratches and the like on said other surface, do not interfere with readout of information by the convergent beam focussed to said spot on said optical structure, and an additional layer secured to the side of said substrate remote from said other surface, said optical structure being disposed between said substrate and said additional layer so that it is protected from damage during handling.

2. The record carrier according to claim 1 wherein said depressions are pressed into said one surface of said substrate and said reflective layer is metallic and is deposited on said one surface.

3. The record carrier according to claim 1 or 2 wherein the thickness of said additional layer is substantially smaller than the thickness of said substrate.

4. The record carrier according to claim 2 wherein said reflective, metallic layer is deposited on said one surface from vapour.

5. The record carrier according to claim 4 wherein said additional layer is a layer of lacquer sprayed on said optical structure.

6. An apparatus for reading information stored on a record carrier having a disk-shaped radiation transmitting substrate with a pair of parallel, planar surfaces on opposite sides thereof and a non-transmissive, radiation reflecting optical structure disposed on one of said planar surfaces, said optical structure comprising a plurality of adjacent, circular tracks extending about the center of the substrate and defining turns of a spiral or concentric circles spaced from each other in the radial direction, each circular track having a plurality of depressions spaced apart by intermediate areas in the track direction, said apparatus comprising means for supporting the record carrier for rotation about the center of the substrate in a plane parallel to the plane of said one surface, means positioned on the side of said substrate remote from said optical structure for producing a beam of radiation which is projected onto the other surface of said substrate so that the radiation passes through said substrate and is incident on said reflective optical structure, an objective system for focusing said beam to a spot on said optical structure so that the radiation is modulated by said optical structure in accordance with information stored thereby and the modulated radiation is reflected by said optical structure back through said other surface and passes through said objective system, said substrate having a thickness such that in the plane

5,068,846

| 7 | 8 |

of said other surface the diameter of the beam is suffi-
ciently larger than the diameter of said spot so that dust
particles, scratches and the like on said other surface do
not interfere with readout of information by the beam
focussed to said spot on said optical structure, radiation-
sensitive means for converting the modulated radiation
into an electrical signal, said radiation sensitive means
being disposed in the path of the modulated radiation
reflected by the optical structure, and means for deriv-
ing from the radiation a signal indicative of a deviation
of the plane of the optical structure from the plane at
which the radiation is focused by said objective system
for correcting the focusing.

7. A record carrier containing information which is
readable by a beam of radiation, said record carrier
comprising a pair of disc-shaped, radiation-transmitting
substrates each having a pair of planar surfaces on oppo-
site sides thereof, a non-transmissive, radiation reflect-
ing optical structure on one of said planar surfaces of
each substrate, said optical structures each comprising a
plurality of adjacent, circular tracks extending about
the center of said substrate and defining turns of spiral
or concentric circles spaced from each other in the
radial direction, each circular track having a plurality of
depressions which are spaced apart in the track direc-

tion by intermediate areas, said substrates being dis-
posed in a superposed relationship with said optical
structures being adjacent each other so that upon illumi-
nation of said one optical structure by a beam of radia-
tion which is projected on and enters through the other
of said planar surfaces of the associated substrate and
which passes through said associated substrate and is
focussed on said one optical structure to a spot of a size
of the order of the smallest detail of the optical struc-
ture, the radiation is modulated by said depressions and
intermediate areas in accordance with the sequence
thereof and the modulated radiation is reflected by said
one optical structure towards and exits through said
other planar surface of said associated substrate, each
substrate defining a substantially rigid support for the
respective optical structure and having a thickness such
that in the plane of said other surface, which forms the
entrance and exit faces for the radiation, the diameter of
the beam is sufficiently larger than the diameter of said
spot so that dust particles, scratches and the like on said
other surface, do not interfere with readout of informa-
tion by the convergent beam focussed to said spot on
said optical structure.

*  *  *  *  *

# Exhibit B

1

RECEIVED MAY 0 8 2003

## CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this __1st__ day of __July____, 2002 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

LLC
ADVANCED DUPLICATION SERVICES, ~~INC.~~, having its registered office in [2155 Niagara Lane North, Suite 120, Plymouth, MN 55447 (hereinafter referred to as "Licensee")

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation of Japan ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System together are referred to as "the CD Systems");

WHEREAS, Philips and Sony own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as such patents relating to the CD Systems which are jointly owned by Philips and Sony, while Philips and Sony each retain the right also to license their respective patents relating to the CD Systems separately, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs and wishes such CD-Discs to be compatible with CD-Players conforming to the Standard Specifications for any of the relevant CD Systems; and

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001753

2

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein; NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## Article 1 - Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.01    **"Disc"** shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.02    **"CD-Audio Disc"** shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined).

1.03    **"CD-Audio Maxi-Single"** shall mean a CD-Audio Disc which, in addition, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.04    **"CD-ROM Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-ROM Player (as hereinafter defined) and which conforms to the CD-ROM Standard Specifications (as hereinafter defined).

1.05    **"Enhanced Music CD Disc/CD Extra Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, a CD-ROM Player and which conforms to the CD-ROM Standard Specifications and an Enhanced Music CD Player (as hereinafter defined) which conforms to the Enhanced Music CD Standard Specifications (as hereinafter defined).

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc and the CD Extra Disc together are referred to as "CD-Discs".

1.06    **"CD-Audio Standard Specifications"** shall mean the specifications for the CD-Audio System, including the Subcode/Control and Display System, Channels R ..W, Chapter 5.8, The CD-TEXT mode, as made available, modified or extended from time to time.

1.07    **"CD-Audio Maxi-Single Standard Specifications"** shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                        November 2002

P 001754

3

1.08    **"CD-ROM Standard Specifications"** shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.09    **"Enhanced Music CD Standard Specifications"** shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time.

The CD-Audio, CD-Audio Maxi-Single, CD-ROM and Enhanced Music CD Standard Specifications together are referred to as the "CD Standard Specifications".

1.10    **"Player"** shall mean a playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.11    **"CD-Audio Player"** shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

1.12    **"CD-ROM Player"** shall mean a Player solely capable of reproducing information stored on a CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.13    **"Enhanced Music CD Player"** shall mean a Player solely capable of reproducing information stored on a CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.14    **"Combi-Player"** shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player together are referred to as the "CD-Players".

1.15    **"Licensed Product"** shall mean a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

1.16    **"Licensed Patents"** shall mean the patents listed in the relevant Exhibits as selected by Licensee pursuant to the Options below.

**Option A1**: Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                      November 2002

P 001755

4

**Option A2**: Licensee chooses the essential patents listed in Exhibit E1 and Exhibit E2, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-ROM Discs, which conform to the CD-ROM Standard Specifications.

**Option A3**: Licensee chooses the essential patents listed in Exhibit E1, Exhibit E2 and Exhibit E3, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs, which conform to the Enhanced Music CD Standard Specifications.

**Option A4**: Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information.

**Option A5**: Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs.

Option(s):      ✓ A1          o A2          ✓ A3          ✓ A4          o A5

(please tick any combination as appropriate)

Initial: _____

The term **"essential"** as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips will commission an independent patent expert to review the European, Japanese and US patents listed as essential in Exhibits E1, E2, E3 and E4 in order to confirm the essentiality of such patents. In the event that such independent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips shall delete such patent (as well as the equivalent national patents) from the relevant Exhibit and such patent will be put on the relevant Exhibit of non-essential patents. Any such finding and deletion however, shall not affect the obligation of Licensee to pay the royalty on each Licensed Product as specified in Article 5.02, provided that, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302          November 2002

P 001756

5

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of January 1, 1985), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of Licensed Products and which have a filing date or are entitled to a so-called priority date prior to either January 1, 1983 for CD-Audio Discs, January 1, 1985 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Exhibits hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents. Any patents as may be added as essential patents to any of the respective Exhibits hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of the Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon execution of this Agreement.

1.17    **"Associated Company"** shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.18    **"Territory"** shall mean the geographic area known as the United States of America, its territories and possessions.

## Article 2 – Grant of Rights

Subject to the conditions of this Agreement:

2.01    For the term of this Agreement, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents selected by Licensee pursuant to Article 1.16 to manufacture Licensed Products within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302          November 2002

P 001757

6

2.02    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee, upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire from third parties the free right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Article 2.02, additional royalties may have to be paid over and above the royalties specified in Article 5.02.

2.03    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, to manufacture CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players and to sell or otherwise dispose of such Players so manufactured in all countries of the world, under any and all present and future patents essential to the manufacture, sale or other disposal of such Players, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire the free right to grant licenses.

2.04    In consideration of the undertakings set forth in Articles 2.01, 2.02 and 2.03 and similar undertakings by third party licensees of Philips and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date (as hereinafter defined) Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16 and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which have made the same selection pursuant to Article 1.16 as Licensee and which in that respect accept or have accepted a similar undertaking as contained in this Article 2.04.

2.05    In addition, in consideration of the undertakings set forth in Articles 2.01, 2.02, 2.03 and 2.04 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning Players, non-

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                November 2002

P 001758

7

exclusive, non-transferable licenses on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of such CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such Players and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which accept or have accepted a similar undertaking as contained in this Article 2.05.

2.06    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

In consideration of Philips' undertaking as set out in the preceding paragraph, Licensee undertakes that all of its Associated Companies which have or may hereafter acquire patents essential to the manufacture, sale or other disposal of CD-Discs and which patents were first filed in any country of the world prior to the date of termination of this Agreement, shall make available licenses under such patents, on reasonable, non-discriminatory conditions comparable to those set forth herein to Philips, any of Philips' Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips in respect of CD-Discs.

2.07    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER/RECORDER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF RECORDING/PLAYBACK DEVICES DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR RECORDING/PLAYBACK DEVICES (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVI-CES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR PATENTS RELATING TO CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS, RECORDING/PLAYBACK DEVICES WITH ANY OTHER ITEMS, PRODUCTS, SYSTEMS, STRUCTURES, EQUIPMENT OR

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documents\advamced duplication services-cd disc-joint-usa-121302          November 2002

**P 001759**

8

SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED
PRODUCT AND A PLAYER OR RECORDING/PLAYBACK DEVICE.

### Article 3 - Standard Specifications,
### Technical Information and Support

3.01    Upon receipt of the payment provided for in Article 5.01 and the payment provided for in
        Article 5.12, Philips shall make available to Licensee for use by Licensee in accordance with
        the provisions hereof, a copy of the then current version of the respective CD Standard
        Specifications, as correspond with the Licensed Patents selected by Licensee pursuant to
        Article 1.16, together with such other information and support as Philips considers necessary
        for the interpretation and/or correct application of the relevant CD Standard Specifications.

3.02    Licensee shall be notified in writing of any addition or modification to any of the relevant CD
        Standard Specifications and shall be provided with relevant information in connection
        therewith.

3.03    Philips and Licensee undertake to keep each other generally informed of developments or
        initiatives, which may have an impact on the relevant CD Standard Specifications.

### Article 4 - Have Made

4.01    The rights granted to Licensee pursuant to Article 2 and the right to use the information
        pursuant to Article 3, include the right for Licensee to have Licensed Products made for it by
        third party manufacturers, duly licensed by Philips under an agreement similar to this
        Agreement, provided that Licensee will properly identify such third party manufacturer in the
        royalty reporting forms to be submitted to Philips hereunder, together with the quantities of
        Licensed Products so purchased.

        Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any
        third party not licensed by Philips, where such purchase or sale would constitute an act of
        infringement of any of the Licensed Patents.

### Article 5 - Royalties, Reports and Payments

5.01    In consideration of the rights granted by Philips and the information to be provided by
        Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable,
        non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.02    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee
        agrees to pay to Philips a royalty on each Licensed Product sold by Licensee, in which any
        one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed
        Patent(s) is (are) used in the country of manufacture, sale or other disposal.

        These royalties shall amount to:

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

**P 001760**

9

(a)  US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)  US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)  US$ 0.027 (two point seven US Dollar cents) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)  US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)  US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm; and

(f)  US$ 0.045 (four and a half US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)  US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Standard Rates".

With respect to Licensed Products sold after July 1, 2002, provided that Licensee is in full compliance with its obligations under this Agreement and subject to Article 6.01, the royalties shall amount to:

(a)  US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)  US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)  US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)  US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)  US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm;

(f)  US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)  US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations hereunder, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the moment of such non-compliance until such moment that Licensee's non-compliance will have been remedied in full.

A Licensed Product shall be considered sold when invoiced or, if not invoiced, when delivered to a party other than Licensee.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302          November 2002

P 001761

10

No royalties shall be payable on Licensed Products purchased by Licensee on a "have made" basis in accordance with Article 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such Licensed Products.

For the avoidance of doubt, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist.

5.03    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Exhibit C3 (Royalty Reporting Form) signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee, specified per individual type of CD-Disc;

(2)    the quantities of CD-Discs purchased from other licensed manufacturers in accordance with the provisions of Article 4, specified per individual type of CD-Disc;

(3)    on a per-country basis, specifying for each individual type of CD-Disc:

(a)    the quantities of CD-Discs sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)    the quantities of CD-Discs sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period, in such US Dollars.

5.04    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Article 5.03, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder.

P 001762

11

Licensee acknowledges and agrees that any Advance shall not be due by way of penalty but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time; the payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form; the payment by Licensee of an Advance shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.05    Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be public certified auditors, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet Philips' requirements as specified in the Audit Guidelines attached hereto as Exhibit C1 and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement shall be verified by Philips by means of a work paper review, conducted by one of the public certified auditors selected by Philips. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Article 5.10.

5.06    Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of Licensed Products in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Article 5.02 and Article 5.12, shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Article 5.06 shall be without prejudice to the provisions of Article 12.06.

5.07    Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.08    All payments to Philips under this Agreement shall be made by transfer in such currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.09    All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001763

12

a country imposes any income taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Article 5 may be verified, Licensee shall keep complete and accurate books and records and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each Licensed Product.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a public certified auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Article 5.03 and Article 5.05, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Article 5.10 shall survive termination or expiration of this Agreement.

5.11    Without prejudice to the provisions of Article 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12    As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of CD-Discs manufactured and sold or otherwise disposed of by Licensee before the Effective Date of this Agreement in accordance with the provisions of Article 5.03. Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties on such CD-Discs, calculated by applying the royalty rates of (a) US$ 0.03 for each CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, (b) US$ 0.02 for each CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, (c) US$ 0.027 for each CD-Audio Maxi-Single and (d) US$ 0.045 or US$ 0.048 for each CD Extra Disc, depending on the selection made by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement. The above rates are effective for CD-Discs sold after June 30, 2000. CD-Audio Discs and CD-ROM Discs having an outer diameter greater than 90 mm sold prior to July 1, 1998 are subject to a royalty rate of US$

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001764

13

0.045; if sold after June 30, 1998 and prior to July 1, 1999 such Discs are subject to a royalty rate of US$ 0.04; and if sold after June 30, 1999 and prior to July 1, 2000 such Discs are subject to a royalty rate of US$ 0.035. The royalty statement shall similarly be subject to Philips' right of audit as set out in Article 5.10. Within 45 days following the execution of this Agreement, Licensee shall submit to Philips an audit statement by its external auditors, who shall be public certified auditors, confirming that this royalty statement is true, complete and accurate in every respect.

## Article 6 – Manufacturing Equipment Identification System

6.01    Upon signing of the Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment used for the manufacture of Licensed Products. Further, upon any acquisition, transfer or disposal of manufacturing equipment used for the manufacture of Licensed Products, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Article 5.05. Such overview shall be in the form as attached hereto as Exhibit C2 (Manufacturing Equipment List), signed by a duly authorized officer on behalf of Licensee. The Compliance Rates referred to in Article 5.02 shall only apply to Licensed Products manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting Philips' requirements as set out in the Audit Guidelines, in accordance with the provisions in Article 5.05. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used for the manufacture of Licensed Products prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee can demonstrate to Philips' full satisfaction, that the newly acquired manufacturing equipment originates from and has been used by a company which was properly licensed by Philips for the manufacture of Licensed Products and in full compliance with its obligations under its license agreement at the time of the acquisition of the newly acquired manufacturing equipment by Licensee. In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rates shall apply to Licensee's manufacture and sale of Licensed Products instead of the Compliance Rates.

## Article 7 - Most Favourable Conditions

7.01    In the event that licenses under the patents referred to in Article 2 are granted by Philips for Licensed Products to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302                     November 2002

**P 001765**

15

9.03    The obligations concerning confidentiality contained in Article 9.01 and Article 9.02 shall survive termination of this Agreement

9.04    Philips shall, during the term of this Agreement as specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party any confidential information obtained by Philips in connection with Article 5.03 and/or Article 5.05, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections a, b and/or c of Article 9.02.

## Article 10 - Logo

10.01    For the term of this Agreement and subject to the full and timely performance and observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be entitled to use on the Licensed Products as well as in advertisements and sales literature with respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo") in accordance with the instructions laid down in the CD-Logo Guide which shall be made available to Licensee together with the Standard Specifications.

10.02    Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of the Logo does not infringe or will not cause infringement of any third party intellectual property rights.

## Article 11 – No Assignment

11.01    This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips.

## Article 12 - Term and Termination

12.01    This Agreement shall enter into force on the "Effective Date", being the date first written above. In the event that validation of this Agreement is required by the competent governmental authorities, the Effective Date shall be the date of such validation. This Agreement shall remain in force for a period of 10 years from the Effective Date unless terminated earlier in accordance with the provisions of this Article 12.

12.02    Without prejudice to the provisions of Article 12.03 through 12.06, each party may terminate this Agreement at any time by means of written notice to the other party in the event that the other party fails to perform any obligation under this Agreement and such failure is not remedied within 30 days after receipt of a notice specifying the nature of such failure and

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001766

17

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips International B.V.
Intellectual Property & Standards - Legal Department
P.O. Box 220, Building WAH-2
5600 AE Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

U.S. Philips Corporation
580 White Plains Road
Tarrytown, New York 10591
Fax: +(914) 332-0615

or to such other address as may have been previously specified in writing by either party to
the other.

13.02   This Agreement sets forth the entire understanding and agreement between the parties as to
the subject matter hereof and supersedes and replaces all prior arrangements, discussions and
understandings between the parties relating thereto. Neither party shall be bound by any
obligation, warranty, waiver, release or representation except as expressly provided herein, or
as may subsequently be agreed in writing between the parties.

13.03   Nothing contained in this Agreement shall be construed:

(a)     as imposing on either party any obligation to instigate any suit or action for
infringement of any of the patents licensed hereunder or to defend any suit or action
brought by a third party which challenges or relates to the validity of any of such
patents. Licensee shall have no right to instigate any such suit or action for
infringement of any of the patents licensed by Philips hereunder, nor the right to
defend any such suit or action which challenges or relates to the validity of any such
patent licensed by Philips hereunder;

(b)     as imposing any obligation to file any patent application or to secure any patent or to
maintain any patent in force;

(c)     as conferring any license or right to copy or imitate the appearance and/or design of
any product of Philips, Sony or any of their Associated Companies;

(d)     as conferring any license to manufacture, sell or otherwise dispose of any product or
device other than a Licensed Product.

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&d\company documentss\advamced duplication services-cd disc-joint-usa-121302                    November 2002

P 001767

18

13.04    Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

13.05    Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by written notice to Licensee.

13.06    This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS N.V.

Name:  H. Sanders

Title:  by proxy

Date:_____

ADVANCED DUPLICATION SERVICES, INC. LLC

Name:_____

Title:_____

Date:_____

USA-CD-Audio-ROM-Extra-Disc/06-2002/2
s:\s&l\company documentss\advancced duplication services-cd disc-joint-usa-121302                    November 2002

P 001768

Exhibit E1 to the CD Disc Patent License Agreement
CD-Disc/CD-Audio and CD-Maxi Single part

| COUNTRY | | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AR | | Q 080007 - | 285958 | 02-Jul-81 | | 250649 | 06-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | | Q 080009 - | 285400 | 20-May-81 | | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | | Q 080007 - | 81-A3107 | 14-Jul-81 | | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | | Q 080009 - | 81-A2215 | 18-May-81 | 395794 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | | Q 080007 - | 98-00033 | 21-Apr-98 | | | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | | P15.688 - | 399564 | 26-Mar-82 | | 1207443 | 08-Jul-03 | Optical readable carriers |
| CA | | Q 080007 - | 381362 | 08-Jul-81 | | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| ES | | Q 080007 A | 514656 | 02-Aug-82 | | 514656 | 20-Jun-03 | Block N to K compact disc modulation code (EFM) |
| ES | | Q 080009 - | 502320 | 19-May-81 | | 502320 | 09-Sep-02 | Error correctable data transmission method |
| US | | N 006493 D | 06/858550 | 23-Apr-86 | | 5068846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | | P15.688 - | 890316 | 30-Mar-82 | | 5305301 | 19-Apr-11 | Optical readable carriers |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list.*

*Page 1 of 1*                    *Prindate        21 June 2002*

P 001769

Exhibit E2 to the CD Disc Patent License Agreement

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | P18.816 | 84901011.1 | 02-Mar-84 | | 52866 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AT | Q 083025 | 84-A2769 | 29-Aug-84 | | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | E49835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-42040 | 22-Mar-85 | | 584983 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | PI8501277.7 | 21-Mar-85 | | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | PI8700846 | 23-Feb-07 | Real-time format switching |
| CA | P | | | | 1235812 | 26-Apr-05 | Disc playback apparatus |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 1280208 | 12-Feb-08 | Real-time format switching |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 1010517 | 21-Feb-07 | Real-time format switching |
| CZ | Q 084008 | 85-PV2009 | 21-Mar-85 | | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | P | 84305176.4 | 30-Jul-84 | | P3476289.2 | 30-Jul-04 | Disc playback apparatus |
| DE | P18.816 | 84901011.1 | 02-Mar-84 | | P3482231.7 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 3701763 | 22-Jan-07 | Real-time format switching |
| FR | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| FR | P18.816 | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 2561639 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 2594996 | 20-Feb-07 | Real-time format switching |
| GB | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| GB | P18.816 | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-I discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM/XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

P 001770

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | Q 084008 | 8507248 | 20-Mar-85 | | 2156555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 | 8704011 | 20-Feb-87 | | 2187008 | 20-Feb-07 | Real-time format switching |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | NOT GIVEN | 20-Mar-85 | | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 086003 | 87-A19447 | 20-Feb-87 | | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | P | | | | 1912619 | 30-Jul-03 | Disc playback apparatus |
| JP | P18.816 | 35459/83 | 04-Mar-83 | | 19126134 | 04-Mar-03 | Method and apparatus for recording digitized infor |
| JP | Q 083025 | 83-161514 | 01-Sep-83 | 60-52961 | | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | 84-57595 | 24-Mar-84 | 60-201575 | | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 | 87-38997 | 23-Feb-87 | 87-217468 | | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 | 85-1914 | 23-Mar-85 | 94-8742 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 95-7946 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| NL | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8500450 | 192151 | 24-Feb-06 | Real-time format switching |
| SE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 | 9290553.8 | 20-Mar-85 | | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 | 84-PV6607 | 03-Sep-84 | | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 | 85-PV2009 | 21-Mar-85 | | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 | 76100969 | 25-Feb-87 | | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 | 3874714 | 22-Mar-85 | | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | P18.816 | 666237 | 02-Mar-84 | | 4707818 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| US | Q 084008 R | 07/379627 | 13-Jul-89 | | RE33462 | 22-Nov-05 | CD-ROM Error Correction System A |
| US | Q 086003 | 07/018163 | 24-Feb-87 | | 4802169 | 24-Feb-07 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086003 and P 186/6 are essential to CD-ROM/XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Page 2 of 2                                                                                    Primleire        27 September 2002

Exhibit E3 to the CD-Disc Patent License Agreement
CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | S85P0059 | 85900170.3 | 30-Nov-84 | - | E76996 | 30-Nov-04 | Disc recording medium |
| AT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| AT | S95P0806 | - | | | E206238 | | Recording medium having a first management area |
| AU | N 013661 | 92-13942 | 31-Mar-92 | 92-13942 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S85P0059 | 37412/85 | 30-Nov-84 | 3741285 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S94P5088 | 34358/95 | 19-Oct-95 | - | 703045 | 19-Oct-15 | Mass produced multisessions disc |
| AU | S95P0806 | 40388/95 | 13-Dec-95 | 692961 | 692961 | 13-Dec-15 | Recording medium having a first management area |
| AU | S96P0005 | 22565/00 | 24-Mar-00 | - | 728279 | 23-Jan-16 | Multi-session disc having disc type code area loca |
| BR | S95P0806 | 9505999 | 21-Dec-95 | - | - | | Recording medium having a first management area |
| CA | N 013661 | 2064511 | 31-Mar-92 | - | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | S95P0806 | 2164801 | 08-Dec-95 | - | - | | Recording medium having a first management area |
| CH | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| CH | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| CN | S94P5088 | 95116095.6 | 19-Oct-95 | CN1113131A | - | | Mass produced multisessions disc |
| CN | S95P0806 | 95121699 | 22-Dec-95 | CN1135533A | - | | Recording medium having a first management area |
| CN | S96P0005 | 96104382 | 30-Jan-96 | CN1137675A | - | | Multi-session disc having disc type code area loca |
| CZ | N 013685 | 92-PV970 | 01-Apr-92 | - | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 69228116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S85P0059 | 85900170.3 | 30-Nov-84 | - | P3485761.3 | 30-Nov-04 | Disc recording medium |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | oduced multisessions disc for playback on audio-on |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| DE | S95P0806 | 95119580.9 | 12-Dec-95 | DE69522917T | 69522917 | 12-Dec-15 | Recording medium having a first management area |
| ES | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 2118784 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ES | S95P0806 | 95119580.9 | 12-Dec-95 | ES2183468T | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S85P0059 | 85900170.3 | 30-Nov-84 | 708445 | 165320 | 30-Nov-04 | Disc recording medium |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate    21 June 2002

P 001772

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| FR | S94P5088 | 95307463.0 | 19-Oct-95 | - | - | - | Mass produced multisessions disc |
| FR | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| GB | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 | 859001170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| GB | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| GB | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| HK | S85P0059 | - | - | - | 08151/1995 | - | Disc recording medium |
| HK | S94P5088 | 981037767 | 04-May-98 | - | - | - | Mass produced multisessions disc |
| HU | N 013685 | P9201055 | 30-Mar-92 | - | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S95P0806 | P-952737 | 19-Dec-95 | - | - | - | Recording medium having a first management area |
| ID | S96P0005 | P-950210 | 30-Jan-96 | 012.685A | ID00004712 | 30-Jan-16 | Multi-session disc having disc type code area loca |
| IN | S95P0806 | 2287/DEL/95 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| IN | S96P0005 | 0188/DEL/96 | 29-Jan-96 | - | - | - | Multi-session disc having disc type code area loca |
| IT | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| IT | S95P0806 | 95119580.9 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| IT | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| JP | 84000899 | 58226598 | 30-Nov-83 | 60-119670 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 | 59-057593 | 24-Mar-84 | 60-201575 | 2085642 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060063 | 07311437 | 29-Nov-95 | 08-227577 | - | - | Recording medium having a first management area |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013661 | 92-81010 | 02-Apr-92 | 93-89896 | 3293851 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013685 | 82-79901 | 01-Apr-92 | 93-94675 | - | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S85P0059 | 59-057596 | 24-Mar-84 | 60-201576 | 1981180 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | S94P5088 | 07-270200 | 18-Oct-95 | - | - | - | Mass produced multisessions disc |

All corresponding patent applications, patents, divisions, continuations and reissue based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list
Page 2 of 4      Printdate     21 June 2002

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| JP | S95P0806 | 06320107 | 22-Dec-94 | | - | | Recording medium having a first management area |
| JP | S96P005 | 07013211 | 30-Jan-95 | 08-203210 | - | | Multi-session disc having disc type code area loca |
| KR | N 013661 | 92-5313 | 31-Mar-92 | 92-20420 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013685 | 92-5314 | 31-Mar-92 | 92-20418 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 | 85-700146 | 29-Jul-85 | 85-00175 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 | 92-702698 | 30-Oct-92 | - | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S94P5088 | 95-35873 | 18-Oct-95 | - | - | | Mass produced multisessions disc |
| KR | S95P0806 | 95-72133 | 21-Dec-95 | 96-25644 | - | | Recording medium having a first management area |
| KR | S96P0005 | 96-02552 | 30-Jan-96 | 96-30119 | - | | Multi-session disc having disc type code area loca |
| MX | S95P0806 | 955172 | 11-Dec-95 | - | 189100 | 11-Dec-05 | Recording medium having a first management area |
| MY | S95P0806 | PI9503773 | 07-Dec-95 | - | - | | Recording medium having a first management area |
| MY | S96P0005 | PI9600317 | 29-Jan-96 | - | - | | Multi-session disc having disc type code area loca |
| NL | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| NL | S95P0806 | 95119580.9 | 12-Dec-95 | - | - | | Recording medium having a first management area |
| NL | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | | Multi-session disc having disc type code area loca |
| PL | S95P0806 | P312001 | 21-Dec-95 | - | 179800 | 21-Dec-15 | Recording medium having a first management area |
| PL | S95P0806 | P338168 | 28-Feb-00 | - | 179603 | 21-Dec-15 | Recording medium having a first management area |
| RU | N 013661 | 5011395 | 01-Apr-92 | - | 2072566 | 01-Apr-12 | Recording of content information in Lead-Out |
| RU | S95P0806 | 95122380 | 21-Dec-95 | - | 2162252 | 21-Dec-15 | Recording medium having a first management area |
| RU | S95P0806 | 99128046 | 30-Dec-99 | - | - | | Recording medium having a first management area |
| RU | S95P0806 | 99104165 | 03-Jan-99 | - | - | | Recording medium having a first management area |
| RU | S95P0806 | 99103927 | 03-Jan-99 | - | - | | Recording medium having a first management area |
| SE | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| SE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| SG | S95P0806 | 9502053 | 07-Dec-95 | - | 38892 | 07-Dec-15 | Recording medium having a first management area |
| SG | S96P0005 | 9600515 | 27-Jan-96 | - | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013685 | 92-PV0970 | 01-Apr-92 | - | 282293 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TH | S95P0806 | 029364 | 20-Dec-95 | 22587 | - | | Recording medium having a first management area |
| TR | S95P0806 | 053122 | 21-Dec-95 | 960597 | - | | Recording medium having a first management area |

*All corresponding patent applications, patents, divisions, patents, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded*
*as an integral part of this list*

*Printdate        21 June 2002*

P 001774

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| TW | N 013661 . | 80109966 | 19-Dec-91 | UNKNOWN 57337 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| TW | N 013685 . | 80109963 | 19-Dec-91 | 59397 | 59397 | 19-Dec-11 | CD-ROM XA Multi-session WO |
| TW | S94P5088 . | 83109977 | 28-Oct-94 | . | 72376 | 27-Oct-14 | Mass produced multisessions disc |
| TW | S95P0806 . | 84113465 | 16-Dec-95 | . | 86403 | 15-Dec-15 | Recording medium having a first management area |
| UA | N 013661 . | 93002573 | 15-Nov-93 | . | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 013661 V | 07/900874 | 18-Jun-92 | . | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |
| US | N 013685 A | 08/180002 | 11-Jan-94 | . | 5390159 | 14-Feb-12 | CD-ROM XA Multi-session WO |
| US | N 013685 B | 08/328307 | 24-Oct-94 | . | 5878019 | 02-Mar-16 | CD-ROM XA Multi-session WO |
| US | N 013685 V | 08/371644 | 12-Jan-95 | . | 5884786 | 04-Nov-14 | CD-ROM XA Multi-session WO |
| US | N 013709 D | 08/707845 | 09-Sep-96 | . | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S85P0059 . | 266207 | 27-Oct-88 | . | 4893193 | 09-Jan-07 | Disc recording medium |
| US | S94P5088 . | 324406 | 20-Oct-94 | . | - | | Mass produced multisessions disc |
| US | S94P5088 . | 471982 | 06-Jun-95 | . | 5661715 | 20-Oct-14 | Mass produced multisessions disc |
| US | S95P0806 . | 572528 | 14-Dec-95 | . | 5754521 | 14-Dec-15 | Recording medium having a first management area |
| US | S96P0005 . | 592962 | 29-Jan-96 | . | 5778257 | 29-Jan-16 | Multi-session disc having disc type code area loca |
| VN | S95P0806 . | S-1614/95T2 | 26-Jun-00 | . | - | | Recording medium having a first management area |
| VN | S95P0806 . | S-1614/95 | 21-Dec-95 | . | - | | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 4 of 4                                                                                                                  Printdate        21 June 2002

P 001775

Exhibit E4 to the CD Disc Patent License Agreement
CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104337 | 13-Sep-96 | | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| AT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 65625/96 | 13-Sep-96 | . | 714409 | 13-Sep-16 | Reproducing medium having text information recorde |
| AU | D 088009 | 89-28557 | 18-Jan-89 | 639411 | 639411 | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603829 | 20-Sep-96 | . | - | 22-Sep-16 | Reproducing medium having text information recorde |
| CA | D 088009 | 588304 | 16-Jan-89 | . | 1322593 | 28-Sep-10 | Repeated transfer of subcode data |
| CH | 95069128 | 9200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | - | 22-Sep-16 | Reproducing medium having text information recorde |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| CN | D 088009 | 89101069.6 | 19-Jan-89 | 1035577-A | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009 A | 92102717.6 | 19-Jan-89 | 1066673-A | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 284768 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | 95063039 | 9611937.1 | 03-Dec-96 | 783167 | P69612472.6 | 03-Dec-16 | Disc Reproducing apparatus |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| DE | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | - | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 68927063.1 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 9611937.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| FR | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | - | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 9611937.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | - | 31-Oct-16 | Recording medium and its reproducing apparatus |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

P 001776

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98106421.9 | 16-Jan-89 | - | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-96 | - | - | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963566 | 02-Dec-96 | - | 655 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962647 | 19-Sep-96 | - | - | 19-Nov-16 | Reproducing medium having text information records |
| ID | 95085448 | P963188 | 04-Nov-96 | - | 5137 | 04-Nov-16 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | 014759-A | - | 12-Sep-10 | Transferring information via the lead-in of CD |
| IN | 95069128 | 2023/DEL/96 | 16-Sep-96 | - | - | 16-Sep-11 | Reproducing medium having text information records |
| IN | N 015474 | 96-1617 | 11-Sep-96 | - | - | 11-Sep-10 | Transferring information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | - | 26-Aug-16 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244959 | 22-Sep-95 | 09-091880 | - | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310080 | 02-Nov-95 | 09-128868 | - | 22-Sep-15 | Reproducing medium having text information records |
| JP | 95100948 | 08-242659 | 26-Aug-96 | 10-64245 | - | 02-Nov-15 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7176 | 3092924 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-505270 | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | 95063039 | 96-62692 | 07-Dec-96 | 97-50685 | - | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | - | 23-Sep-16 | Reproducing medium having text information records |
| KR | 95085448 | 96-51644 | 02-Nov-96 | 98-29706 | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | - | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | - | 196099 | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | 95069128 | 964179 | 19-Sep-96 | - | - | 19-Sep-16 | Reproducing medium and its reproducing apparatus |
| MX | N 015474 | 973530 | 09-Sep-96 | - | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 95063039 | 9605148 | 07-Dec-96 | - | - | | Disc Reproducing apparatus |
| MY | 95069128 | 9603888 | 20-Sep-96 | - | - | | Reproducing medium having text information records |
| MY | N 015474 | PI9603765 | 13-Sep-96 | - | - | | Transferring information via the lead-in of CD |
| NL | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information records |
| PH | 95069128 | 54335 | 19-Sep-96 | 54335 | - | | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3                                                                                                    Printdate          21 June 2002

P 001777

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| PT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 | 4613351 | 17-Jan-89 | | 2095857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | 9704855.5 | 09-Sep-96 | | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 | 89-PV0287 | 16-Jan-89 | | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 95069128 | 8511577 | 21-Sep-96 | | 94512 | 20-Sep-16 | Reproducing medium having text information records |
| TW | D 088009 | 78100300 | 17-Jan-89 | | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | 85114202 | 19-Nov-96 | 410326 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 | 93003372 | 17-Jan-89 | | 28980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 95063039 | 09/515656 | 24-Feb-00 | | 5745454 | 20-Sep-16 | Disc Reproducing apparatus |
| US | 95063039 | 753675 | 27-Nov-96 | | 582573 | 27-Nov-16 | Disc Reproducing apparatus |
| US | 95069128 | 716953 | 20-Sep-96 | | 5859821 | 30-Oct-16 | Reproducing medium having text information records |
| US | 95085448 | 739821 | 30-Oct-96 | | | | Recording medium and its reproducing apparatus |
| US | D 088009  B | 08300002 | 05-Apr-93 | | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | 08/716688 | 16-Sep-96 | | 5798990 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 95069128 | SC0210/96 | 21-Sep-96 | | - | 02-Nov-10 | Recording medium and its reproducing apparatus |
| VN | 95085448 | SC0328/96 | 02-Nov-96 | | - | 21-Sep-10 | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

P 001778

## Exhibit E5 to the CD Disc Patent License Agreement

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Sector and Word Offset in Video Header |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Method of transmitting full motion |
| AT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | E157830 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219 641726 | 641726 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| BE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2036585 | 19-Feb-91 | | 2036585 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Sector and Word Offset in Video Header |
| CA | N 013409 A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Sector and Word Offset in Video Header |
| DE | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 3855114 | 27-Apr-08 | Motion estimation on superblocks |
| DE | N 013257 | 91200329.0 | 18-Feb-91 | 0443876-A1 | 69109346.6 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Method of transmitting full motion |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 69127504.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DK | N 013257 | 91200329.0 | 18-Feb-91 | 0443876-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DK | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FI | N 013257 | 910791 | 19-Feb-91 | | 101442 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 91200329.0 | 18-Feb-91 | 0443876-A1 | 0443876 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Page 1 of 3*                    *Printdate*        *21 June 2002*

P 001779

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | N 013257 - | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| GB | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| GB | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| GB | N 013709 - | 91201337.2 | 03-Jun-91 |  | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| HK | N 013257 - | NOT GIVEN | 18-Feb-91 |  | 0960615 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013257 - | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| IT | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| IT | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| JP | D 087091 - | 88-109222 | 06-May-88 | 88-287186 | 2630609 | 06-May-08 | Motion estimation on superblocks |
| JP | N 013257 - | 91-47659 | 20-Feb-91 | 92-216288 | 3174586 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| JP | N 013257 A | 00-344604 | 13-Nov-00 |  |  |  | Image Data Block with hierarchical encoding level |
| JP | N 013409 - | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 - | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 A | 01-151175 | 21-May-01 |  |  | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 A | 01-151175 | 21-May-01 |  |  | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 |  |  | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 B | 01-387556 | 20-Dec-01 |  |  | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013709 - | 91-159490 | 04-Jun-91 | 92-229464 | 3162110 | 04-Jun-11 | Decoder delay in coded video frames |
| JP | N 013709 A | 00-393982 | 26-Dec-00 |  |  | 04-Jun-11 | Decoder delay in coded video frames |
| KR | N 013409 - | 91-9152 | 03-Jun-91 |  | 0245962 | 03-Jun-11 | Method of transmitting full motion |
| KR | N 013409 - | 91-9152 | 03-Jun-91 |  | 0245962 | 03-Jun-11 | Sector and Word Offset in Video Header |
| KR | N 013709 - | 91-9187 | 04-Jun-91 | 92-1479 | 239837 | 04-Jun-11 | Decoder delay in coded video frames |
| NL | N 013257 - | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| NL | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SE | N 013257 - | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| SE | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| SE | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| SE | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SG | N 013257 - | 9690467.7 | 18-Feb-91 |  | 30173 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| US | D 087091 B | 07/590450 | 24-Sep-90 |  | 5021879 | 25-Apr-08 | Motion estimation on superblocks |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Printdate        21 June 2002

CD-Disc/CD Non-essential part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| US | N 013257 | C | 08/647149 | 09-May-96 | | 5699476 | 16-Dec-14 | Image Data Block with hierarchical encoding level |
| US | N 013409 | A | 08/269941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Method of transmitting full motion |
| US | N 013409 | A | 08/269941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Method of transmitting full motion |
| US | N 013409 | B | 08/563799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013709 | B | 08/299027 | 31-Aug-94 | | 5606539 | 25-Feb-14 | Decoder delay in coded video frames |
| US | N 013709 | C | 08/616951 | 18-Mar-96 | | 5608697 | 04-Mar-14 | Decoder delay in coded video frames |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 3 of 3

Printdate          21 June 2002

P 001781

# Exhibit H

1

## CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this ___1st_ day of _July_____, 2002 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

EVA-TONE, INC., having its registered office in 4801 Ulmerton, Road, Clearwater, FL 34622 (hereinafter referred to as "Licensee")

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation of Japan ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System together are referred to as "the CD Systems");

WHEREAS, Philips and Sony own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as such patents relating to the CD Systems which are jointly owned by Philips and Sony, while Philips and Sony each retain the right also to license their respective patents relating to the CD Systems separately, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs and wishes such CD-Discs to be compatible with CD-Players conforming to the Standard Specifications for any of the relevant CD Systems; and

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\eva-tone\cd disc-joint -usa-102802                                          June 2002

**P 001404**

2

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein; NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## Article 1 - Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.01    **"Disc"** shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.02    **"CD-Audio Disc"** shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined).

1.03    **"CD-Audio Maxi-Single"** shall mean a CD-Audio Disc which, in addition, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.04    **"CD-ROM Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-ROM Player (as hereinafter defined) and which conforms to the CD-ROM Standard Specifications (as hereinafter defined).

1.05    **"Enhanced Music CD Disc/CD Extra Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, a CD-ROM Player and which conforms to the CD-ROM Standard Specifications and an Enhanced Music CD Player (as hereinafter defined) which conforms to the Enhanced Music CD Standard Specifications (as hereinafter defined).

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc and the CD Extra Disc together are referred to as "CD-Discs".

1.06    **"CD-Audio Standard Specifications"** shall mean the specifications for the CD-Audio System, including the Subcode/Control and Display System, Channels R .W, Chapter 5.8, The CD-TEXT mode, as made available, modified or extended from time to time.

1.07    **"CD-Audio Maxi-Single Standard Specifications"** shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

3

1.08    **"CD-ROM Standard Specifications"** shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.09    **"Enhanced Music CD Standard Specifications"** shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time.

    The CD-Audio, CD-Audio Maxi-Single, CD-ROM and Enhanced Music CD Standard Specifications together are referred to as the "CD Standard Specifications".

1.10    **"Player"** shall mean a playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.11    **"CD-Audio Player"** shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

1.12    **"CD-ROM Player"** shall mean a Player solely capable of reproducing information stored on a CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.13    **"Enhanced Music CD Player"** shall mean a Player solely capable of reproducing information stored on a CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.14    **"Combi-Player"** shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

    The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player together are referred to as the "CD-Players".

1.15    **"Licensed Product"** shall mean a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

1.16    **"Licensed Patents"** shall mean the patents listed in the relevant Exhibits as selected by Licensee pursuant to the Options below.

    **Option A1**: Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications.

4

**Option A2**: Licensee chooses the essential patents listed in Exhibit E1 and Exhibit E2, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-ROM Discs, which conform to the CD-ROM Standard Specifications.

**Option A3**: Licensee chooses the essential patents listed in Exhibit E1, Exhibit E2 and Exhibit E3, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs, which conform to the Enhanced Music CD Standard Specifications.

**Option A4**: Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information.

**Option A5**: Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs.

Option(s):      ✗ A1          ✗ A2          ✗ A3          o A4          ✗ A5

(please tick any combination as appropriate)

Initial: _____

The term **"essential"** as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips will commission an independent patent expert to review the European, Japanese and US patents listed as essential in Exhibits E1, E2, E3 and E4 in order to confirm the essentiality of such patents. In the event that such independent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips shall delete such patent (as well as the equivalent national patents) from the relevant Exhibit and such patent will be put on the relevant Exhibit of non-essential patents. Any such finding and deletion however, shall not affect the obligation of Licensee to pay the royalty on each Licensed Product as specified in Article 5.02, provided that, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

5

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of January 1, 1985), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of Licensed Products and which have a filing date or are entitled to a so-called priority date prior to either January 1, 1983 for CD-Audio Discs, January 1, 1985 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Exhibits hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents. Any patents as may be added as essential patents to any of the respective Exhibits hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of the Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon execution of this Agreement.

1.17    **"Associated Company"** shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.18    **"Territory"** shall mean the geographic area known as the United States of America, its territories and possessions.

### Article 2 – Grant of Rights

Subject to the conditions of this Agreement:

2.01    For the term of this Agreement, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents selected by Licensee pursuant to Article 1.16 to manufacture Licensed Products within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world.

6

2.02    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee, upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire from third parties the free right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Article 2.02, additional royalties may have to be paid over and above the royalties specified in Article 5.02.

2.03    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, to manufacture CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players and to sell or otherwise dispose of such Players so manufactured in all countries of the world, under any and all present and future patents essential to the manufacture, sale or other disposal of such Players, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire the free right to grant licenses.

2.04    In consideration of the undertakings set forth in Articles 2.01, 2.02 and 2.03 and similar undertakings by third party licensees of Philips and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date (as hereinafter defined) Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16 and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which have made the same selection pursuant to Article 1.16 as Licensee and which in that respect accept or have accepted a similar undertaking as contained in this Article 2.04.

2.05    In addition, in consideration of the undertakings set forth in Articles 2.01, 2.02, 2.03 and 2.04 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning Players, non-

7

exclusive, non-transferable licenses on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of such CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such Players and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which accept or have accepted a similar undertaking as contained in this Article 2.05.

2.06    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

In consideration of Philips' undertaking as set out in the preceding paragraph, Licensee undertakes that all of its Associated Companies which have or may hereafter acquire patents essential to the manufacture, sale or other disposal of CD-Discs and which patents were first filed in any country of the world prior to the date of termination of this Agreement, shall make available licenses under such patents, on reasonable, non-discriminatory conditions comparable to those set forth herein to Philips, any of Philips' Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips in respect of CD-Discs.

2.07    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER/RECORDER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF RECORDING/PLAYBACK DEVICES DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR RECORDING/PLAYBACK DEVICES (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVI-CES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR PATENTS RELATING TO CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS, RECORDING/PLAYBACK DEVICES WITH ANY OTHER ITEMS, PRODUCTS, SYSTEMS, STRUCTURES, EQUIPMENT OR

8

SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED
PRODUCT AND A PLAYER OR RECORDING/PLAYBACK DEVICE.

### Article 3 - Standard Specifications, Technical Information and Support

3.01    Upon receipt of the payment provided for in Article 5.01 and the payment provided for in
        Article 5.12, Philips shall make available to Licensee for use by Licensee in accordance with
        the provisions hereof, a copy of the then current version of the respective CD Standard
        Specifications, as correspond with the Licensed Patents selected by Licensee pursuant to
        Article 1.16, together with such other information and support as Philips considers necessary
        for the interpretation and/or correct application of the relevant CD Standard Specifications.

3.02    Licensee shall be notified in writing of any addition or modification to any of the relevant CD
        Standard Specifications and shall be provided with relevant information in connection
        therewith.

3.03    Philips and Licensee undertake to keep each other generally informed of developments or
        initiatives, which may have an impact on the relevant CD Standard Specifications.

### Article 4 - Have Made

4.01    The rights granted to Licensee pursuant to Article 2 and the right to use the information
        pursuant to Article 3, include the right for Licensee to have Licensed Products made for it by
        third party manufacturers, duly licensed by Philips under an agreement similar to this
        Agreement, provided that Licensee will properly identify such third party manufacturer in the
        royalty reporting forms to be submitted to Philips hereunder, together with the quantities of
        Licensed Products so purchased.

        Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any
        third party not licensed by Philips, where such purchase or sale would constitute an act of
        infringement of any of the Licensed Patents.

### Article 5 - Royalties, Reports and Payments

5.01    In consideration of the rights granted by Philips and the information to be provided by
        Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable,
        non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.02    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee
        agrees to pay to Philips a royalty on each Licensed Product sold by Licensee, in which any
        one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed
        Patent(s) is (are) used in the country of manufacture, sale or other disposal.

        These royalties shall amount to:

9

(a)     US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-Audio Disc
        with an outer diameter greater than 90 mm; and

(b)     US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-Audio Disc
        with an outer diameter smaller than 90 mm; and

(c)     US$ 0.027 (two point seven US Dollar cents) for each Licensed Product being a CD-
        Audio Maxi-Single; and

(d)     US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-ROM Disc
        with an outer diameter greater than 90 mm; and

(e)     US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-ROM Disc
        with an outer diameter smaller than 90 mm; and

(f)     US$ 0.045 (four and a half US Dollar cents) for each Licensed Product being a CD
        Extra Disc with an outer diameter greater than 90 mm; and

(g)     US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc
        with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Standard Rates".

With respect to Licensed Products sold after July 1, 2002, provided that Licensee is in full
compliance with its obligations under this Agreement and subject to Article 6.01, the royalties
shall amount to:

(a)     US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product
        being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)     US$ 0.0115 (one and fifteen hundredths of a US-Dollar cent) for each Licensed Pro-
        duct being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)     US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each Licensed
        Product being a CD-Audio Maxi-Single; and

(d)     US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product
        being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)     US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Pro-
        duct being a CD-ROM Disc with an outer diameter smaller than 90 mm;

(f)     US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc
        with an outer diameter greater than 90 mm; and

(g)     US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD Extra Disc
        with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations hereunder,
the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs
instead of the Compliance Rates, as applicable, with immediate effect from the moment of
such non-compliance until such moment that Licensee's non-compliance will have been
remedied in full.

A Licensed Product shall be considered sold when invoiced or, if not invoiced, when
delivered to a party other than Licensee.

10

No royalties shall be payable on Licensed Products purchased by Licensee on a "have made" basis in accordance with Article 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such Licensed Products.

For the avoidance of doubt, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist.

5.03    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Exhibit C3 (Royalty Reporting Form) signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee, specified per individual type of CD-Disc;

(2)    the quantities of CD-Discs purchased from other licensed manufacturers in accordance with the provisions of Article 4, specified per individual type of CD-Disc;

(3)    on a per-country basis, specifying for each individual type of CD-Disc:

(a)    the quantities of CD-Discs sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)    the quantities of CD-Discs sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period, in such US Dollars.

5.04    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Article 5.03, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder.

11

Licensee acknowledges and agrees that any Advance shall not be due by way of penalty but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time; the payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form; the payment by Licensee of an Advance shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.05    Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be public certified auditors, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet Philips' requirements as specified in the Audit Guidelines attached hereto as Exhibit C1 and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement shall be verified by Philips by means of a work paper review, conducted by one of the public certified auditors selected by Philips. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Article 5.10.

5.06    Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of Licensed Products in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Article 5.02 and Article 5.12, shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Article 5.06 shall be without prejudice to the provisions of Article 12.06.

5.07    Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.08    All payments to Philips under this Agreement shall be made by transfer in such currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.09    All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of

P 001414

12

a country imposes any income taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Article 5 may be verified, Licensee shall keep complete and accurate books and records and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each Licensed Product.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a public certified auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Article 5.03 and Article 5.05, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Article 5.10 shall survive termination or expiration of this Agreement.

5.11    Without prejudice to the provisions of Article 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12    As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of CD-Discs manufactured and sold or otherwise disposed of by Licensee before the Effective Date of this Agreement in accordance with the provisions of Article 5.03. Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties on such CD-Discs, calculated by applying the royalty rates of (a) US$ 0.03 for each CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, (b) US$ 0.02 for each CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, (c) US$ 0.027 for each CD-Audio Maxi-Single and (d) US$ 0.045 or US$ 0.048 for each CD Extra Disc, depending on the selection made by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement. The royalty statement shall similarly be subject to Philips' right of audit as set out in Article 5.10. Within 45 days following the execution of this Agreement, Licensee shall submit to Philips an audit statement by its

13

external auditors, who shall be public certified auditors, confirming that this royalty statement is true, complete and accurate in every respect.

## Article 6 – Manufacturing Equipment Identification System

6.01    Upon signing of the Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment used for the manufacture of Licensed Products. Further, upon any acquisition, transfer or disposal of manufacturing equipment used for the manufacture of Licensed Products, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Article 5.05. Such overview shall be in the form as attached hereto as Exhibit C2 (Manufacturing Equipment List), signed by a duly authorized officer on behalf of Licensee. The Compliance Rates referred to in Article 5.02 shall only apply to Licensed Products manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting Philips' requirements as set out in the Audit Guidelines, in accordance with the provisions in Article 5.05. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used for the manufacture of Licensed Products prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee can demonstrate to Philips' full satisfaction, that the newly acquired manufacturing equipment originates from and has been used by a company which was properly licensed by Philips for the manufacture of Licensed Products and in full compliance with its obligations under its license agreement at the time of the acquisition of the newly acquired manufacturing equipment by Licensee. In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rates shall apply to Licensee's manufacture and sale of Licensed Products instead of the Compliance Rates.

## Article 7 - Most Favourable Conditions

7.01    In the event that licenses under the patents referred to in Article 2 are granted by Philips for Licensed Products to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

14

### Article 8 – No Warranty and Indemnification

8.01    Whereas Philips has made efforts to ensure that the information to be supplied by it
        hereunder is complete and accurate, Philips makes no representation or warranty as to the
        accuracy or completeness of such information, nor with respect to the ability of Licensee to
        achieve interchangeability with respect to Licensed Products through the use of such
        information.

8.02    It is acknowledged by Licensee that third parties may own industrial and/or intellectual
        property rights in the field of CD-Discs. Philips and Sony make no warranty whatsoever that
        the manufacture, sale or other disposal of Licensed Products or the use of information
        supplied by Philips hereunder, does not infringe or will not cause infringement of any
        industrial and/or intellectual property rights other than Licensed Patents. Philips, Sony and
        their respective Associated Companies shall be fully indemnified and held harmless by
        Licensee from and against any and all third party claims in connection with CD-Discs
        manufactured, sold or otherwise disposed of by Licensee.

### Article 9 - Confidentiality

9.01    Licensee shall at all times maintain strict confidentiality with regard to the CD Standard
        Specifications and shall not disclose same to any third party without the prior written consent
        of Philips.

9.02    Without prejudice to Article 9.01, Licensee shall, during the term of this Agreement as
        specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party
        any information acquired from Philips or any of Philips' Associated Companies in connection
        with this Agreement, or use such information for any other purpose than the manufacture or
        disposal of Licensed Products in accordance with this Agreement. This obligation shall not
        apply to the extent information so acquired:

        (a)    was known to Licensee prior to the date on which such information was acquired
               from Philips or any of Philips' Associated Companies, as shown by records of
               Licensee or otherwise demonstrated to Philips' satisfaction;

        (b)    is or has become available to the public through no fault of Licensee;

        (c)    was or is received from a third party who was under no confidentiality obligation in
               respect of such information.

        In protecting information acquired from Philips or any of Philips' Associated Companies,
        Licensee shall take all necessary measures and precautions, including but not limited to
        measures requiring its present and future employees to give suitable undertakings of secrecy
        both for the period of their employment and thereafter, and shall protect such information in
        the same manner and with the same degree of care (but no less than a reasonable degree of
        care) with which Licensee protects its own information of a confidential nature.

15

9.03    The obligations concerning confidentiality contained in Article 9.01 and Article 9.02 shall
        survive termination of this Agreement

9.04    Philips shall, during the term of this Agreement as specified in Article 12.01 and for a period
        of 3 years thereafter, not disclose to any third party any confidential information obtained by
        Philips in connection with Article 5.03 and/or Article 5.05, except that Philips may disclose
        such information to its external auditors, legal representatives and to the competent courts to
        the extent this is necessary for Philips in connection with the enforcement of its rights
        hereunder. Further, Philips shall not use such information for other purposes than to verify
        Licensee's compliance with its royalty reporting and payment obligations as provided in this
        Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this
        paragraph shall not apply to information referred to in sections a, b and/or c of Article 9.02.

## Article 10 - Logo

10.01   For the term of this Agreement and subject to the full and timely performance and
        observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be
        entitled to use on the Licensed Products as well as in advertisements and sales literature with
        respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo")
        in accordance with the instructions laid down in the CD-Logo Guide which shall be made
        available to Licensee together with the Standard Specifications.

10.02   Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of
        the Logo does not infringe or will not cause infringement of any third party intellectual
        property rights.

## Article 11 – No Assignment

11.01   This Agreement shall inure to the benefit of and be binding upon each of the parties hereto
        and their respective assignees. It may not be assigned in whole or in part by Licensee without
        the prior written consent of Philips.

## Article 12 - Term and Termination

12.01   This Agreement shall enter into force on the "Effective Date", being the date first written
        above. In the event that validation of this Agreement is required by the competent
        governmental authorities, the Effective Date shall be the date of such validation. This
        Agreement shall remain in force for a period of 10 years from the Effective Date unless
        terminated earlier in accordance with the provisions of this Article 12.

12.02   Without prejudice to the provisions of Article 12.03 through 12.06, each party may terminate
        this Agreement at any time by means of written notice to the other party in the event that the
        other party fails to perform any obligation under this Agreement and such failure is not
        remedied within 30 days after receipt of a notice specifying the nature of such failure and
        requiring it to be remedied. Such right of termination shall not be exclusive of any other

16

remedies or means of redress to which the non-defaulting party may be lawfully entitled, and all such remedies shall be cumulative. Any such termination shall not affect any royalty or other payment obligations under this Agreement accrued prior to such termination.

12.03  Philips may terminate this Agreement forthwith by means of notice in writing to Licensee in the event that a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Licensee or in the event that Licensee makes any voluntary arrangement with its creditors or becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law.

12.04  Additionally, insofar as legally permitted, Philips may terminate this Agreement at any time by means of written notice to Licensee in case Licensee or an Associated Company of Licensee has been found liable by a competent court or administrative authority to have committed an act of copyright piracy.

12.05  Philips shall have the right to terminate this Agreement forthwith or to revoke the license granted under any of Philips' or Sony's respective patents in the event that Licensee or any of its Associated Companies brings a claim for infringement of any of Licensee's or any of Licensee's Associated Companies essential patents relating to CD-Discs or CD-Players against Philips, Sony or any of their respective Associated Companies and Licensee refuses to license such patents on fair and reasonable conditions.

12.06  Upon the termination of this Agreement by Philips for any reason pursuant to Article 12.02 through 12.05, Licensee shall immediately cease the manufacture, sale or other disposal of CD-Discs in which any one or more of the Licensed Patents are used. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

12.07  All provisions of this Agreement which are intended to survive (whether express or implied) the expiry or termination of this Agreement, shall so survive.

## Article 13 - Miscellaneous

13.01  Any notice required under this Agreement to be sent by either party shall be given in writing by means of a letter, facsimile or electronic mail directed:

in respect of Licensee, to:

Eva-Tone, Inc.
4801 Ulmerton Road
Clearwater, FL 34622
Fax: + (727) 572-7076

17

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips International B.V.
Intellectual Property & Standards - Legal Department
P.O. Box 220, Building WAH-2
5600 AE  Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

U.S. Philips Corporation
580 White Plains Road
Tarrytown, New York 10591
Fax: +(914) 332-0615

or to such other address as may have been previously specified in writing by either party to the other.

13.02   This Agreement sets forth the entire understanding and agreement between the parties as to the subject matter hereof and supersedes and replaces all prior arrangements, discussions and understandings between the parties relating thereto. Neither party shall be bound by any obligation, warranty, waiver, release or representation except as expressly provided herein, or as may subsequently be agreed in writing between the parties.

13.03   Nothing contained in this Agreement shall be construed:

(a)   as imposing on either party any obligation to instigate any suit or action for infringement of any of the patents licensed hereunder or to defend any suit or action brought by a third party which challenges or relates to the validity of any of such patents. Licensee shall have no right to instigate any such suit or action for infringement of any of the patents licensed by Philips hereunder, nor the right to defend any such suit or action which challenges or relates to the validity of any such patent licensed by Philips hereunder;

(b)   as imposing any obligation to file any patent application or to secure any patent or to maintain any patent in force;

(c)   as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips, Sony or any of their Associated Companies;

(d)   as conferring any license to manufacture, sell or otherwise dispose of any product or device other than a Licensed Product.

13.04   Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

**P 001420**

18

13.05   Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by written notice to Licensee.

13.06   This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS N.V.

EVA-TONE, INC.

Name: H . SAKKERS

Title: by proxy

Date:

Name: NORMAN H. WELCH JR

Title: PRESIDENT

Date: 11/25/02

P 001421

# Exhibit E1 to the CD Disc Patent License Agreement

## CD-Disc/CD-Audio and CD-Maxi Single part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | Q.080007 - | 285959 | 02-Jul-81 | | 250649 | 05-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | Q.080009 - | 285400 | 20-May-81 | | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | Q.080007 - | 81-A3107 | 14-Jul-81 | | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | Q.080009 - | 81-A2215 | 18-May-81 | 395794 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | Q.080007 - | 98-00033 | 21-Apr-98 | | | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | P15.688 - | 399564 | 26-Mar-82 | | 1207443 | 08-Jul-03 | Optical readable carriers |
| CA | Q.080007 - | 381362 | 08-Jul-81 | | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q.080007 A | 514656 | 02-Aug-82 | | 514656 | 20-Jun-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q.080009 - | 502320 | 19-May-81 | | 502320 | 09-Sep-02 | Error correctable data transmission method |
| US | N005493 D | 06/858550 | 23-Apr-86 | | 5068846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | P15.688 - | 890316 | 30-Mar-82 | | 5305301 | 19-Apr-11 | Optical readable carriers |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate    21. June 2002

P 001422

# Exhibit E2 to the CD Disc Patent License Agreement

## CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | P18.816 | - | 84901011.1 | 02-Mar-84 | | 52866 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AT | Q 083025 | - | 84-A27769 | 29-Aug-84 | | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | - | 85200431.6 | 20-Mar-85 | | E49835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 603761 | 20-Mar-05 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | - | 84-32584 | 31-Aug-84 | | 603761 | 31-Aug-04 | CD-ROM Error Correction System A |
| AU | Q 084008 | - | 85-40240 | 22-Mar-85 | | 584883 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | - | PI8404319.9 | 29-Aug-84 | | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | - | PI8501277.7 | 21-Mar-85 | | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | - | PI8700946.7 | 23-Feb-87 | | PI8700946 | 23-Feb-07 | Real-time format switching |
| CA | P | - | | | | 1235812 | 26-Apr-05 | Disc playback apparatus |
| CA | Q 084008 | - | 477183 | 21-Mar-85 | | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | - | 530120 | 19-Feb-87 | | 1260208 | 12-Feb-08 | Real-time format switching |
| CH | Q 084008 | - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | - | 87100929.3 | 21-Feb-87 | 87100929-A | 1010517 | 21-Feb-07 | Real-time format switching |
| C2 | Q 084008 | - | 85-PV2009 | 21-Mar-85 | | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | P | - | 84305176.4 | 30-Jul-84 | | P3476289.2 | 30-Jul-04 | Disc playback apparatus |
| DE | P18.816 | - | 84901011.1 | 02-Mar-84 | | P3462291.7 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | Q 083025 | - | P3431810.0 | 30-Aug-84 | 3431810 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | - | P3701763.2 | 22-Jan-87 | 3701763 | 3701763 | 22-Jan-07 | Real-time format switching |
| FR | P | - | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| FR | P18.816 | - | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | Q 084008 | - | 8504297 | 22-Mar-85 | | 2561839 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | - | 8702234 | 20-Feb-87 | | 2594996 | 20-Feb-07 | Real-time format switching |
| GB | P | - | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| GB | P18.816 | - | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | P18.816 | - | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | Q 083025 | - | 8421705 | 28-Aug-84 | | 2148555 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086003 and P18816 are essential to CD-ROM/XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Printdate    27 September 2002

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | Q 084008 - | 8507248 | 20-Mar-85 | | 2156555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 - | 8704011 | 20-Feb-87 | | 2187008 | 20-Feb-07 | Real-time format switching |
| HK | Q 083025 - | NOT GIVEN | 28-Aug-84 | | 093012? | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 - | NOT GIVEN | 20-Mar-85 | | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 1215362 | 20-Feb-07 | CD-ROM Error Correction System A |
| IT | Q 086003 - | 87-A19447 | 20-Feb-87 | | 1912619 | 20-Feb-07 | Real-time format switching |
| JP | P | | | | 1912619 | 30-Jul-03 | Disc playback apparatus |
| JP | P18,816 | 35459/83 | 04-Mar-83 | | 19126134 | 04-Mar-03 | Method and apparatus for recording digitized infor |
| JP | Q 083025 - | 83-161514 | 01-Sep-83 | 60-52961 | | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 - | 84-57595 | 24-Mar-84 | 60-201575 | | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 - | 87-39997 | 23-Feb-87 | 87-217468 | | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 - | 85-1914 | 23-Mar-85 | 94-8742 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 - | 87-1501 | 23-Feb-87 | 95-7946 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| NL | Q 084008 - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 - | 8600450 | 24-Feb-86 | 8600450 | 192151 | 24-Feb-06 | Real-time format switching |
| SE | Q 084008 - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 - | 8700711-8 | 20-Feb-87 | | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 - | 9290553.8 | 20-Mar-85 | | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 - | 84-PV6807 | 03-Sep-84 | | 278585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 - | 85-PV2009 | 21-Mar-85 | | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 - | 78100969 | 25-Feb-87 | | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 - | 3874714 | 22-Mar-85 | | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | P18,816 | 666237 | 02-Mar-84 | | 4707818 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| US | Q 084008 R | 07379627 | 13-Jul-89 | | RE33462 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 086003 - | 07/018163 | 24-Feb-87 | | 4802169 | 24-Feb-07 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084/08 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086/003 and P 18816 are essential to CD-ROM/X4 type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Printdate   27 September 2002

Exhibit E3 to the CD-Disc Patent License Agreement

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | S86P0059 - | 85900170.3 | 30-Nov-84 | - | E76996 | 30-Nov-04 | Disc recording medium |
| AT | S94P5088 - | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| AT | S96P0806 - | - | - | - | E206238 | - | Recording medium having a first management area |
| AU | N 013661 - | 92-13942 | 31-Mar-92 | 92-13942  661991 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S86P0059 - | 3741285 | 30-Nov-84 | 3741285 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S94P5088 - | 3435895 | 19-Oct-95 | - | 703045 | 19-Oct-15 | Mass produced multisessions disc |
| AU | S96P0806 - | 4038895 | 13-Dec-95 | 692961 | 692961 | 23-Jan-16 | Recording medium having a first management area |
| AU | S96P0005 - | 2265500 | 24-Mar-00 | - | 728279 | 23-Jan-16 | Multi-session disc having disc type code area loca |
| BR | S96P0806 - | 9505999 | 21-Dec-95 | - | - | - | Recording medium having a first management area |
| CA | N 013661 - | 2064511 | 31-Mar-92 | - | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | S96P0806 - | 2164801 | 08-Dec-95 | - | - | - | Recording medium having a first management area |
| CH | S86P0059 - | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| CH | S94P5088 - | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| CN | S94P5088 - | 95116095.8 | 19-Oct-95 | CN1131311A | - | - | Mass produced multisessions disc |
| CN | S96P0806 - | 95121699 | 22-Dec-95 | CN1135633A | - | - | Recording medium having a first management area |
| CN | S96P0005 - | 96104382 | 30-Jan-96 | CN1137675A | - | - | Multi-session disc having disc type code area loca |
| CZ | N 013885 - | 92-PV970 | 01-Apr-92 | - | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 - | 92200893.3 | 30-Mar-92 | 0507397-A3 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013885 - | 92200909.7 | 30-Mar-92 | 0507403-A3 | 69226116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S86P0059 - | 85900170.3 | 30-Nov-84 | - | P3485761.3 | 30-Nov-04 | Disc recording medium |
| DE | S94P5088 - | 95307463.0 | 19-Oct-95 | 708445 | - | - | oduced multisessions disc for playback on audio-on |
| DE | S94P5088 - | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| DE | S96P0806 - | 95119580.9 | 12-Dec-95 | DE69522917T | 69522917 | 12-Dec-15 | Recording medium having a first management area |
| ES | N 013661 - | 92200893.3 | 30-Mar-92 | 0507397-A3 | 2118784 | 30-Mar-12 | Recording medium having a first management area |
| ES | N 013885 - | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ES | S96P0806 - | 95119580.9 | 12-Dec-95 | ES2163469T | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | N 013661 - | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013885 - | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S86P0059 - | 85900170.3 | 30-Nov-84 | 708445 | 165320 | 30-Nov-04 | Disc recording medium |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 4                                                                                                                    Printdate          21 June 2002

P 001425

## CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| FR | S94P5088 - | 95307463.0 | 19-Oct-95 | - | - | | Mass produced multisessions disc |
| FR | S99P0806 - | 95119580.9 | 12-Dec-95 | - | - | | Recording medium having a first management area |
| FR | S99P0005 - | 96101066.7 | 25-Jan-96 | 724283 | | | Multi-session disc having disc type code area loca |
| GB | N 013661 - | 92200893.3 | 30-Mar-92 | 0507397 | 718845 | 12-Dec-15 | Recording of content information in Lead-Out |
| GB | N 013885 - | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 - | 85900170.3 | 30-Nov-84 | | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S94P5088 - | 95307463.0 | 19-Oct-95 | - | - | | Mass produced multisessions disc |
| GB | S99P0806 - | 95119580.9 | 12-Dec-95 | - | - | | Recording medium having a first management area |
| GB | S99P0005 - | 96101066.7 | 25-Jan-96 | 724283 | 718845 | 12-Dec-15 | Multi-session disc having disc type code area loca |
| HK | S85P0059 - | 96101066.7 | 25-May-95 | - | 0815/1995 | | Disc recording medium |
| HK | S94P5088 - | 98103776.7 | 04-May-98 | - | - | | Mass produced multisessions disc |
| HU | N 013885 - | P9201055 | 30-Mar-92 | | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S99P0806 - | P-962737 | 19-Dec-95 | - | - | | Recording medium having a first management area |
| ID | N 013885 - | P-960210 | | 012.695A | ID000004712 | 30-Jan-16 | Multi-session disc having disc type code area loca |
| IN | S99P0806 - | 2287/DEL/95 | 12-Dec-95 | - | - | | Recording medium having a first management area |
| IN | S99P0005 - | 0188/DEL/96 | 29-Jan-96 | - | - | | Multi-session disc having disc type code area loca |
| IT | N 013661 - | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 013885 - | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S94P5088 - | 95307463.0 | 19-Oct-95 | 709445 | | | Mass produced multisessions disc |
| IT | S99P0806 - | 95119580.9 | 12-Dec-95 | - | - | | Recording medium having a first management area |
| IT | S99P0005 - | 96101066.7 | 25-Jan-96 | 724283 | | | Multi-session disc having disc type code area loca |
| JP | 84000899 - | 58228598 | 30-Nov-83 | 60-119670 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 - | 59-057595 | 24-Mar-84 | 60-201575 | 2085642 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060963 - | 07311437 | 29-Nov-95 | 08-227577 | - | | Recording medium having a first management area |
| JP | N 013409  B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409  B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013661 - | 92-41010 | 02-Apr-92 | 93-80596 | 3293651 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013885 - | 92-79301 | 01-Apr-92 | 93-94675 | | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S85P0059 - | 59-057596 | 24-Mar-84 | 60-201576 | 1981180 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | S94P5088 - | 07-270200 | 19-Oct-95 | - | - | | Mass produced multisessions disc |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate    21 June 2002

P 001426

## CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| JP | S95P0806 - | 06320107 | 22-Dec-94 | | | | Recording medium having a first management area loca |
| JP | S96P005 | 07013211 | 30-Jan-95 | 08-203210 | | | Multi-session disc having disc type code area loca |
| KR | N 013861 - | 92-5313 | 31-Mar-92 | 92-20420 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013861 - | 92-5314 | 31-Mar-92 | 92-20418 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 - | 85-700146 | 29-Jul-85 | 85-00175 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 - | 92-702898 | 30-Oct-92 | | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S94P5088 - | 95-35873 | 18-Oct-95 | | | | Mass produced multisessions disc |
| KR | S95P0806 - | 95-72133 | 21-Dec-95 | 96-25644 | | | Recording medium having a first management area |
| KR | S96P0005 - | 96-02552 | 30-Jan-96 | 96-30119 | | | Multi-session disc having disc type code area loca |
| MX | S95P0005 - | 955172 | 11-Dec-95 | | 189100 | 11-Dec-15 | Recording medium having a first management area |
| MY | S95P0806 - | PI9503773 | 07-Dec-95 | | | | Recording medium having a first management area |
| MY | S96P0005 - | PI9600317 | 29-Jan-96 | | | | Multi-session disc having disc type code area loca |
| NL | S85P0059 - | 8500170.3 | 30-Nov-84 | | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S94P5088 - | 95307463.0 | 19-Oct-95 | 708445 | | | Mass produced multisessions disc |
| NL | S95P0806 - | 9511950.9 | 12-Dec-95 | 724263 | | | Recording medium having a first management area |
| NL | S95P0806 - | 95011066.7 | 25-Jan-96 | | | | Recording medium having a first management area |
| NL | S95P0806 - | | 21-Dec-95 | | | | Recording medium having a first management area |
| PL | S95P0806 - | P312001 | 21-Dec-95 | | 179800 | 21-Dec-15 | Recording medium having a first management area |
| PL | S95P0806 - | P339168 | 28-Feb-00 | | 179603 | 21-Dec-15 | Recording medium having a first management area |
| RU | N 013861 | 5011395 | 01-Apr-92 | | 2072566 | 01-Apr-12 | Recording of content information in Least-Out |
| RU | S85P0059 - | 91522380 | 21-Dec-95 | | | 21-Dec-15 | Recording medium having a first management area |
| RU | S95P0806 - | 91128046 | 30-Dec-99 | | | | Recording medium having a first management area |
| RU | S95P0806 - | 99104165 | 03-Jan-99 | | | | Recording medium having a first management area |
| RU | S95P0806 - | 99103827 | 03-Jan-99 | | 2162252 | 21-Dec-15 | Recording medium having a first management area |
| SE | S84P5088 - | 8500170.3 | 30-Nov-84 | | | | Disc recording medium |
| SE | S95P0806 - | 95307463.0 | 19-Oct-95 | 708445 | | | Mass produced multisessions disc |
| SE | S95P0806 - | | 07-Dec-95 | | 165320 | 30-Nov-04 | Recording medium having a first management area |
| SG | S96P0005 - | 9502053 | 07-Dec-95 | | 38982 | 07-Dec-15 | Recording medium having a first management area |
| SG | S96P0005 - | 9605515 | 27-Jan-96 | | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013885 - | 92-PV0970 | 01-Apr-92 | 282293 | | 01-Apr-12 | CD-ROM XA Multi-session WO |
| SK | N 013885 - | 92-PV0970 | 01-Apr-92 | 282293 | | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TH | S95P0806 - | 02936.4 | 20-Dec-95 | 22587 | | | Recording medium having a first management area |
| TR | S95P0806 - | 053122 | 21-Dec-95 | 960597 | | | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

**P 001427**

CD–Disc/CD–Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| TW | N 013661 - | 80109966 | 19-Dec-91 | UNKNOWN 57337 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| TW | N 013665 - | 80109963 | 19-Dec-91 | 59397 | 59397 | 19-Dec-11 | CD-ROM XA Multi-session WO |
| TW | S94F5088 - | 83109977 | 28-Jun-94 | | 72376 | 27-Oct-14 | Mass produced multisessions disc |
| TW | S95P0806 - | 84113465 | 16-Dec-95 | | 86403 | 15-Dec-15 | Recording medium having a first management area |
| UA | N 013661 - | 93002573 | 15-Nov-93 | | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 013661 V | 07/900874 | 18-Jun-92 | | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |
| US | N 013665 A | 08/180002 | 11-Jan-94 | | 5390159 | 14-Feb-12 | CD-ROM XA Multi-session WO |
| US | N 013665 B | 08/028307 | 24-Oct-94 | | 5876019 | 02-Mar-15 | CD-ROM XA Multi-session WO |
| US | N 013665 V | 08/371644 | 12-Jan-95 | | 5684786 | 04-Nov-14 | CD-ROM XA Multi-session WO |
| US | N 013709 D | 08/707845 | 09-Sep-96 | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S85P0059 - | 266207 | 27-Oct-88 | | 4893193 | 09-Jan-07 | Disc recording medium |
| US | S94F5088 - | 324406 | 20-Oct-94 | | - | | Mass produced multisessions disc |
| US | S94F5088 - | 471982 | 06-Jun-95 | | 5661715 | 20-Oct-14 | Mass produced multisessions disc |
| US | S95P0806 - | 572528 | 14-Dec-95 | | 5754521 | 14-Dec-15 | Recording medium having a first management area |
| US | S96P0005 - | 592962 | 29-Jan-96 | | 5778257 | 29-Jan-16 | Multi-session disc having disc type code area loca |
| VN | S95P0806 - | S-1614/9572 | 26-Jun-00 | | - | | Recording medium having a first management area |
| VN | S95P0806 - | S-1614/95 | 21-Dec-95 | | - | | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate    21 June 2002

P 001428

# Exhibit E4 to the CD Disc Patent License Agreement
CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104337 | 13-Sep-96 | | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information recorde |
| AT | D 088009 | 8920008.1 | 16-Jan-89 | 0325325-A3 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 6562596 | 13-Sep-96 | | 714409 | 13-Sep-16 | Reproducing medium having text information recorde |
| AU | D 088009 | 89-28557 | 18-Jan-89 | 639411 | | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603829 | 20-Sep-96 | | | 22-Sep-16 | Reproducing medium having text information recorde |
| CA | D 088009 | 583004 | 16-Jan-89 | 1322593 | | 28-Sep-10 | Repeated transfer of subcode data |
| CH | D 088009 | 8920008.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | | 22-Sep-16 | Reproducing medium having text information recorde |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | | 02-Nov-16 | Reproducing medium and its reproducing apparatus |
| CN | D 088009 | 89101059.6 | 19-Jan-89 | 1035577-A | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009 A | 92102717.6 | 19-Jan-89 | 1068673-A | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 284768 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | P696124672.6 | 03-Dec-16 | Disc Reproducing apparatus |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information recorde |
| DE | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 8920008.1 | 16-Jan-89 | 0325325-A3 | 68927063.1 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information recorde |
| FR | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 8920008.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information recorde |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate   21 June 2002

P 001429

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98106421.9 | 16-Jan-89 | | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-95 | | | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963566 | 02-Dec-96 | | 656 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962847 | 19-Sep-96 | | | 19-Nov-16 | Reproducing medium and its reproducing apparatus |
| ID | 95085448 | P963188 | 04-Nov-96 | | 5137 | 04-Nov-16 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | 014759-A | | 12-Sep-10 | Transferring information via the lead-in of CD |
| IN | 95069128 | 2023/DEL/96 | 16-Sep-96 | | | 16-Sep-11 | Reproducing medium having text information recorde |
| IN | N 015474 | 96-1617 | 11-Sep-96 | | | 16-Sep-10 | Transferring information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | | 26-Aug-16 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244959 | 22-Sep-95 | 09-091880 | | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310080 | 22-Nov-95 | 09-128868 | | 22-Sep-15 | Reproducing medium and its reproducing apparatus |
| JP | 95100948 | 08-242659 | 26-Aug-96 | 10-84245 | | 02-Nov-15 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7176 | | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-509270 | 3092924 | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | 95063039 | 96-62892 | 07-Dec-96 | 97-50695 | | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | | 23-Sep-16 | Reproducing medium and its reproducing apparatus |
| KR | 95085448 | 96-51644 | 02-Nov-96 | 98-28706 | | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | 95069128 | 964179 | 19-Sep-96 | | 196099 | 19-Sep-16 | Recording medium and its reproducing apparatus |
| MX | N 015474 | 973530 | 09-Sep-96 | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 95063039 | 9605148 | 07-Dec-96 | | | | Disc Reproducing apparatus |
| MY | 95069128 | 9603888 | 20-Sep-96 | | | | Reproducing medium having text information records |
| MY | 95085448 | PI9603785 | 13-Sep-96 | | | | Transferring information via the lead-in of CD |
| NL | N 015474 | 96115095.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| PH | 95069128 | 54335 | 19-Sep-96 | 54335 | | | Reproducing medium having text information recorde |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3                                                                                                                              Printdate          21 June 2002

P 001430

## CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| PT | N 015474 - | 96927834.0 | 09-Sep-96 | 0792504A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 - | 4613351 | 17-Jan-89 | | 2099857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 - | 89200081.1 | 16-Jan-89 | 0325325 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 - | 9704856.5 | 09-Sep-96 | 0325325-A3 | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 - | 89-PV0287 | 16-Jan-89 | | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 95069128 - | 85115577 | 21-Sep-96 | | 94512 | 20-Sep-16 | Reproducing medium having text information records |
| TW | D 088009 - | 78100300 | 17-Jan-89 | | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 - | 85114202 | 19-Nov-96 | | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 - | 93003372 | 17-Jan-89 | 410326 | 26980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 95083039 - | 09/515696 | 24-Feb-00 | | 5745454 | 20-Sep-16 | Disc Reproducing apparatus |
| US | 95083039 - | 753675 | 27-Nov-96 | | 5825731 | 27-Nov-16 | Disc Reproducing apparatus |
| US | 95069128 - | 716953 | 20-Sep-96 | | 5859821 | 30-Oct-16 | Reproducing medium having text information records |
| US | 95085448 - | 739821 | 30-Oct-96 | | - | - | Recording medium and its reproducing apparatus |
| US | D 088009 B | 08200002 | 05-Apr-93 | | 5557979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 - | 08716688 | 16-Sep-96 | | 5789890 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 95085448 - | SC0210/96 | 16-Sep-96 | | - | - | Recording medium and its reproducing apparatus |
| VN | 95069128 - | SC0210/96 | 21-Sep-96 | | - | 02-Nov-10 | Reproducing medium having text information records |
| VN | 95085448 - | SC0328/96 | 02-Nov-96 | | - | 21-Sep-10 | Recording medium and its reproducing apparatus |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

P 001431

Exhibit I

 

### Koninklijke Philips Electronics N.V.

P.O. Box 218 - 5600 MD Eindhoven - The Netherlands


Re. **CD Disc Patent License Agreement**                    Ref: 1203-0757
                                                            Date: October 29, 2002


Dear Sirs,

Reference is made to the CD Disc Patent License Agreement ("Agreement") between Eva-Tone, Inc.
("Licensee") and Koninklijke Philips Electronics N.V. ("Philips") covering the Territory of the
United States and having an effective date of July 1, 2002, as well as the definitions used therein.

It is hereby agreed as follows:

1.  This Side Letter shall constitute a legally binding and integral part of the Agreement and shall
    be effective as of July 1, 2002.

2.  The Agreement supercedes and replaces the Comprehensive CD Disc License Agreement
    between between U.S. Philips Corporation and Licensee having an effective date of June 10,
    1993.

3.  Licensee shall not be required to pay the initial fee set forth in Article 5.01, as this fee was
    previously paid by Licensee in the Comprehensive CD Disc License Agreement effective June
    10, 1993.

4.  Licensee shall not be required to make a report and payment pursuant to Article 5.12, as
    Licensee has reported and paid the royalties accrued through July 1, 2002 (subject to
    paragraph 5 below).

5.  In order to qualify for the Compliance Rates as set forth in Article 5.02, Licensee shall
    provide Philips with an audit statement pursuant to Article 5.05 covering the period July 1,
    1999 through June 30, 2002.  Philips has issued revised Audit Guidelines (Exhibit C1) which
    are attached hereto.  Licensee shall have a reasonable time to complete such audit, but no
    later than December 15, 2002.  Licensee may pay the royalties due for the period July 1, 2002
    through September 30, 2002 at the Compliance Rate, subject to timely completion of the
    audit.  If the audit statement reveals an under-payment of more than 3%, Licensee shall not
    be entitled to the Compliance Rate through the date that such discrepancy is fully remedied
    by Licensee.

6.  Philips and Licensee agree to keep the terms of this Side Letter confidential and shall not
    disclose it to third parties, except as may be necessary by either Philips or Licensee to enforce
    its rights hereunder or to comply with a requirement of a competent court or governmental
    body.

**P 001402**

Koninklijke Philips Electronics N.V.
Eindhoven The Netherlands
Commercial Register Eindhoven no. 17001910

 

Ref: Licensee CD
Page: 2

If the above properly reflects our mutual understanding and agreement, please indicate so by signing both copies of this Side Letter and returning these to us. Upon receipt thereof we will arrange for countersignature on our part.

Yours sincerely,

Koninklijke Philips Electronics N.V.

Name: **H . SAKKERS**
Title: **BY PROXY**
Date:

**Read and Agreed:**
Eva-Tone, Inc.

Name: *NORMAN H. WELCHTA.*
Title: *PRESIDENT*
Date: *11/25/02*

**P 001403**

Koninklijke Philips Electronics N.V.
Eindhoven The Netherlands
Commercial Register Eindhoven no. 17001910

Exhibit J

# PHILIPS

**Philips Intellectual Property & Standards**

49512

Direct Dial:   (914) 333-9622
E-Mail: william.lenihan@philips.com

Our File: 1203-0757

January 17, 2006

Mr. Douglas P. Franzen, VP
Eva-Tone, Inc.
P.O. Box 7020
4801 Ulmerton Road
Clearwater, Florida 33762

Re:     Comprehensive CD Disc Licensing Agreement, the DVD Video Disc and DVD RoM
Disc Patent License Agreement and the Patent License Agreement for the Use of AC-3
Technology in the Manufacturing of DVD Video Discs.

Dear Mr. Franzen:

    1. Under the Art. 5.04 of the Comprehensive CD Disc Licensing Agreement, under the
Art. 4.05 of the DVD Video Disc and DVD RoM Disc Patent License Agreement and under the
Art. 3.02 of the Patent License Agreement for the use of AC-3 Technology in the Manufacturing
of DVD Video Discs, ("CD, DVD & AC-3 Agreements") Eva-Tone, Inc. is required to provide
KPENV with royalty reports thirty days after the end of each calendar quarter and to make
royalty payments thirty days after the end of each calendar quarter on all Licensed Product sold
during the preceding calendar quarter.  Eva-Tone, Inc. (i) failed to make such reports and
payments for the 2nd, 3rd, & 4th calendar quarters of the year 2005.  Eva-Tone, Inc. has asked
KPENV (i) to forbear on the remedies available to KPENV under such CD, DVD & AC-3
Agreements (including termination of the CD, DVD & AC-3 Agreements and commencement of
legal action for immediate payment) and (ii) to re-structure payment for the unpaid royalties due
and owing ("Arrears").

    2. Eva-Tone, Inc. has subsequently reported the Arrears for the 2nd and 3rd and 4th
calendar quarters of the year 2005 in the total amount of Five Hundred and Seven Thousand,
Nine Hundred and Forty Four Dollars and Forty-Nine Cents (**$507,944.49**) ("Arrears Amount")
and represents and warrants that the Arrears Amount is true and accurate in all material respects.
Eva-Tone, Inc. shall, prior to January 31, 2008, (i) pay the Arrears Amount in full according to
the following payment schedule.  Interest is calculated at the rate of 6% a year.



Philips Electronics North America Corporation
345 Scarborough Road
PO Box 3001
Briarcliff Manor, NY 10510-8001

Tel: (914) 945-6000
Fax: (914) 332-0615

Mr. Douglas P. Franzen VP
January 17, 2006
Page 2

| Monthly Payment | $22,512.41 |
|---|---|
| Total Interest Without Pre-Payment | $32,353.34 |

| Year | Month | Payment | Principal | Interest | Balance |
|---|---|---|---|---|---|
| 2006 | Feb 5 | $22,512.41 | $19,972.69 | $2,539.72 | $487,971.80 |
| 2006 | Mar 5 | 22512.41 | 20072.55 | 2439.86 | 467899.25 |
| 2006 | Apr 5 | 22512.41 | 20172.91 | 2339.50 | 447726.34 |
| 2006 | May 5 | 22512.41 | 20273.78 | 2238.63 | 427452.56 |
| 2006 | Jun 5 | 22512.41 | 20375.15 | 2137.26 | 407077.41 |
| 2006 | Jul 5 | 22512.41 | 20477.02 | 2035.39 | 386600.39 |
| 2006 | Aug 5 | 22512.41 | 20579.41 | 1933.00 | 366020.98 |
| 2006 | Sep 5 | 22512.41 | 20682.30 | 1830.11 | 345338.68 |
| 2006 | Oct 5 | 22512.41 | 20785.72 | 1726.69 | 324552.96 |
| 2006 | Nov 5 | 22512.41 | 20889.65 | 1622.76 | 303663.31 |
| 2006 | Dec 5 | 22512.41 | 20994.09 | 1518.32 | 282669.22 |
| 2007 | Jan 5 | 22512.41 | 21099.06 | 1413.35 | 261570.16 |
| 2007 | Feb 5 | 22512.41 | 21204.56 | 1307.85 | 240365.60 |
| 2007 | Mar 5 | 22512.41 | 21310.58 | 1201.83 | 219055.02 |
| 2007 | Apr 5 | 22512.41 | 21417.14 | 1095.27 | 197637.88 |
| 2007 | May 5 | 22512.41 | 21524.22 | 988.19 | 176113.66 |
| 2007 | Jun 5 | 22512.41 | 21631.84 | 880.57 | 154481.82 |
| 2007 | Jul 5 | 22512.41 | 21740.00 | 772.41 | 132741.82 |
| 2007 | Aug 5 | 22512.41 | 21848.70 | 663.71 | 110893.12 |
| 2007 | Sep 5 | 22512.41 | 21957.95 | 554.46 | 88935.17 |
| 2007 | Oct 5 | 22512.41 | 22067.73 | 444.68 | 66867.44 |
| 2007 | Nov 5 | 22512.41 | 22178.07 | 334.34 | 44689.37 |
| 2007 | Dec 5 | 22512.41 | 22288.97 | 223.44 | 22400.40 |
| 2008 | Jan 5 | $22,512.40 | $22,400.40 | $112.00 | 0.00 |

Eva-Tone, Inc. CD,DVD, AC-3 workout-011706

Mr. Douglas P. Franzen VP
January 17, 2006
Page 3

3. The Arrears Amount is in addition to and is not a substitute for any other payments due after January 31, 2006, in whole or in part, under the CD, DVD & AC-3 Agreements. Eva-Tone, Inc. shall report and pay royalties due for the period January 1, 2006 through March 31, 2006 no later than April 30, 2006.

4. In view of KPENV's forbearance in not immediately enforcing its rights under the CD, DVD & AC-3 Agreements and in agreeing to the payment terms set forth in paragraph 2, Eva-Tone, Inc. further agrees that:

(a) Eva-Tone, Inc. shall not contest the Arrears Amount and any interest thereon;

(b) Eva-Tone, Inc. stipulates that with respect to the payments due under this Workout Agreement, the Licensed Patents under the CD, DVD & AC-3 Agreements are valid and infringed by the Licensed Products manufactured by Eva-Tone, Inc. during the Arrears period, and Eva-Tone, Inc. shall not contest the validity or infringement of the Licensed Patents with respect to the Arrears Amount (provided, however, that nothing herein shall prevent Eva-Tone, Inc. from contesting the Licensed Patents with respect to sales of Licensed Products after the full and timely payment of all monies payable under paragraph 2; and

(c) If Eva-Tone, Inc. (i) fails to make any of the payments for Arrears as of the due date specified and Eva-Tone, Inc. fails to cure such error within ten (10) business days of written notice by KPENV then:
        (i) the entire remaining unpaid balance of the Arrears Amount shall immediately become due and payable;
        (ii) KPENV shall be entitled to injunctive relief as well as or confession of judgement for the entire unpaid portion of the Arrears Amount; and
        (iii) KPENV shall be entitled to an award of reasonable counsel fees and costs for enforcement of this Workout Agreement.

5. Eva-Tone, Inc. and KPENV shall treat the contents of this Workout Agreement as confidential information and shall not disclose it to third parties, except as may be necessary by either KPENV or Eva-Tone, Inc. to enforce its rights hereunder in a governmental body or court of law.

6. In addition to the other remedies set forth in this Workout Agreement, KPENV shall have the option to terminate this Workout Agreement in the event Eva-Tone, Inc. breaches any term hereof by providing written notice to Eva-Tone, Inc. and Eva-Tone, Inc. fails to cure such breach within ten (10) days of written notice by KPENV. In the event this termination option is exercised by KPENV, Eva-Tone, Inc. shall be entitled to credit for payments made hereunder, but all other rights, remedies and defenses of KPENV shall be preserved. KPENV shall have the right to immediately assert claims (and take whatever legal action it deems appropriate) against

Eva-Tone, Inc. CD,DVD, AC-3 workout-011706

Mr. Douglas P. Franzen VP
January 17, 2006
Page 4

Eva-Tone, Inc. for the full amounts due (as opposed to the compromised amounts set forth herein), less credits to Eva-Tone, Inc. for payments made hereunder.

      7. Eva-Tone, Inc. forever releases and discharges KPENV, its agents, servants, employees, directors, officers, lawyers, branches, parent, affiliates, subsidiaries, successors and assigns and all person, firms, corporations and organizations acting on KPENV's behalf (collectively, the "KPENV Released Entities") of and from any and all losses, damages, claims, demands, liabilities, obligations, actions and causes of action, of any nature whatsoever in law or in equity, contribution or indemnity, which the Eva-Tone, Inc. may have or claim to have against KPENV or any one or more of the KPENV Released Entities, as of January 6, 2006, of every nature and kind whatsoever, on account of or in any way touching, concerning, arising out of, founded upon or relating to i) the CD, DVD & AC-3 Agreements, ii) the obligations of KPENV under the CD, DVD & AC-3 Agreements or otherwise, iii) this Workout Agreement, iv) enforcement or negotiations of this Workout Agreement or the CD, DVD & AC-3 Agreements, v) the dealings of the parties to this Workout Agreement, and vi) anything else whatsoever.

      8. KPENV shall maintain its right of audit under the CD, DVD & AC-3 Agreements and should any such audit reveal facts which are materially different than those represented by Eva-Tone, Inc. to KPENV in negotiating this Workout Agreement, KPENV shall have the right to enforce the CD, DVD & AC-3 Agreements and seek any additional monies which may be due and owing under the CD, DVD & AC-3 Agreements and discovered as a result of such audit.

                            Very truly yours,

                            William J. Lenihan

Mr. Douglas P. Franzen VP
January 17, 2006
Page 5

     Please acknowledge Eva-Tone, Inc.'s approval and acceptance to the foregoing by completing the signature block below.

Eva-Tone, Inc.                                    Koninklijke Philips Electronics N.V.

By:_____          By:_____

Title:_____Pres/CEO_____         Title:___R. PETERS_____
                                                        BY PROXY

Date:___1-18-06_____         Date:_____

Eva-Tone, Inc. CD,DVD, AC-3 workout-011706

Exhibit K

1

# CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this _9th_ day of _August_, 2002 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

METATEC INTERNATIONAL, INC., having its registered office in 7001 Metatec Blvd., Dublin, Ohio 43017 (hereinafter referred to as "Licensee")

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation of Japan ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System together are referred to as "the CD Systems");

WHEREAS, Philips and Sony own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as such patents relating to the CD Systems which are jointly owned by Philips and Sony, while Philips and Sony each retain the right also to license their respective patents relating to the CD Systems separately, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs and wishes such CD-Discs to be compatible with CD-Players conforming to the Standard Specifications for any of the relevant CD Systems; and

2

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein; NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## Article 1 - Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.01 **"Disc"** shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.02 **"CD-Audio Disc"** shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined).

1.03 **"CD-Audio Maxi-Single"** shall mean a CD-Audio Disc which, in addition, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.04 **"CD-ROM Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-ROM Player (as hereinafter defined) and which conforms to the CD-ROM Standard Specifications (as hereinafter defined).

1.05 **"Enhanced Music CD Disc/CD Extra Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, a CD-ROM Player and which conforms to the CD-ROM Standard Specifications and an Enhanced Music CD Player (as hereinafter defined) which conforms to the Enhanced Music CD Standard Specifications (as hereinafter defined).

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc and the CD Extra Disc together are referred to as "CD-Discs".

1.06 **"CD-Audio Standard Specifications"** shall mean the specifications for the CD-Audio System, including the Subcode/Control and Display System, Channels R .W, Chapter 5.8, The CD-TEXT mode, as made available, modified or extended from time to time.

1.07 **"CD-Audio Maxi-Single Standard Specifications"** shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

3

1.08    **"CD-ROM Standard Specifications"** shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.09    **"Enhanced Music CD Standard Specifications"** shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time.

The CD-Audio, CD-Audio Maxi-Single, CD-ROM and Enhanced Music CD Standard Specifications together are referred to as the "CD Standard Specifications".

1.10    **"Player"** shall mean a playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.11    **"CD-Audio Player"** shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

1.12    **"CD-ROM Player"** shall mean a Player solely capable of reproducing information stored on a CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.13    **"Enhanced Music CD Player"** shall mean a Player solely capable of reproducing information stored on a CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.14    **"Combi-Player"** shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player together are referred to as the "CD-Players".

1.15    **"Licensed Product"** shall mean a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

1.16    **"Licensed Patents"** shall mean the patents listed in the relevant Exhibits as selected by Licensee pursuant to the Options below.

**Option A1**: Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications.

4

**Option A2**: Licensee chooses the essential patents listed in Exhibit E1 and Exhibit E2, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-ROM Discs, which conform to the CD-ROM Standard Specifications.

**Option A3**: Licensee chooses the essential patents listed in Exhibit E1, Exhibit E2 and Exhibit E3, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs, which conform to the Enhanced Music CD Standard Specifications.

**Option A4**: Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information.

**Option A5**: Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs.

Option(s):    ✓ A1        ✓ A2        ✓ A3        ✓ A4        ✓ A5

(please tick any combination as appropriate)

Initial: _____

The term **"essential"** as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips will commission an independent patent expert to review the European, Japanese and US patents listed as essential in Exhibits E1, E2, E3 and E4 in order to confirm the essentiality of such patents. In the event that such independent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips shall delete such patent (as well as the equivalent national patents) from the relevant Exhibit and such patent will be put on the relevant Exhibit of non-essential patents. Any such finding and deletion however, shall not affect the obligation of Licensee to pay the royalty on each Licensed Product as specified in Article 5.02, provided that, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

5

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of January 1, 1985), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of Licensed Products and which have a filing date or are entitled to a so-called priority date prior to either January 1, 1983 for CD-Audio Discs, January 1, 1985 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Exhibits hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents. Any patents as may be added as essential patents to any of the respective Exhibits hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of the Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon execution of this Agreement.

1.17    **"Associated Company"** shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.18    **"Territory"** shall mean the geographic area known as the United States of America, its territories and possessions.

### Article 2 – Grant of Rights

Subject to the conditions of this Agreement:

2.01    For the term of this Agreement, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents selected by Licensee pursuant to Article 1.16 to manufacture Licensed Products within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world.

6

2.02   Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and
       effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee,
       upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-
       license arrangement or by means of individual licenses from Philips and/or Sony respectively,
       on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the
       Territory and to sell or otherwise dispose of Licensed Products so manufactured in all
       countries of the world, under any patents not yet licensed hereunder and which are essential
       to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or
       Sony and their respective Associated Companies may hereafter acquire from third parties the
       free right to grant licenses. It is acknowledged and agreed that in respect of the patents as
       may be licensed pursuant to this Article 2.02, additional royalties may have to be paid over
       and above the royalties specified in Article 5.02.

2.03   Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and
       effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee
       upon Licensee's request as well as to those of Licensee's Associated Companies who so
       request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory
       conditions either by means of a sub-license arrangement or by means of individual licenses
       from Philips and/or Sony respectively, to manufacture CD-Audio Players, CD-ROM Players,
       Enhanced Music CD Players and/or Combi-Players and to sell or otherwise dispose of such
       Players so manufactured in all countries of the world, under any and all present and future
       patents essential to the manufacture, sale or other disposal of such Players, for which Philips
       and/or Sony and their respective Associated Companies may hereafter acquire the free right
       to grant licenses.

2.04   In consideration of the undertakings set forth in Articles 2.01, 2.02 and 2.03 and similar
       undertakings by third party licensees of Philips and without prejudice to the provisions of
       Article 12, for a period of ten years from the Effective Date (as hereinafter defined) Licensee
       agrees to grant to Philips, Sony and their respective Associated Companies and to other third
       parties who have entered or will enter into a license agreement with Philips or an Associated
       Company of Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on
       reasonable, non-discriminatory conditions comparable to those set forth herein, to
       manufacture, sell or otherwise dispose of CD-Discs, under any and all present and future
       patents, for which Licensee or its Associated Companies have or may hereafter acquire the
       right to grant licenses and which are essential to the manufacture, sale or other disposal of
       such CD-Discs as correspond with the Licensed Patents selected by Licensee pursuant to
       Article 1.16 and which patents were first filed in any country of the world prior to the date of
       termination of this Agreement. For the avoidance of doubt, the undertaking set out in the
       preceding sentence shall only apply to those companies which have made the same selection
       pursuant to Article 1.16 as Licensee and which in that respect accept or have accepted a
       similar undertaking as contained in this Article 2.04.

2.05   In addition, in consideration of the undertakings set forth in Articles 2.01, 2.02, 2.03 and 2.04
       and similar undertakings by third party licensees of Philips or any of its Associated
       Companies and without prejudice to the provisions of Article 12, for a period of ten years
       from the Effective Date, Licensee agrees to grant to Philips, Sony and their respective
       Associated Companies and to other third parties who have entered or will enter into a license
       agreement with Philips or an Associated Company of Philips concerning Players, non-

7

exclusive, non-transferable licenses on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of such CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such Players and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which accept or have accepted a similar undertaking as contained in this Article 2.05.

2.06    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

In consideration of Philips' undertaking as set out in the preceding paragraph, Licensee undertakes that all of its Associated Companies which have or may hereafter acquire patents essential to the manufacture, sale or other disposal of CD-Discs and which patents were first filed in any country of the world prior to the date of termination of this Agreement, shall make available licenses under such patents, on reasonable, non-discriminatory conditions comparable to those set forth herein to Philips, any of Philips' Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips in respect of CD-Discs.

2.07    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER/RECORDER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF RECORDING/PLAYBACK DEVICES DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR RECORDING/PLAYBACK DEVICES (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVI-CES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR PATENTS RELATING TO CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS, RECORDING/PLAYBACK DEVICES WITH ANY OTHER ITEMS, PRODUCTS, SYSTEMS, STRUCTURES, EQUIPMENT OR

8

SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED
PRODUCT AND A PLAYER OR RECORDING/PLAYBACK DEVICE.

### Article 3 - Standard Specifications, Technical Information and Support

3.01    Upon receipt of the payment provided for in Article 5.01 and the payment provided for in Article 5.12, Philips shall make available to Licensee for use by Licensee in accordance with the provisions hereof, a copy of the then current version of the respective CD Standard Specifications, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, together with such other information and support as Philips considers necessary for the interpretation and/or correct application of the relevant CD Standard Specifications.

3.02    Licensee shall be notified in writing of any addition or modification to any of the relevant CD Standard Specifications and shall be provided with relevant information in connection therewith.

3.03    Philips and Licensee undertake to keep each other generally informed of developments or initiatives, which may have an impact on the relevant CD Standard Specifications.

### Article 4 - Have Made

4.01    The rights granted to Licensee pursuant to Article 2 and the right to use the information pursuant to Article 3, include the right for Licensee to have Licensed Products made for it by third party manufacturers, duly licensed by Philips under an agreement similar to this Agreement, provided that Licensee will properly identify such third party manufacturer in the royalty reporting forms to be submitted to Philips hereunder, together with the quantities of Licensed Products so purchased.

Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any third party not licensed by Philips, where such purchase or sale would constitute an act of infringement of any of the Licensed Patents.

### Article 5 - Royalties, Reports and Payments

5.01    In consideration of the rights granted by Philips and the information to be provided by Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable, non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.02    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee agrees to pay to Philips a royalty on each Licensed Product sold by Licensee, in which any one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed Patent(s) is (are) used in the country of manufacture, sale or other disposal.

These royalties shall amount to:

9

(a)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-Audio Disc
       with an outer diameter greater than 90 mm; and
(b)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-Audio Disc
       with an outer diameter smaller than 90 mm; and
(c)    US$ 0.027 (two point seven US Dollar cents) for each Licensed Product being a CD-
       Audio Maxi-Single; and
(d)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-ROM Disc
       with an outer diameter greater than 90 mm; and
(e)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-ROM Disc
       with an outer diameter smaller than 90 mm; and
(f)    US$ 0.045 (four and a half US Dollar cents) for each Licensed Product being a CD
       Extra Disc with an outer diameter greater than 90 mm; and
(g)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc
       with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Standard Rates".

With respect to Licensed Products sold after July 1, 2002, provided that Licensee is in full
compliance with its obligations under this Agreement and subject to Article 6.01, the royalties
shall amount to:

(a)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product
       being a CD-Audio Disc with an outer diameter greater than 90 mm; and
(b)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Pro-
       duct being a CD-Audio Disc with an outer diameter smaller than 90 mm; and
(c)    US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each Licensed
       Product being a CD-Audio Maxi-Single; and
(d)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product
       being a CD-ROM Disc with an outer diameter greater than 90 mm; and
(e)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Pro-
       duct being a CD-ROM Disc with an outer diameter smaller than 90 mm;
(f)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc
       with an outer diameter greater than 90 mm; and
(g)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD Extra Disc
       with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations hereunder,
the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs
instead of the Compliance Rates, as applicable, with immediate effect from the moment of
such non-compliance until such moment that Licensee's non-compliance will have been
remedied in full.

A Licensed Product shall be considered sold when invoiced or, if not invoiced, when
delivered to a party other than Licensee.

10

No royalties shall be payable on Licensed Products purchased by Licensee on a "have made" basis in accordance with Article 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such Licensed Products.

For the avoidance of doubt, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist.

5.03    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Exhibit C3 (Royalty Reporting Form) signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee, specified per individual type of CD-Disc;

(2)    the quantities of CD-Discs purchased from other licensed manufacturers in accordance with the provisions of Article 4, specified per individual type of CD-Disc;

(3)    on a per-country basis, specifying for each individual type of CD-Disc:

(a)    the quantities of CD-Discs sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)    the quantities of CD-Discs sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period, in such US Dollars.

5.04    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Article 5.03, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder.

11

Licensee acknowledges and agrees that any Advance shall not be due by way of penalty but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time; the payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form; the payment by Licensee of an Advance shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.05    Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be public certified auditors, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet Philips' requirements as specified in the Audit Guidelines attached hereto as Exhibit C1 and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement shall be verified by Philips by means of a work paper review, conducted by one of the public certified auditors selected by Philips. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Article 5.10.

5.06    Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of Licensed Products in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Article 5.02 and Article 5.12, shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Article 5.06 shall be without prejudice to the provisions of Article 12.06.

5.07    Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.08    All payments to Philips under this Agreement shall be made by transfer in such currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.09    All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of

P 001593

12

a country imposes any income taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Article 5 may be verified, Licensee shall keep complete and accurate books and records and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each Licensed Product.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a public certified auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Article 5.03 and Article 5.05, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Article 5.10 shall survive termination or expiration of this Agreement.

5.11    Without prejudice to the provisions of Article 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12    As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of CD-Discs manufactured and sold or otherwise disposed of by Licensee before the Effective Date of this Agreement in accordance with the provisions of Article 5.03. Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties on such CD-Discs, calculated by applying the royalty rates of (a) US$ 0.03 for each CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, (b) US$ 0.02 for each CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, (c) US$ 0.027 for each CD-Audio Maxi-Single and (d) US$ 0.045 or US$ 0.048 for each CD Extra Disc, depending on the selection made by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement. The royalty statement shall similarly be subject to Philips' right of audit as set out in Article 5.10. Within 45 days following the execution of this Agreement, Licensee shall submit to Philips an audit statement by its

**P 001594**

13

external auditors, who shall be public certified auditors, confirming that this royalty statement is true, complete and accurate in every respect.

## Article 6 – Manufacturing Equipment Identification System

6.01    Upon signing of the Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment used for the manufacture of Licensed Products. Further, upon any acquisition, transfer or disposal of manufacturing equipment used for the manufacture of Licensed Products, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Article 5.05. Such overview shall be in the form as attached hereto as Exhibit C2 (Manufacturing Equipment List), signed by a duly authorized officer on behalf of Licensee. The Compliance Rates referred to in Article 5.02 shall only apply to Licensed Products manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting Philips' requirements as set out in the Audit Guidelines, in accordance with the provisions in Article 5.05. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used for the manufacture of Licensed Products prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee can demonstrate to Philips' full satisfaction, that the newly acquired manufacturing equipment originates from and has been used by a company which was properly licensed by Philips for the manufacture of Licensed Products and in full compliance with its obligations under its-license agreement at the time of the acquisition of the newly acquired manufacturing equipment by Licensee. In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rates shall apply to Licensee's manufacture and sale of Licensed Products instead of the Compliance Rates.

## Article 7 - Most Favourable Conditions

7.01    In the event that licenses under the patents referred to in Article 2 are granted by Philips for Licensed Products to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

14

## Article 8 – No Warranty and Indemnification

8.01    Whereas Philips has made efforts to ensure that the information to be supplied by it hereunder is complete and accurate, Philips makes no representation or warranty as to the accuracy or completeness of such information, nor with respect to the ability of Licensee to achieve interchangeability with respect to Licensed Products through the use of such information.

8.02    It is acknowledged by Licensee that third parties may own industrial and/or intellectual property rights in the field of CD-Discs. Philips and Sony make no warranty whatsoever that the manufacture, sale or other disposal of Licensed Products or the use of information supplied by Philips hereunder, does not infringe or will not cause infringement of any industrial and/or intellectual property rights other than Licensed Patents. Philips, Sony and their respective Associated Companies shall be fully indemnified and held harmless by Licensee from and against any and all third party claims in connection with CD-Discs manufactured, sold or otherwise disposed of by Licensee.

## Article 9 - Confidentiality

9.01    Licensee shall at all times maintain strict confidentiality with regard to the CD Standard Specifications and shall not disclose same to any third party without the prior written consent of Philips.

9.02    Without prejudice to Article 9.01, Licensee shall, during the term of this Agreement as specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Associated Companies in connection with this Agreement, or use such information for any other purpose than the manufacture or disposal of Licensed Products in accordance with this Agreement. This obligation shall not apply to the extent information so acquired:

(a)    was known to Licensee prior to the date on which such information was acquired from Philips or any of Philips' Associated Companies, as shown by records of Licensee or otherwise demonstrated to Philips' satisfaction;

(b)    is or has become available to the public through no fault of Licensee;

(c)    was or is received from a third party who was under no confidentiality obligation in respect of such information.

In protecting information acquired from Philips or any of Philips' Associated Companies, Licensee shall take all necessary measures and precautions, including but not limited to measures requiring its present and future employees to give suitable undertakings of secrecy both for the period of their employment and thereafter, and shall protect such information in the same manner and with the same degree of care (but no less than a reasonable degree of care) with which Licensee protects its own information of a confidential nature.

15

9.03    The obligations concerning confidentiality contained in Article 9.01 and Article 9.02 shall survive termination of this Agreement

9.04    Philips shall, during the term of this Agreement as specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party any confidential information obtained by Philips in connection with Article 5.03 and/or Article 5.05, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections a, b and/or c of Article 9.02.

## Article 10 - Logo

10.01    For the term of this Agreement and subject to the full and timely performance and observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be entitled to use on the Licensed Products as well as in advertisements and sales literature with respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo") in accordance with the instructions laid down in the CD-Logo Guide which shall be made available to Licensee together with the Standard Specifications.

10.02    Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of the Logo does not infringe or will not cause infringement of any third party intellectual property rights.

## Article 11 – No Assignment

11.01    This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips.

## Article 12 - Term and Termination

12.01    This Agreement shall enter into force on the "Effective Date", being the date first written above. In the event that validation of this Agreement is required by the competent governmental authorities, the Effective Date shall be the date of such validation. This Agreement shall remain in force for a period of 10 years from the Effective Date unless terminated earlier in accordance with the provisions of this Article 12.

12.02    Without prejudice to the provisions of Article 12.03 through 12.06, each party may terminate this Agreement at any time by means of written notice to the other party in the event that the other party fails to perform any obligation under this Agreement and such failure is not remedied within 30 days after receipt of a notice specifying the nature of such failure and requiring it to be remedied. Such right of termination shall not be exclusive of any other

16

remedies or means of redress to which the non-defaulting party may be lawfully entitled, and all such remedies shall be cumulative. Any such termination shall not affect any royalty or other payment obligations under this Agreement accrued prior to such termination.

12.03    Philips may terminate this Agreement forthwith by means of notice in writing to Licensee in the event that a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Licensee or in the event that Licensee makes any voluntary arrangement with its creditors or becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law.

12.04    Additionally, insofar as legally permitted, Philips may terminate this Agreement at any time by means of written notice to Licensee in case Licensee or an Associated Company of Licensee has been found liable by a competent court or administrative authority to have committed an act of copyright piracy.

12.05    Philips shall have the right to terminate this Agreement forthwith or to revoke the license granted under any of Philips' or Sony's respective patents in the event that Licensee or any of its Associated Companies brings a claim for infringement of any of Licensee's or any of Licensee's Associated Companies essential patents relating to CD-Discs or CD-Players against Philips, Sony or any of their respective Associated Companies and Licensee refuses to license such patents on fair and reasonable conditions.

12.06    Upon the termination of this Agreement by Philips for any reason pursuant to Article 12.02 through 12.05, Licensee shall immediately cease the manufacture, sale or other disposal of CD-Discs in which any one or more of the Licensed Patents are used. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

12.07    All provisions of this Agreement which are intended to survive (whether express or implied) the expiry or termination of this Agreement, shall so survive.

## Article 13 - Miscellaneous

13.01    Any notice required under this Agreement to be sent by either party shall be given in writing by means of a letter, facsimile or electronic mail directed:

in respect of Licensee, to:

Metatec International, Inc.
7001 Metatec Blvd.
Dublin, Ohio 43017
Fax: (614) 798-5847

17

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips International B.V.
Intellectual Property & Standards - Legal Department
P.O. Box 220, Building WAH-2
5600 AE Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

U.S. Philips Corporation
580 White Plains Road
Tarrytown, New York 10591
Fax: (914) 332-0615

or to such other address as may have been previously specified in writing by either party to
the other.

13.02   This Agreement sets forth the entire understanding and agreement between the parties as to
the subject matter hereof and supersedes and replaces all prior arrangements, discussions and
understandings between the parties relating thereto. Neither party shall be bound by any
obligation, warranty, waiver, release or representation except as expressly provided herein, or
as may subsequently be agreed in writing between the parties.

13.03   Nothing contained in this Agreement shall be construed:

(a)     as imposing on either party any obligation to instigate any suit or action for
infringement of any of the patents licensed hereunder or to defend any suit or action
brought by a third party which challenges or relates to the validity of any of such
patents. Licensee shall have no right to instigate any such suit or action for
infringement of any of the patents licensed by Philips hereunder, nor the right to
defend any such suit or action which challenges or relates to the validity of any such
patent licensed by Philips hereunder;

(b)     as imposing any obligation to file any patent application or to secure any patent or to
maintain any patent in force;

(c)     as conferring any license or right to copy or imitate the appearance and/or design of
any product of Philips, Sony or any of their Associated Companies;

(d)     as conferring any license to manufacture, sell or otherwise dispose of any product or
device other than a Licensed Product.

13.04   Neither the failure nor the delay of either party to enforce any provision of this Agreement
shall constitute a waiver of such provision or of the right of either party to enforce each and
every provision of this Agreement.

18

13.05   Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by written notice to Licensee.

13.06   This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS N.V.

Name:   B. Mache

Title:   by prox.

Date:   8/13/2002

METATEC  INTERNATIONAL, INC.

Name:

Title:   CFO

Date:   8\2\2002

Exhibit E1 to the CD Disc Patent License Agreement

CD-Disc/CD-Audio and CD-Maxi Single part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AR | Q 080007 | - | 285958 | 02-Jul-81 | | 250649 | 06-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | Q 080009 | - | 285400 | 20-May-81 | | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | Q 080007 | - | 81-A3107 | 14-Jul-81 | | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | Q 080009 | - | 81-A2215 | 18-May-81 | 395794 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | Q 080007 | - | 98-00033 | 21-Apr-98 | | | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | P15.688 | - | 399554 | 26-Mar-82 | | 1207443 | 08-Jul-03 | Optical readable carriers |
| CA | Q 080007 | - | 381362 | 08-Jul-81 | | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q 080007 | A | 514656 | 02-Aug-82 | | 514656 | 20-Jun-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q 080009 | - | 502320 | 19-May-81 | | 502320 | 09-Sep-02 | Error correctable data transmission method |
| US | N 006493 | D | 06/858550 | 23-Apr-86 | | 5068846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | P15.688 | - | 890316 | 30-Mar-82 | | 5305301 | 19-Apr-11 | Optical readable carriers |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate        21 June 2002

Exhibit E2 to the CD Disc Patent License Agreement

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | P18,816 | 84901011.1 | 02-Mar-84 | | 52866 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AT | Q 083025 | 84-42769 | 29-Aug-84 | | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | E40835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-40240 | 22-Mar-85 | | 584883 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | PI8404319 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | PI8501277.7 | 21-Mar-85 | | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | PI8700846 | 23-Feb-07 | Real-time format switching |
| CA | P | | | | 1235812 | 26-Apr-05 | Disc playback apparatus |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 1280208 | 12-Feb-08 | Real-time format switching |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 1010517 | 21-Feb-07 | Real-time format switching |
| CZ | Q 084008 | 85-PV2009 | 21-Mar-85 | | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | P | 84305176.4 | 30-Jul-84 | | P3476289.2 | 30-Jul-04 | Disc playback apparatus |
| DE | P18,816 | 84901011.1 | 02-Mar-84 | | P3482291.7 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | P3701763.2 | 21-Feb-87 | 3701763 | 3701763 | 22-Jan-87 | Real-time format switching |
| FR | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| FR | P18,816 | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 2561839 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 2594996 | 20-Feb-07 | Real-time format switching |
| GB | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| GB | P18,816 | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM /XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Printdate          27 June 2002

P 001602

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| GB | Q 084008 | | 8507248 | 20-Mar-85 | | 2166555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 | | 8704011 | 20-Feb-87 | | 2187008 | 20-Feb-07 | Real-time format switching |
| HK | Q 083025 | | NOT GIVEN | 28-Aug-84 | | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | | NOT GIVEN | 20-Mar-85 | | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 086003 | | 87-A19447 | 20-Feb-87 | | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | P | | | | | 1912619 | 30-Jul-03 | Disc playback apparatus |
| JP | P18,816 | | 35459/83 | 04-Mar-83 | | 19126134 | 04-Mar-03 | Method and apparatus for recording digitized infor |
| JP | Q 083025 | | 83-161514 | 01-Sep-83 | 60-52361 | | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | | 84-57595 | 24-Mar-84 | 60-201575 | | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 | | 87-39997 | 23-Feb-87 | 87-217468 | | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 | | 85-1914 | 23-Mar-85 | 94-8742 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 | | 87-1501 | 23-Feb-87 | 95-7946 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | P | | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| NL | Q 084008 | | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 | | 8600450 | 24-Feb-86 | 8600450 | 192151 | 24-Feb-06 | Real-time format switching |
| SE | Q 084008 | | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 | | 8700711.8 | 20-Feb-87 | | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 | | NOT GIVEN | 20-Mar-85 | | 9290553.8 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 | | 84-PV6607 | 03-Sep-84 | | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 | | 85-PV2009 | 21-Mar-85 | | 278566 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 | | 76100969 | 25-Feb-87 | | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 | | 3874714 | 22-Mar-85 | | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | P | | 18845 | 24-Feb-84 | | 4731774 | 15-Mar-05 | CD-ROM Error Correction System A |
| US | P18,816 | | 666237 | 02-Mar-84 | | 4707818 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| US | Q 084008 | R | 07/379627 | 13-Jul-89 | | RE33462 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 086003 | | 07/018163 | 24-Feb-87 | | 4802169 | 24-Feb-07 | Real-time format switching |

Page 2 of 2

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
*as an integral part of this list*

Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM /XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Printdate        27 June 2002

Exhibit E3 to the CD-Disc Patent License Agreement
CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | S85P0059 | 85900170.3 | 30-Nov-84 | · | E76996 | 30-Nov-04 | Disc recording medium |
| AT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | · | | Mass produced multisessions disc |
| AT | S85P0806 | · | · | · | E206238 | | Recording medium having a first management area |
| AU | N 013661 | 92-13942 | 31-Mar-92 | 9213942 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S85P0059 | 37412/85 | 30-Nov-84 | 3741285 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S94P5088 | 34358/95 | 19-Oct-95 | · | 703045 | 19-Oct-15 | Mass produced multisessions disc |
| AU | S85P0806 | 40388/95 | 13-Dec-85 | 692361 | 692361 | 13-Dec-15 | Recording medium having a first management area |
| AU | S96P0005 | 22565/00 | 24-Mar-00 | · | 728279 | 23-Jan-16 | Multi-session disc having disc type code area loca |
| BR | S85P0806 | 9505999 | 21-Dec-85 | · | · | | Recording medium having a first management area |
| CA | N 013661 | 2064511 | 31-Mar-92 | · | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | S85P0806 | 2164801 | 08-Dec-95 | · | · | | Recording medium having a first management area |
| CH | S85P0059 | 85900170.3 | 30-Nov-84 | · | 165320 | 30-Nov-04 | Disc recording medium |
| CH | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | · | | Mass produced multisessions disc |
| CN | S94P5088 | 95116095.8 | 19-Oct-95 | CN1131311A | · | | Mass produced multisessions disc |
| CN | S85P0806 | 95121699 | 22-Dec-95 | CN1135633A | · | | Recording medium having a first management area |
| CN | S96P0005 | 96104382 | 30-Jan-96 | CN1137675A | · | | Multi-session disc having disc type code area loca |
| CZ | N 013685 | 92-PV970 | 01-Apr-92 | · | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 69226116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S85P0059 | 85900170.3 | 30-Nov-84 | · | P3485761.3 | 30-Nov-04 | Disc recording medium |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | · | | Mass produced multisessions disc |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | · | | oduced multisessions disc for playback on audio-on |
| DE | S85P0806 | 95119580.9 | 12-Dec-95 | DE69522917T | 69522917 | 12-Dec-15 | Recording medium having a first management area |
| ES | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 2118784 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ES | S85P0806 | 95119580.9 | 12-Dec-85 | ES2163469T | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S85P0059 | 85900170.3 | 30-Nov-84 | 708445 | 165320 | 30-Nov-04 | Disc recording medium |

*All corresponding patent applications, patents, divisions, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Page 1 of 4                                                                 Printdate            21 June 2002

P 001604

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| FR | S94P5088 | 95307463.0 | 19-Oct-95 | - | - | - | Mass produced multisessions disc |
| FR | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| GB | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| GB | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| GB | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| HK | S85P0059 | - | 25-May-95 | - | 081511995 | - | Disc recording medium |
| HK | S94P5088 | 98103776.7 | 04-May-98 | - | - | - | Mass produced multisessions disc |
| HU | N 013685 | P9201055 | 30-Mar-92 | - | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S95P0806 | P-952737 | 19-Dec-95 | - | - | - | Recording medium having a first management area |
| ID | S96P0005 | P-960210 | 30-Jan-96 | 012.695A | ID0004712 | 30-Jan-16 | Multi-session disc having disc type code area loca |
| IN | S95P0806 | 2287/DEL/95 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| IN | S96P0005 | 0188/DEL/96 | 29-Jan-96 | - | - | - | Multi-session disc having disc type code area loca |
| IT | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content Information in Lead-Out |
| IT | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| IT | S95P0806 | 95119580.9 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| IT | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| JP | 84000899 | 58226598 | 30-Nov-83 | 60-119670 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 | 59-057595 | 24-Mar-84 | 60-201575 | 2085842 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060963 | 07311437 | 29-Nov-95 | 08-227577 | - | - | Recording medium having a first management area |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013661 | 92-81010 | 02-Apr-92 | 93-89596 | 3239651 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013685 | 92-79901 | 01-Apr-92 | 93-94675 | - | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S85P0059 | 59-057596 | 24-Mar-84 | 60-201576 | 1981180 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | S94P5088 | 07-270200 | 18-Oct-95 | - | - | - | Mass produced multisessions disc |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 4    Printdate    21 June 2002

P 001605

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|----------|-------------|-------|
| JP | S95P0806 | 06320107 | 22-Dec-94 | . | . | . | Recording medium having a first management area |
| JP | S96P005 | 07013211 | 30-Jan-95 | 08-203210 | . | . | Multi-session disc having disc type code area loca |
| KR | N 013661 | 92-5313 | 31-Mar-92 | 92-20420 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013685 | 92-5314 | 31-Mar-92 | 92-20418 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 | 85-700146 | 29-Jul-85 | 85-00175 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 | 92-702698 | 30-Oct-92 | . | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S94P5088 | 95-35873 | 18-Oct-95 | . | . | . | Mass produced multisessions disc |
| KR | S95P0806 | 95-72133 | 21-Dec-95 | 96-25644 | . | . | Recording medium having a first management area |
| KR | S96P0005 | 96-42552 | 30-Jan-96 | 96-30119 | . | . | Multi-session disc having disc type code area loca |
| MX | S95P0806 | 955172 | 11-Dec-95 | . | 189100 | 11-Dec-15 | Recording medium having a first management area |
| MY | S95P0806 | PI9503773 | 07-Dec-95 | . | . | . | Recording medium having a first management area |
| MY | S96P0005 | PI9600317 | 29-Jan-96 | . | . | . | Multi-session disc having disc type code area loca |
| NL | S85P0059 | 85900170.3 | 30-Nov-84 | . | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | . | . | Mass produced multisessions disc |
| NL | S95P0806 | 95119580.9 | 12-Dec-95 | . | . | . | Recording medium having a first management area |
| NL | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | . | . | Multi-session disc having disc type code area loca |
| PL | S95P0806 | P312001 | 21-Dec-95 | . | 179600 | 21-Dec-15 | Recording medium having a first management area |
| PL | S95P0806 | P338168 | 28-Feb-00 | . | 179603 | 21-Dec-15 | Recording medium having a first management area |
| RU | N 013661 | 5011395 | 01-Apr-92 | . | 2072566 | 01-Apr-12 | Recording of content information in Lead-Out |
| RU | S95P0806 | 95122380 | 21-Dec-95 | . | 2162252 | 21-Dec-15 | Recording medium having a first management area |
| RU | S95P0805 | 99128046 | 30-Dec-99 | . | . | . | Recording medium having a first management area |
| RU | S95P0806 | 99104165 | 03-Jan-99 | . | . | . | Recording medium having a first management area |
| RU | S95P0806 | 99103927 | 03-Jan-99 | . | . | . | Recording medium having a first management area |
| SE | S85P0059 | 85900170.3 | 30-Nov-84 | . | 165320 | 30-Nov-04 | Disc recording medium |
| SE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | . | . | Mass produced multisessions disc |
| SG | S95P0806 | 9502053 | 07-Dec-95 | . | 38892 | 07-Dec-15 | Recording medium having a first management area |
| SG | S96P0005 | 9600515 | 27-Jan-96 | . | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013685 | 92-PV0970 | 01-Apr-92 | . | 282293 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TH | S95P0806 | 028364 | 20-Dec-95 | 22587 | . | . | Recording medium having a first management area |
| TR | S95P0806 | 053122 | 21-Dec-95 | 960597 | . | . | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Page 3 of 4                                                                                              Printdate          21 June 2002

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| TW | N 013661 . | 80109966 | 19-Dec-91 | UNKNOWN 57337 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| TW | N 013685 . | 80109963 | 19-Dec-91 | 59397 | 59397 | 19-Dec-11 | CD-ROM XA Multi-session WO |
| TW | S94P5088 . | 83109977 | 28-Oct-94 | | 72376 | 27-Oct-14 | Mass produced multisessions disc |
| TW | S95P0806 . | 84113465 | 16-Dec-95 | | 86403 | 15-Dec-15 | Recording medium having a first management area |
| UA | N 013661 . | 93002573 | 15-Nov-93 | | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 013661  V | 07/800874 | 18-Jun-92 | | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |
| US | N 013685  A | 08/180002 | 11-Jan-94 | | 5390159 | 14-Feb-12 | CD-ROM XA Multi-session WO |
| US | N 013685  B | 08/328307 | 24-Oct-94 | | 5878019 | 02-Mar-16 | CD-ROM XA Multi-session WO |
| US | N 013685  V | 08/371644 | 12-Jan-95 | | 5684786 | 04-Nov-14 | CD-ROM XA Multi-session WO |
| US | N 013709  D | 08/707845 | 09-Sep-96 | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S85P0059 . | 266207 | 27-Oct-88 | | 4893193 | 09-Jan-07 | Disc recording medium |
| US | S94P5088 . | 324406 | 20-Oct-94 | | | | Mass produced multisessions disc |
| US | S94P5088 . | 471982 | 06-Jun-95 | | 5661715 | 20-Oct-14 | Mass produced multisessions disc |
| US | S95P0806 . | 572528 | 14-Dec-95 | | 5754521 | 14-Dec-15 | Recording medium having a first management area |
| US | S96P0005 . | 592962 | 29-Jan-96 | | 5778257 | 29-Jan-16 | Multi-session disc having disc type code area loca |
| VN | S95P0806 . | S-1614/95T2 | 26-Jun-00 | | . | | Recording medium having a first management area |
| VN | S95P0806 . | S-1614/95 | 21-Dec-95 | | . | | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate        21 June 2002

Exhibit E4 to the CD Disc Patent License Agreement

CD–Disc/CD–Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104337 | 13-Sep-96 | | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information recorde |
| AT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 65625/96 | 13-Sep-96 | - | 714409 | 13-Sep-16 | Reproducing medium having text information recorde |
| AU | D 088009 | 89-28557 | 18-Jan-89 | 639411 | 639411 | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603829 | 20-Sep-96 | - | | 28-Sep-16 | Reproducing medium having text information recorde |
| CA | D 088009 | 588304 | 16-Jan-89 | | 1322593 | 28-Sep-10 | Repeated transfer of subcode data |
| CH | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | - | 22-Sep-16 | Reproducing medium having text information recorde |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| CN | D 088009 | 89101069.6 | 19-Jan-89 | 1035577-A | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009  A | 92102717.6 | 19-Jan-89 | 1068673-A | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 284768 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | P63612472.6 | 03-Dec-16 | Disc Reproducing apparatus |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| DE | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | - | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 68927063.1 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| FR | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | - | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information recorde |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | - | 31-Oct-16 | Recording medium and its reproducing apparatus |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98105421.9 | 16-Jan-89 | - | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-96 | - | - | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963566 | 02-Dec-96 | - | 656 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962647 | 19-Sep-96 | - | - | 19-Nov-16 | Reproducing medium having text information records |
| ID | 95085448 | P963188 | 04-Nov-96 | - | 5137 | 04-Nov-16 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | 014759-A | - | 12-Sep-10 | Transferring information via the lead-in of CD |
| IN | 95069128 | 2023/DEL/96 | 16-Sep-96 | - | - | 16-Sep-11 | Reproducing medium having text information records |
| IN | N 015474 | 96-1617 | 11-Sep-96 | - | - | 11-Sep-10 | Transferring Information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | - | 26-Aug-16 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244959 | 22-Sep-95 | 09-091880 | - | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310080 | 02-Nov-95 | 09-128868 | - | 22-Sep-15 | Reproducing medium having text information records |
| JP | 95100948 | 08-242859 | 26-Aug-96 | 10-64245 | - | 02-Nov-15 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7176 | 3092924 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-509270 | - | 09-Sep-16 | Transferring Information via the lead-in of CD |
| KR | 95063039 | 96-62692 | 07-Dec-96 | 97-50695 | - | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | - | 23-Sep-16 | Reproducing medium having text information records |
| KR | 95085448 | 96-51644 | 02-Nov-96 | 98-29706 | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | - | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | - | 196099 | 09-Sep-16 | Transferring Information via the lead-in of CD |
| MX | 95069128 | 964179 | 19-Sep-96 | - | - | 19-Sep-16 | Recording medium and its reproducing apparatus |
| MX | N 015474 | 973530 | 09-Sep-96 | - | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 95063039 | 9605148 | 07-Dec-96 | - | - | | Disc Reproducing apparatus |
| MY | 95069128 | 9603888 | 20-Sep-96 | - | - | | Reproducing medium having text information records |
| MY | N 015474 | PI9603765 | 13-Sep-96 | | - | | Transferring Information via the lead-in of CD |
| NL | 95069128 | 96115085.1 | 19-May-96 | 791925 | - | 19-Sep-16 | Reproducing medium having text information records |
| PH | 95069128 | 54335 | 19-Sep-96 | 54335 | - | | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3

Printdate    21 June 2002

P 001609

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| PT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 | 4613351 | 17-Jan-89 | | 2095857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | 9704856.5 | 09-Sep-96 | | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 | 89-PV0287 | 16-Jan-89 | | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 95069128 | 851577 | 21-Sep-96 | • | 94512 | 20-Sep-16 | Reproducing medium having text information recorde |
| TW | D 088009 | 78100300 | 17-Jan-89 | | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | 85114202 | 19-Nov-96 | 410326 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 | 93003372 | 17-Jan-89 | | 26980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 95063039 | 09/515696 | 24-Feb-00 | • | 5745464 | 20-Sep-16 | Disc Reproducing apparatus |
| US | 95063039 | 753675 | 27-Nov-96 | • | 5825731 | 27-Nov-16 | Disc Reproducing apparatus |
| US | 95069128 | 716953 | 20-Sep-96 | • | 5859821 | 30-Oct-16 | Reproducing medium having text information recorde |
| US | 95085448 | 739821 | 30-Oct-96 | | - | | Recording medium and its reproducing apparatus |
| US | D 088009  B | 08/300002 | 05-Apr-93 | • | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | 08/716668 | 16-Sep-96 | • | 5798990 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 95069128 | SC0210/96 | 21-Sep-96 | • | - | 02-Nov-10 | Recording medium and its reproducing apparatus |
| VN | 95085448 | SC0328/96 | 02-Nov-96 | • | - | 21-Sep-10 | Reproducing medium having text information recorde |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Printdate          21 June 2002

# Exhibit E5 to the CD Disc Patent License Agreement

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Sector and Word Offset in Video Header |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Method of transmitting full motion |
| AT | N 013709 | 91201373.2 | 03-Jun-91 | 0460751-A3 | E157830 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219    641726 | 641726 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| BE | N 013709 | 91201373.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2036585 | 19-Feb-91 | | 2036585 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Sector and Word Offset in Video Header |
| CA | N 013409 | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409  A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Sector and Word Offset in Video Header |
| DE | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 3855114 | 27-Apr-08 | Motion estimation on superblocks |
| DE | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 69109346.6 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Method of transmitting full motion |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 69127504.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DK | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DK | N 013709 | 91201373.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FI | N 013257 | 910791 | 19-Feb-91 | | 101442 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |

All corresponding patent applications, patents, divisions, continuations, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 3

Prindsize          21 June 2002

P 001611

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | N 013257 - | 91200329.0 | 18-Feb-91 | 0443876-A1 | 0443876 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| GB | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| GB | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| GB | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| HK | N 013257 - | NOT GIVEN | 18-Feb-91 | | 0960615 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013257 - | 91200329.0 | 18-Feb-91 | 0443876-A1 | 0443876 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| IT | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| IT | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| IT | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| JP | D 087091 - | 88-109222 | 06-May-88 | 88-287186 | 2830809 | 06-May-08 | Motion estimation on superblocks |
| JP | N 013257 A | 91-47659 | 20-Feb-91 | 92-216288 | 3174586 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| JP | N 013409 - | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 - | 91-159489 | 04-Jun-91 | 92-233380 | 3280999 | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 A | 01-151175 | 21-May-01 | | | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 A | 01-151175 | 21-May-01 | | | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | | | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013709 - | 91-159490 | 04-Jun-91 | 92-223464 | 3162110 | 04-Jun-11 | Decoder delay in coded video frames |
| JP | N 013709 A | 00-393982 | 26-Dec-00 | | | 04-Jun-11 | Decoder delay in coded video frames |
| KR | N 013409 - | 91-9152 | 03-Jun-91 | | 0245962 | 03-Jun-11 | Method of transmitting full motion |
| KR | N 013409 - | 91-9152 | 03-Jun-91 | | 0245962 | 03-Jun-11 | Sector and Word Offset in Video Header |
| KR | N 013709 - | 91-9187 | 04-Jun-91 | 92-1479 | 239837 | 04-Jun-11 | Decoder delay in coded video frames |
| NL | N 013257 - | 91200329.0 | 18-Feb-91 | 0443876-A1 | 0443876 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| NL | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SE | N 013257 - | 91200329.0 | 18-Feb-91 | 0443876-A1 | 0443876 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| SE | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| SE | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| SE | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SG | N 013257 - | 96804677 | 18-Feb-91 | | 30173 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| US | D 087091 B | 07/590450 | 24-Sep-90 | | 5021879 | 25-Apr-08 | Motion estimation on superblocks |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3    Printdate    21 June 2002

P 001612

CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| US | N 013257 | C | 08/647149 | 09-May-96 | | 5699476 | 16-Dec-14 | Image Data Block with hierarchical encoding level |
| US | N 013409 | A | 08/268941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Method of transmitting full motion |
| US | N 013409 | A | 08/268941 | 28-Jun-94 | | 5740310 | 14-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013409 | B | 08/553799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Method of transmitting full motion |
| US | N 013409 | B | 08/553799 | 28-Nov-95 | | 5745641 | 28-Apr-15 | Sector and Word Offset in Video Header |
| US | N 013709 | B | 08/299027 | 31-Aug-94 | | 5606539 | 25-Feb-14 | Decoder delay in coded video frames |
| US | N 013709 | C | 08/616951 | 18-Mar-96 | | 5606697 | 04-Mar-14 | Decoder delay in coded video frames |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |

Page 3 of 3

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Printdate        21 June 2002

P 001613

Exhibit L

**FINAL**

## STIPULATION AND AGREEMENT FOR ASSIGNMENT
## AND ASSUMPTION OF LICENSE AGREEMENTS

THIS STIPULATION AND AGREEMENT FOR ASSIGNMENT AND ASSUMPTION OF LICENSE AGREEMENTS (the "Agreement") is made by, between and among Metatec, Inc., formerly doing business as Metatec International, Inc. ("Assignor"), MTI Acquisition, LLC, ("Assignee") and U.S. Philips Corporation and Koninklijke Philips Electronics N.V. (together, ("Licensor") as of December 19, 2003.

### RECITALS

A.  Assignor and Licensor are parties to the following agreements, each entered into on August 9, 2002, pursuant to which Assignor is the licensee of certain systems, technologies, patents and other intellectual property from Licensor (collectively, the "License Agreement"):

    1.  CD Disc Patent License Agreement (the "CD Disc Agreement");

    2.  DVD Video Disc and DVD ROM Disc Patent License Agreement (the "DVD Disc Agreement");

    3.  Patent License Agreement for the Use of AC-3 Technology in the Manufacture of DVD-Video Discs; and

    4.  MPEG Audio Patent License Agreement.

B.  Section 11.01 of the CD Disc Agreement and Section 9.01 of the DVD Disc Agreement each provides that those License Agreements may not be assigned in whole or in part by Assignor without the prior written consent of Licensor.

C.  On August 9, 2002, Licensor and Assignor also entered into and executed a certain letter agreement (the "Workout Agreement") with respect to certain accrued and unpaid royalty payments then due and owing (defined in the Workout Agreement as the "Arrears") under the License Agreements and that certain Comprehensive CD Disc License Agreement, dated January 1, 1996, as thereafter superceded by the License Agreements and the Workout Agreement .

D.  Pursuant to the Workout Agreement, Licensor and Assignor agreed to restructure the payment of the Arrears in the form of a promissory note made by Assignor in the amount of $3,469,702 (the "Promissory Note") to be paid in accordance with a payment schedule attached to the Promissory Note.

E.  Assignor and Assignee have entered into an Asset Purchase Agreement dated October 16, 2003 (the "Purchase Agreement") whereby, subject to certain closing conditions as set forth in the Purchase Agreement, Assignee has agreed to purchase substantially all the assets of Assignor (the "Sale").

F.  On October 17, 2003, Assignor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court") and filed a motion seeking an order from the Bankruptcy Court approving the Sale at a hearing to be conducted on December 18, 2003 (the "Sale Motion").

{H0387633.3 }

G.      In connection with the Sale and pursuant to an order of the Bankruptcy Court, on November 25, 2003, Assignor served its Notice of Intent to Cure Defaults Under, Assume and Assign Certain Executory Contracts and Unexpired Leases (the "Cure Notice") to, among other parties, Licensor.

H.      The Cure Notice lists the License Agreements indicating that Assignor intends to assume and assign the License Agreement to Assignee as part of the Sale, and shows a proposed aggregated cure payment of $147,569.00 for all of the License Agreements.

I.      The Cure Notice does not list the Workout Agreement or the Promissory Note indicating that Assignor does not intend to assume and assign the Workout Agreement and the Promissory Note to Assignee.

J.      On December 5, 2003, Licensor filed its Objection to Schedule of Cure Amounts Stated by Debtor and Debtor-In-Possession in Its Motion to Cure Defaults Under, Assume and Assign Certain Executory Contracts and Unexpired Leases (the "Philips Objection").

K.      In the Philips Objection, Licensor disputes the amount of the proposed cure payment and requests that the Bankruptcy Court find that the assumption and assignment of the License Agreements coincide with the assumption and assignment of the Workout Agreement and the Promissory Note.

L.      Licensor and Assignee desire to resolve the Philips Objection and permit Assignor to assume the License Agreements and assign the License Agreements to Assignee pursuant to the terms, conditions and limitations of this Agreement.

In consideration of the foregoing and conditioned upon the closing of the Sale by and between Assignor and Assignee:

1.      Assignor hereby expressly agrees to assume the License Agreements and immediately assign all of its rights, privileges and obligations under the License Agreements (but not the Workout Agreement or the Promissory Note) to Assignee.

2.      Contemporaneously with the closing of the Sale, Assignee will pay Licensor $1,000,000 in immediately available funds by wire transfer in accordance with instructions to be provided by Licensor.

3.      In consideration of the foregoing payment, Licensor agrees to (a) withdraw the Philips Objection at or prior to the Sale Hearing; (b) affirmatively support the assumption and assignment of the License Agreements; (c) waive and release its claims under the Workout Agreement and the Promissory Note and not assert such claims against Assignor, Assignee or any other person or entity; and (d) promptly deliver to Assignor the original executed Promissory Note marked "Paid and Satisfied".

4.      In addition to the agreements set forth in Paragraph 3 above, by executing this Agreement, Licensor expressly consents to the assumption of the License Agreements by Assignor and the assignment of the License Agreements to Assignee.

5.      Assignee hereby expressly agrees to perform all the obligations of Assignor pursuant to the terms and conditions of the License Agreements from and after the closing of the Sale including, but not limited to, the timely delivery of royalty reports and other statements as required thereunder and the timely and full payment of all amounts due thereunder from and after the closing of the sale.

6.      The parties to this Agreement, on behalf of themselves and their respective employees, representatives, attorneys and other professionals, agree to maintain and preserve the confidentiality

**P 001620**

of the terms, conditions and contents of this Agreement, as well as the existence of this Agreement (collectively, the "Confidential Matter") and not to disclose the Confidential Matter to any person or entity unless compelled to do so by judicial or regulatory order or process; provided, however that a party subject to any such order or process shall promptly notify the other parties to this Agreement, to the extent possible in advance of making any disclosure, so as to permit such other parties to intervene and seek to protect the confidentiality of the Confidential Matter.

IN WITNESS WHEREOF, Assignor, Assignee and Licensor have executed this Agreement as of the day and year first written above.

ASSIGNOR                                    ASSIGNEE

Metatec, Inc.                               MTI Acquisition, LLC.

By: _____                 By: _____

Name: _____                 Name: _____

Title: _____CFO_____                 Title: _____

                                            Address: _____
                                                     _____

                                            Tel:  _____
                                            Fax:  _____

LICENSOR
U.S. Philips Corporation

By: _____

Name: _MICHAEL MARION_____

Title: _SENIOR MANAGER_____

Address: _345 Scarborough Road_
         _Briarcliff Manor, NY 10510_

Tel:  _(914) 333-9641_
Fax:  _(914) 332-0615_

P 001621

of the terms, conditions and contents of this Agreement, as well as the existence of this Agreement (collectively, the "Confidential Matter") and not to disclose the Confidential Matter to any person or entity unless compelled to do so by judicial or regulatory order or process; provided, however that a party subject to any such order or process shall promptly notify the other parties to this Agreement, to the extent possible in advance of making any disclosure, so as to permit such other parties to intervene and seek to protect the confidentiality of the Confidential Matter.

IN WITNESS WHEREOF, Assignor, Assignee and Licensor have executed this Agreement as of the day and year first written above.

ASSIGNOR                                                   ASSIGNEE

Metatec, Inc.                                              MTI Acquisition, LLC.

By: _____                               By: _Carl Klein_____

Name: _____                               Name: _____

Title: _____                               Title: _____

                                                          Address: _____
                                                          _____

                                                          Tel:   _____
                                                          Fax:   _____

LICENSOR
U.S. Philips Corporation

By: _MICHAEL MARION_____ for

Name: _____

Title: _SENIOR MANAGER_____

Address: _345 Scarborough Road_
         _Briarcliff Manor, N.Y. 10510_

Tel:   _(914) 333-9641_
Fax:   _(914) 332-0615_

P 001622

LICENSOR
Koninklijke Philips Electronics N.V.

By: _____  Bw

Name: __H. SAKKERS__

Title: __By  Proxy__

Address: __P.O. Box  220__
__5600 AE   EINDHOVEN__
__THE  NETHERLANDS__

Tel: _____

Fax: __+ 31 -40 - 2734131__

P 001623

# Exhibit M

2069·

1203-1231

1

## CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this __1st__ day of __July__, 2002 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

MUSIC CITY OPTICAL MEDIA, INC., having its registered office in 1045 Firestone Parkway, La Vergne, TN 37086 (hereinafter referred to as "Licensee")

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation of Japan ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System together are referred to as "the CD Systems");

WHEREAS, Philips and Sony own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as such patents relating to the CD Systems which are jointly owned by Philips and Sony, while Philips and Sony each retain the right also to license their respective patents relating to the CD Systems separately, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs and wishes such CD-Discs to be compatible with CD-Players conforming to the Standard Specifications for any of the relevant CD Systems; and

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                                    June 2002

P 001548

2

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein; NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## Article 1 - Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.01    **"Disc"** shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.02    **"CD-Audio Disc"** shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined).

1.03    **"CD-Audio Maxi-Single"** shall mean a CD-Audio Disc which, in addition, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.04    **"CD-ROM Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-ROM Player (as hereinafter defined) and which conforms to the CD-ROM Standard Specifications (as hereinafter defined).

1.05    **"Enhanced Music CD Disc/CD Extra Disc"** shall mean a Disc comprising information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, a CD-ROM Player and which conforms to the CD-ROM Standard Specifications and an Enhanced Music CD Player (as hereinafter defined) which conforms to the Enhanced Music CD Standard Specifications (as hereinafter defined).

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc and the CD Extra Disc together are referred to as "CD-Discs".

1.06    **"CD-Audio Standard Specifications"** shall mean the specifications for the CD-Audio System, including the Subcode/Control and Display System, Channels R ..W, Chapter 5.8, The CD-TEXT mode, as made available, modified or extended from time to time.

1.07    **"CD-Audio Maxi-Single Standard Specifications"** shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                    June 2002

**P 001549**

3

1.08    **"CD-ROM Standard Specifications"** shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.09    **"Enhanced Music CD Standard Specifications"** shall mean the specifications for the Enhanced Music CD System as made available, modified or extended from time to time.

The CD-Audio, CD-Audio Maxi-Single, CD-ROM and Enhanced Music CD Standard Specifications together are referred to as the "CD Standard Specifications".

1.10    **"Player"** shall mean a playback device for optically reading information stored on a Disc and converting such information into electrical signals for reproduction purposes.

1.11    **"CD-Audio Player"** shall mean a Player solely capable of reproducing information stored on a CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are directly capable of and intended to be used for sound reproduction through amplifiers and loudspeakers.

1.12    **"CD-ROM Player"** shall mean a Player solely capable of reproducing information stored on a CD-ROM Disc and converting such information into electrical signals, in accordance with the CD-ROM Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of computer related data through data handling and/or data processing equipment.

1.13    **"Enhanced Music-CD Player"** shall mean a Player solely capable of reproducing information stored on a CD Extra Disc and converting such information into electrical signals, in accordance with the Enhanced Music CD Standard Specifications, which electrical signals are directly capable of and intended to be used for the reproduction of video, text and/or computer related data through data handling and/or data processing equipment.

1.14    **"Combi-Player"** shall mean a Player which is any combination of a CD-Audio Player, a CD-ROM Player and/or an Enhanced Music CD Player.

The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-Player together are referred to as the "CD-Players".

1.15    **"Licensed Product"** shall mean a CD-Audio Disc, a CD-Audio Maxi-Single, a CD-ROM Disc and/or a CD Extra Disc, as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16, manufactured and/or sold in accordance with the provisions hereof, which has been duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement.

1.16    **"Licensed Patents"** shall mean the patents listed in the relevant Exhibits as selected by Licensee pursuant to the Options below.

**Option A1:** Licensee chooses the essential patents listed in Exhibit E1, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Audio Discs and/or CD-Audio Maxi Singles, which conform to the CD-Audio Standard Specifications.

P 001550

4

**Option A2:** Licensee chooses the essential patents listed in Exhibit E1 and Exhibit E2, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-ROM Discs, which conform to the CD-ROM Standard Specifications.

**Option A3:** Licensee chooses the essential patents listed in Exhibit E1, Exhibit E2 and Exhibit E3, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs, which conform to the Enhanced Music CD Standard Specifications.

**Option A4:** Licensee chooses, in addition to Option A1 and/or A3 the essential patents listed in Exhibit E4, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD-Discs, excluding CD-ROM Discs, containing CD Text information.

**Option A5:** Licensee chooses the non-essential patents listed in Exhibit E5, for the use of any one or more of these patents, exclusively for the manufacture and/or sale of CD Extra Discs.

Option(s):     ✓A1      ✓A2      ✓A3      ✓A4      ✓A5

(please tick any combination as appropriate)

Initial: _____

The term **"essential"** as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips will commission an independent patent expert to review the European, Japanese and US patents listed as essential in Exhibits E1, E2, E3 and E4 in order to confirm the essentiality of such patents. In the event that such independent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips shall delete such patent (as well as the equivalent national patents) from the relevant Exhibit and such patent will be put on the relevant Exhibit of non-essential patents. Any such finding and deletion however, shall not affect the obligation of Licensee to pay the royalty on each Licensed Product as specified in Article 5.02, provided that, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

P 001551

5

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of January 1, 1985), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of Licensed Products and which have a filing date or are entitled to a so-called priority date prior to either January 1, 1983 for CD-Audio Discs, January 1, 1985 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Exhibits hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents. Any patents as may be added as essential patents to any of the respective Exhibits hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

The patent lists provided to Licensee upon execution of the Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon execution of this Agreement.

1.17    **"Associated Company"** shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.18    **"Territory"** shall mean the geographic area known as the United States of America, its territories and possessions.

### Article 2 – Grant of Rights

Subject to the conditions of this Agreement:

2.01    For the term of this Agreement, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents selected by Licensee pursuant to Article 1.16 to manufacture Licensed Products within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&d\company documents\music city optical median, inc-cd disc-joint -usa-070302                                        June 2002

**P 001552**

6

2.02    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee, upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire from third parties the free right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Article 2.02, additional royalties may have to be paid over and above the royalties specified in Article 5.02.

2.03    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations hereunder, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, to manufacture CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players and to sell or otherwise dispose of such Players so manufactured in all countries of the world, under any and all present and future patents essential to the manufacture, sale or other disposal of such Players, for which Philips and/or Sony and their respective Associated Companies may hereafter acquire the free right to grant licenses.

2.04    In consideration of the undertakings set forth in Articles 2.01, 2.02 and 2.03 and similar undertakings by third party licensees of Philips and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date (as hereinafter defined) Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs as correspond with the Licensed Patents selected by Licensee pursuant to Article 1.16 and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which have made the same selection pursuant to Article 1.16 as Licensee and which in that respect accept or have accepted a similar undertaking as contained in this Article 2.04.

2.05    In addition, in consideration of the undertakings set forth in Articles 2.01, 2.02, 2.03 and 2.04 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Article 12, for a period of ten years from the Effective Date, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips concerning Players, non-

P 001553

7

exclusive, non-transferable licenses on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of such CD-Audio Players, CD-ROM Players, Enhanced Music CD Players and/or Combi-Players under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such Players and which patents were first filed in any country of the world prior to the date of termination of this Agreement. For the avoidance of doubt, the undertaking set out in the preceding sentence shall only apply to those companies which accept or have accepted a similar undertaking as contained in this Article 2.05.

2.06    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

In consideration of Philips' undertaking as set out in the preceding paragraph, Licensee undertakes that all of its Associated Companies which have or may hereafter acquire patents essential to the manufacture, sale or other disposal of CD-Discs and which patents were first filed in any country of the world prior to the date of termination of this Agreement, shall make available licenses under such patents, on reasonable, non-discriminatory conditions comparable to those set forth herein to Philips, any of Philips' Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips or an Associated Company of Philips in respect of CD-Discs.

2.07    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER/RECORDER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF RECORDING/PLAYBACK DEVICES DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR RECORDING/PLAYBACK DEVICES (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVI-CES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR PATENTS RELATING TO CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS, RECORDING/PLAYBACK DEVICES WITH ANY OTHER ITEMS, PRODUCTS, SYSTEMS, STRUCTURES, EQUIPMENT OR

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&j\company documents\music city optical median, inc-cd disc-joint -usa-070302                                    June 2002

P 001554

8

SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED
PRODUCT AND A PLAYER OR RECORDING/PLAYBACK DEVICE.

### Article 3 - Standard Specifications,
### Technical Information and Support

3.01    Upon receipt of the payment provided for in Article 5.01 and the payment provided for in
        Article 5.12, Philips shall make available to Licensee for use by Licensee in accordance with
        the provisions hereof, a copy of the then current version of the respective CD Standard
        Specifications, as correspond with the Licensed Patents selected by Licensee pursuant to
        Article 1.16, together with such other information and support as Philips considers necessary
        for the interpretation and/or correct application of the relevant CD Standard Specifications.

3.02    Licensee shall be notified in writing of any addition or modification to any of the relevant CD
        Standard Specifications and shall be provided with relevant information in connection
        therewith.

3.03    Philips and Licensee undertake to keep each other generally informed of developments or
        initiatives, which may have an impact on the relevant CD Standard Specifications.

### Article 4 - Have Made

4.01    The rights granted to Licensee pursuant to Article 2 and the right to use the information
        pursuant to Article 3, include the right for Licensee to have Licensed Products made for it by
        third party manufacturers, duly licensed by Philips under an agreement similar to this
        Agreement, provided that Licensee will properly identify such third party manufacturer in the
        royalty reporting forms to be submitted to Philips hereunder, together with the quantities of
        Licensed Products so purchased.
        Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any
        third party not licensed by Philips, where such purchase or sale would constitute an act of
        infringement of any of the Licensed Patents.

### Article 5 - Royalties, Reports and Payments

5.01    In consideration of the rights granted by Philips and the information to be provided by
        Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable,
        non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.02    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee
        agrees to pay to Philips a royalty on each Licensed Product sold by Licensee, in which any
        one or more of the Licensed Patents is (are) used, irrespective of whether such Licensed
        Patent(s) is (are) used in the country of manufacture, sale or other disposal.

        These royalties shall amount to:

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                    June 2002

**P 001555**

9

(a)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)    US$ 0.027 (two point seven US Dollar cents) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm; and

(f)    US$ 0.045 (four and a half US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Standard Rates".

With respect to Licensed Products sold after July 1, 2002, provided that Licensee is in full compliance with its obligations under this Agreement and subject to Article 6.01, the royalties shall amount to:

(a)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter greater than 90 mm; and

(b)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Disc with an outer diameter smaller than 90 mm; and

(c)    US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each Licensed Product being a CD-Audio Maxi-Single; and

(d)    US$ 0.0175 (one and three quarters of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter greater than 90 mm; and

(e)    US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each Licensed Product being a CD-ROM Disc with an outer diameter smaller than 90 mm;

(f)    US$ 0.03 (three US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter greater than 90 mm; and

(g)    US$ 0.02 (two US Dollar cents) for each Licensed Product being a CD Extra Disc with an outer diameter smaller than 90 mm,

such rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations hereunder, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the moment of such non-compliance until such moment that Licensee's non-compliance will have been remedied in full.

A Licensed Product shall be considered sold when invoiced or, if not invoiced, when delivered to a party other than Licensee.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302          June 2002

P 001556

10

No royalties shall be payable on Licensed Products purchased by Licensee on a "have made" basis in accordance with Article 4 from third party manufacturers, duly licensed by Philips, provided that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such Licensed Products.

For the avoidance of doubt, in the event that the manufacture by Licensee of Licensed Products within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to pay royalties in respect of Licensed Products manufactured within the Territory and which are directly sold for final use within the Territory or directly exported for final use to a country in which no Licensed Patents subsist.

5.03    Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Exhibit C3 (Royalty Reporting Form) signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

(1)    the quantities of CD-Discs manufactured by Licensee, specified per individual type of CD-Disc;

(2)    the quantities of CD-Discs purchased from other licensed manufacturers in accordance with the provisions of Article 4, specified per individual type of CD-Disc;

(3)    on a per-country basis, specifying for each individual type of CD-Disc:

(a)    the quantities of CD-Discs sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

(b)    the quantities of CD-Discs sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

(4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period, in such US Dollars.

5.04    In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Article 5.03, Licensee shall be obliged to pay to Philips within 30 days after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder.

P 001557

11

Licensee acknowledges and agrees that any Advance shall not be due by way of penalty but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time; the payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form; the payment by Licensee of an Advance shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.05    Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be public certified auditors, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet Philips' requirements as specified in the Audit Guidelines attached hereto as Exhibit C1 and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement shall be verified by Philips by means of a work paper review, conducted by one of the public certified auditors selected by Philips. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Article 5.10.

5.06    Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of Licensed Products in stock at the time of expiration or termination of this Agreement. Royalties, calculated in accordance with Article 5.02 and Article 5.12, shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Article 5.06 shall be without prejudice to the provisions of Article 12.06.

5.07    Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.08    All payments to Philips under this Agreement shall be made by transfer in such currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.09    All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                                    June 2002

P 001558

12

a country imposes any income taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Article 5 may be verified, Licensee shall keep complete and accurate books and records and shall keep the books and records available for a period of 5 years following the manufacture, sale or other disposal of each Licensed Product.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a public certified auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Article 5.03 and Article 5.05, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

Philips' right of inspection as set out in this Article 5.10 shall survive termination or expiration of this Agreement.

5.11    Without prejudice to the provisions of Article 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12    As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of CD-Discs manufactured and sold or otherwise disposed of by Licensee before the Effective Date of this Agreement in accordance with the provisions of Article 5.03. Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties on such CD-Discs, calculated by applying the royalty rates of (a) US$ 0.03 for each CD-Audio Disc or CD-ROM Disc with an outer diameter greater than 90 mm, (b) US$ 0.02 for each CD-Audio Disc or CD-ROM Disc with an outer diameter smaller than 90 mm, (c) US$ 0.027 for each CD-Audio Maxi-Single and (d) US$ 0.045 or US$ 0.048 for each CD Extra Disc, depending on the selection made by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement. The royalty statement shall similarly be subject to Philips' right of audit as set out in Article 5.10. Within 45 days following the execution of this Agreement, Licensee shall submit to Philips an audit statement by its

P 001559

13

external auditors, who shall be public certified auditors, confirming that this royalty statement is true, complete and accurate in every respect.

## Article 6 – Manufacturing Equipment Identification System

6.01    Upon signing of the Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment used for the manufacture of Licensed Products. Further, upon any acquisition, transfer or disposal of manufacturing equipment used for the manufacture of Licensed Products, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Article 5.05. Such overview shall be in the form as attached hereto as Exhibit C2 (Manufacturing Equipment List), signed by a duly authorized officer on behalf of Licensee. The Compliance Rates referred to in Article 5.02 shall only apply to Licensed Products manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting Philips' requirements as set out in the Audit Guidelines, in accordance with the provisions in Article 5.05. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used for the manufacture of Licensed Products prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee can demonstrate to Philips' full satisfaction, that the newly acquired manufacturing equipment originates from and has been used by a company which was properly licensed by Philips for the manufacture of Licensed Products and in full compliance with its obligations under its license agreement at the time of the acquisition of the newly acquired manufacturing equipment by Licensee. In the event that Licensee is unable to comply with the requirements under this Article 6.01, the Standard Rates shall apply to Licensee's manufacture and sale of Licensed Products instead of the Compliance Rates.

## Article 7 - Most Favourable Conditions

7.01    In the event that licenses under the patents referred to in Article 2 are granted by Philips for Licensed Products to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on payment of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&d\company documents\music city optical median, inc-cd disc-joint -usa-070302                                    June 2002

**P 001560**

14

### Article 8 – No Warranty and Indemnification

8.01    Whereas Philips has made efforts to ensure that the information to be supplied by it
hereunder is complete and accurate, Philips makes no representation or warranty as to the
accuracy or completeness of such information, nor with respect to the ability of Licensee to
achieve interchangeability with respect to Licensed Products through the use of such
information.

8.02    It is acknowledged by Licensee that third parties may own industrial and/or intellectual
property rights in the field of CD-Discs. Philips and Sony make no warranty whatsoever that
the manufacture, sale or other disposal of Licensed Products or the use of information
supplied by Philips hereunder, does not infringe or will not cause infringement of any
industrial and/or intellectual property rights other than Licensed Patents. Philips, Sony and
their respective Associated Companies shall be fully indemnified and held harmless by
Licensee from and against any and all third party claims in connection with CD-Discs
manufactured, sold or otherwise disposed of by Licensee.

### Article 9 - Confidentiality

9.01    Licensee shall at all times maintain strict confidentiality with regard to the CD Standard
Specifications and shall not disclose same to any third party without the prior written consent
of Philips.

9.02    Without prejudice to Article 9.01, Licensee shall, during the term of this Agreement as
specified in Article 12.01 and for a period of 3 years thereafter, not disclose to any third party
any information acquired from Philips or any of Philips' Associated Companies in connection
with this Agreement, or use such information for any other purpose than the manufacture or
disposal of Licensed Products in accordance with this Agreement. This obligation shall not
apply to the extent information so acquired:

(a)    was known to Licensee prior to the date on which such information was acquired
from Philips or any of Philips' Associated Companies, as shown by records of
Licensee or otherwise demonstrated to Philips' satisfaction;

(b)    is or has become available to the public through no fault of Licensee;

(c)    was or is received from a third party who was under no confidentiality obligation in
respect of such information.

In protecting information acquired from Philips or any of Philips' Associated Companies,
Licensee shall take all necessary measures and precautions, including but not limited to
measures requiring its present and future employees to give suitable undertakings of secrecy
both for the period of their employment and thereafter, and shall protect such information in
the same manner and with the same degree of care (but no less than a reasonable degree of
care) with which Licensee protects its own information of a confidential nature.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                    June 2002

P 001561

15

9.03    The obligations concerning confidentiality contained in Article 9.01 and Article 9.02 shall
        survive termination of this Agreement

9.04    Philips shall, during the term of this Agreement as specified in Article 12.01 and for a period
        of 3 years thereafter, not disclose to any third party any confidential information obtained by
        Philips in connection with Article 5.03 and/or Article 5.05, except that Philips may disclose
        such information to its external auditors, legal representatives and to the competent courts to
        the extent this is necessary for Philips in connection with the enforcement of its rights
        hereunder. Further, Philips shall not use such information for other purposes than to verify
        Licensee's compliance with its royalty reporting and payment obligations as provided in this
        Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this
        paragraph shall not apply to information referred to in sections a, b and/or c of Article 9.02.

### Article 10 - Logo

10.01   For the term of this Agreement and subject to the full and timely performance and
        observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be
        entitled to use on the Licensed Products as well as in advertisements and sales literature with
        respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo")
        in accordance with the instructions laid down in the CD-Logo Guide which shall be made
        available to Licensee together with the Standard Specifications.

10.02   Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of
        the Logo does not infringe or will not cause infringement of any third party intellectual
        property rights.

### Article 11 – No Assignment

11.01   This Agreement shall inure to the benefit of and be binding upon each of the parties hereto
        and their respective assignees. It may not be assigned in whole or in part by Licensee without
        the prior written consent of Philips.

### Article 12 - Term and Termination

12.01   This Agreement shall enter into force on the "Effective Date", being the date first written
        above. In the event that validation of this Agreement is required by the competent
        governmental authorities, the Effective Date shall be the date of such validation. This
        Agreement shall remain in force for a period of 10 years from the Effective Date unless
        terminated earlier in accordance with the provisions of this Article 12.

12.02   Without prejudice to the provisions of Article 12.03 through 12.06, each party may terminate
        this Agreement at any time by means of written notice to the other party in the event that the
        other party fails to perform any obligation under this Agreement and such failure is not
        remedied within 30 days after receipt of a notice specifying the nature of such failure and
        requiring it to be remedied. Such right of termination shall not be exclusive of any other

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                              June 2002

**P 001562**

16

remedies or means of redress to which the non-defaulting party may be lawfully entitled, and all such remedies shall be cumulative. Any such termination shall not affect any royalty or other payment obligations under this Agreement accrued prior to such termination.

12.03    Philips may terminate this Agreement forthwith by means of notice in writing to Licensee in the event that a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Licensee or in the event that Licensee makes any voluntary arrangement with its creditors or becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law.

12.04    Additionally, insofar as legally permitted, Philips may terminate this Agreement at any time by means of written notice to Licensee in case Licensee or an Associated Company of Licensee has been found liable by a competent court or administrative authority to have committed an act of copyright piracy.

12.05    Philips shall have the right to terminate this Agreement forthwith or to revoke the license granted under any of Philips' or Sony's respective patents in the event that Licensee or any of its Associated Companies brings a claim for infringement of any of Licensee's or any of Licensee's Associated Companies essential patents relating to CD-Discs or CD-Players against Philips, Sony or any of their respective Associated Companies and Licensee refuses to license such patents on fair and reasonable conditions.

12.06    Upon the termination of this Agreement by Philips for any reason pursuant to Article 12.02 through 12.05, Licensee shall immediately cease the manufacture, sale or other disposal of CD-Discs in which any one or more of the Licensed Patents are used. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

12.07    All provisions of this Agreement which are intended to survive (whether express or implied) the expiry or termination of this Agreement, shall so survive.

## Article 13 - Miscellaneous

13.01    Any notice required under this Agreement to be sent by either party shall be given in writing by means of a letter, facsimile or electronic mail directed:

in respect of Licensee, to:

Music City Optical Media, Inc.
1045 Firestone Parkway
La Vergne, TN 37086

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips International B.V.
Intellectual Property & Standards - Legal Department

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                                                                    June 2002

P 001563

17

P.O. Box 220, Building WAH-2
5600 AE Eindhoven
The Netherlands
Fax: +31 40 2734131

with a copy to:

U.S. Philips Corporation
580 White Plains Road
Tarrytown, New York 10591

or to such other address as may have been previously specified in writing by either party to the other.

13.02    This Agreement sets forth the entire understanding and agreement between the parties as to the subject matter hereof and supersedes and replaces all prior arrangements, discussions and understandings between the parties relating thereto. Neither party shall be bound by any obligation, warranty, waiver, release or representation except as expressly provided herein, or as may subsequently be agreed in writing between the parties.

13.03    Nothing contained in this Agreement shall be construed:

(a)    as imposing on either party any obligation to instigate any suit or action for infringement of any of the patents licensed hereunder or to defend any suit or action brought by a third party which challenges or relates to the validity of any of such patents. Licensee shall have no right to instigate any such suit or action for infringement of any of the patents licensed by Philips hereunder, nor the right to defend any such suit or action which challenges or relates to the validity of any such patent licensed by Philips hereunder;

(b)    as imposing any obligation to file any patent application or to secure any patent or to maintain any patent in force;

(c)    as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips, Sony or any of their Associated Companies;

(d)    as conferring any license to manufacture, sell or otherwise dispose of any product or device other than a Licensed Product.

13.04    Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

13.05    Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by written notice to Licensee.

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                    June 2002

P 001564

18

13.06   This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS
N.V.

MUSIC CITY OPTICAL MEDIA, INC.

Name:  H . SAKKERS

Title:  BY   PROXY

Date:  18  SEPT.  2002

Name:

Title:  President

Date:  9 - 18 - 02

USA-CD-Audio-ROM-Extra-Disc/06-2002
s:\s&l\company documents\music city optical median, inc-cd disc-joint -usa-070302                                                 June 2002

P 001565

Exhibit E1 to the CD Disc Patent License Agreement

CD-Disc/CD-Audio and CD-Maxi Single part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|----------|-------------|-------|
| AR | Q 080007 - | 285958 | 02-Jul-81 | | 250649 | 06-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | Q 080009 - | 285400 | 20-May-81 | | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | Q 080007 - | 81-A3107 | 14-Jul-81 | | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | Q 080009 - | 81-A2215 | 18-May-81 | 395794 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | Q 080007 - | 98-00033 | 21-Apr-98 | | 1207443 | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | P15.688 - | 399564 | 28-Mar-82 | | 1207443 | 08-Jul-03 | Optical readable carriers |
| CA | Q 080007 - | 381362 | 08-Jul-81 | | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q 080007 A | 514656 | 02-Aug-82 | | 514656 | 20-Jun-03 | Block N to K compact disc modulation code (EFM) |
| ES | Q 080009 - | 502320 | 19-May-81 | | 502320 | 09-Sep-02 | Error correctable data transmission method |
| US | N 006493 D | 06/856550 | 23-Apr-86 | | 5058846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | P15.688 - | 890316 | 30-Mar-82 | | 5305301 | 19-Apr-11 | Optical readable carriers |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Printdate        21 June 2002

P 001573

Exhibit E2 to the CD Disc Patent License Agreement

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | P18.816 | 84901011.1 | 02-Mar-84 | | 52866 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AT | Q 083025 | 84-A2769 | 29-Aug-84 | | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | E49835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-40240 | 22-Mar-85 | | 584683 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | PI8501277.7 | 21-Mar-85 | | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | PI8700846 | 23-Feb-07 | Real-time format switching |
| CA | P | | | | 1235812 | 26-Mar-05 | Disc playback apparatus |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 1280206 | 12-Feb-08 | Real-time format switching |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 1010517 | 21-Feb-07 | Real-time format switching |
| CZ | Q 084008 | 85-PV2009 | 21-Mar-85 | | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | P | 84305176.4 | 30-Jul-84 | | P3476289.2 | 30-Jul-04 | Disc playback apparatus |
| DE | P18.816 | 84901011.1 | 02-Mar-84 | | P34822917 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 3701763 | 22-Jan-07 | Real-time format switching |
| FR | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| FR | P18.816 | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 2561939 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 2594996 | 20-Feb-07 | Real-time format switching |
| GB | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| GB | P18.816 | 84901011.1 | 02-Mar-84 | | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
us an integral part of this list

Patents with reference Q 084008 are essential to CD-ROM type mode-l discs
Patents with reference Q 086003 and P 18816 are essential to CD-ROM/XA type discs
Patents with reference Q 083025 and P are essential to all type of CD-ROM discs

Page 1 of 2

Prindisc          27 September 2002

P 001574

CD-Disc/CD-ROM part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| GB | Q 084008 | 8507248 | 20-Mar-85 | | 2156555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 | 8704011 | 20-Feb-87 | | 2187008 | 20-Feb-07 | Real-time format switching |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | NOT GIVEN | 20-Mar-85 | | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 086003 | 87-A19447 | 20-Feb-87 | | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | P | | | | 1912619 | 30-Jul-03 | Disc playback apparatus |
| JP | P18,816 | 35459/83 | 04-Mar-83 | | 19126134 | 04-Mar-03 | Method and apparatus for recording digitized infor |
| JP | Q 083025 | 83-161514 | 01-Sep-83 | 60-52961 | | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | 84-57595 | 24-Mar-84 | 60-201575 | | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 | 87-39997 | 23-Feb-87 | 87-217468 | | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 | 85-1914 | 23-Mar-85 | 94-8742 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 95-7946 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | P | 84305176.4 | 30-Jul-84 | | 133790 | 30-Jul-04 | Disc playback apparatus |
| NL | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8600450 | 192151 | 24-Feb-06 | Real-time format switching |
| SE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 | 9290553.8 | 20-Mar-85 | | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 | 84-PV6607 | 03-Sep-84 | | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 | 85-PV2009 | 21-Mar-85 | | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 | 76100969 | 25-Feb-87 | | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 | 3874714 | 22-Mar-85 | | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | P18,816 | 666237 | 02-Mar-84 | | 4707818 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| US | Q 084008 R | 07/379627 | 13-Jul-89 | | RE33462 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 086003 | 07/018163 | 24-Feb-87 | | 4802169 | 24-Feb-07 | Real-time format switching |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Patents with reference Q 084008 are essential to CD-ROM type mode-1 discs*
*Patents with reference Q 086003 and P 18816 are essential to CD-ROM/XA type discs*
*Patents with reference Q 083025 and P are essential to all type of CD-ROM discs*

Prividan    27 September 2002

P 001575

Exhibit E3 to the CD-Disc Patent License Agreement

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | S85P0059 | 85900170.3 | 30-Nov-84 | | E76996 | 30-Nov-04 | Disc recording medium |
| AT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| AT | S95P0806 | - | - | - | E206238 | | Recording medium having a first management area |
| AU | N 013661 | 92-13942 | 31-Mar-92 | 92-13942 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S85P0059 | 3741285 | 30-Nov-84 | 3741285 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S94P5088 | 3435895 | 19-Oct-95 | - | 703045 | 19-Oct-15 | Mass produced multisessions disc |
| AU | S95P0806 | 4038695 | 13-Dec-95 | 692961 | 692961 | 13-Dec-15 | Recording medium having a first management area |
| AU | S96P0005 | 2256500 | 24-Mar-92 | - | 728279 | 23-Jan-16 | Multi-session disc having disc type code area loca |
| BR | S95P0806 | 9505999 | 21-Dec-95 | - | - | | Recording medium having a first management area |
| CA | N 013661 | 2064511 | 31-Mar-92 | - | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CA | S95P0806 | 2164801 | 08-Dec-95 | - | - | | Recording medium having a first management area |
| CH | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| CH | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| CN | S94P5088 | 95116095.8 | 19-Oct-95 | CN1131311A | - | | Mass produced multisessions disc |
| CN | S95P0806 | 95121699 | 22-Dec-95 | CN1135633A | - | | Recording medium having a first management area |
| CN | S96P0005 | 96104382 | 30-Jan-96 | CN1137675A | - | | Multi-session disc having disc type code area loca |
| CZ | N 013685 | 92-PV970 | 01-Apr-92 | - | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 69226116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S85P0059 | 85900170.3 | 30-Nov-84 | - | P3485761.3 | 30-Nov-04 | Disc recording medium |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | oduced multisessions disc for playback on audio-on |
| DE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | | Mass produced multisessions disc |
| DE | S95P0806 | 95119580.9 | 12-Dec-95 | DE69522917T | 69522917 | 12-Dec-15 | Recording medium having a first management area |
| ES | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 2118784 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ES | S95P0806 | 95119580.9 | 12-Dec-95 | ES2163469T | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S85P0059 | 85900170.3 | 30-Nov-84 | 708445 | 165320 | 30-Nov-04 | Disc recording medium |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded*

*us an integral part of this list*

Page 1 of 4                    *Printdate        21 June 2002*

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| FR | S94P5088 | 95307463.0 | 19-Oct-95 | - | - | - | Mass produced multisessions disc |
| FR | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| FR | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| GB | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| GB | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| GB | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| HK | S85P0059 | - | 25-May-95 | - | 081519385 | - | Disc recording medium |
| HK | S94P5088 | 98103776.7 | 04-May-98 | - | - | - | Mass produced multisessions disc |
| HU | N 013685 | P9201055 | 30-Mar-92 | - | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S95P0806 | P-952737 | 19-Dec-95 | - | - | - | Recording medium having a first management area |
| ID | S96P0005 | P-960210 | 30-Jan-96 | 012.695A | ID0004712 | 30-Jan-16 | Multi-session disc having disc type code area loca |
| IN | S95P0806 | 2287/DEL/95 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| IN | S96P0005 | 0186/DEL/96 | 29-Jan-96 | - | - | - | Multi-session disc having disc type code area loca |
| IT | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| IT | S95P0806 | 95119580.9 | 12-Dec-95 | - | 718845 | 12-Dec-15 | Recording medium having a first management area |
| IT | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| JP | 84000899 | 58226598 | 30-Nov-83 | 60-119670 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 | 59-057595 | 24-Mar-84 | 60-201575 | 2086642 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060963 | 07311437 | 29-Nov-95 | 08-227577 | - | - | Recording medium having a first management area |
| JP | N 013409  B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Sector and Word Offset in Video Header |
| JP | N 013409  B | 01-387556 | 20-Dec-01 | - | - | 04-Jun-11 | Method of transmitting full motion |
| JP | N 013661 | 92-81010 | 02-Apr-92 | 93-83596 | 3293651 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013685 | 92-79501 | 01-Apr-92 | 93-94675 | - | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S85P0059 | 59-057596 | 24-Mar-84 | 60-201576 | 1981180 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | S94P5088 | 07270200 | 18-Oct-95 | - | - | - | Mass produced multisessions disc |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 4                    Printdate        21 June 2002

P 001577

CD-Disc/CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| JP | S95P0806 | 06320107 | 22-Dec-94 | - | - | - | Recording medium having a first management area |
| JP | S96P005 | 07013211 | 30-Jan-95 | 08-203210 | - | - | Multi-session disc having disc type code area loca |
| KR | N 013661 | 92-5313 | 31-Mar-92 | 92-20420 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013685 | 92-5314 | 31-Mar-92 | 92-20418 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 | 85-700146 | 29-Jul-85 | 85-00175 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 | 92-702698 | 30-Oct-92 | - | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S94P5088 | 95-35873 | 18-Oct-95 | - | - | - | Mass produced multisessions disc |
| KR | S95P0806 | 95-72133 | 21-Dec-95 | 96-25644 | - | - | Recording medium having a first management area |
| KR | S96P0005 | 96-02552 | 30-Jan-96 | 96-30119 | - | - | Multi-session disc having disc type code area loca |
| MX | S95P0806 | 955172 | 11-Dec-95 | - | 189100 | 11-Dec-15 | Recording medium having a first management area |
| MY | S95P0806 | PI9503773 | 07-Dec-95 | - | - | - | Recording medium having a first management area |
| MY | S96P0005 | PI9600317 | 29-Jan-96 | - | - | - | Multi-session disc having disc type code area loca |
| NL | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| NL | S95P0806 | 95119580.9 | 12-Dec-95 | - | - | - | Recording medium having a first management area |
| NL | S96P0005 | 96101066.7 | 25-Jan-96 | 724263 | - | - | Multi-session disc having disc type code area loca |
| PL | S95P0806 | P312001 | 21-Dec-95 | - | 179800 | 21-Dec-15 | Recording medium having a first management area |
| PL | S95P0806 | P338168 | 28-Feb-00 | - | 179603 | 21-Dec-15 | Recording medium having a first management area |
| RU | N 013661 | 5011395 | 01-Apr-92 | - | 2072566 | 01-Apr-12 | Recording of content information in Lead-Out |
| RU | S95P0806 | 95122380 | 21-Dec-95 | - | 2162252 | 21-Dec-15 | Recording medium having a first management area |
| RU | S96P0005 | 96128046 | 30-Dec-99 | - | - | - | Recording medium having a first management area |
| RU | S96P0806 | 99104165 | 03-Jan-99 | - | - | - | Recording medium having a first management area |
| RU | S96P0806 | 99103927 | 03-Jan-99 | - | - | - | Recording medium having a first management area |
| SE | S85P0059 | 85900170.3 | 30-Nov-84 | - | 165320 | 30-Nov-04 | Disc recording medium |
| SE | S94P5088 | 95307463.0 | 19-Oct-95 | 708445 | - | - | Mass produced multisessions disc |
| SG | S95P0806 | 9602053 | 07-Dec-95 | - | 38892 | 07-Jan-15 | Recording medium having a first management area |
| SG | S96P0005 | 9600515 | 27-Jan-96 | - | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013685 | 92-PV0970 | 01-Apr-92 | - | 282293 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TH | S95P0806 | 029364 | 20-Dec-95 | 22587 | - | - | Recording medium having a first management area |
| TR | S95P0806 | 053122 | 21-Dec-95 | 960597 | - | - | Recording medium having a first management area |

All corresponding patent applications, patents, divisions, continuations and reissue based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Prindate        21 June 2002

**Exhibit E4 to the CD Disc Patent License Agreement**

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104437 | 13-Sep-96 | | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| AT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A-A1 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 65625/96 | 13-Sep-96 | | 714409 | 13-Sep-16 | Reproducing medium having text information records |
| AU | D 088009 | 89-25557 | 18-Jan-89 | 639411 | 639411 | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603829 | 20-Sep-96 | | | 22-Sep-16 | Reproducing medium having text information records |
| CA | D 088009 | 588304 | 16-Jan-89 | | 1322593 | 28-Sep-10 | Repeated transfer of subcode data |
| CH | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | | 22-Sep-16 | Reproducing medium having text information records |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | | 02-Nov-16 | Recording medium and its reproducing apparatus |
| CN | D 088009 | 89101069.6 | 19-Jan-89 | 1035577-A | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009 A | 92102717.6 | 19-Jan-89 | 1068673-A | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 284768 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | P69612472.6 | 03-Dec-16 | Disc Reproducing apparatus |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| DE | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 68927063.1 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A-A1 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| FR | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | | 19-Sep-16 | Reproducing medium having text information records |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | 31-Oct-16 | Recording medium and its reproducing apparatus |

All corresponding patent applications, patents, divisions, continuations and reissue based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Page 1 of 3

Printdate    21 June 2002

P 001579

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|----------|-------------|-------|
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98106421.9 | 16-Jan-89 | - | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-96 | - | - | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963566 | 02-Dec-96 | - | 655 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962647 | 19-Sep-96 | - | - | 19-Nov-16 | Reproducing medium having text information records |
| ID | 95085448 | P963108 | 04-Nov-96 | - | 5137 | 04-Nov-16 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | 014759-A | - | 12-Sep-10 | Transferring information via the lead-in of CD |
| IN | 95069128 | 2023/DEL/96 | 16-Sep-96 | - | - | 16-Sep-11 | Reproducing medium having text information records |
| IN | N 015474 | 96-1617 | 11-Sep-96 | - | - | 11-Sep-10 | Transferring information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | - | 26-Aug-16 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244959 | 22-Sep-95 | 09-091880 | - | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310380 | 02-Nov-95 | 09-128868 | - | 22-Sep-15 | Reproducing medium having text information records |
| JP | 95100948 | 08-242659 | 26-Aug-96 | 10-64245 | - | 02-Nov-15 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7176 | 3092324 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-509270 | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | 95063039 | 96-62892 | 07-Dec-96 | 97-50695 | - | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | - | 23-Sep-16 | Reproducing medium having text information records |
| KR | 95085448 | 96-51644 | 02-Nov-96 | 98-23706 | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | - | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | - | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | 95069128 | 964179 | 19-Sep-96 | - | 196099 | 19-Sep-16 | Recording medium and its reproducing apparatus |
| MX | N 015474 | 973530 | 09-Sep-96 | - | - | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 95063039 | 9605148 | 07-Dec-96 | - | - | | Disc Reproducing apparatus |
| MY | 95069128 | 9603888 | 20-Sep-96 | - | - | | Reproducing medium having text information records |
| MY | N 015474 | PI9603785 | 13-Sep-96 | 791925 | - | | Transferring information via the lead-in of CD |
| NL | 95069128 | 96115085.1 | 19-May-96 | - | - | 19-Sep-16 | Reproducing medium having text information records |
| PH | 95069128 | 54335 | 19-Sep-96 | 54335 | - | | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3                                                                                    Printdate     21 June 2002

P 001580

CD-Disc/CD-Text part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|---|-----------|-------------|----------------|----------|---------|-------|
| PT | N 015474 | - | 96927834.0 | 09-Sep-96 | 0792504-A1 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 | - | 4613351 | 17-Jan-89 | | 2095857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 | - | 89200081.1 | 16-Jan-89 | 0325325-A3 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | - | 9704856.5 | 09-Sep-96 | | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 | - | 89-PV0287 | 16-Jan-89 | | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 95069128 | - | 8511577 | 21-Sep-96 | - | 94512 | 20-Sep-16 | Reproducing medium having text information records |
| TW | D 088009 | - | 78100300 | 17-Jan-89 | | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | - | 85114202 | 19-Nov-96 | 410326 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 | - | 93003372 | 17-Jan-89 | | 26980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 95063039 | - | 09515696 | 24-Feb-00 | - | 5745454 | 20-Sep-16 | Disc Reproducing apparatus |
| US | 95063039 | - | 753675 | 27-Nov-96 | - | 5825731 | 27-Nov-16 | Disc Reproducing apparatus |
| US | 95069128 | - | 716953 | 20-Sep-96 | - | 5859921 | 30-Oct-16 | Reproducing medium having text information records |
| US | 95085448 | - | 739821 | 30-Oct-96 | - | | | Recording medium and its reproducing apparatus |
| US | D 088009 B | | 08300002 | 05-Apr-93 | - | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | - | 08716688 | 16-Sep-96 | - | 5798990 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 95069128 | - | SC0210/96 | 21-Sep-96 | - | - | 02-Nov-10 | Recording medium and its reproducing apparatus |
| VN | 95085448 | - | SC0328/96 | 02-Nov-96 | - | - | 21-Sep-10 | Reproducing medium having text information records |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

*Printdate        21 June 2002*

Exhibit E5 to the CD Disc Patent License Agreement
CD-Disc/CD Non-essentials part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Sector and Word Offset in Video Header |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | E157801 | 03-Jun-11 | Method of transmitting full motion |
| AT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | E157830 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219 | 641726 | 20-Feb-11 | Image Data Block with hierarchical encoding level |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| BE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2036585 | 19-Feb-91 | | 2036585 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 | 2043670 | 31-May-91 | | 2043670 | 31-May-11 | Sector and Word Offset in Video Header |
| CA | N 013409 A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Method of transmitting full motion |
| CA | N 013409 A | 2335403 | 31-May-91 | | 2335403 | 31-May-11 | Sector and Word Offset in Video Header |
| DE | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 3855114 | 27-Apr-08 | Motion estimation on superblocks |
| DE | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 69100346.6 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Method of transmitting full motion |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 69127506.8 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 69127504.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DK | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| DK | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FI | N 013257 | 910791 | 19-Feb-91 | | 101442 | 19-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | 0443676 | 18-Feb-11 | Image Data Block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Sector and Word Offset in Video Header |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 0460764 | 03-Jun-11 | Method of transmitting full motion |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 3                    Prindine                    21 June 2002

P 001582

# Exhibit N

Sep-17-2002 14:38    From-PHILIPS ELECTRONICS ICS    914-332-0615    T-305  P.004/008  F-488

 

37965-01

**Philips Intellectual Property & Standards**

Direct Dial: (914) 333-9633
E-Mail:    Brian.Wieghaus@philips.com

**VIA FACSIMILE**
615-641-8577

Our File: 1203-1231

September 17, 2002

Mr. John E. Moll, President
Music City Optical Media, Inc.
1045 Firestone Parkway
La Vergne, TN 37086

Re: CD Disc License Agreement

Dear Mr. Moll:

This will confirm our agreement ("Workout Agreement") with respect to the CD Disc
Patent License Agreement ("License Agreement") between Koninklijke Philips Electronics N.V.
("Philips") and Music City Optical Media, Inc. ("MCOM"), having an effective date of July 1,
2002:

1. With reference to Article 5.12, MCOM hereby represents and warrants that it
manufactured and sold 6,666,666 CD Discs before the effective date of the License Agreement
("Past Use Period") and owes Philips US$200,000 (Two Hundred Thousand U.S. Dollars)("Past
Use Amount") in royalties for the Past Use Period.

2. MCOM shall pay Philips the Past Use Amount in installments according to the
following schedule. Interest is assessed on the past use amount at 6% simple interest.

| Date | Total Payment | Principal Payment | Interest Payment | Outstanding Principal |
|---|---|---|---|---|
| July 1, 2002 | | | | $200,000.00 |
| July 31, 2002 | $2,000.00 | $1,000.00 | $1,000.00 | $199,000.00 |
| August 31, 2002 | $2,000.00 | $1,005.00 | $995.00 | $197,995.00 |
| September 30, 2002 | $2,000.00 | $1,010.03 | $989.98 | $196,984.98 |
| October 31, 2002 | $2,000.00 | $1,015.08 | $984.92 | $195,969.90 |
| November 30, 2002 | $2,000.00 | $1,020.15 | $979.85 | $194,949.75 |

Philips Electronics North America Corporation
580 White Plains Road Tarrytown, NY 10591-5190
Tel. (914) 332-0222 Fax: (914) 332-0615

P 001527

Sep-17-2002  14:38    From-PHILIPS ELECTRONICS ICS              914-332-0615        T-305  P.005/008  F-488

Mr. John E. Moll, President
Music City Optical Media, Inc.
September 17, 2002
Page 2

| | | | |
|---|---|---|---|
| December 31, 2002 | $2,000.00 | $1,025.25 | $974.75 | $193,924.50 |
| January 31, 2003 | $4,000.00 | $3,030.38 | $969.62 | $190,894.12 |
| February 28, 2003 | $4,000.00 | $3,045.53 | $954.47 | $187,848.59 |
| March 31, 2003 | $4,000.00 | $3,060.76 | $939.24 | $184,787.83 |
| April 30, 2003 | $4,000.00 | $3,076.06 | $923.94 | $181,711.77 |
| May 31, 2003 | $4,000.00 | $3,091.44 | $908.56 | $178,620.33 |
| June 30, 2003 | $4,000.00 | $3,106.90 | $893.10 | $175,513.43 |
| July 31, 2003 | $4,000.00 | $3,122.43 | $877.57 | $172,391.00 |
| August 31, 2003 | $4,000.00 | $3,138.04 | $861.96 | $169,252.96 |
| September 30, 2003 | $4,000.00 | $3,153.74 | $846.26 | $166,099.22 |
| October 31, 2003 | $4,000.00 | $3,169.50 | $830.50 | $162,929.72 |
| November 30, 2003 | $4,000.00 | $3,185.35 | $814.65 | $159,744.37 |
| December 31, 2003 | $4,000.00 | $3,201.28 | $798.72 | $156,543.09 |
| January 31, 2004 | $4,000.00 | $3,217.28 | $782.72 | $153,325.80 |
| February 29, 2004 | $4,000.00 | $3,233.37 | $766.63 | $150,092.43 |
| March 31, 2004 | $4,000.00 | $3,249.54 | $750.46 | $146,842.89 |
| April 30, 2004 | $4,000.00 | $3,265.79 | $734.21 | $143,577.11 |
| May 31, 2004 | $4,000.00 | $3,282.11 | $717.89 | $140,294.99 |
| June 30, 2004 | $4,000.00 | $3,298.53 | $701.47 | $136,996.47 |
| July 31, 2004 | $5,000.00 | $4,315.02 | $684.98 | $132,681.45 |
| August 31, 2004 | $5,000.00 | $4,336.59 | $663.41 | $128,344.86 |
| September 30, 2004 | $5,000.00 | $4,358.28 | $641.72 | $123,986.58 |
| October 31, 2004 | $5,000.00 | $4,380.07 | $619.93 | $119,606.52 |
| November 30, 2004 | $5,000.00 | $4,401.97 | $598.03 | $115,204.55 |
| December 31, 2004 | $5,000.00 | $4,423.98 | $576.02 | $110,780.57 |
| January 31, 2005 | $5,000.00 | $4,446.10 | $553.90 | $106,334.47 |
| February 28, 2005 | $5,000.00 | $4,468.33 | $531.67 | $101,866.15 |
| March 31, 2005 | $5,000.00 | $4,490.67 | $509.33 | $97,375.48 |
| April 30, 2005 | $5,000.00 | $4,513.12 | $486.88 | $92,862.35 |
| May 31, 2005 | $5,000.00 | $4,535.69 | $464.31 | $88,326.67 |
| June 30, 2005 | $5,000.00 | $4,558.37 | $441.63 | $83,768.30 |
| July 31, 2005 | $5,000.00 | $4,581.16 | $418.84 | $79,187.14 |
| August 31, 2005 | $5,000.00 | $4,604.06 | $395.94 | $74,583.08 |
| September 30, 2005 | $5,000.00 | $4,627.08 | $372.92 | $69,955.99 |
| October 31, 2005 | $5,000.00 | $4,650.22 | $349.78 | $65,305.77 |
| November 30, 2005 | $5,000.00 | $4,673.47 | $326.53 | $60,632.30 |
| December 31, 2005 | $5,000.00 | $4,696.84 | $303.16 | $55,935.46 |
| January 31, 2006 | $5,000.00 | $4,720.32 | $279.68 | $51,215.14 |
| February 28, 2006 | $5,000.00 | $4,743.92 | $256.08 | $46,471.22 |
| March 31, 2006 | $5,000.00 | $4,767.64 | $232.36 | $41,703.57 |
| April 30, 2006 | $5,000.00 | $4,791.48 | $208.52 | $36,912.09 |
| May 31, 2006 | $5,000.00 | $4,815.44 | $184.56 | $32,096.65 |
| June 30, 2006 | $5,000.00 | $4,839.52 | $160.48 | $27,267.13 |
| July 31, 2006 | $5,000.00 | $5,863.71 | $136.29 | $21,393.42 |
| August 31, 2006 | $6,000.00 | $5,893.03 | $106.97 | $15,500.39 |
| September 30, 2006 | $6,000.00 | $5,922.50 | $77.50 | $9,577.89 |
| October 31, 2006 | $6,000.00 | $5,952.11 | $47.89 | $3,625.78 |
| November 30, 2006 | $3,643.91 | $3,625.78 | $18.13 | |

P 001528

Mr. John E. Moll, President
Music City Optical Media, Inc.
September 17, 2002
Page 3

    3. Concurrently with execution of this side letter, MCOM shall execute a Promissory Note payable to Philips with a payment schedule according to paragraph 2 above.

    4. Notwithstanding the provisions of Article 5.12, MCOM shall not be required to submit an audit statement by its external auditors within 45 days following execution of the License Agreement.

    5. MCOM shall pay the initial fee of $25,000 upon execution of the License Agreement, in accordance with Article 5.01.

    6. MCOM has further asked for forbearance on immediate payment of the royalties due for the third quarter of 2002, payable on October 30, 2002. MCOM shall provide the royalty report for the third quarter of 2002 to Philips no later than October 30, 2002 and pay the royalties due thereon in installments of $10,000 per month plus interest at 6% simple interest per annum. MCOM shall provide Philips with a Promissory Note for such payments no later than November 30, 2002. These amounts are in addition to those set forth in paragraph 2 above.

    7. In view of Philips' forbearance in not immediately enforcing its rights under the CD Disc Agreement and in agreeing to the payment schedule set forth in paragraph 2, MCOM further agrees that:

        (a) MCOM shall not contest the Past Use Amount and interest thereon;

        (b) MCOM stipulates that with respect to the payments due under this Workout Agreement, the Licensed Patents under the License Agreement are valid and infringed by the Licensed Products manufactured by MCOM during the Past Use period, and MCOM shall not contest the validity or infringement of the Licensed Patents with respect to the Past Use Amount (provided, however, that nothing herein shall prevent MCOM from contesting the Licensed Patents with respect to sales of Licensed Products after the full and timely payment of all monies payable under paragraph 2);

        (c) If MCOM (i) fails to make any of the payments for Past Use as of the due date specified or (ii) if MCOM fails to timely provide any of the quarterly royalty reports or timely make any of the quarterly royalty payments due thereon as specified in Article 5.04 of the License Agreement, and MCOM fails to cure such error within ten (10) business days of written notice by Philips, then:
            (i) the entire remaining unpaid balance of the Past Use Amount shall immediately become due and payable;
            (ii) Philips shall be entitled to injunctive relief as well as or confession of judgment for the entire unpaid portion of the Past Use Amount; and
            (iii) Philips shall be entitled to an award of reasonable counsel fees and costs for enforcement of this Workout Agreement.

Mr. John E. Moll, President
Music City Optical Media, Inc.
September 17, 2002
Page 4

    (iv) Philips shall have the right to audit the Past Use Amount and should any such audit reveal facts which are materially different than those represented by MCOM to Philips in negotiating this Workout Agreement, Philips shall have the right to enforce the License Agreement and seek any additional monies which may be due and owing under the License Agreement prior to July 1, 2002 and discovered as a result of such audit.

  8. MCOM and Philips shall treat the contents of this Workout Agreement as confidential information and shall not disclose it to third parties, except as may be necessary by either Philips or MCOM to enforce its rights hereunder in a governmental body or court of law.

  9. In addition to the other remedies set forth in this Workout Agreement, Philips shall have the option to terminate this Workout Agreement in the event MCOM breaches any term hereof by providing written notice to MCOM and MCOM fails to cure such breach within ten (10) days of written notice by Philips. In the event this termination option is exercised by Philips, MCOM shall be entitled to credit for payments made hereunder, but all other rights, remedies and defenses of Philips shall be preserved. Philips shall have the right to immediately assert claims (and take whatever legal action it deems appropriate) against MCOM for the full amounts due, less credits to MCOM for payments made hereunder.

  10. MCOM forever releases and discharges Philips, its agents, servants, employees, directors, officers, lawyers, branches, parent, affiliates, subsidiaries, successors and assigns and all person, firms, corporations and organizations acting on Philips's behalf (collectively, the "Philips Released Entities") of and from any and all losses, damages, claims, demands, liabilities, obligations, actions and causes of action, of any nature whatsoever in law or in equity, contribution or indemnity, which the MCOM may have or claim to have against Philips or any one or more of the Philips Released Entities, as of July 1, 2002, of every nature and kind whatsoever, on account of or in any way touching, concerning, arising out of, founded upon or relating to i) the License Agreement, ii) the obligations of Philips under the License Agreement or otherwise, iii) this Workout Agreement, iv) enforcement or negotiations of this Workout Agreement or the License Agreement, v) the dealings of the parties to this Workout Agreement, and vi) anything else whatsoever.

  11. MCOM further acknowledges that it was offered a DVD Disc License Agreement under the patents of Philips, Sony and Pioneer, or alternatively under the patents of Philips only. MCOM further represents and warrants that MCOM has never replicated DVD discs, and has accordingly declined to execute either of the above DVD Disc License agreements at this time. Furthermore, MCOM acknowledges its obligation to only trade in DVD discs manufactured by replicators duly licensed by Philips.

  12. This Side Letter is valid only if executed by MCOM no later than September 18, 2002 along with the License Agreement.

Mr. John E. Moll, President
Music City Optical Media, Inc.
September 17, 2002
Page 5

Please acknowledge MCOM's approval and acceptance to the foregoing by completing the signature block below.

Very truly yours,

By: _____
       H. SAKKERS

Title: BY PROXY

Date: 18-9-2002

Music City Optical Media, Inc.

By: _____
      John E. Moll

Title: President

Date: 9-18-'02

s:\s&f\company documents\mcom-workout agreement Past Use-091702

37966

## PROMISSORY NOTE

Music City Optical Media, Inc., a Tennessee corporation (the "Obligor"),
for value received, hereby unconditionally and irrevocably promises to pay to the order of
Koninklijke Philips Electronics N.V. ("Philips"), a corporation of the Netherlands, in
lawful money of the United States the principal sum of US$ 200,000 (Two Hundred
Thousand U.S. dollars) plus interest, in the following installments:

### PAYMENT SCHEDULE - MUSIC CITY OPTICAL MEDIA - JULY 1, 2002

| Date | Total Payment | Principal Payment | Interest Payment | Outstanding Principal |
|---|---|---|---|---|
| July 1, 2002 | | | | $200,000.00 |
| July 31, 2002 | $2,000.00 | $1,000.00 | $1,000.00 | $199,000.00 |
| August 31, 2002 | $2,000.00 | $1,005.00 | $995.00 | $197,995.00 |
| September 30, 2002 | $2,000.00 | $1,010.03 | $989.98 | $196,984.98 |
| October 31, 2002 | $2,000.00 | $1,015.08 | $984.92 | $195,969.90 |
| November 30, 2002 | $2,000.00 | $1,020.15 | $979.85 | $194,949.75 |
| December 31, 2002 | $2,000.00 | $1,025.25 | $974.75 | $193,924.50 |
| January 31, 2003 | $4,000.00 | $3,030.38 | $969.62 | $190,894.12 |
| February 28, 2003 | $4,000.00 | $3,045.53 | $954.47 | $187,848.59 |
| March 31, 2003 | $4,000.00 | $3,060.76 | $939.24 | $184,787.83 |
| April 30, 2003 | $4,000.00 | $3,076.06 | $923.94 | $181,711.77 |
| May 31, 2003 | $4,000.00 | $3,091.44 | $908.56 | $178,620.33 |
| June 30, 2003 | $4,000.00 | $3,106.90 | $893.10 | $175,513.43 |
| July 31, 2003 | $4,000.00 | $3,122.43 | $877.57 | $172,391.00 |
| August 31, 2003 | $4,000.00 | $3,138.04 | $861.96 | $169,252.96 |
| September 30, 2003 | $4,000.00 | $3,153.74 | $846.26 | $166,099.22 |
| October 31, 2003 | $4,000.00 | $3,169.50 | $830.50 | $162,929.72 |
| November 30, 2003 | $4,000.00 | $3,185.35 | $814.65 | $159,744.37 |
| December 31, 2003 | $4,000.00 | $3,201.28 | $798.72 | $156,543.09 |
| January 31, 2004 | $4,000.00 | $3,217.28 | $782.72 | $153,325.80 |
| February 29, 2004 | $4,000.00 | $3,233.37 | $766.63 | $150,092.43 |
| March 31, 2004 | $4,000.00 | $3,249.54 | $750.46 | $146,842.89 |
| April 30, 2004 | $4,000.00 | $3,265.79 | $734.21 | $143,577.11 |
| May 31, 2004 | $4,000.00 | $3,282.11 | $717.89 | $140,294.99 |
| June 30, 2004 | $4,000.00 | $3,298.53 | $701.47 | $136,996.47 |
| July 31, 2004 | $5,000.00 | $4,315.02 | $684.98 | $132,681.45 |
| August 31, 2004 | $5,000.00 | $4,336.59 | $663.41 | $128,344.86 |
| September 30, 2004 | $5,000.00 | $4,358.28 | $641.72 | $123,986.58 |
| October 31, 2004 | $5,000.00 | $4,380.07 | $619.93 | $119,606.52 |
| November 30, 2004 | $5,000.00 | $4,401.97 | $598.03 | $115,204.55 |
| December 31, 2004 | $5,000.00 | $4,423.98 | $576.02 | $110,780.57 |
| January 31, 2005 | $5,000.00 | $4,446.10 | $553.90 | $106,334.47 |
| February 28, 2005 | $5,000.00 | $4,468.33 | $531.67 | $101,866.15 |
| March 31, 2005 | $5,000.00 | $4,490.67 | $509.33 | $97,375.48 |
| April 30, 2005 | $5,000.00 | $4,513.12 | $486.88 | $92,862.35 |
| May 31, 2005 | $5,000.00 | $4,535.69 | $464.31 | $88,326.67 |
| June 30, 2005 | $5,000.00 | $4,558.37 | $441.63 | $83,768.30 |

-1-

NY12532:309726.1
s:\s&l\company documents\mcom- past use -promissory note-070302

P 001535

| | | | |
|---|---|---|---|
| July 31, 2005 | $5,000.00 | $4,581.16 | $418.84 | $79,187.14 |
| August 31, 2005 | $5,000.00 | $4,604.06 | $395.94 | $74,583.08 |
| September 30, 2005 | $5,000.00 | $4,627.08 | $372.92 | $69,955.99 |
| October 31, 2005 | $5,000.00 | $4,650.22 | $349.78 | $65,305.77 |
| November 30, 2005 | $5,000.00 | $4,673.47 | $326.53 | $60,632.30 |
| December 31, 2005 | $5,000.00 | $4,696.84 | $303.16 | $55,935.46 |
| January 31, 2006 | $5,000.00 | $4,720.32 | $279.68 | $51,215.14 |
| February 28, 2006 | $5,000.00 | $4,743.92 | $256.08 | $46,471.22 |
| March 31, 2006 | $5,000.00 | $4,767.64 | $232.36 | $41,703.57 |
| April 30, 2006 | $5,000.00 | $4,791.48 | $208.52 | $36,912.09 |
| May 31, 2006 | $5,000.00 | $4,815.44 | $184.56 | $32,096.65 |
| June 30, 2006 | $5,000.00 | $4,839.52 | $160.48 | $27,257.13 |
| July 31, 2006 | $6,000.00 | $5,863.71 | $136.29 | $21,393.42 |
| August 31, 2006 | $6,000.00 | $5,893.03 | $106.97 | $15,500.39 |
| September 30, 2006 | $6,000.00 | $5,922.50 | $77.50 | $9,577.89 |
| October 31, 2006 | $6,000.00 | $5,952.11 | $47.89 | $3,625.78 |
| November 30, 2006 | $3,643.91 | $3,625.78 | $18.13 | |

Interest is calculated
   at 6% annually

Any installment on this Note not paid when due shall bear interest from its due date until paid in full at the rate of 10% per annum, payable on demand.

All payments on this Note shall be payable without setoff, counterclaim or deduction of any kind whatsoever.

If this Note becomes due and payable on a Saturday, Sunday, or public or other banking holiday under the laws of the State of New York, the maturity thereof shall be extended to the next succeeding business day.

If any of the following events (each being herein referred to as an "Event of Default"), shall occur: (i) the Obligor shall fail to pay any installment on this Note when due and such failure shall continue unremedied for five (5) days after written notice by Philips; (ii) the Obligor shall fail to pay any other amount owing hereunder and such failure shall continue unremedied for ten (10) days after written notice from Philips, or (iii) the Obligor shall make an assignment for the benefit of creditors, or any order shall be entered relating to the Obligor under any bankruptcy, reorganization, dissolution, or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, whereby Obligor becomes or is adjudicated insolvent or bankrupt, or the Obligor shall petition or , apply to any tribunal for any receiver of or any trustee for it or any substantial part of its property; then  in any such event Philips may declare all of the then unpaid installments on this Note and all other amounts owing hereunder to be immediately due and payable; provided, however, that upon the happening of any event specified in clause (iii) above, all unpaid installments on this Note and all other amounts owing hereunder shall become immediately due and payable without declaration or other notice to the Obligor.

-2-

P 001536

If Philips institutes any action for the enforcement or collection of this Note and recovers on such action, the Obligor shall pay on demand all costs and expenses of such action including reasonable attorney's fees and costs.

The Obligor expressly waives any presentment, demand, protest, or other notice of any kind.

The obligation under this Note shall not be transferable by the Obligor without the written consent of Philips.

**THIS NOTE SHALL BE GOVERNED B THE LAWS OF THE STATE OF NEW YORK, BOTH IN INTERPRETATION AND IN PERFORMANCE.**

The Obligor hereby irrevocably submits to the jurisdiction of any state or federal court in the State of New York for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Note. The Obligor hereby irrevocably consents to the jurisdiction of any such court in any such action and to the laying of venue in New York State. The Obligor hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection to the laying of the venue of any such suit, action or proceeding brought in the aforesaid courts and hereby irrevocably waives any claim that any such suit or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, nothing herein shall in any way affect the right of Philips to bring any action arising out of or relating to this Note in any competent court elsewhere having jurisdiction over the Obligor or its property.

Music City Optical Media, Inc.

By _____
John E. Moll, President

-3-

P 001537

# Exhibit O

# PHILIPS

42043

## Philips Intellectual Property & Standards

Mr. John E. Moll, President
Music City Optical Media, Inc.
1045 Firestone Parkway
La Vergne, TN 37086

Re:  Workout Agreement

November 24, 2002

Dear Mr. Moll:

This will confirm our agreement ("Workout Agreement") with respect to the CD
Disc Patent License Agreement ("License Agreement") between Koninklijke Philips
Electronics N.V. ("Philips") and Music City Optical Media, Inc. ("MCOM), having an
effective date of July 1, 2002:

1. Under the Article 5.04 of the CD Disc Agreement, MCOM is required to make
to Philips royalty payments thirty days after the end of each calendar quarter on all
Licensed Product sold during the preceding calendar quarter.  MCOM (i) failed to make
such payments for the first, second, third and fourth calendar quarters of the year 2003.
MCOM has asked Philips (i) to forbear on the remedies available to Philips under such
CD Disc Agreement (including termination of the CD Disc Agreement and
commencement of legal action for immediate payment) and (ii) to re-structure payment
for the unpaid royalties due and owing ("Arrears").

2. MCOM has subsequently provided Philips with an accounting of Arrears under
the CD Disc Agreement for the First, Second, Third calendar quarters of 2003 in the
respective amounts of: $116,152.68, $133,404.57, $153,584.03, and hereby estimates it
will owe Philips $100,000 for the Fourth calendar quarter of 2003 and represents and
warrants that these amounts and accurate in all material respects. The Total Arrears,
without interest, as of December 1, 2003 equals $503,1414.28 U.S. Dollars ("Arrears
Amount"). MCOM shall pay Philips the Arrears Amount (plus interest at 5% / year,
calculated from December 1, 2003) in monthly payments of $9,494.90 as follows:



345 Scarborough Road        Tel: (914) 945-6000
P.O. Box 3001              Fax: (914) 332-0615
Briarcliff Manor, NY 10510-8001

| Music City Optical Media Debt repayment schedule $503,141.28 | | | | |
|---|---|---|---|---|
| Year | Month | Total Principal Paid | Total Interest Paid | Outstanding Balance |
| $9490.90 | 12/20/03 | $7398.48 | $2096.42 | $495742.80 |
| $9490.90 | 1/20/04 | $7429.30 | $2065.60 | $488313.50 |
| $9490.90 | 2/20/04 | $7460.26 | $2034.64 | $480853.24 |
| $9490.90 | 3/20/04 | $7491.34 | $2003.56 | $473361.89 |
| $9490.90 | 4/20/04 | $7522.56 | $1972.34 | $465839.33 |
| $9490.90 | 5/20/04 | $7553.90 | $1941.00 | $458285.43 |
| $9490.90 | 6/20/04 | $7585.38 | $1909.52 | $450700.05 |
| $9490.90 | 7/20/04 | $7616.98 | $1877.92 | $443083.07 |
| $9490.90 | 8/20/04 | $7648.72 | $1846.18 | $435434.35 |
| $9490.90 | 9/20/04 | $7680.59 | $1814.31 | $427753.76 |
| $9490.90 | 10/20/04 | $7712.59 | $1782.31 | $420041.17 |
| $9490.90 | 11/20/04 | $7744.73 | $1750.17 | $412296.44 |
| | | | | |
| $9490.90 | 12/20/04 | $7777.00 | $1717.90 | $404519.44 |
| $9490.90 | 1/20/05 | $7809.40 | $1685.50 | $396710.04 |
| $9490.90 | 2/20/05 | $7841.94 | $1652.96 | $388868.10 |
| $9490.90 | 3/20/05 | $7874.62 | $1620.28 | $380993.48 |
| $9490.90 | 4/20/05 | $7907.43 | $1587.47 | $373086.05 |
| $9490.90 | 5/20/05 | $7940.37 | $1554.53 | $365145.68 |
| $9490.90 | 6/20/05 | $7973.46 | $1521.44 | $357172.22 |
| $9490.90 | 7/20/05 | $8006.68 | $1488.22 | $349165.54 |
| $9490.90 | 8/20/05 | $8040.04 | $1454.86 | $341125.49 |
| $9490.90 | 9/20/05 | $8073.54 | $1421.36 | $333051.95 |
| $9490.90 | 10/20/05 | $8107.18 | $1387.72 | $324944.76 |
| $9490.90 | 11/20/05 | $8140.96 | $1353.94 | $316803.80 |
| | | | | |
| $9490.90 | 12/20/05 | $8174.88 | $1320.02 | $308628.92 |
| $9490.90 | 1/20/06 | $8208.95 | $1285.95 | $300419.97 |
| $9490.90 | 2/20/06 | $8243.15 | $1251.75 | $292176.82 |
| $9490.90 | 3/20/06 | $8277.50 | $1217.40 | $283899.32 |
| $9490.90 | 4/20/06 | $8311.99 | $1182.91 | $275587.34 |
| $9490.90 | 5/20/06 | $8346.62 | $1148.28 | $267240.72 |
| $9490.90 | 6/20/06 | $8381.40 | $1113.50 | $258859.32 |
| $9490.90 | 7/20/06 | $8416.32 | $1078.58 | $250443.00 |
| $9490.90 | 8/20/06 | $8451.39 | $1043.51 | $241991.61 |
| $9490.90 | 9/20/06 | $8486.60 | $1008.30 | $233505.01 |
| $9490.90 | 10/20/06 | $8521.96 | $972.94 | $224983.05 |
| $9490.90 | 11/20/06 | $8557.47 | $937.43 | $216425.58 |
| | | | | |
| $9490.90 | 12/20/06 | $8593.13 | $901.77 | $207832.45 |
| $9490.90 | 1/20/07 | $8628.93 | $865.97 | $199203.52 |
| $9490.90 | 2/20/07 | $8664.89 | $830.01 | $190538.64 |
| $9490.90 | 3/20/07 | $8700.99 | $793.91 | $181837.65 |

P 001539

| | | | | |
|---|---|---|---|---|
| $9490.90 | 4/20/07 | $8737.24 | $757.66 | $173100.40 |
| $9490.90 | 5/20/07 | $8773.65 | $721.25 | $164326.76 |
| $9490.90 | 6/20/07 | $8810.21 | $684.69 | $155516.55 |
| $9490.90 | 7/20/07 | $8846.91 | $647.99 | $146669.64 |
| $9490.90 | 8/20/07 | $8883.78 | $611.12 | $137785.86 |
| $9490.90 | 9/20/07 | $8920.79 | $574.11 | $128865.07 |
| $9490.90 | 10/20/07 | $8957.96 | $536.94 | $119907.11 |
| $9490.90 | 11/20/07 | $8995.29 | $499.61 | $110911.82 |
| | | | | |
| $9490.90 | 12/20/07 | $9032.77 | $462.13 | $101879.05 |
| $9490.90 | 1/20/08 | $9070.40 | $424.50 | $92808.65 |
| $9490.90 | 2/20/08 | $9108.20 | $386.70 | $83700.45 |
| $9490.90 | 3/20/08 | $9146.15 | $348.75 | $74554.30 |
| $9490.90 | 4/20/08 | $9184.26 | $310.64 | $65370.04 |
| $9490.90 | 5/20/08 | $9222.52 | $272.38 | $56147.52 |
| $9490.90 | 6/20/08 | $9260.95 | $233.95 | $46886.57 |
| $9490.90 | 7/20/08 | $9299.54 | $195.36 | $37587.03 |
| $9490.90 | 8/20/08 | $9338.29 | $156.61 | $28248.74 |
| $9490.90 | 9/20/08 | $9377.20 | $117.70 | $18871.54 |
| $9490.90 | 10/20/08 | $9416.27 | $78.63 | $9455.28 |
| $9490.90 | 11/20/08 | $9455.50 | $39.40 | 0 |
| | | | | |

3. Concurrently with execution of this side letter, MCOM shall execute a Promissory Note payable to Philips with a payment schedule according to paragraph 2 above.

4. The Arrears Amount and interest thereon is in addition to and is not a substitute for any other payments due after December 1, 2003, in whole or in part, under the License Agreement.

5. In view of Philips forbearance in not immediately enforcing its rights under the CD Disc Agreement and in agreeing to the payment schedule set forth in paragraph 2, MCOM further agrees that:

(a) MCOM shall not contest the Arrears Amount and interest thereon;

(b) MCOM stipulates that with respect to the payments due under this Workout Agreement, the Licensed Patents under the CD Disc Agreement are valid and infringed by the Licensed Products manufactured by MCOM during the Arrears period, and OEM shall not contest the validity or infringement of the Licensed Patents with respect to the Arrears Amount (provided, however, that nothing herein shall prevent MCOM from contesting the Licensed Patents with respect to sales of Licensed Products after the full and timely payment of all monies payable under paragraph 2;

P 001540

(c) If MCOM (i) fails to make any of the payments for Arrears as of the due date specified or (ii) if MCOM fails to timely provide any of the quarterly royalty reports or timely make any of the quarterly royalty payments due thereon as specified in Article 5.04 of the CD Disc License Agreement and MCOM fails to cure such error within ten (10) business days of written notice by Philips then:

(i) the entire remaining unpaid balance of the Arrears Amount shall immediately become due and payable;

(ii) Philips shall be entitled to injunctive relief as well as or confession of judgment for the entire unpaid portion of the Arrears Amount; and

(iii) Philips shall be entitled to an award of reasonable counsel fees and costs for enforcement of this Workout Agreement.

6. MCOM and Philips shall treat the contents of this Workout Agreement as confidential information and shall not disclose it to third parties, except as may be necessary by either Philips or MCOM to enforce its rights hereunder in a governmental body or court of law.

7. In addition to the other remedies set forth in this Workout Agreement, Philips shall have the option to terminate this Workout Agreement in the event MCOM breaches any term hereof by providing written notice to MCOM and MCOM fails to cure such breach within ten (10) days of written notice by Philips. In the event this termination option is exercised by Philips, MCOM shall be entitled to credit for payments made hereunder, but all other rights, remedies and defenses of Philips shall be preserved. Philips shall have the right to immediately assert claims (and take whatever legal action it deems appropriate) against MCOM for the full amounts due (as opposed to the compromised amounts set forth herein), less credits to Philips for payments made hereunder.

8. MCOM forever releases and discharges Philips, its agents, servants, employees, directors, officers, lawyers, branches, parent, affiliates, subsidiaries, successors and assigns and all person, firms, corporations and organizations acting on Philips' behalf (collectively, the "Philips' Released Entities") of and from any and all losses, damages, claims, demands, liabilities, obligations, actions and causes of action, of any nature whatsoever in law or in equity, contribution or indemnity, which the MCOM may have or claim to have against Philips or any one or more of the Philips Released Entities

P 001541

9. Philips shall maintain its right of audit under the License Agreement and should any such audit reveal facts which are materially different than those represented by MCOM to Philips in negotiating this Workout Agreement, Philips shall have the right to enforce the License Agreement and seek any additional monies which may be due and owing under the License Agreement prior to December 1, 2003 and discovered as a result of such audit.

Please acknowledge MCOM approval and acceptance to the foregoing by completing the signature block below.

Very truly yours,

By: _____
H. SAKKERS

Title: __By  PROXY__

Date: _____


Music City Optical Media, Inc.

By: _____
John E. Moll

Title: President Chairman

Date: __12/2/03__

**42044**

## PROMISSORY NOTE

Music City Optical Media, Inc., a Tennessee corporation (the "Obligor"), for value received, hereby unconditionally and irrevocably promises to pay to the order of Koninklijke Philips Electronics N.V. ("Philips"), a corporation of the Netherlands, in lawful money of the United States the principal sum of US$ $503,141.28 (Five Hundred and Three Thousand, One Hundred and Forty One U.S. dollars) plus interest, in the following installments with first payment due December 20, 2003:

The monthly payment: **$9,494.90.**

| Music City Optical Media Debt repayment schedule $503,141.28 | | | | |
|---|---|---|---|---|
| Monthly Payment | Due Date | Total Principal Paid | Total Interest Paid | Outstanding Balance |
| $9490.90 | 12/20/03 | $7398.48 | $2096.42 | $495742.80 |
| $9490.90 | 1/20/04 | $7429.30 | $2065.60 | $488313.50 |
| $9490.90 | 2/20/04 | $7460.26 | $2034.64 | $480853.24 |
| $9490.90 | 3/20/04 | $7491.34 | $2003.56 | $473361.89 |
| $9490.90 | 4/20/04 | $7522.56 | $1972.34 | $465839.33 |
| $9490.90 | 5/20/04 | $7553.90 | $1941.00 | $458285.43 |
| $9490.90 | 6/20/04 | $7585.38 | $1909.52 | $450700.05 |
| $9490.90 | 7/20/04 | $7616.98 | $1877.92 | $443083.07 |
| $9490.90 | 8/20/04 | $7648.72 | $1846.18 | $435434.35 |
| $9490.90 | 9/20/04 | $7680.59 | $1814.31 | $427753.76 |
| $9490.90 | 10/20/04 | $7712.59 | $1782.31 | $420041.17 |
| $9490.90 | 11/20/04 | $7744.73 | $1750.17 | $412296.44 |
| $9490.90 | 12/20/04 | $7777.00 | $1717.90 | $404519.44 |
| $9490.90 | 1/20/05 | $7809.40 | $1685.50 | $396710.04 |
| $9490.90 | 2/20/05 | $7841.94 | $1652.96 | $388868.10 |
| $9490.90 | 3/20/05 | $7874.62 | $1620.28 | $380993.48 |
| $9490.90 | 4/20/05 | $7907.43 | $1587.47 | $373086.05 |
| $9490.90 | 5/20/05 | $7940.37 | $1554.53 | $365145.68 |
| $9490.90 | 6/20/05 | $7973.46 | $1521.44 | $357172.22 |
| $9490.90 | 7/20/05 | $8006.68 | $1488.22 | $349165.54 |
| $9490.90 | 8/20/05 | $8040.04 | $1454.86 | $341125.49 |
| $9490.90 | 9/20/05 | $8073.54 | $1421.36 | $333051.95 |
| $9490.90 | 10/20/05 | $8107.18 | $1387.72 | $324944.76 |
| $9490.90 | 11/20/05 | $8140.96 | $1353.94 | $316803.80 |
| $9490.90 | 12/20/05 | $8174.88 | $1320.02 | $308628.92 |
| $9490.90 | 1/20/06 | $8208.95 | $1285.95 | $300419.97 |
| $9490.90 | 2/20/06 | $8243.15 | $1251.75 | $292176.82 |
| $9490.90 | 3/20/06 | $8277.50 | $1217.40 | $283899.32 |
| $9490.90 | 4/20/06 | $8311.99 | $1182.91 | $275587.34 |
| $9490.90 | 5/20/06 | $8346.62 | $1148.28 | $267240.72 |
| $9490.90 | 6/20/06 | $8381.40 | $1113.50 | $258859.32 |

-1-

P 001532

| | | | | |
|---|---|---|---|---|
| $9490.90 | 7/20/06 | $8416.32 | $1078.58 | $250443.00 |
| $9490.90 | 8/20/06 | $8451.39 | $1043.51 | $241991.61 |
| $9490.90 | 9/20/06 | $8486.60 | $1008.30 | $233505.01 |
| $9490.90 | 10/20/06 | $8521.96 | $972.94 | $224983.05 |
| $9490.90 | 11/20/06 | $8557.47 | $937.43 | $216425.58 |
| | | | | |
| $9490.90 | 12/20/06 | $8593.13 | $901.77 | $207832.45 |
| $9490.90 | 1/20/07 | $8628.93 | $865.97 | $199203.52 |
| $9490.90 | 2/20/07 | $8664.89 | $830.01 | $190538.64 |
| $9490.90 | 3/20/07 | $8700.99 | $793.91 | $181837.65 |
| $9490.90 | 4/20/07 | $8737.24 | $757.66 | $173100.40 |
| $9490.90 | 5/20/07 | $8773.65 | $721.25 | $164326.76 |
| $9490.90 | 6/20/07 | $8810.21 | $684.69 | $155516.55 |
| $9490.90 | 7/20/07 | $8846.91 | $647.99 | $146669.64 |
| $9490.90 | 8/20/07 | $8883.78 | $611.12 | $137785.86 |
| $9490.90 | 9/20/07 | $8920.79 | $574.11 | $128865.07 |
| $9490.90 | 10/20/07 | $8957.96 | $536.94 | $119907.11 |
| $9490.90 | 11/20/07 | $8995.29 | $499.61 | $110911.82 |
| | | | | |
| $9490.90 | 12/20/07 | $9032.77 | $462.13 | $101879.05 |
| $9490.90 | 1/20/08 | $9070.40 | $424.50 | $92808.65 |
| $9490.90 | 2/20/08 | $9108.20 | $386.70 | $83700.45 |
| $9490.90 | 3/20/08 | $9146.15 | $348.75 | $74554.30 |
| $9490.90 | 4/20/08 | $9184.26 | $310.64 | $65370.04 |
| $9490.90 | 5/20/08 | $9222.52 | $272.38 | $56147.52 |
| $9490.90 | 6/20/08 | $9260.95 | $233.95 | $46886.57 |
| $9490.90 | 7/20/08 | $9299.54 | $195.36 | $37587.03 |
| $9490.90 | 8/20/08 | $9338.29 | $156.61 | $28248.74 |
| $9490.90 | 9/20/08 | $9377.20 | $117.70 | $18871.54 |
| $9490.90 | 10/20/08 | $9416.27 | $78.63 | $9455.28 |
| $9490.90 | 11/20/08 | $9455.50 | $39.40 | 0 |
| | | | | |

Any installment on this Note not paid when due shall bear interest from its due date until paid in full at the rate of 10% per annum, payable on demand.

All payments on this Note shall be payable without setoff, counterclaim or deduction of any kind whatsoever.

If this Note becomes due and payable on a Saturday, Sunday, or public or other banking holiday under the laws of the State of New York, the maturity thereof shall be extended to the next succeeding business day.

If any of the following events (each being herein referred to as an "Event of Default"), shall occur: (i) the Obligor shall fail to pay any installment on this Note when due and such failure shall continue unremedied for five (5) days after written notice by Philips; (ii) the Obligor shall fail to pay any other amount owing hereunder and such

-2-

NY12532:309726.1
s:\s&l\company documents\mcom-promissory note-112403

P 001533

failure shall continue unremedied for ten (10) days after written notice from Philips, or (iii) the Obligor shall make an assignment for the benefit of creditors, or any order shall be entered relating to the Obligor under any bankruptcy, reorganization, dissolution, or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, whereby Obligor becomes or is adjudicated insolvent or bankrupt, or the Obligor shall petition or apply to any tribunal for any receiver of or any trustee for it or any substantial part of its property; then in any such event Philips may declare all of the then unpaid installments on this Note and all other amounts owing hereunder to be immediately due and payable; provided, however, that upon the happening of any event specified in clause (iii) above, all unpaid installments on this Note and all other amounts owing hereunder shall become immediately due and payable without declaration or other notice to the Obligor.

If Philips institutes any action for the enforcement or collection of this Note and recovers on such action, the Obligor shall pay on demand all costs and expenses of such action including reasonable attorney's fees and costs.

The Obligor expressly waives any presentment, demand, protest, or other notice of any kind.

The obligation under this Note shall not be transferable by the Obligor without the written consent of Philips.

**THIS NOTE SHALL BE GOVERNED B THE LAWS OF THE STATE OF NEW YORK, BOTH IN INTERPRETATION AND IN PERFORMANCE.**

The Obligor hereby irrevocably submits to the jurisdiction of any state or federal court in the State of New York for the purpose of any suit, action, proceeding or judgment relating to or arising out of this Note. The Obligor hereby irrevocably consents to the jurisdiction of any such court in any such action and to the laying of venue in New York State. The Obligor hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection to the laying of the venue of any such suit, action or proceeding brought in the aforesaid courts and hereby irrevocably waives any claim that any such suit or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, nothing herein shall in any way affect the right of Philips to bring any action arising out of or relating to this Note in any competent court elsewhere having jurisdiction over the Obligor or its property.

Music City Optical Media, Inc.

By _____
John E. Moll, ~~President~~
*Chairman*

NY12532:309726.1
s:\s&l\company documents\mcom-promissory note-112403

P 001534

Exhibit P

**PHILIPS**

37965-02

## Philips Intellectual Property & Standards

November 24, 2003

Mr. John E. Moll, President
Music City Optical Media, Inc.
1045 Firestone Parkway
La Vergne, TN 37086

Re: Workout Agreement

Dear Mr. Moll:

This will confirm our agreement ("Workout Agreement") with respect to the CD Disc Patent License Agreement ("CD Disc Agreement") between Koninklijke Philips Electronics N.V. ("Philips") and Music City Optical Media, Inc. ("MCOM"), having an effective date of July 1, 2002:

1. Under the Article 5.04 of the CD Disc Agreement, MCOM is required to make to Philips royalty payments thirty days after the end of each calendar quarter on all Licensed Product sold during the preceding calendar quarter. MCOM (i) failed to make such payments for the first, second, and third calendar quarters of the year 2003. MCOM has asked Philips (i) to forbear on the remedies available to Philips under such CD Disc Agreement (including termination of the CD Disc Agreement and commencement of legal action for immediate payment) and (ii) to re-structure payment for the unpaid royalties due and owing through the third quarter of 2003 ("Arrears") as well as the estimated payments due for the fourth quarter of 2003.

2. MCOM has subsequently provided Philips with an accounting of Arrears under the CD Disc Agreement for the first, second, and third calendar quarters of 2003 in the respective amounts of: $116,152.68, $133,404.57, $153,584.03, and hereby estimates it will owe Philips $100,000 for the fourth calendar quarter of 2003 and represents and warrants that these amounts and accurate in all material respects. The total Arrears (including estimated amounts for Q4, 2003), without interest, as of December 1, 2003 equals $503,141.28 U.S. Dollars ("Arrears Amount"). MCOM shall pay Philips the Arrears Amount (plus interest at 5% / year, calculated from December 1, 2003) in monthly payments of $9,494.90, each due by the Due Date, as follows:



345 Scarborough Road
P.O. Box 3001
Briarcliff Manor, NY 10510-8001

Tel: (914) 945-6000
Fax: (914) 332-0615

S:s&l/company documents/workout agreement 11.24.03.doc

P 001543

| Music City Optical Media Debt repayment schedule $503,141.28 | | | | |
|---|---|---|---|---|
| Monthly Payment | Due Date | Total Principal Paid | Total Interest Paid | Outstanding Balance |
| $9490.90 | 12/20/03 | $7398.48 | $2096.42 | $495742.80 |
| $9490.90 | 1/20/04 | $7429.30 | $2065.60 | $488313.50 |
| $9490.90 | 2/20/04 | $7460.26 | $2034.64 | $480853.24 |
| $9490.90 | 3/20/04 | $7491.34 | $2003.56 | $473361.89 |
| $9490.90 | 4/20/04 | $7522.56 | $1972.34 | $465839.33 |
| $9490.90 | 5/20/04 | $7553.90 | $1941.00 | $458285.43 |
| $9490.90 | 6/20/04 | $7585.38 | $1909.52 | $450700.05 |
| $9490.90 | 7/20/04 | $7616.98 | $1877.92 | $443083.07 |
| $9490.90 | 8/20/04 | $7648.72 | $1846.18 | $435434.35 |
| $9490.90 | 9/20/04 | $7680.59 | $1814.31 | $427753.76 |
| $9490.90 | 10/20/04 | $7712.59 | $1782.31 | $420041.17 |
| $9490.90 | 11/20/04 | $7744.73 | $1750.17 | $412296.44 |
| $9490.90 | 12/20/04 | $7777.00 | $1717.90 | $404519.44 |
| $9490.90 | 1/20/05 | $7809.40 | $1685.50 | $396710.04 |
| $9490.90 | 2/20/05 | $7841.94 | $1652.96 | $388868.10 |
| $9490.90 | 3/20/05 | $7874.62 | $1620.28 | $380993.48 |
| $9490.90 | 4/20/05 | $7907.43 | $1587.47 | $373086.05 |
| $9490.90 | 5/20/05 | $7940.37 | $1554.53 | $365145.68 |
| $9490.90 | 6/20/05 | $7973.46 | $1521.44 | $357172.22 |
| $9490.90 | 7/20/05 | $8006.68 | $1488.22 | $349165.54 |
| $9490.90 | 8/20/05 | $8040.04 | $1454.86 | $341125.49 |
| $9490.90 | 9/20/05 | $8073.54 | $1421.36 | $333051.95 |
| $9490.90 | 10/20/05 | $8107.18 | $1387.72 | $324944.76 |
| $9490.90 | 11/20/05 | $8140.96 | $1353.94 | $316803.80 |
| $9490.90 | 12/20/05 | $8174.88 | $1320.02 | $308628.92 |
| $9490.90 | 1/20/06 | $8208.95 | $1285.95 | $300419.97 |
| $9490.90 | 2/20/06 | $8243.15 | $1251.75 | $292176.82 |
| $9490.90 | 3/20/06 | $8277.50 | $1217.40 | $283899.32 |
| $9490.90 | 4/20/06 | $8311.99 | $1182.91 | $275587.34 |
| $9490.90 | 5/20/06 | $8346.62 | $1148.28 | $267240.72 |
| $9490.90 | 6/20/06 | $8381.40 | $1113.50 | $258859.32 |
| $9490.90 | 7/20/06 | $8416.32 | $1078.58 | $250443.00 |
| $9490.90 | 8/20/06 | $8451.39 | $1043.51 | $241991.61 |
| $9490.90 | 9/20/06 | $8486.60 | $1008.30 | $233505.01 |
| $9490.90 | 10/20/06 | $8521.96 | $972.94 | $224983.05 |
| $9490.90 | 11/20/06 | $8557.47 | $937.43 | $216425.58 |
| $9490.90 | 12/20/06 | $8593.13 | $901.77 | $207832.45 |
| $9490.90 | 1/20/07 | $8628.93 | $865.97 | $199203.52 |
| $9490.90 | 2/20/07 | $8664.89 | $830.01 | $190538.64 |

S:s&l/company documents/workout agreement 11.24.03.doc

| | | | | |
|---|---|---|---|---|
| $9490.90 | 3/20/07 | $8700.99 | $793.91 | $181837.65 |
| $9490.90 | 4/20/07 | $8737.24 | $757.66 | $173100.40 |
| $9490.90 | 5/20/07 | $8773.65 | $721.25 | $164326.76 |
| $9490.90 | 6/20/07 | $8810.21 | $684.69 | $155516.55 |
| $9490.90 | 7/20/07 | $8846.91 | $647.99 | $146669.64 |
| $9490.90 | 8/20/07 | $8883.78 | $611.12 | $137785.86 |
| $9490.90 | 9/20/07 | $8920.79 | $574.11 | $128865.07 |
| $9490.90 | 10/20/07 | $8957.96 | $536.94 | $119907.11 |
| $9490.90 | 11/20/07 | $8995.29 | $499.61 | $110911.82 |
| | | | | |
| $9490.90 | 12/20/07 | $9032.77 | $462.13 | $101879.05 |
| $9490.90 | 1/20/08 | $9070.40 | $424.50 | $92808.65 |
| $9490.90 | 2/20/08 | $9108.20 | $386.70 | $83700.45 |
| $9490.90 | 3/20/08 | $9146.15 | $348.75 | $74554.30 |
| $9490.90 | 4/20/08 | $9184.26 | $310.64 | $65370.04 |
| $9490.90 | 5/20/08 | $9222.52 | $272.38 | $56147.52 |
| $9490.90 | 6/20/08 | $9260.95 | $233.95 | $46886.57 |
| $9490.90 | 7/20/08 | $9299.54 | $195.36 | $37587.03 |
| $9490.90 | 8/20/08 | $9338.29 | $156.61 | $28248.74 |
| $9490.90 | 9/20/08 | $9377.20 | $117.70 | $18871.54 |
| $9490.90 | 10/20/08 | $9416.27 | $78.63 | $9455.28 |
| $9490.90 | 11/20/08 | $9455.50 | $39.40 | 0 |

3. Concurrently with execution of this side letter, MCOM shall execute a Promissory Note payable to Philips with a payment schedule according to paragraph 2 above.

4. The Arrears Amount and interest thereon is in addition to and is not a substitute for any other payments due after January 1, 2003, in whole or in part, under the License Agreement. Notwithstanding the foregoing, MCOM shall provide a royalty report for the fourth quarter of 2003 no later than January 31, 2004, and if the royalty due and owing exceeds the estimated amount of $100,000, MCOM shall pay the difference concurrently with the report. If the amount due and owing is less than $100,000, the difference shall be deducted from the monthly payments due according to paragraph 2, starting from the last payment due November 20, 2008 until the difference is satisfied.

5. In view of Philips forbearance in not immediately enforcing its rights under the CD Disc Agreement and in agreeing to the payment schedule set forth in paragraph 2, MCOM further agrees that:

(a) MCOM shall not contest the Arrears Amount and interest thereon;

(b) MCOM stipulates that with respect to the payments due under this Workout Agreement, the Licensed Patents under the CD Disc Agreement are valid and infringed by the CD-Discs manufactured by MCOM during the Arrears

S:\s&l/company documents/workout agreement 11.24.03.doc

P 001545

period, and OEM shall not contest the validity or infringement of the Licensed Patents with respect to the Arrears Amount (provided, however, that nothing herein shall prevent MCOM from contesting the Licensed Patents with respect to sales of Licensed Products after the full and timely payment of all monies payable under paragraph 2);

(c) If MCOM (i) fails to make any of the payments for Arrears as of the due date specified or (ii) if MCOM fails to timely provide any of the quarterly royalty reports or timely make any of the quarterly royalty payments due thereon as specified in Article 5.04 of the CD Disc License Agreement and MCOM fails to cure such error within ten (10) business days of written notice by Philips then:

(i) the entire remaining unpaid balance of the Arrears Amount shall immediately become due and payable;

(ii) Philips shall be entitled to injunctive relief as well as or confession of judgment for the entire unpaid portion of the Arrears Amount; and

(iii) Philips shall be entitled to an award of reasonable counsel fees and costs for enforcement of this Workout Agreement.

6. MCOM and Philips shall treat the contents of this Workout Agreement as confidential information and shall not disclose it to third parties, except as may be necessary by either Philips or MCOM to enforce its rights hereunder in a governmental body or court of law.

7. In addition to the other remedies set forth in this Workout Agreement, Philips shall have the option to terminate this Workout Agreement in the event MCOM breaches any term hereof by providing written notice to MCOM and MCOM fails to cure such breach within ten (10) days of written notice by Philips. In the event this termination option is exercised by Philips, MCOM shall be entitled to credit for payments made hereunder, but all other rights, remedies and defenses of Philips shall be preserved. Philips shall have the right to immediately assert claims (and take whatever legal action it deems appropriate) against MCOM for the full amounts due (as opposed to the compromised amounts set forth herein), less credits to Philips for payments made hereunder.

8. MCOM forever releases and discharges Philips, its agents, servants, employees, directors, officers, lawyers, branches, parent, affiliates, subsidiaries, successors and assigns and all person, firms, corporations and organizations acting on Philips' behalf (collectively, the "Philips' Released Entities") of and from any and all losses, damages, claims, demands, liabilities, obligations, actions and causes of action, of any nature whatsoever in law or in equity, contribution or indemnity, which the MCOM may have or claim to have against Philips or any one or more of the Philips Released Entities.

9. Philips shall maintain its right of audit under the License Agreement and should any such audit reveal facts which are materially different than those represented by MCOM to Philips in negotiating this Workout Agreement, Philips shall have the right

to enforce the License Agreement and seek any additional monies which may be due and owing under the License Agreement prior to December 1, 2003 and discovered as a result of such audit.

10. Nothing in this Workout Agreement shall be construed as modifying any obligations or payments that remain due and owing to Philips by MCOM under the Workout Agreement dated September 17, 2002, nor as modifying any remedies available to Philips thereunder.

Please acknowledge MCOM approval and acceptance to the foregoing by completing the signature block below.

Very truly yours,

By: H. SAKKERS    BW

Title: BY PROXY

Date: 2 FEBRUARY 2004

Music City Optical Media, Inc.

By: John E. Moll

Title: President CHAIRMAN

Date: 1/28/04

P 001547

Exhibit Q

1

## CD DISC PATENT LICENSE AGREEMENT

This Agreement is entered into this /1st day of October, 2003 by and between

KONINKLIJKE PHILIPS ELECTRONICS N.V., having its registered office in Eindhoven, The Netherlands, (hereinafter referred to as "Philips")

and

ZOMAX INCORPORATED, having its registered office in 5353 Nathan Lane, Plymouth, Minnesota 55442 (hereinafter referred to as "Licensee").

WHEREAS, the Philips' group of companies has for many years been engaged in research and development of systems, in which signals encoded in digital form and stored on a disc are read and reproduced by means of devices using an optical read-out beam, and has acquired valuable know-how and expertise therein;

WHEREAS, one of the achievements of such research and development efforts has been a revolutionary high-fidelity sound storage and reproduction system, of which the specifications have been further defined in a joint research and development co-operation with Sony Corporation ("Sony") and which has been presented under the name "Compact Disc Digital Audio System" (CD-Audio System);

WHEREAS, on the basis of the CD-Audio System Philips and Sony have developed a further system, which has been presented under the name "Compact Disc Data System" (CD-ROM System);

WHEREAS, Philips and Sony have developed an additional multi-session CD system, which has been presented under the name "Enhanced Music Compact Disc System" ("Enhanced Music CD System" or "CD Extra System" (the CD-Audio System, the CD-ROM System and the CD Extra System are collectively referred to as "the CD Systems");

WHEREAS, Philips and Sony each own certain patents relating to the CD Systems;

WHEREAS, Philips has been authorized by Sony to grant licenses under certain patents relating to the CD Systems, which are owned or controlled by Sony and its Associated Companies (as hereinafter defined), as well as under such patents relating to the CD Systems as are jointly owned by Philips and Sony;

WHEREAS, Philips and Sony have each retained their rights to license their respective patents separately and to give non-assertion undertakings with regard to jointly owned patents, whether within or outside the standard specifications of the CD Systems, so that interested manufacturers may opt to take out separate licenses under the relevant patents of each of Philips and Sony, instead of a combined license;

**P 001213**

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803

July 2003

2

WHEREAS, Licensee has requested from Philips a license under the relevant patents of Philips and Sony relating to CD-Discs (as hereinafter defined) and wishes such CD-Discs to be compatible with devices capable of playing discs, conforming to the Standard Specifications for any of the relevant CD Systems;

WHEREAS, Philips is willing to grant Licensee a license under the relevant patents and to make available certain basic information relating to the CD Systems, on the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual obligations and covenants hereinafter set forth, the parties hereto have agreed as follows:

## 1.    Definitions

The following terms used in this Agreement shall have the meanings set out below:

1.1    "Disc" shall mean a non-recordable reflective disc-shaped information carrier comprising any kind of information including, but not limited to, audio, video, text and/or data-related information, which is irreversibly stored in a layer during and as an integral part of the manufacturing process of the disc in a form which is optically readable by playback devices using a laser-beam.

1.2    "CD-Audio Disc" shall mean a Disc comprising audio information encoded in digital form, which is optically readable by a CD-Audio Player (as hereinafter defined) and which conforms to the CD-Audio Standard Specifications (as hereinafter defined). A CD-Audio Disc may, in addition to audio information, comprise CD Text information.

1.3    "CD-Audio Maxi-Single" shall mean a CD-Audio Disc which, in addition to conforming to the CD-Audio Standard Specifications, conforms to the CD-Audio Maxi-Single Standard Specifications.

1.4    "CD-ROM Disc" shall mean a Disc containing data, arranged in sectors as defined in the CD-ROM Standard Specifications (as hereinafter defined) in the chapter Digital Data Structure, Parts I to V, under the names: General data specification, Sync., Header, User data and Auxiliary data respectively, and protected against errors in accordance with the error correction system as defined in the CD-ROM Standard Specifications in the chapter Error Correction System under the name Cross Interleaved Reed-Solomon Code - "CIRC".

1.5    "CD-ROM Disc mode 1" shall mean a CD-ROM Disc with an additional error correction system for computer or other data as defined in the CD-ROM Standard Specifications in the chapter Digital Data Structure, Part VII, under the name Error Detection and Error Correction specification (a third layer error correction).

1.6    "CD-ROM Disc mode 2" shall mean a CD-ROM Disc containing data protected against errors solely by the error correction system as defined in the CD-ROM Standard

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

**P 001214**

Specifications in the chapter Error Correction System under the name Cross Interleaved Reed-Solomon Code - "CIRC".

1.7 "CD-ROM XA Disc sub-mode 1" shall mean a CD-ROM Disc, which is in compliance with the CD-ROM-XA Specifications (as hereinafter defined) and comprises at least one sector containing data protected by an additional error correction system for data as defined in the CD-ROM Standard Specifications in the chapter Digital Data Structure, Part VII, under the name Error Detection and Error Correction specification (a third layer error correction).

1.8 "CD-ROM XA Disc sub-mode 2" shall mean a CD-ROM Disc, which is in compliance with the CD-ROM-XA Specifications and comprises solely sectors containing data protected against errors solely by the error correction system as defined in the CD-ROM Standard Specifications in the chapter Error Correction System under the name Cross Interleaved Reed-Solomon Code – "CIRC".

1.9 "CD Extra Disc" shall mean a Disc conforming to the Enhanced Music CD Standard Specifications (as hereinafter defined) and which comprises first information encoded in digital form, which is optically readable by a CD-Audio Player and which conforms to the CD-Audio Standard Specifications, and second information conforming to the CD-ROM XA Specifications and which is optically readable by a CD-ROM Player or by an Enhanced Music CD Player (as hereinafter defined).

1.10 "CD Extra Disc sub-mode 1" shall mean a CD Extra Disc wherein the second information is in accordance with the data format on a CD-ROM XA Disc sub-mode 1.

1.11 "CD Extra Disc sub-mode 2" shall mean a CD Extra Disc wherein the second information is solely in accordance with the data format on a CD-ROM XA Disc sub-mode 2.

The CD-Audio Disc, the CD-Audio Maxi-Single, the CD-ROM Disc mode 1 and mode 2, the CD-ROM XA Disc sub-mode 1 and sub-mode 2 and the CD Extra Disc sub-mode 1 and sub-mode 2 are collectively referred to as "CD-Disc(s)".

1.12 "CD-Audio Standard Specifications" shall mean the specifications for the CD-Audio System, including, if applicable, the Subcode/Control and Display System, Channels R ..W, chapter 5.8, the CD-TEXT mode, as made available, modified or extended from time to time.

1.13 "CD-Audio Maxi-Single Standard Specifications" shall mean the specifications for the CD-Audio Maxi-Single system, specifying among other things a maximum playing time of 30 minutes, as made available, modified or extended from time to time. For the purpose of this Agreement, the CD-Audio Maxi-Single Standard Specifications shall be considered to form part of the CD-Audio Standard Specifications.

1.14 "CD-ROM Standard Specifications" shall mean the specifications for the CD-ROM System as made available, modified or extended from time to time.

1.15 "CD-ROM-XA Specifications" shall mean the specifications of the System Description CD-ROM XA as made available, modified or extended from time to time.

4

1.16    "Enhanced Music CD Standard Specifications" shall mean the specifications for the
        Enhanced Music CD System as made available, modified or extended from time to time.
        The CD-Audio Standard Specifications, the CD-Audio Maxi-Single Standard Specifications,
        the CD-ROM Standard Specifications, the Enhanced Music CD Standard Specifications and
        the CD-ROM-XA Specifications are collectively referred to as the "CD Standard
        Specifications".

1.17    "Player" shall mean a single spindle playback device for optically reading information stored
        on a Disc and converting such information into electrical signals for reproduction purposes.

1.18    "CD-Audio Player" shall mean a Player solely capable of reproducing information stored on a
        CD-Audio Disc or CD-Audio Maxi-Single and converting such information into electrical
        signals, in accordance with the CD-Audio Standard Specifications, which electrical signals are
        directly capable of and intended to be used for sound reproduction through amplifiers and
        loudspeakers.

1.19    "CD-ROM Player" shall mean a Player solely capable of reproducing information stored on
        any kind of CD-ROM Disc and converting such information into electrical signals, in
        accordance with the CD-ROM Standard Specifications, which electrical signals are directly
        capable of and intended to be used for the reproduction of computer related data through
        data handling and/or data processing equipment.

1.20    "Enhanced Music CD Player" shall mean a Player solely capable of reproducing information
        stored on any kind of CD Extra Disc and converting such information into electrical signals,
        in accordance with the Enhanced Music CD Standard Specifications, which electrical signals
        are directly capable of and intended to be used for the reproduction of video, text and/or
        computer related data through data handling and/or data processing equipment.

1.21    "Combi-Player" shall mean a Player which is any combination of a CD-Audio Player, a CD-
        ROM Player and/or an Enhanced Music CD Player.

        The CD-Audio Player, the CD-ROM Player, the Enhanced Music CD Player and the Combi-
        Player are collectively referred to as the "CD-Players".

1.22    "Licensed Product(s)" shall mean

        Option A:    CD-Audio Discs and/or CD-Audio Maxi Singles

        Option B:    CD-Audio Discs and/or CD-Audio Maxi Singles containing CD Text
                     information

        Option C:    CD-ROM Discs mode 1

        Option D:    CD-ROM Discs mode 2

        Option E:    CD-ROM XA Discs sub-mode 1

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                            July 2003

**P 001216**

5

Option F:    CD-ROM XA Discs sub-mode 2

Option G:    CD-Extra Discs sub-mode 1

Option H:    CD-Extra Discs sub-mode 2

Option I:    CD-Extra Discs sub-mode 1 containing CD Text information

Option J:    CD-Extra Discs sub-mode 2 containing CD Text information

Option K:    CD-Extra Discs containing video-related data in accordance with the MPEG
             Video System ISO DIS 11172 Standard

as selected by Licensee, manufactured and/or sold in accordance with the provisions hereof,
which are duly reported and on which the royalties due hereunder are paid in accordance
with the provisions of this Agreement.

Option(s):    o✓A    o✓B    o✓C    o✓D    o✓E    o✓F
              o✓G    o✓H    o✓I    o✓J    o✓K

(please tick any combination as appropriate)

**Initial:** _____

1.23    "Licensed Patents" shall mean any one or more of the essential patents for the manufacture
        and/or sale of the various types of CD-Discs, as follows:

        Category I

        (a)    CD-Audio Discs and/or CD-Audio Maxi Singles, as listed in Annex A1;

        (b)    CD-Audio Discs and/or CD-Audio Maxi Singles containing CD Text information, as
               listed in Annex A1 and Annex A7;

        Category II

        (c)    CD-ROM Discs mode 1, as listed in Annex A1 and Annex A2;

        (d)    CD-ROM Discs mode 2, as listed in Annex A1 and Annex A3;

        (e)    CD-ROM XA Discs sub-mode 1, as listed in Annex A1 and Annex A4;

        (f)    CD-ROM XA Discs sub-mode 2, as listed in Annex A1 and Annex A5;

        Category III

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

P 001217

6

(g)     CD Extra Discs sub-mode 1, as listed in Annex A1, Annex A6 and Annex A4;

(h)     CD Extra Discs sub-mode 2, as listed in Annex A1, Annex A6 and Annex A5;

(i)     CD Extra Discs sub-mode 1 containing CD Text information, as listed in Annex A1, Annex A6, Annex A4 and Annex A7;

(j)     CD-Extra Discs sub-mode 2 containing CD Text information, as listed in Annex A1, Annex A6, Annex A5 and Annex A7;

(k)     CD-Extra Discs containing video-related data in accordance with the MPEG Video System ISO DIS 11172 Standard, as listed in Annex A1, Annex A6, Annex A4 or Annex A5 as well as Annex A8.

The term "essential" as used in relation to patents in this Agreement shall refer to patents, the use of which is necessary (either directly or as a practical matter) for compliance with the Standard Specifications defining the relevant CD System(s).

Philips has commissioned an independent patent expert to review the European, Japanese and US patents listed as essential in Annexes A1, A2, A3, A4, A5, A6, A7 and A8 in order to confirm the essentiality of such patents. In the event that such independent patent expert would find that any of the patents does not qualify as essential as defined in this Agreement, Philips will delete such patent (as well as the equivalent corresponding patents) from the relevant Annex and such patent will be put on a list of non-essential patents. Notwithstanding such deletion, Licensee shall retain the right to continue the use of such deleted patent(s) in accordance with the provisions of this Agreement, without any additional payment, unless Licensee explicitly notifies Philips in writing of its decision to waive such right.

In the event that Philips or Sony (or any of their respective Associated Companies) would have additional patents relevant to CD-Audio Discs (except for CD Text information and other than patents acquired from third parties after the date of January 1, 1983), CD-ROM Discs (other than patents acquired from third parties after the date of July 1, 1986), CD Extra Discs (other than patents acquired from third parties after the date of January 1, 1996) or the CD Text mode of CD-Discs, excluding CD-ROM Discs, (other than patents acquired from third parties after the date of October 1, 1996) in their respective patent portfolios which are essential to the manufacture, sale or other disposal of CD-Discs and which have a filing date or are entitled to a priority date prior to either January 1, 1983 for CD-Audio Discs, July 1, 1986 for CD-ROM Discs, January 1, 1996 for CD Extra Discs or October 1, 1996 for the CD Text mode of CD-Discs, excluding CD-ROM Discs, but which have not been listed as essential patents in the respective Annexes hereto, Philips will notify Licensee accordingly and such additional patents will be added to the Licensed Patents and such addition shall not affect the provisions of this Agreement, including without limitation, the duration of this Agreement as specified in Clause 12.1 and the duration of the grant-back undertakings on the part of Licensee pursuant to Clause 2. Any patents as may be added as essential patents to any of the respective Annexes hereto, will similarly be subject to the review by the independent patent expert in accordance with the preceding paragraph.

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803          July 2003

P 001218

7

The patent lists provided to Licensee upon execution of this Agreement are subject to change in accordance with the provisions of this Agreement. With regard to the rights granted to Licensee hereunder, the patent lists published by Philips on its website (www.licensing.philips.com) or otherwise communicated by Philips to Licensee after the date of execution hereof shall prevail over the lists provided to Licensee upon the execution of this Agreement.

1.24    "Associated Company" shall mean any one or more business entities (1) owned or controlled by Philips, Sony or Licensee, (2) owning or controlling Philips, Sony or Licensee, or (3) owned or controlled by the business entity owning or controlling Philips, Sony or Licensee at the material time. For the purposes of this definition a business entity shall be deemed to own and/or to control another business entity if more than 50% (fifty per cent) of the voting stock of the latter business entity, ordinarily entitled to vote in the election of directors, (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter business entity) is held by the owning and/or controlling business entity.

1.25    "Territory" shall mean the geographic area known as the United States of America, its territories and possessions.


2.    **Grant of Rights**

2.1    For the term of this Agreement and subject to the provisions hereof, Philips hereby grants to Licensee a non-exclusive, non-transferable license under the Licensed Patents (listed in the relevant Annex(es)) to manufacture Licensed Products as selected by Licensee pursuant to the Options of Clause 1.22 within the Territory in accordance with the relevant CD Standard Specifications and to sell or otherwise dispose of such Licensed Products so manufactured in all countries of the world.

2.2    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations under this Agreement, to grant Licensee upon Licensee's request, a non-exclusive, non-transferable license, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, on reasonable, non-discriminatory conditions, to manufacture Licensed Products in the Territory and to sell or otherwise dispose of Licensed Products so manufactured in all countries of the world, under any patents not yet licensed hereunder and which are essential to the manufacture, sale or other disposal of Licensed Products, for which Philips, Sony and/or their respective Associated Companies may hereafter acquire from third parties the right to grant licenses. It is acknowledged and agreed that in respect of the patents as may be licensed pursuant to this Clause 2.2, additional royalties may have to be paid over and above the royalties specified in Clause 5.2.

2.3    Philips, also on behalf of Sony, further agrees, for as long as this Agreement is in force and effect and Licensee is in full compliance with its obligations under this Agreement, to grant Licensee upon Licensee's request as well as to those of Licensee's Associated Companies who so request, a non-exclusive, non-transferable license, on reasonable, non-discriminatory conditions, either by means of a sub-license arrangement or by means of individual licenses from Philips and/or Sony respectively, to manufacture CD-Players and to sell or otherwise

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803          July 2003

P 001219

8

dispose of such CD-Players so manufactured in all countries of the world under any and all present and future patents essential to the manufacture, sale or other disposal of CD-Players for which Philips, Sony and/or their respective Associated Companies have or may hereafter acquire the right to grant licenses.

2.4    In consideration of the undertakings set forth in Clauses 2.1, 2.2 and 2.3 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Clause 12, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips concerning CD-Discs, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs, as correspond with the Category of CD-Discs from which Licensee has made a selection pursuant to the Options of Clause 1.22, under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Discs and which patents were first filed or are entitled to a priority date in any country of the world prior to the date of termination of this Agreement. The duration of such licenses shall be a period ending at the expiration date of the last to expire patent of Licensee or the relevant Associated Company of Licensee, essential to the Category of CD-Discs from which Licensee has made a selection pursuant to the Options of Clause 1.22. For the avoidance of doubt, the undertaking set out in this Clause 2.4 shall only apply to those companies which accept or have accepted a similar undertaking as given by Licensee in this Clause 2.4 and only in respect of those Categories of CD-Discs from which both Licensee and such companies have made a selection.

2.5    In addition, in consideration of the undertakings set forth in Clauses 2.1, 2.2, 2.3 and 2.4 and similar undertakings by third party licensees of Philips or any of its Associated Companies and without prejudice to the provisions of Clause 12, Licensee agrees to grant to Philips, Sony and their respective Associated Companies and to other third parties who have entered or will enter into a license agreement with Philips concerning CD-Players, non-exclusive, non-transferable licenses, on reasonable, non-discriminatory conditions, to manufacture, sell or otherwise dispose of CD-Players capable of playing CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22 under any and all present and future patents, for which Licensee or its Associated Companies have or may hereafter acquire the right to grant licenses and which are essential to the manufacture, sale or other disposal of such CD-Players and which patents were first filed or are entitled to a priority date in any country of the world prior to the date of termination of this Agreement. The duration of such licenses shall be a period ending at the expiration date of the last to expire patent of Licensee or the relevant Associated Company of Licensee, essential to CD-Players capable of playing CD-Discs, as correspond with the selection made by Licensee pursuant to the Options of Clause 1.22. For the avoidance of doubt, the undertaking set out in this Clause 2.5 shall only apply to those companies which accept or have accepted a similar undertaking as given by Licensee in this Clause 2.5.

2.6    Philips undertakes that it will offer, at the request of any of Licensee's Associated Companies to any such Associated Company, a non-exclusive and non-transferable license under the Licensed Patents on reasonable and non-discriminatory conditions comparable to those set forth herein, to manufacture, sell or otherwise dispose of CD-Discs.

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                July 2003

P 001220

9

2.7    IT IS EXPRESSLY ACKNOWLEDGED AND AGREED THAT:

(I)    THE LICENSES AND LICENSE UNDERTAKINGS HEREIN CONTAINED WITH RESPECT TO THE MANUFACTURE OF LICENSED PRODUCTS DO NOT EXTEND TO MASTER RECORDING MACHINES, EQUIPMENT OR METHODS FOR THE REPLICATION OF DISCS, NOR TO THE MANUFACTURE OF MATERIALS OR REPRODUCTION RIGHTS FOR INFORMATION (SUCH AS AUDIO, VIDEO, TEXT AND/OR DATA-RELATED INFORMATION), CONTAINED ON DISCS TO BE PLAYED BACK ON A PLAYER. FURTHER, THE LICENSE UNDERTAKINGS WITH RESPECT TO THE MANUFACTURE OF PLAYERS DO NOT EXTEND TO THE MANUFACTURE OF COMPONENTS FOR PLAYERS (INCLUDING BUT NOT LIMITED TO SEMICONDUCTOR DEVICES, INTEGRATED CIRCUITS, LASERS, MOTORS AND LENSES), EXCEPT FOR CIRCUITRY AND/OR SYSTEM ASPECTS SPECIFIC TO THE CD SYSTEMS (AND SIMILAR OPTICAL READ-OUT SYSTEMS);

(II)    THE RIGHTS AND LICENSES GRANTED UNDER THIS AGREEMENT DO NOT EXTEND TO ANY COMBINATION OF ONE OR MORE LICENSED PRODUCTS OR PLAYERS WITH ANY OTHER ELEMENTS, PRODUCTS, SYSTEMS, EQUIPMENT OR SOFTWARE OTHER THAN THE COMBINATION OF A LICENSED PRODUCT AND A CD PLAYER.

## 3.    Standard Specifications, Technical Information and Support

3.1    Upon receipt of the payment provided for in Clause 5.1 and the payment provided for in Clause 5.12, Philips shall make available to Licensee for use by Licensee in accordance with the provisions hereof, a copy of the then current version of the respective CD Standard Specifications, as correspond with the Licensed Products as selected by Licensee pursuant to the Options of Clause 1.22, together with such other information and support as Philips considers necessary for the interpretation and/or the correct application of the relevant CD Standard Specifications.

3.2    Licensee shall be notified in writing of any addition or modification to any of the relevant CD Standard Specifications and shall be provided with relevant information in connection therewith.

3.3    Philips and Licensee undertake to keep each other generally informed of developments or initiatives which may have an impact on the relevant CD Standard Specifications.

## 4.    Procurement from other Licensed Manufacturers

4.1    The rights granted to Licensee pursuant to Clause 2 and the right to use the information pursuant to Clause 3, include the right for Licensee to have Licensed Products made for it by third party manufacturers, duly licensed by Philips under an agreement similar to this

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                July 2003

**P 001221**

10

Agreement, provided that Licensee will properly identify such third party manufacturer in the royalty reporting forms to be submitted to Philips hereunder, together with the quantities of Licensed Products so purchased.

Conversely, Licensee shall refrain from purchasing or selling CD-Discs manufactured by any third party not licensed by Philips, where such purchase or sale would constitute an act of infringement of any of the Licensed Patents.

**5.    Royalties, Reports and Payments**

5.1    In consideration of the rights granted by Philips and the information to be provided by Philips hereunder, Licensee shall, upon execution of this Agreement, make a non-refundable, non-recoupable payment of US$ 25,000 (twenty-five thousand US Dollars) to Philips.

5.2    In further consideration of the rights granted hereunder by Philips to Licensee, Licensee shall pay to Philips a royalty for each CD-Disc sold or otherwise disposed of by Licensee, any of Licensee's Associated Companies or an agent of Licensee, in any country where at least one of the Licensed Patents essential to the type(s) of CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22 exists.

These royalties shall amount to:

(a)    US$ 0.03 (three US Dollar cents) for each CD-Audio Disc with an outer diameter greater than 90 mm, if applicable, containing CD Text information;

(b)    US$ 0.02 (two US Dollar cents) for each CD-Audio Disc with an outer diameter smaller than 90 mm, if applicable, containing CD Text information;

(c)    US$ 0.027 (two point seven US Dollar cents) for each CD-Audio Maxi-Single, if applicable, containing CD Text information;

(d)    US$ 0.03 (three US Dollar cents) for each CD-ROM Disc (irrespective of the type) with an outer diameter greater than 90 mm;

(e)    US$ 0.02 (two US Dollar cents) for each CD-ROM Disc (irrespective of the type) with an outer diameter smaller than 90 mm;

(f)    US$ 0.045 (four and a half US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter greater than 90 mm, if applicable, containing CD Text information; and

(g)    US$ 0.03 (three US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter smaller than 90 mm, if applicable, containing CD Text information,

said rates hereinafter referred to as "Standard Rates".

With respect to CD-Discs sold on or after July 1, 2002, <u>provided that</u>:

a)    Licensee is in full compliance with its obligations under this Agreement; and

b)    Licensee has submitted an audit statement by its external auditors, who shall be certified public auditors as specified in the Audit Guidelines attached hereto as Annex B2, confirming that the quarterly royalty statements as submitted by Licensee to

11

Philips for the last twelve quarterly periods, are true, complete and accurate in every respect; and such statement must meet the requirements as specified in the Audit Guidelines;

and subject to the provisions of Clause 6, Licensee may apply the following royalty rates:

(a)   US$ 0.0175 (one and three quarters of a US Dollar cent) for each CD-Audio Disc with an outer diameter greater than 90 mm, if applicable, containing CD Text information;

(b)   US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each CD-Audio Disc with an outer diameter smaller than 90 mm, if applicable containing CD Text information;

(c)   US$ 0.0155 (one and fifty-five hundredths of a US Dollar cent) for each CD-Audio Maxi-Single, if applicable, containing CD Text information;

(d)   US$ 0.0175 (one and three quarters of a US Dollar cent) for each CD-ROM Disc (irrespective of the type) with an outer diameter greater than 90 mm;

(e)   US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each CD-ROM Disc (irrespective of the type) with an outer diameter smaller than 90 mm;

(f)   US$ 0.0175 (one and three quarters of a US Dollar cent) for each CD Extra Disc (irrespective of the type) with an outer diameter greater than 90 mm, if applicable, containing CD Text information; and

(g)   US$ 0.0115 (one and fifteen hundredths of a US Dollar cent) for each CD Extra Disc (irrespective of the type) with an outer diameter smaller than 90 mm, if applicable, containing CD Text information,

said rates hereinafter referred to as "Compliance Rates".

In the event that Licensee fails to comply at any time with any of its obligations under this Agreement, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the first day of the reporting period to which the occurrence of non-compliance relates until such moment that Philips confirms in writing to Licensee that Licensee's non-compliance has been remedied in full.

A CD-Disc shall be considered sold when invoiced or, if not invoiced, when delivered to a party other than Licensee.

For the avoidance of doubt, Philips confirms that it shall not assert any of the Licensed Patents against Licensee, nor against any of Licensee's customers or subsequent buyers of CD-Discs manufactured and sold by Licensee, prior to the day on which such CD-Discs are to be reported pursuant to the provisions of this Agreement, nor, provided that such CD-Discs have been duly reported in accordance with the provisions of this Agreement, prior to the day when payment of royalties in respect of CD-Discs manufactured and sold by Licensee is due in accordance with the provisions of this Agreement.

No royalties shall be payable for CD-Discs purchased by Licensee on a "have made" basis in accordance with Clause 4 from third party manufacturers, duly licensed by Philips, provided

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

P 001223

12

that Licensee can demonstrate to Philips' satisfaction, that such third party manufacturer has paid to Philips the royalties due in respect of such CD-Discs.

For the avoidance of doubt, in the event that the manufacture by Licensee of CD-Discs within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to report and pay royalties in respect of CD-Discs manufactured within the Territory and which are sold for final use within the Territory or imported (either by Licensee or by a third party) into a country where no Licensed Patents exist, for final use in such country.

5.3     Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, Licensee shall submit to Philips (even in the event that no sales have been made) a written statement in the form as attached hereto as Annex B1 ("Royalty Reporting Form") (or in such other form as may be subsequently communicated by Philips to Licensee), signed by a duly authorized officer on behalf of Licensee, setting forth with respect to the preceding quarterly period:

   (1)    the quantities of CD-Discs manufactured by Licensee on which royalties are due in accordance with the provisions of this Agreement, specified per individual type of CD-Disc;

   (2)    the quantities of CD-Discs corresponding with the CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22, purchased from other licensed manufacturers in accordance with the provisions of Clause 4, on which royalties are due in accordance with the provisions of the CD Disc patent license agreement of said other manufacturers, specified per individual type of CD-Disc and per such third party manufacturer who shall be named in the Royalty Reporting Form;

   (3)    on a per-country basis, specifying per individual type of CD-Disc:

      (a)    the quantities of CD-Discs on which royalties are due in accordance with the provisions of this Agreement, sold or otherwise disposed of, specifying the identity of the buyers and the trademarks used on or in connection with the CD-Discs;

      (b)    the quantities of CD-Discs on which royalties are due in accordance with the provisions of this Agreement, sold to other manufacturers, duly licensed by Philips, specifying the identity of such other manufacturers and the trademarks used on or in connection with the CD-Discs;

   (4)    a computation of the royalties due under this Agreement.

Licensee shall pay the royalties due to Philips within 30 days after the end of each quarterly period in US Dollars to a bank account, as specified by Philips.

5.4     In the event that Licensee fails to submit to Philips a Royalty Reporting Form for any royalty reporting period within 30 days from the end of the relevant reporting period in accordance with the provisions of Clause 5.3, Licensee shall be obliged to pay to Philips within 30 days

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803          July 2003

P 001224

13

after the end of the relevant quarterly period for which the Royalty Reporting Form was not submitted, an estimated royalty (hereinafter referred to as an "Advance"), being an amount equal to the highest amount of royalties due for any royalty reporting period over the preceding eight royalty reporting periods (or over all preceding royalty reporting periods if fewer than eight). Such payment shall be treated as a non-refundable advance, primarily against the royalties and interest for the relevant royalty reporting period and then, if any sum remains, against any future royalties or other payments payable by Licensee hereunder. Licensee acknowledges and agrees that any Advance shall not be due by way of penalty, but that such payment shall constitute a non-refundable advance as aforesaid. For the avoidance of doubt, such payment shall be payable without any further notice or action by Philips, legal or otherwise, and shall take effect by virtue of the failure to submit a Royalty Reporting Form on time. The payment by Licensee of an Advance shall not affect Licensee's obligation to submit a Royalty Reporting Form and shall be without prejudice to any other rights or remedies of Philips, including, without limitation, Philips' right to charge 2% (two per cent) interest per month on overdue payments (including overdue payments of the Advance), and Philips' right to terminate this Agreement in accordance with its provisions. The Advance will not be set off against other sums due to Philips until a Royalty Reporting Form has been submitted in respect of the relevant royalty reporting period. In respect of any royalty reporting period for which an Advance has been paid and the Royalty Reporting Form subsequently submitted, Philips will first set off against the Advance all royalties and interest due for that period. Any remaining sum from the Advance will be set off against further royalty, interest or Advance payments due to Philips hereunder (if any).

5.5       Licensee shall submit to Philips, once per calendar year, an audit statement by its external auditors, who shall be certified public auditors as specified in the Audit Guidelines attached hereto as Annex B2, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last four quarterly periods, are true, complete and accurate in every respect. Such statement must meet the requirements as specified in the Audit Guidelines and shall be submitted to Philips within 90 days following the end of Licensee's financial year. The correctness of this audit statement may be verified by Philips by means of a work paper review, conducted by one of the certified public auditors selected by Philips. Licensee shall procure that its auditors provide full cooperation with said work paper review. Notwithstanding this audit statement, Philips reserves the right to inspect the books and records of Licensee from time to time in accordance with Clause 5.10.

The requirement to submit an audit statement by its external auditors as contained in the preceding paragraph only applies to those licensees who are entitled to apply the Compliance Rates in accordance with the provisions of this Agreement. Licensees who are entitled to apply the Compliance rates in accordance with the provisions of this Agreement and who have submitted to Philips a statement signed by a duly authorized officer of Licensee confirming that their annual production of CD-Discs is inferior to 5 million units shall be exempted from the requirement to submit the audit statement referred to in the preceding paragraph.

5.6       Within 30 days following the expiration or termination of this Agreement, Licensee shall submit to Philips a certified report on the number of CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22, on which royalties are due in accordance with the provisions of this Agreement, in stock at the time of expiration or termination of this

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&d\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

**P 001225**

14

Agreement. Royalties, calculated in accordance with Clause 5.2 and Clause 5.12, shall be due and payable for all such CD-Discs manufactured prior to, but remaining in stock with Licensee on the date of expiration or termination of this Agreement. For the avoidance of doubt, this Clause 5.6 shall be without prejudice to the provisions of Clause 12.6.

5.7     Any payment under this Agreement which is not made on the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof) or the maximum amount permitted by law, whichever is lower.

5.8     All payments to Philips under this Agreement shall be made by transfer in US Dollar or in such other currency, convertible in the sense of Articles VIII and XIX of the Articles of Agreement of the International Monetary Fund, as designated by Philips. The rate of exchange for converting the currency (if other than US Dollar) of the Territory shall be the telegraphic transfer selling rate of the designated currency as officially quoted in the Territory by the officially authorized foreign exchange bank for payment of currency transactions on the day that the amount is due and payable.

5.9     All costs, stamp duties, taxes and other similar levies arising from or in connection with the conclusion of this Agreement shall be borne by Licensee. In the event that the government of a country imposes any taxes on payments by Licensee to Philips hereunder and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly provide Philips with tax receipts issued by the relevant tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Associated Companies in The Netherlands and to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside The Netherlands.

5.10    In order that the royalty statements provided for in this Clause 5 may be verified, Licensee shall keep complete and accurate books and records relating to the manufacture and sale or other disposal of the CD-Discs as correspond with the CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22 for which at least one Licensed Patent remains in force in any country of the world and shall keep such books and records available for inspection for a period of 5 years following the sale or other disposal.

Philips shall have the right to inspect the books and records of Licensee from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a certified public auditor appointed by Philips. Philips shall give Licensee written notice of such inspection at least 7 days prior to the inspection. Licensee shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that in the event that Licensee has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Clause 5.3 and Clause 5.5, in respect of the period to which the inspection relates or in the event that any discrepancy or error exceeding 3% (three per cent) of the monies actually due is established, in addition to Licensee's obligation promptly to make up for such underpayment, the cost of the inspection shall be borne by Licensee, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&d\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                July 2003

**P 001226**

15

Philips' right of inspection as set out in this Clause 5.10 shall survive termination or expiration of this Agreement.

5.11  Without prejudice to the provisions of Clause 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties payable.

5.12  As a condition precedent to the entry into force of this Agreement, Licensee shall submit to Philips a royalty statement in respect of those CD-Discs as correspond with the CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22 and in which any one or more of the essential Licensed Patents existing at the time is (are) used, manufactured and sold or otherwise disposed of by Licensee before the Effective Date (as hereinafter defined) of this Agreement in accordance with the provisions of Clause 5.3.

Within 7 days following the execution of this Agreement, Licensee shall pay to Philips the royalties for such CD-Discs, calculated by applying the royalty rates of:

(a)  US$ 0.03 (three US Dollar cents) for each CD-Audio Disc with an outer diameter greater than 90 mm, if applicable, containing CD Text information or each CD-ROM Disc (irrespective of the type) with an outer diameter greater than 90 mm;

(b)  US$ 0.02 (two US Dollar cents) for each CD-Audio Disc with an outer diameter smaller than 90 mm, if applicable, containing CD Text information or each CD-ROM Disc (irrespective of the type) with an outer diameter smaller than 90 mm;

(c)  US$ 0.027 (two point seven US Dollar cents) for each CD-Audio Maxi-Single, if applicable, containing CD Text information;

(d)  US$ 0.048 (four point eight US Dollar cents) for each CD Extra Disc, if so selected by Licensee in Schedule I to the Enhanced Music CD Disc License Agreement, if applicable, containing CD Text information;

(e)  US$ 0.045 (four and a half US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter greater than 90 mm, if applicable, containing CD Text information; and

(f)  US$ 0.03 (three US Dollar cents) for each CD Extra Disc (irrespective of the type) with an outer diameter smaller than 90 mm, if applicable, containing CD Text information.

The above rates are effective for CD-Discs sold after June 30, 2000.
CD-Audio Discs, if applicable, containing CD Text information and CD-ROM Discs (irrespective of the type) having an outer diameter greater than 90 mm sold prior to July 1, 1998 are subject to a royalty rate of US$ 0.045; if sold after June 30, 1998 and prior to July 1, 1999 such Discs are subject to a royalty rate of US$ 0.04; and if sold after June 30, 1999 and prior to July 1, 2000 such Discs are subject to a royalty rate of US$ 0.035.

The royalty statement shall similarly be subject to Philips' right of audit as set out in Clause 5.10. Within 45 days following the execution of this Agreement, a Licensee who requests to

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s.s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

P 001227

16

be allowed to apply the Compliance Rates in accordance with Clause 5.2 shall submit to Philips an audit statement by its external auditors, who shall be certified public auditors, confirming that this royalty statement is true, complete and accurate in every respect. Such statement must meet the requirements as specified in the Audit Guidelines.

## 6.    Manufacturing Equipment Identification System

6.1    Upon signing of this Agreement, Licensee shall submit to Philips an overview of its manufacturing equipment currently used, or which is technically capable of being used for the manufacture of CD-Discs. Further, upon any acquisition, transfer or disposal of manufacturing equipment used, or which is technically capable of being used for the manufacture of CD-Discs, Licensee shall submit to Philips details of any such adjustment(s) to its manufacturing equipment. Further, Licensee shall submit to Philips an overview containing all adjustments to its manufacturing equipment during the preceding year, together with and confirmed by the audit statement referred to in Clause 5.5. Such overview shall be in the form as attached hereto as Annex B3 ("Manufacturing Equipment List"), signed by a duly authorized officer on behalf of Licensee.

6.2    The Compliance Rates referred to in Clause 5.2 shall only apply to CD-Discs manufactured by Licensee using manufacturing equipment properly identified in the Manufacturing Equipment List and shall be conditional upon Licensee submitting to Philips the audit statement meeting the requirements as set out in the Audit Guidelines, in accordance with the provisions in Clause 5.5. In the event that Licensee puts into use newly acquired manufacturing equipment which has been used, or which was technically capable of being used for the manufacture of CD-Discs prior to the acquisition by Licensee, the Compliance Rates shall only apply if Licensee confirms to Philips that the newly acquired manufacturing equipment originates from and has been used, or was technically capable of being used by a company which was properly licensed by Philips for the manufacture of CD-Discs at the time of the acquisition of the newly acquired manufacturing equipment by Licensee or that the equipment concerned has not been used by any other entity or person directly or indirectly under the same ultimate control as Licensee. In the event that Licensee is unable to comply with the requirements under this Clause 6, the Standard Rates shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates.

## 7.    Most Favourable Rate

7.1    In the event that licenses under the patents referred to in Clause 2 are granted by Philips for CD-Discs, as correspond with the selection made by Licensee pursuant to the Options of Clause 1.22, to a third party under substantially similar conditions, but at a royalty rate more favourable than the rate payable by Licensee under this Agreement, Licensee shall be entitled to the same royalty rate as applicable to such third party, provided always that this right of Licensee shall not apply in respect of cross-license agreements or other agreements providing for a consideration which is not exclusively based on the payment
of royalties and further provided that this right of Licensee shall not apply in respect of licenses or other arrangements made pursuant to a court decision or the settlement of a

P 001228

17

dispute between Philips and a third party, irrespective of the nature of such dispute, the terms of the court decision or the settlement terms.

8.    **No Warranty and Indemnification**

8.1    Whereas Philips has made efforts to ensure that the information to be supplied by it hereunder is complete and accurate, Philips makes no representation or warranty as to the completeness or accuracy of such information, nor with respect to the ability of Licensee to achieve interchangeability with respect to CD-Discs through the use of such information.

8.2    It is acknowledged by Licensee that third parties may own industrial and/or intellectual property rights in the field of CD-Discs. Philips and Sony make no warranty whatsoever that the manufacture, sale or other disposal of CD-Discs or the use of information supplied by Philips hereunder, does not infringe or will not cause infringement of any industrial and/or intellectual property rights other than the Licensed Patents. Philips, Sony and their respective Associated Companies shall be fully indemnified and held harmless by Licensee from and against any and all third party claims in connection with CD-Discs manufactured, sold or otherwise disposed of by Licensee.

9.    **Confidentiality**

9.1    Licensee shall at all times maintain strict confidentiality with regard to the CD Standard Specifications and shall not disclose same to any third party without the prior written consent of Philips.

9.2    Without prejudice to Clause 9.1, Licensee shall, during the term of this Agreement as specified in Clause 12.1 and for a period of 3 years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Associated Companies in connection with this Agreement, or use such information for any purpose other than the manufacture and disposal of CD-Discs in accordance with the provisions of this Agreement. This obligation shall not apply to the extent information so acquired:

(a)    was known to Licensee prior to the date on which such information was acquired from Philips or any of Philips' Associated Companies, as shown by records of Licensee or otherwise demonstrated to Philips' satisfaction;

(b)    is or has become available to the public through no fault of Licensee;

(c)    was or is received from a third party who was under no confidentiality obligation in respect of such information.

In protecting information acquired from Philips or any of Philips' Associated Companies, Licensee shall take all necessary measures and precautions, including but not limited to measures requiring its present and future employees to give suitable undertakings of secrecy both for the period of their employment and thereafter, and shall protect such information in

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&d\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

**P 001229**

18

the same manner and with the same degree of care (but no less than a reasonable degree of care) as Licensee applies to its own information of a confidential nature.

9.3    The obligations concerning confidentiality contained in Clause 9.1 and Clause 9.2 shall survive termination of this Agreement.

9.4    Philips shall, during the term of this Agreement as specified in Clause 12.1 and for a period of 3 years thereafter, not disclose to any third party any confidential information obtained in connection with Clause 5.3, Clause 5.5, Clause 5.6, Clause 5.12 and/or Clause 6, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections (a), (b) and/or (c) of Clause 9.2.

### 10.    Logo

10.1    For the term of this Agreement and subject to the full and timely performance and observance by Licensee of all its undertakings and obligations hereunder, Licensee shall be entitled to use on the Licensed Products as well as in advertisements and sales literature with respect to Licensed Products sold by Licensee, a logo (hereinafter referred to as "the Logo") in accordance with the instructions laid down in the CD Logo Guide which shall be made available to Licensee together with the relevant CD Standard Specifications.

10.2    Licensee acknowledges and agrees that Philips makes no warranty whatsoever that any use of the Logo does not infringe or will not cause infringement of any third party intellectual property rights.

### 11.    No Assignment

11.1    This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips.

### 12.    Term and Termination

12.1    This Agreement shall enter into force on the "Effective Date", being the date first written above. In the event that validation of this Agreement is required by the competent governmental authorities, the Effective Date shall be the date of such validation. Unless terminated earlier in accordance with the provisions of this Clause 12, this Agreement shall remain in force until the expiration date of the last to expire Licensed Patent in the Territory essential to CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22.

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

P 001230

19

Upon the expiration of all Licensed Patents in the Territory essential to CD-Discs as selected by Licensee pursuant to the Options of Clause 1.22, Philips shall not assert any of the essential Licensed Patents against Licensee or Licensee's customers, provided that Licensee has entered into a contractual arrangement with Philips providing for the situation that, although such CD-Discs manufactured by Licensee are no longer covered by any of the essential Licensed Patents in the Territory, such CD-Discs are being imported by Licensee or a third party into one or more other countries in which one or more of said essential Licensed Patents subsist.

12.2    Without prejudice to the provisions of Clause 12.3 through Clause 12.6, each party may terminate this Agreement at any time by means of a written notice to the other party in the event that the other party fails to perform any obligation under this Agreement and such failure is not remedied within 30 days after receipt of a notice specifying the nature of such failure and requiring it to be remedied. Such right of termination shall not be exclusive of any other remedies or means of redress to which the non-defaulting party may be lawfully entitled and all such remedies shall be cumulative. Any such termination shall not affect any royalty or other payment obligations under this Agreement accrued prior to such termination.

12.3    Philips may terminate this Agreement forthwith by means of a written notice to Licensee in the event that a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of Licensee, or in the event that Licensee makes any voluntary arrangement with its creditors or becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law.

12.4    Additionally, insofar as legally permitted, Philips may terminate this Agreement at any time by means of a written notice to Licensee in case Licensee or an Associated Company of Licensee has been found liable by a competent court or administrative authority to have committed an act of copyright piracy.

12.5    Philips shall have the right to terminate this Agreement forthwith or to revoke the license granted under any of Philips', Sony's or any of their respective Associated Companies' patents in the event that Licensee or any of its Associated Companies brings a claim of infringement of any of Licensee's or any of Licensee's Associated Companies' essential patents relating to CD-Discs or CD-Players against Philips, Sony or any of their respective Associated Companies and Licensee refuses to license such patents on fair and reasonable conditions.

12.6    Upon the termination of this Agreement by Philips for any reason pursuant to Clause 12.2 through Clause 12.5, Licensee shall immediately cease the manufacture, sale or other disposal of CD-Discs in which any one or more of the Licensed Patents are used. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

12.7    All provisions of this Agreement which are intended to survive (whether express or implied) the expiry or termination of this Agreement, shall so survive.

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

P 001231

20

**13.    Miscellaneous**

13.1    Licensee acknowledges that Philips may make modifications to the wording of the standard version of the CD Disc Patent License Agreement in future. Licensee shall at all times have the option of entering into the latest version of the CD Disc Patent License Agreement as published by Philips on its website or otherwise communicated by Philips to Licensee after the Effective Date of this Agreement.

13.2    Any notice required under this Agreement to be sent by either party shall be given in writing by means of a letter, facsimile or electronic mail directed:

in respect of Licensee, to:

Zomax Incorporated
5353 Nathan Lane
Plymouth, Minnesota 55442

in respect of Philips, to:

Koninklijke Philips Electronics N.V.
c/o Philips Intellectual Property & Standards - Legal Department
Building WAH-2
P.O. Box 220
5600 AE Eindhoven
The Netherlands
Fax: +31 40 2743489

with a copy to:

Philips Intellectual Property & Standards
P.O. Box 3001
345 Scarborough Road
Briarcliff Manor, NY 10510-8001
Fax: (914) 332-0615

or to such other address as may have been previously specified in writing by either party to the other.

13.3    This Agreement sets forth the entire understanding and agreement between the parties as to the subject matter hereof and supersedes and replaces all prior arrangements, discussions and understandings between the parties relating thereto. No variation of this Agreement shall be binding upon either party unless made in writing and signed by an authorized representative of each of the parties hereto.

13.4    Nothing contained in this Agreement shall be construed:

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803                    July 2003

**P 001232**

21

    (a)    as imposing on either party any obligation to instigate any suit or action for infringement of any of the patents licensed hereunder or to defend any suit or action brought by a third party which challenges or relates to the validity of any such patents. Licensee shall have no right to instigate any such suit or action for infringement of any of the patents licensed by Philips hereunder, nor the right to defend any such suit or action which challenges or relates to the validity of any such patent licensed by Philips hereunder;

    (b)    as imposing any obligation to file any patent application, to secure any patent or to maintain any patent in force;

    (c)    as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips, Sony or any of their respective Associated Companies;

    (d)    as conferring any license to manufacture, sell or otherwise dispose of any product or device other than a Licensed Product.

13.5    Neither the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

13.6    Should any provision of this Agreement be finally determined void or unenforceable in any judicial proceeding, such determination shall not affect the operation of the remaining provisions hereof, provided that, in such event, Philips shall have the right to terminate this Agreement by means of a written notice to Licensee.

13.7    This Agreement shall be governed by and construed in accordance with the laws of The State of New York.

    Any dispute between the parties hereto in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to any state or federal courts in The State of New York, provided always that, in case Philips is the plaintiff, Philips may, at its sole discretion, submit any such dispute either to the state or federal courts in the venue of Licensee's registered office, or to any of the state or federal courts in the Territory having jurisdiction. Licensee hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

**P 001233**

22

AS WITNESS, the parties hereto have caused this Agreement to be signed on the date first written above.

KONINKLIJKE PHILIPS ELECTRONICS          ZOMAX INCORPORATED
N.V.

Name: H . SAKKERS                        Name:

Title: BY PROXY                          Title: CFO

Date:                                    Date: 12/1/03

USA-CD-Audio-Text-ROM-Extra-Disc/08-2003
s:s&l\company documents\zomax incorporated\cd audio text-rom-extra disc-usa-100803          July 2003

P 001234

Annex A1 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD Disc / CD-General part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|---|
| AR | Q 060007 | - | 285958 | 02-Jul-81 | | 06-Jun-97 | 250849 | 06-Jun-12 | Block N to K compact disc modulation code (EFM) |
| AR | Q 080009 | - | 285400 | 20-May-81 | | 04-Jun-97 | 250648 | 04-Jun-12 | Error correctable data transmission method |
| AT | Q 060007 | - | 81-A3107 | 14-Jul-81 | | 25-Jan-99 | 404652 | 15-May-16 | Block N to K compact disc modulation code (EFM) |
| AT | Q 080009 | - | 81-A2215 | 18-May-81 | 395794 | 25-Mar-93 | 395794 | 15-Jul-10 | Error correctable data transmission method |
| BW | Q 080007 | - | 98-00033 | 21-Apr-98 | | 02-Oct-02 | BWIP/02/00035 | 21-Apr-18 | Block N to K compact disc modulation code (EFM) |
| CA | Q 060007 | - | 381362 | 08-Jul-81 | | 16-Sep-86 | 1211570 | 16-Sep-03 | Block N to K compact disc modulation code (EFM) |
| US | N 006493 | D | 06/658550 | 23-Apr-86 | | 26-Nov-91 | 5068846 | 26-Nov-08 | Video disc with disc body acting as protection |
| US | P15.688 | - | 890316 | 30-Mar-82 | | 19-Apr-94 | 5305301 | 19-Apr-11 | Optical readable carriers |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Version date : 21 July 2003

Page 1 of 1

P 001263

Annex A2 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM Mode 1 part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AT | Q 083025 | 84-A2769 | 29-Aug-84 | | 29-Dec-97 | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | E49835 | 20-Mar-05 | CD-ROM Error Correction System A |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 26-Mar-91 | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-40240 | 22-Mar-85 | | 29-Sep-89 | 584883 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | 17-Apr-02 | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | PI8501277.7 | 21-Mar-85 | | 26-Oct-93 | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 13-Jun-89 | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | S8AP0216 | 459869 | 27-Apr-84 | | 26-Apr-88 | 1235812 | 26-Apr-05 | Disc recording medium |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CZ | Q 084008 | 85-PV2009 | 21-Mar-85 | | 23-Sep-96 | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 14-Jun-95 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | S8AP0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-89 | P3476289.2 | 30-Jul-04 | Disc recording medium |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 02-Nov-87 | 2561839 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | S8AP0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-89 | 133790 | 30-Jul-04 | Disc recording medium |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 03-Feb-88 | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| GB | Q 084008 | 8507248 | 20-Mar-85 | | 09-Mar-88 | 2156555 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | S8AP0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-89 | 133790 | 30-Jul-04 | Disc recording medium |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 18-Feb-93 | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | NOT GIVEN | 20-Mar-85 | | 06-May-93 | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| JP | Q 083025 A | 93-269402 | 01-Sep-83 | 94-195947 | 29-Jan-97 | 2600585 | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | 84-57595 | 24-Mar-84 | 85-201575 95-101543 | 23-Aug-96 | 2085642 | 24-Mar-04 | CD-ROM Error Correction System A |
| KR | Q 084008 | 85-1914 | 23-Mar-85 | 94-8742 | 09-Jan-95 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Version date : 21 July 2003

P 001264

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM Mode 1 part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|-----------|----------|-------------|-------|
| NL | Q 084008 - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | S84P0216 - | 84305176.4 | 30-Jul-84 | | 18-Jan-89 | 133790 | 30-Jul-04 | Disc recording medium |
| SE | Q 084008 - | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SG | Q 084008 - | 9290553.8 | 20-Mar-85 | | 28-Oct-92 | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 - | 84-PV6607 | 03-Sep-84 | | 09-Jun-92 | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 - | 85-PV2009 | 21-Mar-85 | | 26-May-97 | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| UA | Q 084008 - | 3874714 | 22-Mar-85 | | 27-Dec-94 | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 084008 R | 07/379627 | 13-Jul-89 | | 27-Nov-90 | RE33462 | 22-Mar-05 | CD-ROM Error Correction System A |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Version date : 21 July 2003

Annex A3 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM Mode 2 part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AT | Q 083025 | 84-A2769 | 29-Aug-84 | | 29-Dec-97 | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 26-Mar-91 | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | 17-Apr-02 | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| CA | S84P0216 | 459869 | 27-Apr-84 | | 26-Apr-88 | 1235812 | 26-Apr-05 | Disc recording medium |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 14-Jun-95 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | P3476289.2 | 30-Jul-04 | Disc recording medium |
| FR | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 03-Feb-88 | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| GB | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 18-Feb-93 | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| JP | Q 083025 A | 93-269402 | 01-Sep-83 | 94-195947 | 29-Jan-97 | 2600585 | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| NL | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| SK | Q 083025 | 84-PV6607 | 03-Sep-84 | | 09-Jun-92 | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Version date : 21 July 2003

**P 001266**

Annex A4 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM XA Sub-mode 1 (Mode 2 Form 1) part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AT | Q 083025 | 84-A2769 | 29-Aug-84 | | 29-Dec-97 | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | E49835 | 20-Mar-90 | CD-ROM Error Correction System A |
| AT | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | 52866 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 26-Mar-91 | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| AU | Q 084008 | 85-40240 | 22-Mar-85 | | 29-Sep-89 | 584883 | 22-Mar-05 | CD-ROM Error Correction System A |
| BE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | 17-Apr-02 | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 084008 | PI8501277.7 | 21-Mar-85 | | 26-Oct-93 | PI8501277 | 21-Mar-05 | CD-ROM Error Correction System A |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | 30-May-95 | PI8700846 | 23-Feb-07 | Real-time format switching |
| CA | Q 084008 | 477183 | 21-Mar-85 | | 13-Jun-89 | 1255771 | 13-Jun-06 | CD-ROM Error Correction System A |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 12-Feb-91 | 1280208 | 12-Feb-08 | Real-time format switching |
| CA | S84P0216 | 459869 | 27-Apr-84 | | 26-Apr-88 | 1235812 | 26-Apr-05 | Disc recording medium |
| CH | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 13-Mar-91 | 1010517 | 21-Feb-07 | Real-time format switching |
| CZ | Q 084008 | 85-PV2009 | 21-Mar-85 | | 23-Sep-96 | 281601 | 21-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 14-Jun-95 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 084008 | 85200431.6 | 20-Mar-85 | 0156440-A2 | 24-Jan-90 | 3575646 | 20-Mar-05 | CD-ROM Error Correction System A |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 22-May-97 | 3701763 | 22-Jan-07 | Real-time format switching |
| DE | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | P3452291.7 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | P3476289.2 | 30-Jul-04 | Disc recording medium |
| FR | Q 084008 | 8504297 | 22-Mar-85 | | 02-Nov-87 | 2561839 | 22-Mar-05 | CD-ROM Error Correction System A |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 22-Aug-88 | 2594996 | 20-Feb-07 | Real-time format switching |
| FR | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 03-Feb-88 | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 2

Version date : 21 July 2003

P 001267

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM XA Sub-mode 1 (Mode 2 Form 1) part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|---|---|
| GB | Q 084008 | · | 8507248 | 20-Mar-85 | | | 09-Mar-88 | 2165565 | 20-Mar-05 | CD-ROM Error Correction System A |
| GB | Q 086003 | · | 8704011 | 20-Feb-87 | | | 06-Dec-89 | 2187008 | 20-Feb-07 | Real-time format switching |
| GB | S84P0115 | · | 84901011.1 | 02-Mar-84 | | | 16-May-90 | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | S84P0216 | · | 84305176.4 | 30-Jul-84 | | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| HK | Q 083025 | · | NOT GIVEN | 28-Aug-84 | | | 18-Feb-93 | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| HK | Q 084008 | · | NOT GIVEN | 20-Mar-85 | | | 06-May-93 | 0930433 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 084008 | · | 85200431.6 | 20-Mar-85 | 0156440-A2 | | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| IT | Q 086003 | · | 87.A19447 | 20-Feb-87 | | | 08-Feb-90 | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | Q 083025 | A | 93-269402 | 01-Sep-83 | 94-195947 | | 29-Jan-97 | 2600585 | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 084008 | · | 84-57595 | 24-Mar-84 | 85-201575 | 95-101543 | 23-Aug-96 | 2085642 | 24-Mar-04 | CD-ROM Error Correction System A |
| JP | Q 086003 | · | 87.39997 | 23-Feb-87 | 87-217468 | | 19-Dec-97 | 2730024 | 23-Feb-07 | Real-time format switching |
| KR | Q 084008 | · | 85-1914 | 23-Mar-85 | | 94-8742 | 09-Jan-95 | 81142 | 23-Mar-05 | CD-ROM Error Correction System A |
| KR | Q 086003 | · | 87-1501 | 23-Feb-87 | | 95-7946 | 30-Oct-85 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | Q 084008 | · | 85200431.6 | 20-Mar-85 | 0156440-A2 | | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| NL | Q 086003 | · | 8600450 | 24-Feb-86 | 8600450 | | 04-Feb-97 | 192151 | 24-Feb-06 | Real-time format switching |
| NL | S84P0216 | · | 84305176.4 | 30-Jul-84 | | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| SE | Q 084008 | · | 85200431.6 | 20-Mar-85 | 0156440-A2 | | 24-Jan-90 | 0156440 | 20-Mar-05 | CD-ROM Error Correction System A |
| SE | Q 086003 | · | 8700711-8 | 20-Feb-87 | | | 09-Jan-92 | 465442 | 20-Feb-07 | Real-time format switching |
| SG | Q 084008 | · | 9290553.8 | 20-Mar-85 | | | 28-Oct-92 | 32772 | 20-Mar-05 | CD-ROM Error Correction System A |
| SK | Q 083025 | · | 84-PV6607 | 03-Sep-84 | | | 09-Jun-92 | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| SK | Q 084008 | · | 85-PV2009 | 21-Mar-85 | | | 26-May-97 | 278568 | 21-Mar-05 | CD-ROM Error Correction System A |
| TW | Q 086003 | · | 76100969 | 25-Feb-87 | | | 26-Mar-88 | 27916 | 25-Feb-07 | Real-time format switching |
| UA | Q 084008 | · | 3874714 | 22-Mar-85 | | | 27-Dec-94 | 3503 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 084008 | R | 07/379627 | 13-Jul-89 | | | 27-Nov-90 | RE33462 | 22-Mar-05 | CD-ROM Error Correction System A |
| US | Q 086003 | · | 07/018163 | 24-Feb-87 | | | 31-Jan-89 | 4802169 | 24-Feb-07 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Version date : 21 July 2003

Page 2 of 2

P 001268

Annex A5 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM XA Sub-mode 2 (Mode 2 Form 2) part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AT | Q 083025 | 84-A2769 | 29-Aug-84 | | 29-Dec-87 | 403223 | 15-Apr-15 | Framing of data-blocks on CD-ROM |
| AT | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | 52666 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| AU | Q 083025 | 84-32584 | 31-Aug-84 | | 26-Mar-91 | 603761 | 31-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 083025 | PI8404319.9 | 29-Aug-84 | | 17-Apr-02 | PI8404319.9 | 29-Aug-04 | Framing of data-blocks on CD-ROM |
| BR | Q 086003 | PI8700846.7 | 23-Feb-87 | | 30-May-95 | PI8700846 | 23-Feb-07 | Real-time format switching |
| CA | Q 086003 | 530120 | 19-Feb-87 | | 12-Feb-91 | 1280208 | 12-Feb-08 | Real-time format switching |
| CA | S84P0216 | 459869 | 27-Apr-84 | | 26-Apr-88 | 1235812 | 26-Apr-05 | Disc recording medium |
| CN | Q 086003 | 87100929.3 | 21-Feb-87 | 87100929-A | 13-Mar-91 | 1010517 | 21-Feb-07 | Real-time format switching |
| DE | Q 083025 | P3431810.0 | 30-Aug-84 | 3431810 | 14-Jun-95 | 3431810 | 30-Aug-04 | Framing of data-blocks on CD-ROM |
| DE | Q 086003 | P3701763.2 | 22-Jan-87 | 3701763 | 22-May-97 | 3701763 | 22-Jan-07 | Real-time format switching |
| DE | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | P34822917 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| DE | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | P34762892 | 30-Jul-04 | Disc recording medium |
| FR | Q 086003 | 8702234 | 20-Feb-87 | | 22-Aug-88 | 2594996 | 20-Feb-07 | Real-time format switching |
| FR | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| FR | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| GB | Q 083025 | 8421705 | 28-Aug-84 | | 03-Feb-88 | 2145855 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| GB | Q 086003 | 8704011 | 20-Feb-87 | | 06-Dec-89 | 2187008 | 20-Feb-07 | Real-time format switching |
| GB | S84P0115 | 84901011.1 | 02-Mar-84 | | 16-May-90 | 137855 | 02-Mar-04 | Method and apparatus for recording digitized infor |
| GB | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| HK | Q 083025 | NOT GIVEN | 28-Aug-84 | | 18-Feb-93 | 0930121 | 28-Aug-04 | Framing of data-blocks on CD-ROM |
| IT | Q 086003 | 87-A19447 | 20-Feb-87 | | 08-Feb-90 | 1215362 | 20-Feb-07 | Real-time format switching |
| JP | Q 083025 A | 93-269402 | 01-Sep-83 | 94-195947 | 29-Jan-97 | 2600585 | 01-Sep-03 | Framing of data-blocks on CD-ROM |
| JP | Q 086003 | 87-39997 | 23-Feb-87 | 87-217468 | 19-Dec-97 | 2730024 | 23-Feb-07 | Real-time format switching |
| KR | Q 086003 | 87-1501 | 23-Feb-87 | 95-7946 | 30-Oct-95 | 91017 | 23-Feb-07 | Real-time format switching |
| NL | Q 086003 | 8600450 | 24-Feb-86 | 8600450 | 04-Feb-97 | 192151 | 24-Feb-06 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 2

Version date : 21 July 2003

P 001269

Essential Philips and Sony patents relevant to CD-Disc / CD-ROM XA Sub-mode 2 (Mode 2 Form 2) part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|-----------|----------|------------|-------|
| NL | S84P0216 | 84305176.4 | 30-Jul-84 | | 18-Jan-84 | 133790 | 30-Jul-04 | Disc recording medium |
| SE | Q 086003 | 8700711-8 | 20-Feb-87 | | 09-Jan-92 | 465442 | 20-Feb-07 | Real-time format switching |
| SK | Q 083025 | 84-PV6607 | 03-Sep-84 | | 09-Jun-92 | 276585 | 03-Sep-04 | Framing of data-blocks on CD-ROM |
| TW | Q 086003 | 76100969 | 25-Feb-87 | | 26-Mar-88 | 27916 | 25-Feb-07 | Real-time format switching |
| US | Q 086003 | 07/018163 | 24-Feb-87 | | 31-Jan-89 | 4802169 | 24-Feb-07 | Real-time format switching |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

*Version date : 21 July 2003*

Page 2 of 2

P 001270

Annex A6 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AT | S85P0059 | 85900170.3 | 30-Nov-84 | 165320 | 03-Jun-92 | E76996 | 30-Nov-04 | Disc recording medium |
| AU | N 013661 | 92-13942 | 31-Mar-92 | 92-13942 661991 | 19-Feb-96 | 661991 | 31-Mar-12 | Recording of content information in Lead-Out |
| AU | S85P0059 | 37412/85 | 30-Nov-84 | 37412/85 | 07-Sep-89 | 587963 | 30-Nov-04 | Disc recording medium |
| AU | S96P0005 | 22565/00 | 24-Mar-00 | . | 01-Jun-00 | 728279 | 23-Jan-16 | Multi-session disc having disc code area loca |
| CA | N 013661 | 2064511 | 31-Mar-92 | . | 01-Jan-02 | 2064511 | 31-Mar-12 | Recording of content information in Lead-Out |
| CH | S85P0059 | 85900170.3 | 30-Nov-84 | 165320 | 03-Jun-92 | 165320 | 30-Nov-04 | Disc recording medium |
| CN | S96P0005 | 96104382 | 30-Jan-96 | CN1137675A | | . | | Multi-session disc having disc type code area loca |
| CZ | N 013685 | 92-PV970 | 01-Apr-92 | | 20-Jul-00 | 287132 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| DE | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 01-Jul-98 | 69226031.5 | 30-Mar-12 | Recording of content information in Lead-Out |
| DE | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 08-Jul-98 | 69226116.8 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| DE | S85P0059 | 85900170.3 | 30-Nov-84 | 165320 | 03-Jun-92 | P3485761.3 | 30-Nov-04 | Disc recording medium |
| ES | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 01-Jul-98 | 2118784 | 30-Mar-12 | Recording of content information in Lead-Out |
| ES | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 08-Jul-98 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 01-Jul-98 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| FR | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 08-Jul-98 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| FR | S85P0059 | 85900170.3 | 30-Nov-84 | 165320 | 03-Jun-92 | 165320 | 30-Nov-04 | Disc recording medium |
| FR | S96P0005 | 961010066.7 | 25-Jan-96 | 724263 | | . | | Multi-session disc having disc type code area loca |
| GB | N 013661 | 92200893.3 | 30-Mar-92 | 0507397-A3 | 01-Jul-98 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| GB | N 013685 | 92200909.7 | 30-Mar-92 | 0507403-A3 | 08-Jul-98 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| GB | S85P0059 | 85900170.3 | 30-Nov-84 | 165320 | 03-Jun-92 | 165320 | 30-Nov-04 | Disc recording medium |
| GB | S96P0005 | 961010066.7 | 25-Jan-96 | 724263 | | . | | Multi-session disc having disc type code area loca |
| HK | S85P0059 | | 25-May-95 | | 25-May-95 | 0815/1995 | | Disc recording medium |
| HU | N 013685 | P9201055 | 30-Mar-92 | . | 30-Aug-99 | 216680 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| ID | S96P0005 | P-960210 | 30-Jan-96 | 012.695A | 29-Dec-99 | ID000472 | 30-Jan-16 | Multi-session disc having disc type code area loca |
| IN | S96P0005 | 0188/DEL/96 | 29-Jan-96 | . | | . | | Multi-session disc having disc type code area loca |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Page 1 of 3

*Version date : 22 September 2003*

P 001271

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| IT | N 013661 | 922008933 | 30-Mar-92 | 0507397-A3 | 01-Jul-98 | 0507397 | 30-Mar-12 | Recording of content information in Lead-Out |
| IT | N 013685 | 922009097 | 30-Mar-92 | 0507403-A3 | 08-Jul-98 | 0507403 | 30-Mar-12 | CD-ROM XA Multi-session WO |
| IT | S96P0005 | 961010667 | 25-Jan-96 | 724263 | | | | Multi-session disc having disc type code area loca |
| JP | 84000899 | 58226598 | 30-Nov-83 | 60-119870 | 20-Dec-96 | 2123759 | 30-Nov-03 | Disc recording medium |
| JP | 84011554 | 59-057595 | 24-Mar-84 | 60-201575 | 23-Aug-96 | 2085642 | 24-Mar-04 | Method and apparatus for transmitting digital data |
| JP | 95060963 | 07311437 | 29-Nov-95 | 08-227577 | | | | Recording medium having a first management area |
| JP | N 013661 | 92-81010 | 02-Apr-92 | 93-89596 | 05-Apr-02 | 3293651 | 02-Apr-12 | Recording of content information in Lead-Out |
| JP | N 013685 | 92-79901 | 01-Apr-92 | 93-94675 | 15-Nov-02 | 3369211 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | N 013685 A | 02-201276 | 01-Apr-92 | | | | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | N 013685 B | 03-315344 | 01-Apr-92 | | | | 01-Apr-12 | CD-ROM XA Multi-session WO |
| JP | S96P0005 | 07013211 | 30-Jan-95 | 08-203210 | | | | Multi-session disc having disc type code area loca |
| KR | N 013661 | 92-5313 | 31-Mar-92 | 92-20420 | 22-Feb-00 | 256385 | 31-Mar-12 | Recording of content information in Lead-Out |
| KR | N 013685 | 92-5314 | 31-Mar-92 | 92-20418 | 09-Nov-99 | 242218 | 31-Mar-12 | CD-ROM XA Multi-session WO |
| KR | S85P0059 | 85-700146 | 29-Jul-85 | 85-00175 | 30-Apr-93 | 85120 | 30-Nov-04 | Disc recording medium |
| KR | S85P0059 | 92-702698 | 30-Oct-92 | | 22-May-95 | 61735 | 30-Nov-04 | Disc recording medium |
| KR | S96P0005 | 96-02552 | 30-Jan-96 | 96-30119 | | | | Multi-session disc having disc type code area loca |
| MY | S96P0005 | PI9600317 | 29-Jan-96 | | | | | Multi-session disc having disc type code area loca |
| NL | S85P0059 | 859001703 | 30-Nov-84 | 165320 | 03-Jun-92 | 165320 | 30-Nov-04 | Disc recording medium |
| NL | S96P0005 | 961010667 | 25-Jan-96 | 724263 | | | | Multi-session disc having disc type code area loca |
| RU | N 013661 | 5011395 | 01-Apr-92 | | 27-Jan-97 | 2072566 | 01-Apr-12 | Recording of content information in Lead-Out |
| SE | S85P0059 | 859001703 | 30-Nov-84 | | 03-Jun-92 | 165320 | 30-Nov-04 | Disc recording medium |
| SG | S96P0005 | 9600515 | 27-Jan-96 | | 23-May-00 | 33669 | 27-Jan-16 | Multi-session disc having disc type code area loca |
| SK | N 013685 | 92-PV0970 | 01-Apr-92 | | 03-Oct-01 | 282293 | 01-Apr-12 | CD-ROM XA Multi-session WO |
| TW | N 013661 | 80109966 | 19-Dec-91 | UNKNOWN 57337 | 04-Nov-92 | 57337 | 19-Dec-11 | Recording of content information in Lead-Out |
| TW | N 013685 | 80109963 | 19-Dec-91 | 59397 | 02-Mar-93 | 59397 | 19-Dec-11 | CD-ROM XA Multi-session WO |
| UA | N 013661 | 93002573 | 15-Nov-93 | | | | 15-Nov-13 | Recording of content information in Lead-Out |
| US | N 013661 V | 07900874 | 18-Jun-92 | | 23-Aug-94 | 5341356 | 07-Jan-12 | Recording of content information in Lead-Out |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Version date : 22 September 2003

P 001272

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra part

| COUNTRY | REFERENCE | | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|---|-----------|-------------|----------------|-----------|----------|-------------|-------|
| US | N 013685 | A | 08/180002 | 11-Jan-94 | | 14-Feb-95 | 5390159 | 14-Feb-12 | CD-ROM XA Multi-session WO |
| US | N 013685 | B | 08/328307 | 24-Oct-94 | | 02-Mar-99 | 5878019 | 02-Mar-16 | CD-ROM XA Multi-session WO |
| US | N 013685 | V | 08/371644 | 12-Jan-95 | | 04-Nov-97 | 5684786 | 04-Nov-14 | CD-ROM XA Multi-session WO |
| US | N 013709 | D | 08/707845 | 09-Sep-96 | | 01-Dec-98 | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S85P0059 | - | 266207 | 27-Oct-88 | - | 09-Jan-90 | 4893193 | 09-Jan-07 | Disc recording medium |
| US | S96P0005 | - | 592962 | 29-Jan-96 | - | 07-Jul-98 | 5778257 | 29-Jan-16 | Multi-session disc having disc type code area loca |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Version date : 22 September 2003

Annex A7 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| AR | N 015474 | P960104337 | 13-Sep-96 | | 30-Aug-00 | AR003572 | 13-Sep-16 | Transferring information via the lead-in of CD |
| AT | 95069128 | 96115085.1 | 19-May-96 | 791925 | 14-Nov-01 | E208848 | 19-Sep-16 | Reproducing medium having text information recorde |
| AT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | E142391 | 16-Jan-09 | Repeated transfer of subcode data |
| AT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | E202234 | 09-Sep-16 | Transferring information via the lead-in of CD |
| AU | 95069128 | 65625/96 | 13-Sep-96 | | 20-Apr-00 | 714409 | 13-Sep-16 | Reproducing medium having text information recorde |
| AU | D 088009 | 89-28557 | 18-Jan-89 | 639411 | 06-Dec-93 | 639411 | 18-Jan-09 | Repeated transfer of subcode data |
| BE | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| BR | 95069128 | 9603829 | 20-Sep-96 | | | - | 22-Sep-16 | Reproducing medium having text information recorde |
| CA | D 088009 | 588304 | 16-Jan-89 | | 28-Sep-93 | 1322593 | 28-Sep-10 | Repeated transfer of subcode data |
| CH | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| CN | 95069128 | 96121105 | 22-Sep-96 | 1153981 | | - | 22-Sep-16 | Reproducing medium having text information recorde |
| CN | 95085448 | 96121626 | 02-Nov-96 | 1158481 | | - | 02-Nov-16 | Recording medium and its reproducing apparatus |
| CN | D 088009 | 89101069.6 | 19-Jan-89 | 1035577-A | 10-Oct-93 | 1023265 | 19-Jan-09 | Repeated transfer of subcode data |
| CN | D 088009 A | 92102717.6 | 19-Jan-89 | 1068673-A | 01-Jun-94 | 1025701 | 19-Jan-09 | Repeated transfer of subcode data |
| CZ | D 088009 | 89-PV287 | 16-Jan-89 | | 21-Dec-98 | 284768 | 16-Jan-09 | Repeated transfer of subcode data |
| DE | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 11-Apr-01 | P69612472.6 | 03-Dec-16 | Disc Reproducing apparatus |
| DE | 95069128 | 96115085.1 | 19-May-96 | 791925 | 14-Nov-01 | P69616977.0 | 19-Sep-16 | Reproducing medium having text information recorde |
| DE | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | - | 31-Oct-16 | Recording medium and its reproducing apparatus |
| DE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 68927063.1 | 16-Jan-09 | Repeated transfer of subcode data |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 69613339.3 | 09-Sep-16 | Transferring information via the lead-in of CD |
| ES | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| FR | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 11-Apr-01 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| FR | 95069128 | 96115085.1 | 19-May-96 | 791925 | 14-Nov-01 | 791925 | 19-Sep-16 | Reproducing medium having text information recorde |
| FR | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | - | 31-Oct-16 | Recording medium and its reproducing apparatus |
| FR | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patens of this list are considered to be concluded as an integral part of this list

Page 1 of 3                                                                 Version date : 17 July 2003

P 001274

Essential Philips and Sony patents relevant to CD-Disc / CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| FR | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| GB | 95063039 | 96119371.1 | 03-Dec-96 | 783167 | 11-Apr-01 | 783167 | 03-Dec-16 | Disc Reproducing apparatus |
| GB | 95069128 | 96115085.1 | 19-May-96 | 791925 | 14-Nov-01 | 791925 | 19-Sep-16 | Reproducing medium having text information recorde |
| GB | 95085448 | 96117539.5 | 31-Oct-96 | 772198 | | | 31-Oct-16 | Recording medium and its reproducing apparatus |
| GB | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| GB | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| HK | D 088009 | 98106421.9 | 16-Jan-89 | | 01-Apr-99 | HK1007226 | 16-Jan-09 | Repeated transfer of subcode data |
| HU | 95085448 | 9603037 | 01-Nov-96 | . | | . | 01-Nov-16 | Recording medium and its reproducing apparatus |
| ID | 95063039 | P963566 | 02-Dec-96 | . | 03-Nov-00 | 656 | 02-Dec-16 | Disc Reproducing apparatus |
| ID | 95069128 | P962647 | 19-Sep-96 | . | | 7229 | 19-Nov-16 | Reproducing medium having text information recorde |
| ID | 95085448 | P963188 | 04-Nov-96 | . | 07-Jul-00 | 5137 | 04-Nov-16 | Recording medium and its reproducing apparatus |
| ID | N 015474 | P-962584 | 12-Sep-96 | 014759-A | 12-Jul-02 | ID0008395 | 12-Sep-16 | Transferring information via the lead-in of CD |
| IN | 95069128 | 2023/DEL/96 | 16-Sep-96 | | | . | 16-Sep-11 | Reproducing medium having text information recorde |
| IN | N 015474 | 96-1617 | 11-Sep-96 | | | | 11-Sep-10 | Transferring information via the lead-in of CD |
| IN | N 015474   A | 03-265 | 11-Sep-96 | | | | 11-Sep-10 | Transferring information via the lead-in of CD |
| IN | N 015474   B | 03-266 | 11-Sep-96 | | | | 11-Sep-10 | Transferring information via the lead-in of CD |
| IN | N 015474   C | 03-267 | 11-Sep-96 | | | | 11-Sep-10 | Transferring information via the lead-in of CD |
| IT | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| IT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| JP | 95063039 | 07-318956 | 07-Dec-95 | 09-161375 | | . | 07-Dec-15 | Disc Reproducing apparatus |
| JP | 95069128 | 07-244959 | 22-Sep-95 | 09-091880 | | . | 22-Sep-15 | Disc Reproducing apparatus |
| JP | 95085448 | 07-310080 | 02-Nov-95 | 09-128868 | | . | 02-Nov-15 | Reproducing medium having text information recorde |
| JP | 95100948 | 08-242659 | 26-Aug-96 | 10-64245 | | . | 26-Aug-16 | Recording medium and its reproducing apparatus |
| JP | D 088009 | 89-8736 | 19-Jan-89 | 90-7176 | 28-Jul-00 | 3092924 | 19-Jan-09 | Repeated transfer of subcode data |
| JP | N 015474 | 97-511792 | 09-Sep-96 | 98-509270 | | . | 09-Sep-16 | Transferring information via the lead-in of CD |
| KR | 95063039 | 96-62692 | 07-Dec-96 | 97-50695 | | . | 07-Dec-16 | Disc Reproducing apparatus |
| KR | 95069128 | 96-43380 | 23-Sep-96 | 97-17230 | | . | 23-Sep-16 | Reproducing medium having text information recorde |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 2 of 3                                                                                   Version date : 17 July 2003

Essential Philips and Sony patents relevant to CD-Disc / CD-Text part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| KR | 9505448 | 96-51644 | 02-Nov-96 | 98-29706 | | | 02-Nov-16 | Recording medium and its reproducing apparatus |
| KR | D 088009 | 89-517 | 19-Jan-89 | | 16-Feb-98 | 138112 | 16-Feb-13 | Repeated transfer of subcode data |
| KR | N 015474 | 97-703243 | 09-Sep-96 | | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| MX | 9505128 | 964179 | 19-Sep-96 | | 19-Apr-00 | 196099 | 19-Sep-16 | Recording medium and its reproducing apparatus |
| MX | N 015474 | 973530 | 09-Sep-96 | | | | 09-Sep-16 | Transferring information via the lead-in of CD |
| MY | 9505039 | 9605148 | 07-Dec-96 | | | | | Disc Reproducing apparatus |
| MY | 9505128 | 9603888 | 20-Sep-96 | | | | | Reproducing medium having text information records |
| MY | N 015474 | PI9603785 | 13-Sep-96 | | | | | Transferring information via the lead-in of CD |
| NL | 9505128 | 96115085.1 | 19-May-96 | 791925 | 14-Nov-01 | 0791925 | 19-Sep-16 | Reproducing medium having text information records |
| PH | 9505128 | 54335 | 19-Sep-96 | 54335 | | | 19-Sep-16 | Reproducing medium having text information records |
| PT | N 015474 | 96927834.0 | 09-Sep-96 | 0792504-A1 | 13-Jun-01 | 0792504 | 09-Sep-16 | Transferring information via the lead-in of CD |
| RU | D 088009 | 4613351 | 17-Jan-89 | | 10-Nov-97 | 2095857 | 17-Jan-09 | Repeated transfer of subcode data |
| SE | D 088009 | 89200081.1 | 16-Jan-89 | 0325325-A3 | 04-Sep-96 | 0325325 | 16-Jan-09 | Repeated transfer of subcode data |
| SG | N 015474 | 9704856.5 | 09-Sep-96 | | 16-Nov-99 | 45880 | 09-Sep-16 | Transferring information via the lead-in of CD |
| SK | D 088009 | 89-PV0287 | 16-Jan-89 | | 14-Mar-00 | 280685 | 16-Jan-09 | Repeated transfer of subcode data |
| TW | 9505128 | 8511577 | 21-Sep-96 | | 10-Sep-98 | 94512 | 20-Sep-16 | Reproducing medium having text information records |
| TW | D 088009 | 78100300 | 17-Jan-89 | | 03-Sep-91 | 47153 | 17-Jan-09 | Repeated transfer of subcode data |
| TW | N 015474 | 85114202 | 19-Nov-96 | 410326 | 13-Mar-01 | 122112 | 19-Nov-16 | Transferring information via the lead-in of CD |
| UA | D 088009 | 93003372 | 17-Jan-89 | | 28-Feb-00 | 26980 | 17-Jan-09 | Repeated transfer of subcode data |
| US | 9505039 | 753675 | 27-Nov-96 | | 30-Jul-01 | RE37808 | 27-Nov-16 | Disc Reproducing apparatus |
| US | 9505128 | 716953 | 20-Sep-96 | | 28-Apr-98 | 5745454 | 20-Sep-16 | Reproducing medium having text information records |
| US | 9505448 | 739821 | 30-Oct-96 | | 12-Jan-99 | 5859821 | 30-Oct-16 | Recording medium and its reproducing apparatus |
| US | D 088009 B | 08/300002 | 05-Apr-93 | | 24-Dec-96 | 5587979 | 17-Jan-09 | Repeated transfer of subcode data |
| US | N 015474 | 08/716688 | 16-Sep-96 | | 25-Aug-98 | 5798990 | 16-Sep-16 | Transferring information via the lead-in of CD |
| VN | 9505128 | SC0210/96 | 21-Sep-96 | | 21-Aug-00 | 1483 | 21-Sep-16 | Recording medium and its reproducing apparatus |
| VN | 9505448 | SC0328/96 | 02-Nov-96 | | 12-Oct-01 | 2390 | 02-Nov-16 | Reproducing medium having text information records |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 3 of 3

Version date : 17 July 2003

Annex A8 to the CD Disc Patent License Agreement

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra Video part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|---|
| AT | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | | 13-Jul-94 | E108587 | 10-Sep-07 | Coefficient encoder in transform encoding |
| AT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | | 03-Sep-97 | E157801 | 03-Jun-11 | Sector and word offset in video block header |
| AT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | | 03-Sep-97 | E157830 | 03-Jun-11 | Decoder delay in coded video frames |
| AU | N 013257 | 91-71219 | 20-Feb-91 | 91-71219 | 641726 | 25-Jan-94 | 641726 | 20-Feb-11 | Image data block with hierarchical encoding level |
| AU | S90P0340 | 6336294 | 26-May-94 | 6336294 | | | 669983 | 12-Oct-10 | Video signal transmitting system |
| BE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| BE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| CA | N 013257 | 2036585 | 19-Feb-91 | | | 16-Jan-01 | 2036585 | 19-Feb-11 | Image data block with hierarchical encoding level |
| CA | N 013409 A | 2335403 | 31-May-91 | | | 19-Mar-02 | 2335403 | 31-May-11 | Sector and word offset in video block header |
| CA | S90P0340 | 2027659 | 15-Oct-90 | | | | 2027659 | 15-Oct-10 | Video signal transmitting system |
| CN | D 086327 | 87106840.0 | 12-Sep-87 | 87106840-A | | 22-May-91 | 1011459 | 12-Sep-07 | Coefficient encoder in transform encoding |
| DE | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | | 13-Jul-94 | 3750206.9 | 10-Sep-07 | Coefficient encoder in transform encoding |
| DE | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | | 03-May-95 | 69109346.6 | 18-Feb-11 | Image data block with hierarchical encoding level |
| DE | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | | 03-Sep-97 | 69127506.8 | 03-Jun-11 | Sector and word offset in video block header |
| DE | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | | 03-Sep-97 | 69127504.1 | 03-Jun-11 | Decoder delay in coded video frames |
| DE | S90P0340 | 90311145.8 | 11-Oct-90 | 424026-A3 | | | P69031107.3 | 11-Oct-10 | Video signal transmitting system |
| DE | S90P0340 | 96101178 | 29-Jan-96 | 713340-A3 | | | P69033782.5 | 11-Oct-10 | Video signal transmitting system |
| DE | S91P0276 | 91300052.3 | 03-May-91 | 456433-A3 | | | P69127224.7 | 03-May-11 | Methods of recording coded motion picture data |
| DE | S91P0276 | 96107156 | 07-May-96 | 730376-A3 | | | P69132783 | 03-May-11 | Methods of recording coded motion picture data |
| DK | N 013257 | 91200329.0 | 18-Feb-91 | 0443676-A1 | | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| DK | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| DK | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| ES | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| FI | N 013257 | 910791 | 19-Feb-91 | | | 15-Jun-98 | 101442 | 19-Feb-11 | Image data block with hierarchical encoding level |
| FR | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Page 1 of 4

Version date : 17 July 2003

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra Video part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| FR | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 20-Mar-96 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| FR | N 013257 | 912003229.0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| FR | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| FR | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 11-Oct-11 | Decoder delay in coded video frames |
| FR | S90P0340 | 90311145.8 | 11-Oct-90 | 424026-A3 | | 424026 | 11-Oct-10 | Video signal transmitting system |
| FR | S90P0340 | 96101178 | 29-Jan-96 | 713340-A3 | | 713340 | 11-Oct-10 | Video signal transmitting system |
| FR | S91P0276 | 91304052.3 | 03-May-91 | 456433-A3 | | 456433 | 03-May-11 | Methods of recording coded motion picture data |
| FR | S91P0276 | 96107156 | 07-May-96 | 730376-A3 | | 730376 | 03-May-11 | Methods of recording coded motion picture data |
| GB | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| GB | D 087091 | 88200818.8 | 27-Apr-88 | 0290085-A2 | 20-Mar-96 | 0290085 | 27-Apr-08 | Motion estimation on superblocks |
| GB | N 013257 | 912003229.0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| GB | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| GB | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| GB | S90P0340 | 90311145.8 | 11-Oct-90 | 424026-A3 | | 424026 | 11-Oct-10 | Video signal transmitting system |
| GB | S90P0340 | 91101178 | 29-Jan-96 | 713340-A3 | | 713340 | 11-Oct-10 | Video signal transmitting system |
| GB | S91P0276 | 91304052.3 | 03-May-91 | 456433-A3 | | 456433 | 03-May-11 | Methods of recording coded motion picture data |
| GB | S91P0276 | 96107155 | 07-May-96 | 730376-A3 | | 730376 | 03-May-11 | Methods of recording coded motion picture data |
| GB | S92P0579 | 9508250.9 | 24-Apr-95 | 2289194 | | 2289194 | 06-Mar-96 | Multiple data separating |
| GB | S92P0579 | 9508350.7 | 24-Apr-95 | 2289195 | | 2289195 | 06-Mar-96 | Multiple data separating |
| HK | N 013257 | NOT GIVEN | 18-Feb-91 | | 11-Apr-96 | 0960615 | 18-Feb-11 | Image data block with hierarchical encoding level |
| HK | S91P0276 | 98115676 | 08-Feb-00 | 1014415 | | HK1014415 | 03-May-11 | Methods of recording coded motion picture data |
| HK | S91P0276 | 100711.8 | 08-Feb-00 | 1023032 | | HK1023032 | 03-May-11 | Methods of recording coded motion picture data |
| IT | D 086327 | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| IT | N 013257 | 912003229.0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| IT | N 013409 | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| IT | N 013709 | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| JP | D 086327 | 87-226698 | 14-Sep-87 | 88-132530 | 31-Oct-97 | 2711665 | 14-Sep-07 | Coefficient encoder in transform encoding |

*All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list*

Page 2 of 4

*Version date : 17 July 2003*

P 001278

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra Video part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---|---|---|---|---|---|---|---|---|
| JP | D 067091 - | 88-109222 | 06-May-88 | 88-287186 | 25-Apr-97 | 2630809 | 06-May-08 | Motion estimation on superblocks |
| JP | N 013257 - | 91-47659 | 20-Feb-91 | 92-216288 | 30-Mar-01 | 3174586 | 20-Feb-11 | Image data block with hierarchical encoding level |
| JP | N 013257 A | 00-344804 | 13-Nov-00 | 01-186477 | | | 20-Feb-11 | Image data block with hierarchical encoding level |
| JP | N 013409 A | 01-151175 | 21-May-01 | 02-077794 | 24-Jan-03 | 3392834 | 04-Jun-11 | Sector and word offset in video block header |
| JP | N 013409 B | 01-387556 | 20-Dec-01 | 02-262242 | 24-Jan-03 | 3392842 | 04-Jun-11 | Sector and word offset in video block header |
| JP | N 013709 A | 00-393982 | 26-Dec-00 | 01-223988 | | | 04-Jun-11 | Decoder delay in coded video frames |
| JP | S90P0340 - | 01-267044 | 14-Oct-89 | 03-129985 | | 3159310 | 14-Oct-09 | Encoding method and apparatus for video signals |
| JP | S91P0276 - | 02-119604 | 09-May-90 | 04-014974 | | 2969782 | 09-May-10 | Editing method and app. for coded video signals |
| JP | S91P0276 - | 07-352515 | 09-May-90 | 08-265693 | | 2877225 | 09-May-10 | Coding method for video signals |
| JP | S91P0276 - | 07-352516 | 09-May-90 | 08-265694 | | 2874745 | 09-May-10 | Decoding method and decoder for coded video signal |
| KR | D 086327 - | 87-10122 | 12-Sep-87 | 97-5575 | 23-Jul-97 | 118698 | 17-Apr-12 | Coefficient encoder in transform encoding |
| KR | N 013409 - | 91-9152 | 03-Jun-91 | | 02-Dec-99 | 0245962 | 03-Jun-11 | Sector and word offset in video block header |
| KR | N 013709 - | 91-9187 | 04-Jun-91 | 92-1479 | 22-Oct-99 | 239837 | 04-Jun-11 | Decoder delay in coded video frames |
| KR | S91P0276 - | 91-07460 | 09-May-91 | | | 221889 | 09-May-11 | Methods of recording coded motion picture data |
| NL | D 086327 - | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| NL | N 013257 - | 91200329.0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| NL | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SE | D 086327 - | 87201717.3 | 10-Sep-87 | 0260748-A3 | 13-Jul-94 | 0260748 | 10-Sep-07 | Coefficient encoder in transform encoding |
| SE | N 013257 - | 91200329.0 | 18-Feb-91 | 0443676-A1 | 03-May-95 | 0443676 | 18-Feb-11 | Image data block with hierarchical encoding level |
| SE | N 013409 - | 91201373.7 | 03-Jun-91 | 0460764-A1 | 03-Sep-97 | 0460764 | 03-Jun-11 | Sector and word offset in video block header |
| SE | N 013709 - | 91201337.2 | 03-Jun-91 | 0460751-A3 | 03-Sep-97 | 0460751 | 03-Jun-11 | Decoder delay in coded video frames |
| SG | N 013257 - | 9630467.7 | 18-Feb-91 | | 28-May-96 | 30173 | 18-Feb-11 | Image data block with hierarchical encoding level |
| TW | D 086327 - | 76105691 | 23-Sep-87 | | 28-Mar-90 | 35350 | 23-Sep-07 | Coefficient encoder in transform encoding |
| US | D 086327 - | 07/096177 | 11-Sep-87 | | 13-Feb-90 | 4901075 | 11-Sep-07 | Coefficient encoder in transform encoding |
| US | N 013257 C | 08/647149 | 09-May-96 | | 16-Dec-97 | 5699476 | 16-Dec-14 | Image data block with hierarchical encoding level |
| US | N 013409 B | 08/563799 | 28-Nov-95 | | 28-Apr-98 | 5745641 | 28-Apr-15 | Sector and word offset in video block header |
| US | N 013709 C | 08/616951 | 18-Mar-96 | | 04-Mar-97 | 5608697 | 04-Mar-14 | Decoder delay in coded video frames |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded as an integral part of this list

Version date : 17 July 2003

P 001279

Essential Philips and Sony patents relevant to CD-Disc / CD-Extra Video part

| COUNTRY | REFERENCE | FILING NR | FILING DATE | PUBLICATION NR | GRANT DATE | GRANT NR | EXPIRY DATE | TITLE |
|---------|-----------|-----------|-------------|----------------|-----------|----------|-------------|-------|
| US | N 013709 D | 08/707845 | 09-Sep-96 | | 01-Dec-98 | 5844867 | 01-Dec-15 | Decoder delay in coded video frames |
| US | S99P0340 . | 277143 | 19-Jul-94 | | | RE37222 | 12-Oct-10 | Video signal transmitting system |
| US | S91P0276 . | 693707 | 30-Apr-91 | | | 5191436 | 30-Apr-11 | Methods of recording coded motion picture data |
| US | S91P0276 . | 10/093005 (Re.) | 07-Mar-02 | | | | | Methods of recording coded motion picture data |
| US | S92P0579 . | 925736 | 07-Aug-92 | | | 5291486 | 01-Mar-94 | Data multiplexing and multipl. data demultiplexing |

All corresponding patent applications, patents, divisions, continuations and reissues based upon any of the patent applications or patents of this list are considered to be concluded
as an integral part of this list

Version date : 17 July 2003

P 001280

# Exhibit R

 

## Koninklijke Philips Electronics N.V.

P.O. Box 218 - 5600 MD Eindhoven - The Netherlands

Re. **CD Disc Patent License Agreement – United States**

*Privileged and Confidential*

Dear Sirs,

Reference is made to the CD Disc Patent License Agreement ("Agreement") between Zomax Incorporated ("Licensee") and Koninklijke Philips Electronics N.V. ("Philips") covering the Territory of the United States and having an effective date of October 1, 2003 ("Effective Date), as well as the definitions used therein.

It is hereby agreed as follows:

1. This Side Letter shall constitute a legally binding and integral part of the Agreement and shall be effective as of October 1, 2003. The Agreement supersedes and replaces the Comprehensive CD Disc Patent License Agreement between U.S. Philips Corporation and Zomax Optical Media Inc. made effective January 1, 1996, which is hereby terminated effective September 30, 2003.

2. Licensee has indicated that it wishes to enter into a non-assertion agreement for the use of the Licensed Patents upon the expiration of all the United States and Canadian patents licensed under this Agreement. Philips agrees that, upon such expiration, it will make available the then current version of a non-assertion agreement for the Licensed Patents.

3. Clause 3.1 of the Agreement shall be amended to change the phrase "Philips considers necessary" to -- Philips considers reasonably necessary--.

4. In view of the payment of US$25,000 by Zomax Optical Media Limited when entering into the CD Disc License Agreement with US Philips Corporation on August 1, 1993, Licensee is not required to pay the amount of US$25,000 provided for under Clause 5.1.

5. Clause 5.2, first paragraph, is amended to change "any of Licensee's Associated Companies or an agent of Licensee," to "any of Licensee's Associated Companies other than Zomax Canada Corporation and other than Zomax Limited (Ireland) or an agent of Licensee,".

6. The fourth paragraph of Clause 5.2 is amended to delete the words "Philips confirms in writing to Licensee that".

7. The seventh paragraph of Clause 5.2 provides that no royalties are payable for CD-Discs purchased by Licensee on a "have made" basis in accordance with Clause 4 of the Agreement provided that Licensee demonstrates to Philips' satisfaction that royalties have been paid by the third party manufacturer. Philips agrees that checking of the website (www.licensing.philips.com) by Licensee and purchasing "have made" CD-Discs from

**P 001207**

Koninklijke Philips Electronics N.V.
Eindhoven The Netherlands
Commercial Register Eindhoven no. 17001910

 **PHILIPS**

certified manufacturers only, shall constitute adequate demonstration of payment for such CD-Discs under this section. In the event that Licensee purchases CD-Discs not in accordance with this provision, Licensee shall be liable in full for the payment of royalties to Philips for CD-Discs so purchased.

8.  In view of the requirements to report sales by customer in Clause 5.3 (3), in situations where Licensee has an existing supply arrangement requiring it to keep sales volumes for such customers confidential or where Licensee's customer has informed Licensee that it believes disclosure by Licensee of such customer's sales volumes will breach Licensee's confidentiality obligations with regard to confidential information of such customer, Philips will assist Licensee in overcoming such restrictions by (i) providing a copy of Philips' standard license agreement to such customer indicating that Licensee must disclose such sales in its royalty reporting forms in order for such sales to be licensed and (ii) where necessary, executing an appropriate non-disclosure agreement agreeing to keep such supply volumes of Licensee's customer confidential.

    As an alternative, in instances where Licensee can demonstrate to Philips' reasonable satisfaction, on the basis of written communication by Licensee's customer(s), that for such particular customer sub sections (i) and (ii) above do not successfully overcome the customer's conflict so that Licensee can comply with Clause 5.3 (3), Philips will allow Licensee to report the quarterly sales information requested by Clause 5.3 (3) for such customer in combination with the quarterly sales to one or two of its other customers to be selected at Licensee's discretion. Accordingly, in such instance, Licensee's quarterly royalty reporting forms will reflect the combined quantity of CD-Discs sold to any such combination of customers. As of the execution of this Side Letter, Philip's acknowledges and agrees that Licensee has met such standard with regard to the following Licensee customers, and Licensee shall be entitled to report such customers' sales in accordance with the provisions of this paragraph: Dell, Microsoft, Gateway.

9.  The first sentence of Clause 5.3 is amended to change "Within 30 days" to "Within 45 days". The last sentence of Clause 5.3 is amended to change "within 60 days" to "within 45 days".

10. In relation to Licensee's obligations under Clause 5.4 of the Agreement, Philips agrees to notify Licensee for any late royalty reporting forms or royalty payments due by Licensee. Upon receipt of such notification by Licensee, Licensee shall have 10 business days to remedy each such default respectively. If Licensee does not remedy its default under the Agreement within 10 business days of receipt of Philips' notification, such failure brings back into effect Licensee's obligations under Clause 5.4 of the Agreement, with all penalties and interest determined from the original due date of the overdue royalty payment and/or Advance.

11. Philips agrees that the form audit report attached to this Side Letter meets all of the requirements for audit statements required to be submitted to Philips under Clause 5.5 of the Agreement, including, without limitation, the Audit Guidelines.

12. Clause 5.8 is amended to read as follows:

    "All payments to Philips under this Agreement shall be made in United States Dollars."

**P 001208**

 

13. Clause 5.10, first paragraph, is amended to read as follows:

The phrase " for a period of five (5) years" is amended to read "for a period of three (3) years".

The second paragraph, fourth sentence of Clause 5.10 is amended as follows:

"Licensee shall provide all such assistance in connection with such inspection as Philips and/or the auditor may reasonably require."

Clause 5.10, third paragraph, is amended to read as follows:

"Philips' right of inspection as set out in this Clause 5.10 shall survive termination or expiration of this Agreement, provided, however, that such inspection must be initiated within eighteen (18) months after termination of this Agreement.

14. Clause 5.11 is amended to read as follows:

"Without prejudice to the provisions of Clause 5.10, Licensee shall provide all relevant additional information as Philips may reasonably request from time to time, as may be reasonably necessary to enable Philips to ascertain which products manufactured, sold or otherwise disposed of by Licensee are subject to the payment of royalties to Philips hereunder, the patents which have been used in connection with such products, and the amount of royalties, if any, payable thereon."

15. Notwithstanding the provisions of Article 5.12, Licensee need not submit additional royalty statements as Licensee has already submitted royalty reports through Q3, 2003 under the Comprehensive CD Disc Patent License Agreement between U.S. Philips Corporation and Zomax Optical Media Inc. made effective January 1, 1996. Such royalty statements submitted by Licensee shall be subject to audit by the external independent auditors that have been instructed by Philips in March of 2002 to audit Licensee's books and records. If, upon completion of such audit, the external auditors establishes that the reporting submitted by Licensee hereunder contains discrepancies or errors exceeding 3% (three percent) of the actual monies due, Licensee will pay the reasonable costs of such audit and pay Philips at the Standard Rates, as set out in Clause 5.2, for the number of CD-Discs manufactured and sold before the Effective Date of this Agreement as established in the audit by the external auditors appointed by Philips."

Licensee shall pay the royalty for CD-Discs manufactured and sold for the first, second and third quarters of 2003 in the amount of $2,217,592.00 ("Arrears Amount") and interest on the Arrears Amount in the amount of $8,761.83 for a total of $2,226,353.83 within two (2) business days after Licensee's receipt of an executed copy of this Letter Agreement from Philips.

**P 001209**

**PHILIPS**

If the payment referred to above is not made when due, the entire outstanding amount shall immediately become due and payable, and the interest shall be calculated in accordance with Clause 5.7 from the original due date up to the date that actual payment will be made.

16. A new Clause 8.1 will be inserted as follows, and the original Clause 8.1 and 8.2 will be renumbered as Clause 8.2 and 8.3 respectively:

"Philips represents that it has the right to license, including the right not to assert, the Licensed Patents to Licensee hereunder, including, without limitation, the Licensed Patents which are owned or controlled by Sony and its Associated Companies as well as the Licensed Patents which are jointly owned by Philips and Sony."

17. Clause 8.3 of the Agreement, shall be supplemented as follows:

"The indemnified party shall notify Licensee of any third party claim made against it within ten (10) days of knowledge of the same if the indemnified party intends to seek indemnity with respect to such claim under this paragraph. Licensee shall have the right to undertake, conduct and control, through counsel of its own choosing, the defense and settlement of any such claim. The indemnified party shall have the right to be represented by counsel of its own choosing, but at its own expense. So long as Licensee is contesting any such claim in good faith, the indemnified party shall not pay or settle such claim."

18. The first paragraph of Clause 9.2 is amended to read as follows:

"Without prejudice to Clause 9.1, Licensee shall, during the term of this Agreement as specified in Clause 12.1 and for a period of 3 years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Associated Companies in connection with this Agreement, which is marked to indicate that it is "confidential" or "proprietary" information or which a reasonable person would assume to be proprietary or confidential information, or use such information for any other purpose than the manufacture or disposal of Licensed Products in accordance with this Agreement. This obligation shall not apply to the extent information so acquired:"

19. Clause 9.4 is amended to read as follows:

"Philips shall, during the term of this Agreement as specified in Clause 12.1 and for a period of 3 years thereafter, not disclose to any third party any confidential information of Licensee or any of Licensee's Associated Companies, including but not limited to the customer information provided by Licensee under Clause 5.3 (3), obtained by Philips from Licensee or any of Licensee's Associated Companies in connection with this Agreement, except that Philips may disclose such information to its external auditors, legal representatives and to the competent courts to the extent this is necessary for Philips in connection with the enforcement of its rights hereunder. Further, Philips shall not use such information for other purposes than to verify Licensee's compliance with its royalty reporting and payment obligations as provided in this Agreement and to enforce Philips' rights hereunder. Philips' obligations set out in this paragraph shall not apply to information referred to in sections a, b and/or c of Clause 9.2.

**P 001210**

 **PHILIPS**

In protecting such confidential information acquired from Licensee or any of Licensee's Associated Companies, Philips shall take all reasonable measures and precautions and shall protect such information in the same manner and with the same degree of care but not less than a reasonable degree of care) with which Philips protects its own information of a confidential nature."

20. Clause 11.1 is amended as follows:

"This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective assignees. It may not be assigned in whole or in part by Licensee without the prior written consent of Philips, provided, however, that any such consent shall not be unreasonably withheld by Philips."

21. The first paragraph of Clause 12.1 shall be supplemented as follows:

"For purposes of this Agreement, "expiration" of the Licensed Patents shall mean expiration, abandonment, cancellation, disclaimer, award to another in an interference proceeding or declaration of invalidity or unenforceability by a court or other authority of competent jurisdiction from which no further appeal has or can be taken."

22. The phrase "within thirty (30) days" in Clause 12.2 is amended to read "within forty five (45) days".

23. In Clause 12.3, the term "over any of the assets" is amended to read "over any substantial portion of the assets".

24. The final sentence of Clause 12.4 is supplemented to end with the phrase "relating to any of the Licensed Products".

25. The final clause of Clause 12.5 is amended to read as follows:

"and Licensee refuses to license such patents to Philips, Sony or any of their respective Associated Companies on fair and reasonable conditions."

26. The first paragraph of Clause 13.2 is amended to read as follows:

"Any notice required under this Agreement to be sent by either party shall be given in writing and shall be deemed to be duly delivered: (i) when received, if hand delivered, (ii) three (3) business days if placed with a reputable international express carrier for immediate delivery, or (iii) ten (10) days after deposit in the mails for delivery by certified or registered mail, return receipt requested, postage pre-paid and addressed to the appropriate party at the addresses set forth below:"

The following language will be supplemented to Clause 13.2 as a final paragraph:

**P 001211**

 

"Either party may change its address by providing written notice to the other party in accordance with the provisions of this Clause, but any such notice shall not be effective until actually received by the addressee".

27. Notwithstanding Clause 13.7 of the Agreement, Licensee and Philips agree that any dispute between Licensee and Philips in connection with this Agreement shall be submitted to the State or Federal courts in The State of New York.

28. Philips and Licensee agree to keep the terms of this Side Letter confidential and shall not disclose it to third parties, except as may be necessary by either Philips or Licensee to enforce its rights hereunder or to comply with a requirement of a competent court or governmental body.

If the above properly reflects our mutual understanding and agreement, please indicate so by signing both copies of this Side Letter and returning these to us. Upon receipt thereof we will arrange for countersignature on our part.

Yours sincerely,

Koninklijke Philips Electronics N.V.

Name: H. SAKKERS
Title: BY PROXY
Date:

#2876842\4

**Read and Agreed:**
Zomax Incorporated

Name: JOHN GELP
Title: CFO
Date: 12/1/03

**P 001212**

Koninklijke Philips Electronics N.V.
Eindhoven The Netherlands
Commercial Register Eindhoven no. 17001910

Exhibit S

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5512th)

# United States Patent

Kramer

(10) **Number:** US 5,068,846 C1

(45) **Certificate Issued:** Sep. 19, 2006

(54) **REFLECTIVE, OPTICAL RECORD CARRIER**

(75) Inventor: **Pieter Kramer**, Eindhoven (NL)

(73) Assignee: **U.S. Philips Corporation**, New York, NY (US)

**Reexamination Request:**
No. 90/007,336, Dec. 8, 2004

**Reexamination Certificate for:**
Patent No.: **5,068,846**
Issued: **Nov. 26, 1991**
Appl. No.: **06/858,550**
Filed: **Apr. 23, 1986**

**Related U.S. Application Data**

(63) Continuation of application No. 06/146,554, filed on May 5, 1980, now abandoned, which is a continuation of application No. 05/949,919, filed on Oct. 10, 1978, now abandoned, which is a continuation of application No. 05/772,914, filed on Feb. 28, 1977, now abandoned, which is a continuation of application No. 05/344,867, filed on Mar. 26, 1973, now abandoned.

(30) **Foreign Application Priority Data**

Sep. 2, 1972 (NL) ............................................ 7211999

(51) **Int. Cl.**
*G11B 7/24* (2006.01)

(52) **U.S. Cl.** .............................. 369/275.1; 369/109.01; 369/275.5

(58) **Field of Classification Search** ................. 365/113, 365/120; 369/93–94, 107, 275.1, 111, 275.4, 369/125, 275.5, 109.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,898,040 A | 2/1933 | Eldred | |
| 3,174,140 A | 3/1965 | Hagopian et al. | |
| 3,198,880 A | 8/1965 | Toulon | |
| 3,626,386 A | 12/1971 | Feinlieb | |
| 3,635,551 A | 1/1972 | Szymber | |

*Primary Examiner*—Minh Nguyen

(57) **ABSTRACT**

A record carrier for information, for example video and/or audio information, in the form of a disk-shaped carrier substrate provided with an optical structure in accordance with the information is described. By making the optical structure radiation-reflecting and the substrate radiation-transmitting, whilst the surface of the substrate more remote from the optical structure forms both the entrance face and the exit face for the read radiation, and by coating a surface of the optical structure more remote from the substrate with an additional layer, a simple record carrier is obtained which is well protected against dust particles and damage.



US 5,068,846 C1

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1** to **7** is confirmed.

\*    \*    \*    \*    \*